**Nos.  12-1643, 12-8019**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

_____

**GARY LEE SAMPSON,
PETITIONER-APPELLEE**

**v.**

**UNITED STATES OF AMERICA,
RESPONDENT-APPELLANT**

_____

**IN RE: UNITED STATES OF AMERICA, PETITIONER**

_____

**ON APPEAL FROM AN ORDER PURSUANT TO 28 U.S.C. §2255 ENTERED IN THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS VACATING
A DEATH SENTENCE AND GRANTING A NEW CAPITAL PENALTY PHASE TRIAL;
PETITION OF THE UNITED STATES FOR PERMISSION TO TAKE AN INTERLOCUTORY
APPEAL; AND PETITION OF THE UNITED STATES FOR A WRIT OF MANDAMUS**

_____

**GOVERNMENT'S OPENING BRIEF AND PETITION**

_____

**CARMEN M. ORTIZ
UNITED STATES ATTORNEY**

**MARK T. QUINLIVAN
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3606**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    The Offenses of Conviction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    Proceedings in Sampson's Criminal Case . . . . . . . . . . . . . . . . . . . . 8

      C.    Sampson's Amended §2255 Motion . . . . . . . . . . . . . . . . . . . . . . . . . 9

      D.    The Evidentiary Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           1.    The first evidentiary hearing . . . . . . . . . . . . . . . . . . . 11

           2.    The second evidentiary hearing . . . . . . . . . . . . . . . . . 15

           3.    The third evidentiary hearing . . . . . . . . . . . . . . . . . . . 17

      E.    The District Court's *Memorandum and Order
on Jury Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      F.    The May 10, 2012 *Memorandum and Order* . . . . . . . . . . . . . . 24

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I.    THIS COURT HAS JURISDICTION TO HEAR THE GOVERNMENT'S CHALLENGE TO THE DISTRICT COURT'S ORDER VACATING SAMPSON'S DEATH SENTENCE AND GRANTING HIM A NEW PENALTY PHASE TRIAL . . . . . . . . . . . . . . 33

A.    This Court Has Jurisdiction Because the District Court's Order Granting Sampson a New Penalty Phase Trial is a Final, Immediately Appealable Order . . . . . . . . . . . . . . . . . . . . . . . . 34

1.    Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

2.    An order granting a new capital penalty phase proceeding is final and immediately appealable . . . . . . . . . . . . . . . . . . . 38

a.    An order granting a new capital penalty phase trial is best understood as an order granting a "new trial" under §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

b.    The district court's order is final because the §2255 proceeding has been completed . . . . . . . . . . . 46

c.    *Stitt* and *Hammer* were wrongly decided . . . . . . . . . . . 51

B.    If the District Court's Order is Deemed Interlocutory and Not Immediately Appealable, this Court Has Jurisdiction Under 28 U.S.C. §1292(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

1.    A §2255 proceeding is a "civil action" for purposes of §1292(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

a.    Under *Trenkler*, a §2255 proceeding is a "civil action" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

b.    A §2255 proceeding is a "civil action" for appellate purposes . . . . . . . . . . . . . . . . . . . . . . . . . 54

c.    There is precedent for the grant of an interlocutory appeal in a §2255 action . . . . . . . . . . . . . 58

2.     The certification requirements are satisfied . . . . . . . . . . . . . 60

       a.     "Controlling Question of Law" . . . . . . . . . . . . . . . . . 60

       b.     "Substantial Grounds for Difference of Opinion" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

       c.     "Materially advance the ultimate termination of the litigation" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

C.     If §2255 is deemed to be criminal in nature, this Court alternatively has jurisdiction under 18 U.S.C. §3731 . . . . . . . . . . . . 65

D.     This Court Can Exercise its Advisory Mandamus Authority . . . . . . 68

II.    THE DISTRICT COURT ERRED IN CONCLUDING THAT SAMPSON'S SIXTH AMENDMENT RIGHT TO AN IMPARTIAL JURY WAS VIOLATED AND IN GRANTING SAMPSON'S §2255 MOTION BASED ON A JUROR'S SO-CALLED "INFERABLE BIAS" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

A.     Preliminary §2255 Issues and Standard of Review . . . . . . . . . . . . . 72

B.     The *McDonough* Test Requires a Showing of "Demonstrated Bias," and Cannot Be Satisfied by a Showing of "Inferable Bias" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

     1.     Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

       a.     Actual and implied bias . . . . . . . . . . . . . . . . . . . . . . . . 76

       b.     *McDonough* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

       c.     The theory of "inferable bias" . . . . . . . . . . . . . . . . . . . 81

     2.     *McDonough* requires a showing of actual or implied bias, and cannot be satisfied by a showing of "inferable bias" . . . . 84

a.      The district court misinterpreted the test in *McDonough* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

b.      *Amirault* and *Dall* do not support the district court's interpretation of *McDonough* . . . . . . . . . . . 94

c.      The "inferable bias" theory articulated in *Torres* does not apply when a defendant seeks to set aside a conviction based on juror bias. . . . . . . . . . . . . . . . . 102

C.    A Claim of Juror Bias Based Only on a Showing of "Inferable Bias" Should be *Teague*-Barred . . . . . . . . . . . . . . . . . . . . . . . . . . 105

D.    In Any Event, Constitutional Error Does Not Alone Justify §2255 Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

# **TABLE OF AUTHORITIES**

## **Cases**

*Agostini v. Felton*,
　　521 U.S. 203 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Alternative System Concepts, Inc. v. Synopsys, Inc.*,
　　374 F.3d 23 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Amirault v. Fair*,
　　968 F.2d 1404 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 77, 81, 85

*Andrews v. United States*,
　　373 U.S. 334 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Arizona v. Ideal Basic Industrial (In re Cement Antitrust Litigation)*,
　　673 F.2d 1020 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Atkins v. Virginia*,
　　536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Bank of New York v. Hoyt*,
　　108 F.R.D. 184 (D.R.I. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60-61

*Behrens v. Pelletier*,
　　516 U.S. 299 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59-60

*Brecht v. Abrahamson*,
　　507 U.S. 617 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Bucci v. United States*,
　　662 F.3d 18 (1st Cir. 2011), *petition for certiorari filed*
　　(May 31, 2012) (No. 11A946, 12-5015). . . . . . . . . . . . . . . . . . . . . . . . 74

*Buchanan v. Kentucky,*
　　483 U.S. 402 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Bullington v. Missouri*,
   451 U.S. 430 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Butcher v. United States*,
   368 F.3d 1290 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*California v. Brown*,
   479 U.S. 538 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
   526 U.S. 687 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Commonwealth v. Amirault*,
   399 Mass. 617, 506 N.E.2d 129 (1987) . . . . . . . . . . . . . . . . . . . . . . . . 96

*Conaway v. Polk*,
   453 F.3d 567 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Conley v. United States*,
   415 F.3d 183 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Coopers & Lybrand v. Livesay*,
   437 U.S. 463 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Couch v. Telescope Inc.*,
   611 F.3d 629 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Crowley v. L.L. Bean, Inc.*,
   303 F.3d 387 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Cullen v. Pinholster*,
   131 S. Ct. 1388 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Curtis v. Duval*,
   124 F.3d 1 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Dall v. Coffin*,
   970 F.2d 964 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Darden v. Wainwright*,
       477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*David v. United States*,
       134 F.3d 470 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*DeBurgo v. St. Amand*,
       587 F.3d 61 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95, 96

*Dennis v. United States*,
       339 U.S. 162 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Ellis v. United States*,
       313 F.3d 636 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Estelle v. Smith*,
       451 U.S. 454 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Ferrara v. United States*,
       456 F.3d 278 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Fields v. Brown*,
       503 F.3d 755 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 97, 103

*Firestone Tire & Rubber Co. v. Risjord*,
       449 U.S. 368 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Florida v. Nixon*,
       543 U.S. 175 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Government of Virgin Islands v. Felix*,
       569 F.2d 1274 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Heflin v. United States*,
       358 U.S. 415 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 57

*Hill v. United States*,
       368 U.S. 424 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*In re: Bank of New England Corp.*,
　　364 F.3d 355 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*In re Heddendorf*,
　　263 F.2d 887 (1st Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*In re Sony BMG Music Entertainment*,
　　564 F.3d 1 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*J.E.B. v. Alabama ex rel. T.B.*,
　　511 U.S. 127 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Johnson v. Luoma*,
　　425 F.3d 318 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Jones v. Cooper*,
　　311 F.3d 306 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 97

*Jones v. United States*,
　　527 U.S. 373 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 46

*Kimbrough v. United States*,
　　552 U.S. 85 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41-42

*Knight v. United States*,
　　37 F.3d 769 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Koehler v. Bank of Bermuda Ltd.*,
　　101 F.3d 863 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Kotteakos v. United States*,
　　328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Lawuary v. United States*,
　　669 F.3d 864 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Lockhart v. McCree*,
    476 U.S. 162 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Lopez-Nieves v. United States*,
    917 F.2d 645 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Maples v. Thomas*,
    132 S. Ct. 912 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Mayle v. Felix*,
    545 U.S. 644 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*McCloskey v. Mueller*,
    446 F.3d 262 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*McDonough Power Equipment, Inc. v. Greenwood*,
    464 U.S. 548 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*McGillicuddy v. Clements*,
    746 F.2d 76 (1st Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Mercado v. United States*,
    183 F.2d 486 (1st Cir. 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Mistretta v. United States*,
    488 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Mohawk Industrial, Inc. v. Carpenter*,
    130 S. Ct. 599 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Monge v. California*,
    524 U.S. 721 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-43

*Moreno-Espada v. United States*,
    666 F.3d 60 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Morgan v. Illinois*,
    504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 76

*Nogueira v. United States*,
    683 F.2d 576 (1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Oakes v. United States*,
    400 F.3d 92 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 75

*Oregon v. Ice*,
    555 U.S. 160 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Parsley v. United States*,
    604 F.3d 667 (1st Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Ramirez-Burgos v. United States*,
    313 F.3d 23 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Ring v. Arizona*,
    536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Rogers v. United States*,
    180 F.3d 349 (1st Cir.  1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Rompilla v. Beard*,
    545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Roper v. Simmons*,
    543 U.S. 551 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Rossiter v. Potter*,
    357 F.3d 26 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Sampson v. United States*,
    553 U.S. 1035 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Sattazahn v. Pennsylvania*,
    537 U.S. 101 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Scott-Harris v. City of Fall River*,
    134 F.3d 427 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

-x-

*Sepulveda v. United States*,
   330 F.3d 55 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Simmons v. South Carolina*,
   512 U.S. 154 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Singleton v. United States*,
   26 F.3d 233 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 107

*Smith v. Phillips*,
   455 U.S. 207 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Sparf v. United States*,
   156 U.S. 51 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Sumner v. Shuman*,
   483 U.S. 66 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Teague v. Lane*,
   489 U.S. 288 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Thompson v. Oklahoma*,
   487 U.S. 815 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Tome v. United States*,
   513 U.S. 150 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Trenkler v. United States*,
   536 F.3d 85 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 52, 53, 54, 56

*United States v. Acosta-Martinez*,
   252 F.3d 13 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 47

*United States v. Addonizio,*
   442 U.S. 178 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

-xi-

*United States v. Allen*,
605 F.3d 461 (7th Cir. 2010), *cert. denied,* 131 S. Ct. 1475 (2011) . . . . . . 77

*United States v. Allen*,
613 F.2d 1248 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 38

*United States v. Aponte-Suarez*,
905 F.2d 483 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*United States v. Barron*,
127 F.3d 890 (9th Cir. 1997), *rev'd on other grounds on
rehearing en banc*, 172 F.3d 1153 (9th Cir. 1999) . . . . . . . . . . . . . . . . . 58

*United States v. Blackwell*,
127 F.3d 947 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Blackwell*,
436 F. App'x 192 (4th Cir. 2011), *cert. denied*,
132 S. Ct. 1093, 132 S. Ct. 1097 (2012) . . . . . . . . . . . . . . . . . . . . . . . . 97

*United States v. Boney*,
977 F.2d 624 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*United States v. Booker*,
543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Carey*,
120 F.3d 509 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Chandler*,
996 F.2d 1073 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Daugerdas*,
—F. Supp. 2d —, 2012 WL 2149238 (S.D.N.Y. June 4, 2012) . . . . . . . . 70

*United States v. Doke*,
171 F.3d 240 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*United States v. Dunham Concrete Products Inc.*,
   501 F.2d 80 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Ebron*,
   683 F.3d 105 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Fell*,
   360 F.3d 135 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Fiorelli*,
   337 F.3d 282 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Frady*,
   456 U.S. 152 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*United States v. Futch*,
   518 F.3d 887 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. George*,
   676 F.3d 249 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*United States v. Gordon*,
   156 F.3d 376 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Gordon*,
   634 F.2d 638 (1st Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53-54

*United States v. Green*,
   407 F.3d 434 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 68, 69

*United States v. Greer*,
   285 F.3d 158 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 83, 84, 93, 97, 102

*United States v. Hadden*,
   475 F.3d 652 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 54

*United States v. Hammer*,
   564 F.3d 628 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 48, 50

*United States v. Hayman*,
     342 U.S. 205 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Henry*,
     472 F.3d 910 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Jackson*,
     390 U.S. 570 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Keogh*,
     391 F.2d 138 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Lawrence*,
     555 F.3d 254 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 1879 (2010) . . . . . . 67

*United States v. Lighty*,
     616 F.3d 321 (4th Cir. 2010), *cert. denied,* 131 S. Ct. 846 (2010),
     132 S. Ct. 451 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Lujan*,
     603 F.3d 850 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 1718 (2011) . . . . . 44

*United States v. Martinez-Salazar*,
     528 U.S. 304 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Means*,
     133 F.3d 444 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Mitchell*,
     690 F.3d 137 (3d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 93, 97

*United States v. Mitchell*,
     502 F.3d 931 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 46

*United States v. Montgomery*,
     635 F.3d 1074 (8th Cir. 2011), *cert. denied,* 132 S. Ct. 1731 (2012) . . . . . 44

*United States v. Morgan*,
    346 U.S. 502 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Nascimento*,
    491 F.3d 25 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*United States v. North*,
    910 F.2d 843 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 100

*United States v. Ostrander,*
    411 F.3d 684 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Patterson*,
    215 F.3d 776 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*United States v. Pelullo,*
    399 F.3d 197 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Perkins*,
    748 F.2d 1519 (11th Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 100

*United States v. Philip Morris USA, Inc.*,
    396 F.3d 1190 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Pleau*,
    680 F.3d 1 (1st Cir. 2012)*, petitions for certiorari filed*
    (Aug. 21, 2012) (Nos. 12-223, 12A107), (Nos. 12-230, 12A108) . . . . . . . 68

*United States v. Purkey*,
    428 F.3d 738 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Quin*,
    836 F.2d 654 (1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Rivera-Sola*,
    713 F.2d 866 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*United States v. Sampson*,
    486 F.3d 13 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 43

*United States v. Sampson*,
    497 F.3d 55 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Sampson*,
    820 F. Supp. 2d 151 (D. Mass. 2011) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Sampson*,
    820 F. Supp. 2d 202 (D. Mass. 2011) . . . . . . . . . . . . . . . . . . . . . . 5, 10, 18

*United States v. Sampson*,
    820 F. Supp. 2d 249 (D. Mass. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 4, 18

*United States v. Sampson*,
    300 F. Supp. 2d 275 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Sliker*,
    751 F.2d 477 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90-91

*United States v. Stitt*,
    459 F.3d 483 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 34, 48, 49, 70

*United States v. Torres*,
    128 F.3d 38 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Vargas*,
    606 F.2d 341 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*United States v. Whitten*,
    610 F.3d 168 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Williams*,
    610 F.3d 271 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Wood,*
       299 U.S. 123 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 77, 87

*Wall v. Kholi,*
       131 S. Ct. 1278 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Williams v. Price,*
       283 F.3d 223 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Williams v. Taylor,*
       529 U.S. 420 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 77

## Constitutional Provisions

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## Statutes

18 U.S.C. §2119(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. §3591(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. §3592(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. §3592(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. §3592(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

18 U.S.C. §3593(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. §3593(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 45, 47

18 U.S.C. §3593(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. §3593(b)(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

18 U.S.C. §3593(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. §3593(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. §3593(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. §3593(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. §3593(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. §3594 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. §3731 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. §1292(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. §1865(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

28 U.S.C. §2244(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

28 U.S.C. §2253(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. §2255(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 47, 53

28 U.S.C. §2255(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

## Rules of Procedure

Fed. R. App. P. 4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fed. R. Civ. P. 60(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Crim. P. 43(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Rule 11(b), Rules Governing Section 2255 Proceedings . . . . . . . . . . . . . . . . . . 55

Advisory Committee Note to Rule 1 of the Rules Governing
    Section 2255 Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 57

## Other Authorities

3 C. Wright & S. Welling, *Federal Practice and Procedure* (4th ed. 2011) . . . . 57

BLACK'S LAW DICTIONARY (9th ed. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 44, 88

OXFORD ENGLISH DICTIONARY (2d ed. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 40

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) . . . . . . . . . . . . 39, 88

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over the case because the petitioner, Gary Lee Sampson, moved to vacate, set aside, or correct his conviction and death sentence under 28 U.S.C. §2255.

On May 10, 2012, the district court (Wolf, C.J.) entered a *Memorandum and Order* allowing Claim IV of Sampson's amended §2255 motion, vacating his death sentence, and allowing the government's motion to certify an interlocutory appeal under 28 U.S.C. §1292(b).   [D.1240; G.Add.69-102].[1]   On May 18, 2012, the government filed a timely notice of appeal, resulting in Appeal No. 12-1643. [D.1241; JA305-306].  On the same date, the government filed a timely petition for permission to take an interlocutory appeal under 28 U.S.C. §1292(b).  [JA307-405]. That petition, which was docketed on May 22, 2012, resulted in Appeal No. 12-8019.

For the reasons set forth below, this Court has jurisdiction pursuant to 28 U.S.C. §1291 and 28 U.S.C. §2253(a) because the district court's order vacating Sampson's death sentence and granting him a new penalty phase trial is final and appealable.  In the alternative, if that order is deemed interlocutory and not immediately appealable, this Court has jurisdiction pursuant to 28 U.S.C. §1292(b).  The district court has

---

[1] Citations are as follows:  Docket entries are cited as "[D._]."  The government's addendum is cited as "[G.Add.__]."  The Joint Appendix is cited as "[JA__]."  The Joint Sealed Appendix is cited as "[JSA__]."

-1-

certified its order for interlocutory appeal, and this Court should accept the government's petition for permission to take an interlocutory appeal because a §2255 proceeding constitutes a "civil action" under §1292(b), and the standards for an interlocutory appeal under §1292(b) are satisfied. In the alternative, if a §2255 action is deemed a further step in the original, criminal case, this Court has jurisdiction under 18 U.S.C. §3731.

Finally, if the district court's order is not appealable, the government petitions this Court to hear the matter pursuant to its advisory mandamus authority.

## STATEMENT OF ISSUES

1.     This Court has jurisdiction to hear the government's challenge to the district court's order vacating Sampson's death sentence and granting him a new penalty phase trial.

2.     The district court erred in concluding that Sampson's Sixth Amendment right to an impartial jury was violated and in granting Sampson's amended §2255 motion based on a juror's so-called "inferable bias."

## STATEMENT OF THE CASE

On May 11, 2009, Gary Lee Sampson filed a motion under 28 U.S.C. §2255 seeking to vacate, set aside, or correct his conviction and death sentence (hereinafter the "initial §2255 motion"), in which he alleged, *inter alia*, that he was denied the

right to a fair trial in violation of the Sixth Amendment because three jurors at his capital penalty phase trial provided dishonest answers during voir dire. [D.967].[2] On April 6, 2010, Sampson filed an amended §2255 motion, in which he provided additional information regarding several of the claims pled in the initial §2255 motion, but did not raise any new claims. [D.1040; JSA1-252].

On October 20, 2011, the district court held that Sampson had proven his entitlement to relief on Claim IV of his amended §2255 motion as to one of the three jurors – identified as Juror "C" – concluding that he had satisfied all of the elements of the test established in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984),[3] and that he therefore was entitled to a new capital penalty phase trial.

---

[2] The district court opened a new civil case (09-10762 MLW) when Sampson filed his initial §2255 motion, but directed the parties to file all pleadings in the criminal case (01-10384 MLW).

[3] In *McDonough*, which is discussed in greater detail below, the Supreme Court, in reversing the grant of a post-trial motion for a new trial based on a claim of juror bias, held that to obtain a new trial in such a situation:

> [A] party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* at 566.

*United States v. Sampson*, 820 F. Supp. 2d 151, 156-97 (D. Mass. 2011).[4] The district court did not finalize the order, however, so that the parties would have the opportunity to inform the court how the case should proceed, including whether an immediate appeal was available. *Id.* at 202; *see United States v. Sampson*, 820 F. Supp. 2d 249, 250-51 (D. Mass. 2011).

On February 17, 2012, after the parties had informed the court about their differing views on whether an order vacating Sampson's death sentence and ordering a new penalty phase trial was immediately appealable, the government moved the district court to certify an interlocutory appeal under 28 U.S.C. §1292(b), notified the court of its intent to file a petition for a writ of mandamus in this Court, and requested a stay. [D.1235]. On May 10, 2012, the district court formally allowed Claim IV of Sampson's amended §2255 motion and vacated his death sentence, granted the government's motion to certify an interlocutory appeal under §1292(b), and stayed the

---

[4] The district court's published decision, which is included in the government's addendum, replaced the names of jurors and third parties with initials, and included minor redactions concerning particularly sensitive information regarding third parties. *Id.* at 156. An unredacted form of the district court's decision, which was filed under seal and provided to the parties, is included in the joint sealed appendix. Other materials which identify the jurors by name, including the amended §2255 motion, the transcripts of the evidentiary hearings, the exhibits introduced at those hearings, and certain other pleadings also are included in the joint sealed appendix. The government herein will cite to the district court's published decision and refer to the names of jurors and third parties by the initials used by the district court in that decision, consistent with the filing of a public brief.

case pending resolution of the government's appeal and petition for a writ of mandamus.  [G.Add.69-102].

On May 18, 2012, the government filed a timely notice of appeal, and, on the same date, petitioned this Court for permission to take an interlocutory appeal under §1292(b).  [JA305-306, 307-405].  Sampson moved to dismiss the government's notice of appeal, and also opposed the government's motion for permission to take an interlocutory appeal. [JA407-424, 425-450].  On June 1, 2012, this Court granted the government's motion to consolidate the two appeals and also ordered the parties to brief all issues, including jurisdiction, in their respective briefs on appeal.  [JA451-452].

## STATEMENT OF FACTS

### A.     The Offenses of Conviction

Gary Lee Sampson brutally killed three innocent people in a seven-day period between July 24 and July 30, 2001.[5]  Sampson, who grew up in Massachusetts and who spent much of his life in prison between 1979 and 1995, committed a series of

---

[5] The facts are taken from this Court's decision affirming Sampson's death sentence, *see United States v. Sampson*, 486 F.3d 13, 18-19 (1st Cir. 2007), and the district court's *Memorandum and Order on Summary Dismissal*, *see United States v. Sampson*, 820 F. Supp. 2d 202, 214-15 (D. Mass. 2011), both of which are included in the joint appendix.

bank robberies in North Carolina between May 2001 and July 2001, and returned to Massachusetts in July 2001.

On July 24, 2001, Philip A. McCloskey, a 69-year-old retiree with a history of heart problems and shortness of breath, was driving his car in Weymouth, Massachusetts, and picked up Sampson, who was hitchhiking.  After seeing a police officer in the vicinity of the car, Sampson pulled out a knife and told McCloskey to keep driving.  Once they reached Marshfield, Massachusetts, Sampson ordered McCloskey to pull over near a wooded area and forced him to walk into the wooded area and up a very steep hill.  Sampson attempted to restrain McCloskey with a belt and, when McCloskey resisted, attacked McCloskey with the knife, inflicting 24 separate wounds on him, including wounds to McCloskey's neck, chest, abdomen, and back.  One of the wounds to the neck, a nearly eight-inch incision, damaged the trachea and completely severed McCloskey's carotid artery.  According to Sampson, McCloskey exclaimed, "Ah, I'm dying," shortly before Sampson "almost decapitated him."  After he had killed McCloskey, Sampson took his wallet and tried, but failed, to take McCloskey's car.

Three days later, on July 27, 2001, Jonathan Rizzo, a 19-year-old college student, picked up Sampson, who was posing as a stranded traveler, along a road in Plymouth, Massachusetts.  After they had been driving for five or ten minutes,

Sampson pulled out his knife and forced Rizzo to drive to Abington, Massachusetts, where Sampson maintained a makeshift campsite. Sampson ordered Rizzo to park the car and to carry Sampson's belongings into a wooded area, after which Sampson tied Rizzo to a tree and gagged him by stuffing a sock into his mouth. Sampson then repeatedly stabbed Rizzo with the knife, severing Rizzo's jugular vein and trachea and piercing his heart, lungs, and liver. At least seven of the wounds would have been independently, rapidly fatal. According to Sampson, this killing "was premeditated." After Rizzo was dead, Sampson took Rizzo's car and money.

Sampson thereafter drove to New Hampshire and broke into a vacation home on Lake Winnipesaukee. On July 30, 2001, Robert "Eli" Whitney, the 58-year old caretaker of the property, discovered Sampson, whereupon Sampson threatened Whitney with a knife and tied him to a chair. Sampson then wrapped a nylon line around Whitney's neck and strangled him to death. According to Sampson, Whitney "died slowly" over the course of about five minutes. Sampson took Whitney's car and drove to Vermont, where the car broke down.

On July 31, 2001, William Gregory picked up Sampson, who was hitchhiking, near West Bridgewater, Vermont. Sampson pulled a knife and ordered Gregory to drive down a dirt road. Gregory pulled the car into a rest area, jumped out, and ran away. Sampson tried but failed to run Gregory over with the car, and then drove off.

A short time later, Sampson broke into a house, called 911, and surrendered himself. Sampson was arrested by the Vermont State Police and confessed to the murders of McCloskey, Rizzo, and Whitney, and later gave additional tape-recorded confessions to troopers from the Massachusetts State Police.

### B.    Proceedings in Sampson's Criminal Case

On August 8, 2002, a federal grand jury in the District of Massachusetts returned a second superseding indictment charging Sampson with two counts of carjacking with the intent to cause serious bodily injury or death, and further alleging that the carjackings resulted in the deaths of McCloskey and Rizzo, in violation of 18 U.S.C. §2119(3). [D.74; JA95-100]. The second superseding indictment included a Notice of Special Findings that alleged the facts concerning Sampson's state of mind and certain statutory aggravating factors that made him statutorily eligible for the death penalty under the Federal Death Penalty Act ("FDPA"), 18 U.S.C. §§3591-3599. [JA97-100]. On November 19, 2002, the government filed a Notice of Intent to seek the death penalty, as required by the FDPA, 18 U.S.C. §3593(a). [D.103].

On September 9, 2003, Sampson pleaded guilty to both counts of the second superseding indictment, leaving to a jury the issue of whether he should be sentenced to death. [D.338]. On October 27, 2003, following 17 days of voir dire, the district

court empaneled a death-qualified jury to determine what punishment should be imposed, as required by 18 U.S.C. §3593(b)(2)(A).  [D.798].

On December 23, 2003, after a six-week penalty phase trial conducted in accordance with the FDPA, the jury unanimously recommended that Sampson be sentenced to death on both counts.  [D.654].  On January 29, 2004, in accordance with the jury's unanimous recommendation, and as required by 18 U.S.C. §3594, the district court sentenced Sampson to death on both counts.  [D.679; JA207-208; *see United States v. Sampson*, 300 F. Supp. 2d 275, 276-78 (D. Mass. 2004)].

On May 7, 2007, this Court affirmed Sampson's death sentence, *see* 486 F.3d at 19-52, and thereafter denied his petition for rehearing *en banc*, *see United States v. Sampson*, 497 F.3d 55, 56 (1st Cir. 2007).  On May 12, 2008, the Supreme Court denied Sampson's petition for a writ of certiorari.  *See Sampson v. United States*, 553 U.S. 1035 (2008).

### C.    Sampson's Amended §2255 Motion

On May 11, 2009, Sampson filed a timely §2255 motion, Claim IV of which alleged that he was denied the right to a fair trial under the Sixth Amendment because three jurors provided dishonest answers during voir dire.  [D.967].  He thereafter filed an amended §2255 motion which provided additional information regarding several

-9-

of the claims pled in the initial §2255 motion.  [JSA1-252].  The government agreed

that the amended §2255 motion related back to the initial §2255 motion.[ D.1044].

With respect to Claim IV, Sampson alleged that, in the five-plus years since his

trial, he had "developed evidence" that three jurors (Jurors "C," "D," and "G")

provided inaccurate answers to voir dire questions, including inaccurate answers to

questions on their respective questionnaires, and that he therefore was entitled to a

new trial: (1) under *McDonough*; (2) because the three jurors were actually or

impliedly biased; and (3) because he was prevented from intelligently exercising his

peremptory challenges. [JSA193-209].  Specifically, with respect to Juror C, Sampson

alleged that she had provided inaccurate responses to several questions in her

questionnaire because, at the time she completed her questionnaire and answered each

of those questions in the negative, Juror C had been a victim of domestic violence at

the hands of her husband, and she had been questioned by the police.  [JSA193-196].

The government moved to summarily dismiss all of the claims raised in

Sampson's initial §2255 motion, including the juror bias claims, and thereafter moved

to summarily dismiss all of the claims raised in his amended §2255 motion.  [D.1007;

1057].  The district court heard argument on the government's summary dismissal

motion over three days, from August 30 to September 1, 2010.  [D.1087, 1091, 1092;

*see* 820 F. Supp. 2d at 216].  On August 31, 2010, the district court denied summary

-10-

dismissal of the juror bias claim (Claim IV) during a hearing. [D.1091; *see* 820 F. Supp. 2d at 161].

### D.    The Evidentiary Hearings

The district court held evidentiary hearings on the juror bias claim on November 18, 2010, March 18, 2011, and August 8, 2011. During the first evidentiary hearing, all three jurors (identified as Jurors "C," "D," and "G") testified; at the second evidentiary hearing, Juror C was recalled to testify on certain additional matters; and, at the third evidentiary hearing, after the parties had submitted proposed findings of fact and conclusions of law, Juror C was recalled to testify again based on issues raised in Sampson's submission. [JSA311-513, 739-872, 1019-1142; 820 F. Supp. 2d at 161].

### 1.    The first evidentiary hearing

During the evidentiary hearing on November 18, 2010, the jurors were asked to read their jury questionnaires and a transcript of the court's oral instructions to the jury, and asked whether they wished to correct any of their responses to the questions in the questionnaire. [JSA352-364, 402-414, 429-435; 820 F Supp. 2d at 182]. Juror C responded that she wished only to correct her response to Question 24(d), which addressed her ability to consider mental illness as a mitigating factor. [JSA433-435;

820 F. Supp. 2d at 183, 187].  She did not ask to clarify her "no" responses to several

other answers on the questionnaire, including the following:

- whether she or anyone close to her had been charged with committing a crime (Question 63);

- whether she knew anyone who had ever been in prison (Question 64);

- whether she, or anyone close to her, had ever been the victim of a crime or a witness to a crime (Question 59);

- whether she, or anyone close to her, had ever been questioned as part of a criminal investigation (Question 61);

- whether she, or anyone close to her, had an experience with the police in which she or that person was treated fairly (Question 65);

- whether she, or anyone close to her, had ever been employed, in any way, in law enforcement (Question 68); and

- whether she, or anyone close to her, had a drug problem (Question 32).

[JSA263-292, 441-443; 820 F. Supp.2d at 183, 187].

In response to questioning during the hearing, Juror C testified that she married

her second husband, "P," in 1979 and divorced him in 2002; that during their

marriage, P regularly abused alcohol and marijuana; and that his substance abuse

ultimately contributed to her decision to divorce him.  [JSA448-450, 453-454; 820 F.

-12-

Supp. 2d at 184]. In addition, P often threatened to harm her by physically chasing her, punching walls, and causing Juror C to believe he would punch her too if he caught her. [JSA449; 820 F. Supp. 2d at 184]. On May 29, 2000, after refusing Juror C's repeated requests for a divorce, P angrily confronted her in a bar, and came to their house later that day, took possession of her father's shotgun or rifle, and told Juror C that "he was going to shoot [her] and then himself." [JSA438-439, 450-451; 820 F. Supp. 2d at 184]. Juror C had found a suicide note her husband had written after the bar incident, and, as she later wrote in an affidavit to obtain an abuse prevention order, she was genuinely "afraid that he was going to shoot her." [JSA438-439 ; 820 F. Supp. 2d at 184]. Two of Juror C's sons took the weapon away from P, and Juror C took the weapon and suicide note to the Merrimac Chief of Police, whom she knew, and discussed the incident with him. [JSA438-440, 451-453; 820 F. Supp. 2d at 184]. Juror C testified that this incident was "horrible" for her. [JSA442; 820 F. Supp. 2d at 184].

On May 31, 2000, Juror C requested and received an abuse prevention order that required P to stay at least 50 yards away from her, and which stated at the top that violation of the order would be a criminal offense punishable by imprisonment or fine or both. [JSA299, 301, 436-436; 820 F. Supp. 2d at 184]. P violated the order on June 20, 2000, returning to Juror C's home and chasing her into a bedroom, and refusing

-13-

to leave. [JSA303-304, 435-437; 820 F. Supp. 2d at 184]. After one of her sons intervened, Juror C was able to call 911, and, when P returned to the home while the police were questioning her, P was arrested in Juror C's presence for violating the abuse prevention order. [JSA303-305, 435-438; 820 F. Supp. 2d at 184]. P was subsequently prosecuted for violating the abuse prevention order and put on probation. [JSA307-309; 820 F. Supp. 2d at 184-85].

While the abuse prevention order was in place, P stalked Juror C, but the police reported that there was nothing they could do because he was remaining more than 50 yards away from her. [JSA480; 820 F. Supp. 2d at 185]. Juror C testified that she believed the Merrimac police had treated her fairly. [JSA439-440; 820 F. Supp. 2d at 185]. She described the events that led to her divorce from P as "horrible" and "a nightmare." [JSA442-443; 820 F. Supp. 2d at 184].

When asked during the hearing why she had not disclosed information relating to P, Juror C testified that: "When I was filling out this questionnaire, my personal life – that was my personal life * * *. I didn't think my personal life had anything to do with me being a juror." [JSA459; 820 F. Supp. 2d at 187]. When asked whether, in September and October 2003, she knew that these events had happened to her, Juror C responded "yes." [JSA466; 820 F. Supp. 2d at 187]. She also repeatedly and unequivocally testified that her experiences with P, as painful as they had been, did

-14-

not affect her ability to be fair and impartial in deciding whether Sampson should be executed. [JSA444-447, 468-469, 476-478; 820 F. Supp. 2d at 189].

### 2.   The second evidentiary hearing

During the hearing on November 18, 2010, the parties and the court learned for the first time that Juror C had five children, including a daughter "J." [JSA460-461; 820 F. Supp. 2d at 187].[6] Sampson's counsel conducted an additional investigation and persuaded the court to recall Juror C in order to question her about J. [820 F. Supp. 2d at 187]. Juror C was recalled and appeared at an evidentiary hearing on March 18, 2011. [JSA739-872; 820 F. Supp. 2d at 187].

After being placed under oath and questioned whether there was anything in her prior testimony that she wanted to correct, Juror C said that she recalled after she left the courthouse in November 2010 that J had been arrested 20 years earlier, and that she had wanted to call the court to report this, but did not have the telephone number. [JSA775-780; 820 F. Supp. 2d at 187]. In response to questioning, Juror C testified that in or about 1995, J got a job performing administrative duties with the Sanibel, Florida Police Department, where she received promotions and commendations, and that Juror C was very proud of J's success in her career. [JSA789, 969-990; 820 F. Supp. 2d at 183]. This pride had disappeared by September 2003, as J had been

---

[6] Juror C testified that she understood the question in the questionnaire about children to only be asking about children then living with her. [JSA461, 465].

arrested and charged with stealing property from the Sanibel Police Department in 1997, and then was arrested and charged again for stealing and using a coworker's credit card. [JSA791-793, 881-896; 820 F. Supp. 2d at 183]. J was placed on probation for these offenses but, in 1998, was sentenced to six months' imprisonment for violating the terms of her probation by using cocaine and absconding from supervision. [JSA897-933; 820 F. Supp. 2d at 183]. Juror C believed that J had been treated fairly by law enforcement in all these matters and, in connection with them, also learned that J was addicted to cocaine. [JSA792-793; 820 F. Supp. 2d at 183]. Juror C visited J in prison and was distraught by her daughter's appearance, but by 2003, she had a relationship with J, bringing J's children to see her annually. [JSA794-795; 820 F. Supp. 2d at 183].

Juror C testified that she was deeply ashamed of J's criminal conduct, tearfully characterizing J's conviction and incarceration as "humiliating" and a "nightmare," that it had been "a horrible, horrible time in [her] life," and that "I am not proud of [J] * * * I just * * * can't admit it would happen in my family." [JSA778-779, 811-812, 814; 820 F. Supp. 2d at 183, 187]. Juror C also testified, however, that her experiences with her daughter did not affect her ability to be fair and impartial in deciding whether Sampson should be executed. [JSA812-815, 829-830; 820 F. Supp. 2d at 189].

-16-

### 3.    The third evidentiary hearing

During the hearing on March 18, 2011, Juror C testified that she did not speak to any of her fellow jurors after the trial was over, nor had she had any contact with the families of the victims in the case. [JSA808; 820 F. Supp. 2d at 187]. Sampson's counsel conducted additional investigation and persuaded the court to recall Juror C in order to question her about newspaper articles that reported that Juror C had come to the court to observe Sampson's sentencing. [820 F. Supp. 2d at 188]. Juror C was recalled and appeared at an evidentiary hearing on August 8, 2011. [JSA1019-1063, 1105-1116; 820 F. Supp. 2d at 188].

During the hearing, Juror C admitted that she had returned for the sentencing, but testified that she did not consider the sentencing to be part of the trial. [JSA1032-1033, 1055-1056; 820 F. Supp. 2d at 188]. She also testified that during the sentencing, she spoke to another juror who also was in attendance, and spoke to and hugged the parents of Jonathan Rizzo. [JSA1033-1037, 1051-1052; 820 F. Supp. 2d at 188]. She also disclosed that after the verdict was returned, she received letters from the McCloskey and Rizzo families. [JSA1036-1037, 1107-1108; 820 F. Supp. 2d at 188].

### E.      The District Court's *Memorandum and Order on Jury Claim*

On October 20, 2011, the district court issued three decisions, including a *Memorandum and Order on Jury Claim*, in which the court concluded that Sampson had proven Claim IV of his amended §2255 motion as to Juror C (but not as to Jurors D and G), and that he therefore was entitled to a new trial to determine whether the death penalty is justified.   820 F. Supp. 2d at 202.   The court also issued a *Memorandum and Order on Summary Dismissal*, in which the court summarily dismissed each of Sampson's challenges to his conviction, but denied summary dismissal with respect to certain of Sampson's other challenges to his penalty phase trial. *See* 820 F. Supp. 2d at 202-49.  Third, in a *Memorandum and Procedural Order*, the court stated that its order on Claim IV was not final, and directed the parties to confer and inform the court of their positions concerning how the matter should proceed in light of the remaining challenges and whether a formal order granting Sampson relief on Claim IV would be immediately appealable. *See* 820 F. Supp. 2d at 249-51.

In ruling on the juror bias claim, the court first found that Juror C had "intentionally and repeatedly answered a series of questions dishonestly in an effort to avoid disclosing or discussing painful experiences she had endured concerning her daughter J and her former husband P," including the following:

-18-

[I]f the court had been properly informed before empanelment of C's painful personal experiences, it would have excused C for cause primarily because of the substantial risk that those experiences would significantly impair her ability to decide whether the death penalty was justified based solely on the evidence. This conclusion would have been based not only on the matters revealed, but also on C's extreme emotional distress when required to think about them. This concern would have been reinforced by C's repeated dishonesty. Such dishonesty during a jury selection process in which the importance of accurate answers was emphasized would also have caused the court substantial concern that C would not follow its instructions on other issues and would, therefore, have provided another reason to have excused her for cause.

\*    \*    \*

C intentionally lied during the jury selection process in response to questions that should have elicited the facts that: in 2000 her husband P had a rifle or shotgun and threatened to shoot her; C had feared that P would kill her; as a result, C obtained an Abuse Prevention Order against P; P was later arrested in her presence and prosecuted for violating that Order; C's marriage to P ended because of his substance abuse; J also had a drug problem; and J's drug abuse resulted in her serving time in prison, where C visited her. As information concerning these experiences involving J and P emerged slowly in the course of three hearings in these §2255 proceedings, C repeatedly characterized each of those experiences as "horrible" and a "nightmare." She often cried when required to think about these matters. She was frequently unable to discuss them candidly or coherently.

820 F. Supp. 2d at 158.

The court further found that, although Juror C "did not falsely answer any questions as part of a conscious effort to become a juror and punish Sampson for the abuse inflicted on her by P," it had nonetheless "been proven that during the jury selection process C dishonestly answered all material questions that should have revealed important events concerning J and P because C was deeply ashamed, and became distraught when required to think about them," and her "decision to lie rather than reveal these events demonstrates the tremendous emotional impact that they had on C at the time of the voir dire and calls her impartiality into question." *Id.* at 159. That was significant, the court found, because the matters which Juror C attempted to conceal were "comparable to matters involved in Sampson's case"; and the court would have excused her for cause "because of the high risk that she would not be able to decide whether Sampson should live or die based solely on the evidence" if, before empanelment, the court had the same information which it now possessed. *Id.* at 181.

The court therefore concluded that Sampson was entitled to relief under the test set forth in *McDonough*, which, in the court's view, required him to prove by a preponderance of the evidence the following:

> (1) C was asked a question during voir dire that should have elicited particular information; (2) the question was material; (3) C's response was dishonest, meaning deliberately false, rather than the result of a good faith misunderstanding or mistake; (4) her motive for answering dishonestly relates to her ability to decide the case solely on

the evidence and, therefore, calls her impartiality into question; and (5) the concealed information, when considered along with the motive for concealment, the manner of its discovery, and C's demeanor when required to discuss J and P, would have required or resulted in her excusal for cause for either actual bias, implied bias, or what the Second Circuit characterizes as "inferable bias."

*Id.* at 159. In reaching this conclusion, the court rejected the government's argument that *McDonough* requires a showing of actual bias or implied bias. *Id.* at 174-81. The court found persuasive *United States v. Torres*, 128 F.3d 38, 47 (2d Cir. 1997), in which the Second Circuit held that, during the voir dire process, a district court has discretion to dismiss a juror for cause for "inferable" or "inferred bias," which exists "when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." 820 F. Supp. 2d at 165-67 (internal quotation omitted). Although acknowledging that this Court has not expressly recognized "inferable bias," the district court concluded that this Court's "deferential review of trial courts' decisions about juror bias is consistent with the Second Circuit's conclusion that a category of bias must exist for which removal of a juror for cause is permissible, but not mandatory." *Id.* at 167 (citing *Torres*, 128 F.3d at 47).

-21-

In then applying this test, the court found that Sampson had failed to meet his burden of showing that Juror C was actually or impliedly biased, but had shown that she was subject to removal for cause based on "inferable bias." *Id.* at 188-97. As to actual bias, the court found that it was not possible to determine whether or not Juror C was willing and able to decide "whether the death penalty was justified based solely on the evidence, unimpaired by her painful personal experiences." *Id.* at 189. The court noted that she had repeatedly testified that her painful personal experiences did not affect her ability to be fair and impartial in deciding whether Sampson should be executed, but stated that it was not persuaded that this was correct given the nature of those experiences and the fact that she had been dishonest about other matters. *Id.* The court nonetheless found that "there is insufficient evidence for the court to find whether or not C was actually biased," and therefore that "Sampson had not satisfied his burden of proving that he is entitled to a new trial because of actual bias." *Id.* at 190.

Turning to implied bias, although noting it was a "close question," the court found that implied bias had not been shown:

> Although C's repeated dishonesty at voir dire contributes
> to raising a close question about whether she should be
> found to have been impliedly biased, the court does not find
> that implied bias has been proven because C did not have
> a direct relationship to the parties or events in the case, the
> occurrences in her own life which may have affected her

ability to decide the case based solely on the evidence occurred before rather than during the trial, and she did not lie in order to secure a seat on the jury.

*Id.* at 192.

Notwithstanding its findings that neither actual nor implied bias had been proven, the court concluded that Sampson had demonstrated his entitlement to relief under *McDonough* because "inferable bias" had been proven. *Id.* at 194-97. As the court explained:

> [I]f the court had been properly informed by honest answers in C's questionnaire and during individual voir dire, it would have exercised its discretion to excuse her for cause. While the jurors just discussed were excused because of their emotional reaction to matters relating to people close to them, C's difficulties arose largely from things that had happened directly to her, such as P's threat to kill her. As indicated earlier, at the time of voir dire, the court would have foreseen that the trial would include: testimony about violent murders; testimony from female bank tellers who Sampson had threatened to shoot; testimony that Sampson abused alcohol, cocaine, and marijuana; testimony that one of Sampson's marriages ended as a result of his drug use; and testimony that Sampson had been incarcerated. If the court had known that C was deeply distressed because: three years earlier she had herself been threatened with being shot and killed; she had ended a marriage due to her husband's substance abuse; and she felt deeply ashamed of her daughter's criminal activity, drug abuse, and incarceration, the court would have found that, after being exposed to the evidence in the case, C was likely to be influenced by her own life experiences and probably be substantially impaired in her ability to decide the case based solely on the evidence. She

would, therefore, have been excused for cause for this significant risk of partiality alone.

*Id.* at 194-95 (internal citations omitted). The court thus concluded that Sampson had proven each of the showings required by *McDonough* and, therefore, that he was denied his Sixth Amendment right to an impartial jury and was entitled to a new penalty phase trial to determine whether the death penalty was justified. *Id.* at 195-97.

The court found, however, that Sampson had failed to show that he was entitled to relief with respect to the other two jurors who he alleged had given intentionally dishonest answers during voir dire. *Id.* at 197-201. Finally, the court rejected Sampson's claim that he was entitled to a new trial because inaccurate responses by the three jurors deprived him of his right to exercise his peremptory challenges on a properly informed basis, reasoning that "in the context of a juror's inaccurate responses to questions on voir dire, mere injury to the ability to exercise peremptory challenges properly is not a ground on which a new trial may be granted." *Id.* (citing *McDonough,* 464 U.S. at 556).

### F.   **The May 10, 2012 *Memorandum and Order***

On February 1, 2012, the parties notified the district court of their differing opinions concerning the immediate appealability of the court's grant of a new penalty phase trial, and the government informed the court that although it believed that an order granting such relief would be immediately appealable as a final order, it also

would be asking the court to certify an interlocutory appeal under 28 U.S.C. §1292(b),

and additionally would be seeking a writ of mandamus in this Court. [D.1233; JA299-

303]. On February 17, 2012, the government moved the district court to certify an

interlocutory appeal under §1292(b), and requested a stay pending appeal. [D.1235].

Sampson opposed the motion to certify an interlocutory appeal, but did not oppose the

government's request for a stay. [D.1237].

On May 10, 2012, the district court formally allowed Claim IV of Sampson's

amended §2255 motion and vacated his death sentence, and also allowed the

government's motion to certify an interlocutory appeal under §1292(b). [D.1240;

G.Add.69-102]. In granting the government's motion to certify an interlocutory

appeal, the court first noted that the question whether a §2255 proceeding is a "civil

action" for purposes of §1292(b) "is a challenging question," and that "reasonable

judges might differ on whether §1292(b) applies to the decision on the jury claim in

this case." [G.Add.89, 92]. The court concluded, however, that it did not need to

resolve that question because the requirements of §1292(b) were satisfied and "and

it is in the interest of justice to give the First Circuit the opportunity to decide the full

range of issues raised by the government." [G.Add.92-93].

The court next concluded that each of the §1292(b) factors were satisfied.

[G.Add.94-98]. The decision on the jury claim involves a "controlling question of

-25-

law," the court found, because "[i]f this court is found to be incorrect in its holding that *McDonough* provides a third basis for obtaining relief – distinct from actual or implied bias – or incorrect in some material respect concerning its statement of the *McDonough* test, then its decision that a new hearing to determine Sampson's sentence is required will be reversed or remanded." [G.Add.94-95].

There also was a "substantial ground for difference of opinion" as to that question, the court found, in view of the "lack of binding First Circuit authority concerning the meaning of *McDonough* and the confusion that is manifest in some decisions in other circuits * * *." [G.Add.95-97]. An "immediate appeal from the [jury claim] order may materially advance the ultimate termination of the litigation," the court also concluded, because if its decision on the jury claim were reversed, a new penalty phase trial will not be necessary unless the court later finds that Sampson's unresolved issues are meritorious and require a new trial, and if the court's decision is affirmed, the issues concerning Sampson's unresolved claims will be moot. [G.Add.97-98]. Finally, the court concluded that it would exercise its discretion to allow this Court to consider whether an interlocutory appeal of the jury claim decision is legally permissible and, if so, justified. [G.Add.98-100].

The district court therefore certified the following questions for interlocutory appeal: (1) whether *McDonough* requires proof of actual bias or implied bias to obtain

relief; and, if not, (2) whether the court correctly stated the *McDonough* test in its *Memorandum and Order on Jury Claim*. [G.Add.102]. The court also stayed the case pending a resolution of the government's appeal and petition for mandamus by this Court. [G.Add.102].

## SUMMARY OF ARGUMENT

The district court erred in granting Sampson's §2255 motion and in setting aside a death sentence rendered nearly a decade ago based only on its finding that a juror provided inaccurate answers to certain questions on voir dire and its conclusion that the *McDonough* test can be satisfied by a showing of "inferable bias." The court's ruling is unprecedented: no other court has reversed a conviction based only on a showing of "inferable bias," and without a showing of actual or implied bias, and with good reason. The Supreme Court expressly equated a valid challenge for cause with a showing of "demonstrated bias" in *McDonough*, and a showing of "inferable bias," which bespeaks a mere "risk of partiality" on the part of a juror, does not rise to that level. The district court's conclusion that Sampson proved his Sixth Amendment claim necessarily turned on its conclusion that a showing of "inferable bias" could satisfy the *McDonough* test – the court expressly found that neither actual bias nor implied bias had been proven – and the court therefore erred as a matter of law in sustaining that claim. The district court's order granting Sampson a new

-27-

penalty phase trial therefore should be reversed, and this case remanded to the district court with instructions to reinstate Sampson's death sentence.

1.       Sampson claims that this Court has no jurisdiction to review the district court's unprecedented order, which will require putting the families of the victims, witnesses, the public, and the court system through the pain and expense of another lengthy trial.  He is wrong.

a.       The Supreme Court's decision in *Andrews v. United States*, 373 U.S. 334 (1963), upon which Sampson relies in his motion to dismiss, is inapposite. Although *Andrews* held that a §2255 order granting resentencing is not final and appealable, *Andrews* was not a capital case.  The penalty phase of a capital case under the FDPA is best understood as an order granting a "new trial" under §2255 as the term "trial" is commonly understood, and courts have held that an order granting a "new trial" under §2255 is final and immediately appealable.  Under the FDPA, a defendant has a right to a trial by jury; the jury makes factual findings about whether certain aggravating or mitigating factors exist; the government must prove to the jury beyond a reasonable doubt the existence of statutorily-defined aggravating factors that establish the defendant's eligibility for capital punishment; and once a jury makes a final, unanimous determination that a defendant should be sentenced to death or to life imprisonment without the possibility of release, the district court *must* impose that

-28-

sentence.  These features of a penalty phase trial under the FDPA distinguish it from a "sentencing" as that term is commonly understood, and support the conclusion that the district court's order is an order granting a "new trial" within the meaning of §2255.  The court's grant of a new penalty phase trial is also final because, unlike the orders for resentencing in *Andrews*, the district court here must empanel a new jury under the FDPA.  Thus, the district court's §2255 role with respect to Sampson's claim is over, and this aspect of the §2255 has been finally adjudicated.

b.      If this Court determines that the district court's order is not final and immediately appealable, it should grant the government's petition to certify an interlocutory appeal under 28 U.S.C. §1292(b).  A §2255 proceeding constitutes a "civil action" within the meaning of §1292(b), particularly with respect to appellate proceedings, and each of the §1292(b) factors are satisfied in this case, as the district court found in granting the government's motion to certify an interlocutory appeal.

c.      If, on the other hand, this Court determines that a §2255 proceeding is a further step in the original, criminal case, jurisdiction alternatively exists under 18 U.S.C. §3731.  That statute, by its terms, provides that it should be liberally construed, and an order granting a new penalty phase trial under the FDPA is an order granting a "new trial" under §3731, and is therefore appealable.

d.    Finally, if this Court determines that the court's order granting a new penalty phase trial is not appealable, this is an appropriate case for the exercise of this Court's advisory mandamus authority.  The district court's ruling that the *McDonough* test can be satisfied by a showing of "inferable bias," even where actual or implied bias are not proven, is unprecedented; it is likely to recur; and there is a substantial risk that that order will evade review.  Moreover, mandamus is appropriate given the extremely onerous task of conducting another penalty phase trial, which the district court rightly characterized as "another long, expensive, and exhausting sentencing hearing," and would potentially spare needless additional suffering for the families of the victims, which have had to endure these proceedings now for more than a decade.

2.    The district court erred in concluding that the *McDonough* test can be satisfied by a showing of "inferable bias," and does not require a showing of actual or implied bias.  The Supreme Court expressly equated a valid challenge for cause in *McDonough* with "demonstrated bias."  "Inferable bias," which bespeaks only a "risk of partiality," does not rise to the level of "demonstrated bias" or proven bias.  To the contrary, it is more akin to the "hints of bias" which the Court in *McDonough* stated can assist a party in exercising peremptory challenges, but which the Court stated

-30-

would not support the granting of a new trial even if a party is deprived of that information during the voir dire process.

The district court's reading of *McDonough* also is inconsistent with this Court's decisions, which have required a showing of "actual prejudice or bias" to sustain a juror bias claim, and which have further required that such a showing be made as a "demonstrable reality." Other courts of appeals likewise have held that a claim of juror bias can succeed under *McDonough* only where actual or implied bias is shown. A "risk of partiality," which is the touchstone of a showing of "inferable bias," does not satisfy that standard. By contrast, no other court of appeals has held that a conviction may be overturned under *McDonough* based on a showing of "inferable bias," and where actual or implied bias are not proven.

The district court's reading of *McDonough* also fails to appreciate the fundamental difference between the breadth of a court's discretion to excuse a juror for cause during the voir dire process and the test for reversing a conviction based on juror bias, whether raised on appeal, in a Rule 33 motion for new trial, or on collateral review. A district court is properly given wide latitude to dismiss a juror for cause during the voir dire process, but the breadth of that latitude is not the standard when a defendant or prisoner seeks to set aside a conviction based on juror bias. In the latter situation, the question is not whether the court, in its discretion, *could* have excused

-31-

the juror for cause, but rather whether the juror, *in fact*, was impartial.  By focusing on the former question rather than the latter, the district court engaged in the very form of "recreation" of the voir dire process that the Supreme Court disavowed in *McDonough*.

Regardless of the theoretical availability of "inferable bias" as a basis for setting aside a conviction, its application to this case is inappropriate.  New rules of criminal procedure should not be applied retroactively, and although the government did not make this argument in the district court, this Court may overlook that forfeiture in the interests of justice.  A finding of inferable bias also does not rise to the level of "such a denial or infringement of a constitutional righ[t] * * * as to render the judgment vulnerable to collateral attack," 28 U.S.C. §2255(b), which §2255 requires.

This Court should deny Sampson's motion to dismiss, reverse the district court's order granting him a new penalty phase trial, and reinstate Sampson's death sentence.

-32-

## **ARGUMENT**

### I.   THIS COURT HAS JURISDICTION TO HEAR THE GOVERNMENT'S CHALLENGE TO THE DISTRICT COURT'S ORDER VACATING SAMPSON'S DEATH SENTENCE AND GRANTING HIM A NEW PENALTY PHASE TRIAL.

"[T]he first and fundamental question" presented by every case brought to the federal courts is whether the court has jurisdiction to hear the case. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998). Sampson has moved to dismiss the government's notice of appeal on the ground that the district court's order vacating his death sentence and granting him a new penalty phase trial is interlocutory and not immediately appealable, and also has opposed the government's petition for permission to take an interlocutory appeal under 28 U.S.C. §1292(b). The threshold question posed in these appeals therefore is whether this Court has jurisdiction to consider the government's challenge to the district court's order.

As shown below, the answer to that question is "yes," for any of the following four reasons: (1) the district court's order is final and immediately appealable under 28 U.S.C. §1291 and 28 U.S.C. §2253(a); (2) however, if this Court determines that the court's order is interlocutory, it should accept the government's petition for permission to take an interlocutory appeal under 28 U.S.C. §1292(b); (3) alternatively, if this Court determines that an interlocutory appeal under §1292(b) is not available because a §2255 proceeding is a further step in Sampson's original, criminal case, an

-33-

appeal is available under 18 U.S.C. §3731; and (4) finally, if this Court determines that the court's order granting a new penalty phase trial is not appealable, it should grant the government's petition for a writ of mandamus pursuant to its advisory mandamus authority.

### A. This Court Has Jurisdiction Because the District Court's Order Granting Sampson a New Penalty Phase Trial is a Final, Immediately Appealable Order.

The district court's order vacating Sampson's death sentence and granting him a new penalty phase trial is final and immediately appealable because it is best understood as an order granting a "new trial" under §2255. The two courts of appeals that have reached the opposite conclusion, *United States v. Hammer*, 564 F.3d 628, 631-36 (3d Cir. 2009), and *United States v. Stitt*, 459 F.3d 483, 485-86 (4th Cir. 2006), with respect, erred in reaching those respective conclusions.

#### 1. Legal Principles

Section 2255 provides that if a district court determines that a petitioner is entitled to relief, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence." 28 U.S.C. §2255(b).

In *Andrews*, the Supreme Court held that an order granting resentencing in a §2255 action was interlocutory and not immediately appealable. The petitioners in

-34-

that case challenged their sentences on the ground that they had not been afforded the opportunity to allocute at their respective sentencings. *Id.* at 336. The district court ordered resentencing but the Second Circuit reversed on the merits of the allocution issue. *Id.* The Supreme Court vacated that decision, holding that the district court's order was interlocutory and not immediately appealable because it contemplated the petitioners' future resentencings but did not actually resentence them. *Id.* at 339-40.

In reaching this conclusion, the Court distinguished between an order discharging or releasing a prisoner, in which the §2255 proceeding is completed, and an order to "resentence him," which contemplates some future action. *Id.* at 339-40. "For a federal prisoner," the Court explained, "§2255 can perform the full service of habeas corpus, by effecting the immediate and unconditional discharge of the prisoner." *Id.* at 339. By contrast, the Court held, an order to resentence a prisoner does not complete the §2255 proceeding until the prisoner is resentenced: "Where, as here, what was appropriately asked and appropriately granted was the resentencing of the petitioners, it is obvious that there could be no final disposition of the §2255 proceedings until the petitioners were resentenced." *Id.* at 340. In reaching this conclusion, the Court noted that the "long-established rule against piecemeal appeals in federal cases" was applicable to the case because the §2255 proceedings had not been completed:

-35-

> Until the petitioners are resentenced, it is impossible to know whether the Government will be able to show any colorable claim of prejudicial error. The District Court may, as before, sentence the petitioners to the same 25 years' imprisonment; it may place one or both of them on probation; it may make some other disposition with respect to their sentences. But until the court acts, none of the parties to this controversy will have had a final adjudication of his claims by the trial court in these §2255 proceedings.

*Id.*

*Andrews* did not involve a capital penalty phase hearing, nor did it involve the question whether an order for a "new trial" in a §2255 proceeding is immediately appealable. The courts of appeals to have considered the latter question have unanimously held that the reasoning of *Andrews* – that a district court's order to "resentence" a prisoner in a non-capital case is not immediately appealable because it does not complete the §2255 proceeding – compels the conclusion that an order granting a "new trial" under §2255 proceeding is final and immediately appealable. *See United States v. Futch*, 518 F.3d 887, 891-92 (11th Cir. 2008); *United States v. Hadden*, 475 F.3d 652, 662-63 (4th Cir. 2007); *United States v. Gordon*, 156 F.3d 376, 378 (2d Cir. 1998) (per curiam); *United States v. Blackwell*, 127 F.3d 947, 950-51 (10th Cir. 1997); *United States v. Allen*, 613 F.2d 1248, 1250-51 (3d Cir. 1980); *United States v. Dunham Concrete Prods. Inc.*, 501 F.2d 80, 81-82 (5th Cir. 1974). These courts have reasoned that, in contrast to an order to "resentence" a prisoner, "a district court's order granting the prisoner a new trial completes the §2255 proceeding

and is therefore immediately appealable, despite the fact that such an order contemplates further action by the district court – *i.e.*, conducting the new trial itself." *Hadden*, 475 F.3d at 662-63.

The Third Circuit analyzed this question at length in *Allen*, emphasizing the fact that "[a]s opposed to being an integral part of the criminal trial, a proceeding under Section 2255 is an independent and collateral inquiry into the validity of the conviction." 613 F.2d at 1251. That was significant, the Third Circuit explained, because it directly impacted the district court's jurisdiction:

> In a typical case, the jurisdictional basis for the original trial, the grant of a new trial, and the retrial remains the same throughout. The same is not true with §2255. That section confers jurisdiction for a limited purpose and nowhere does it grant the §2255 court authority to retry the defendant. That simply is not one of the "orders on the motion" listed in paragraph 3. All the §2255 court can do is grant a motion to retry. Once it does that, jurisdiction to retry the defendant shifts to an entirely severable basis. Unlike the typical case already postulated, the jurisdictional basis for the trial, grant of a new trial, and retrial is not the same.

> \*   \*   \*

> Thus, the separate nature of §2255 proceedings means that the grant of a new trial in this context is a final order.

*Allen*, 613 F.2d at 1251 (internal quotation and citations omitted); *see also Wall v. Kholi*, 131 S. Ct. 1278, 1289 (2011) (noting that "a motion under 28 U.S.C. §2255

-37-

is entered on the docket of the original criminal case and is typically referred to the judge who originally presided over the challenged proceedings, but there is no dispute that §2255 proceedings are 'collateral.'") (internal citations omitted).  In other words, the court reasoned, "once the §2255 court grants a motion for a new trial, its jurisdiction as a §2255 court ends and there is nothing for the court to do but execute the judgment."  *Allen*, 613 F.2d at 1251 (internal quotation omitted).

### 2. An order granting a new capital penalty phase trial is final and immediately appealable.

An order granting a new capital penalty phase trial is unlike the order to "resentence" the defendants in *Andrews*, a non-capital case, but, rather, is best understood as an order granting a "new trial" under §2255, in which an immediate appeal under 28 U.S.C. §1291 and 28 U.S.C. §2253(a) would be available.[7]

---

[7] Section 1291 provides, in relevant part, that "[t]he courts of appeals * * * shall have jurisdiction of appeals from all final decisions of the district courts of the United States * * *."  28 U.S.C. §1291.  Section 2253(a) provides that "[i]n a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held."  28 U.S.C. §2253(a).

**a.    An order granting a new capital penalty phase trial is best understood as an order granting a "new trial" under §2255.**

Section 2255 provides that a district court can order a "new trial" or "resentence him" if it determines that a prisoner is entitled to relief, but does not define those terms. Whether the district court's order granting Sampson a new penalty phase trial is best understood as an order granting a "new trial" or an order to "resentence" Sampson thus must begin by considering the ordinary understanding of those terms. *See, e.g., Wall*, 131 S. Ct. at 1284 (stating that because the term "collateral review" is not defined in the AEDPA, "[w]e therefore begin by considering the ordinary understanding of the phrase 'collateral review.'") (internal citation omitted); *Williams v. Taylor*, 529 U.S. 420, 431 (2000) ("We give the words of a statute their ordinary, contemporary, common meaning, absent an indication that Congress intended them to bear some different import.") (internal quotation marks omitted).

A "trial," as commonly understood, involves the resolution of disputed questions of fact, typically by a jury. The term "trial" is defined as "the mode of determining a question of fact in a court of law," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2439 (2002) (hereafter "WEBSTER'S"), and while a trial can be either be a jury or bench trial, the Supreme Court has long recognized that "[i]n

-39-

actions at law predominantly factual issues are in most cases allocated to the jury."

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 720 (1999).[8]

The term "sentence," by contrast, in this context means "[t]he judicial determination of the punishment to be inflicted on a convicted criminal."  XIV OXFORD ENGLISH DICTIONARY 991 (2d ed. 1989).  The distinguishing feature of a "trial," as opposed to a "sentence," therefore, is that the former involves the resolution of factual disputes, typically by a jury, while the latter involves a judge's determination and pronouncement of the appropriate punishment or penalty for a crime.

An order granting a new penalty phase trial under the FDPA is best understood as an order granting a "new trial" under §2255, as that proceeding has "the hallmarks of the trial on guilt or innocence." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106 (2003) (citation and internal quotation marks omitted).  A defendant has a right to

---

[8] Indeed, as the Court long ago explained, "up to the period of our separation from England, the fundamental definition of trials by jury depended on the universal maxim, without an exception, 'Ad quaestionem facti respondent juratores, ad quaestionem juris respondent judices,'" *Sparf v. United States*, 156 U.S. 51, 58 (1895), which means "judges don't answer questions of fact; juries don't answer questions of law." *United States v. Sliker*, 751 F.2d 477, 497 (2d Cir. 1984) (Friendly, J.) (explaining that, although there are exceptions, "the maxim that fact-finding is for the jury carries considerable force").  This allocation "serves to preserve the right to a jury's resolution of the ultimate dispute," *City of Monterey*, 526 U.S. at 720 (internal quotation omitted), and is reflected in the jury trial guarantee of the Sixth Amendment, which "assigns the determination of certain facts to the jury's exclusive province." *Oregon v. Ice*, 555 U.S. 160, 167 (2009).

have the penalty phase conducted before a jury. *See* 18 U.S.C. §§3593(b)(1)-(3); *Ring v. Arizona*, 536 U.S. 584, 609 (2002). The government must prove to the jury beyond a reasonable doubt the existence of statutorily-defined aggravating factors that establish the defendant's eligibility for capital punishment. *See* 18 U.S.C. §§3591(a)(2), 3592(c)-(d), 3593(b)(c); *Sattazahn*, 537 U.S. at 106-11; *Ring*, 536 U.S. at 605. The "finder of fact" must also consider whether any mitigating factors exist, including certain statutorily-defined mitigating factors, as well as whether any non-statutory aggravating factors exist. *See* 18 U.S.C. §§3592(a), 3593(d). And once a jury makes a final, unanimous determination that a defendant should be sentenced to death or to life imprisonment without the possibility of release, the district court *must* impose that sentence. *See* 18 U.S.C. §3594; *United States v. Ostrander*, 411 F.3d 684, 687-99 (6th Cir. 2005). A court has discretion to sentence a defendant to a term of years under the FDPA only when the jury fails to reach a unanimous verdict of death or life imprisonment without the possibility of release. *See* 18 U.S.C. §3594; *Jones v. United States*, 527 U.S. 373, 380-81 (1999).

These features of a penalty phase conducted under the FDPA distinguish it from a "sentence" as that term is commonly understood. Unlike a sentencing in a non-capital case, in which a district court has considerable discretion in imposing a sentence within a statutory range, *see, e.g., Kimbrough v. United States*, 552 U.S. 85,

101 (2007), the determination whether a defendant should be sentenced to death under the FDPA is "presumptively decided by the jury." *United States v. Acosta-Martinez*, 252 F.3d 13, 17 (1st Cir. 2001) (citing 18 U.S.C. §3593(b)).  Moreover, the jury makes that determination after hearing evidence and making factual findings regarding the existence of certain statutorily-defined aggravating factors, and a district court is statutorily bound to impose a jury's unanimous "recommendation" whether a defendant should be sentenced to death.  18 U.S.C. §3594.

Hence, and as the Ninth Circuit has stated, "[l]ogically and structurally, 'sentencing' connotes the proceeding when judgment is imposed, not the proceeding during which it is determined whether the defendant is death eligible and what sentence to recommend. * * * Under this construct, the penalty phase of a capital case is plainly a 'trial stage.'"  *United States v. Mitchell*, 502 F.3d 931, 988 (9th Cir. 2007) (considering whether a federal capital defendant can waive their right to be present during the penalty phase under Fed. R. Crim. P. 43(c)(1)(B)).

Indeed, courts commonly refer to the penalty phase of capital proceedings as "trials."  The Supreme Court has stated that "[t]he penalty phase of a capital trial is undertaken to assess the gravity of a particular offense and to determine whether it warrants the ultimate punishment; *it is in many respects a continuation of the trial on guilt or innocence of capital murder*," *Monge v. California*, 524 U.S. 721, 731-32

-42-

(1998) (emphasis added), and, consistent with this formulation, the Court has referred to the penalty phase of a capital case as being a "trial" on numerous occasions.[9] This Court similarly referred to the six-week penalty phase in this case as a "trial" or a "penalty-phase trial" in affirming Sampson's death sentence in his direct appeal. *See Sampson*, 486 F.3d at 17, 19, 29, 42, 47, 49; *see also McCloskey v. Mueller,* 446 F.3d 262, 265 (1st Cir. 2006) ("Sampson eventually pleaded guilty to a federal charge of carjacking resulting in Philip McCloskey's death. Following a penalty-phase trial, the district court imposed a death sentence.") (internal citation omitted); *United States v. Green*, 407 F.3d 434, 436-37 (1st Cir. 2005) ("A capital case potentially involves two separate *trial phases*. * * * If the defendant is convicted of a capital offense, a second proceeding ensues to determine whether that offense, under the circumstances of the case, warrants the death sentence.") (emphasis added). The district court likewise described the penalty phase in this case as a "trial" in granting Sampson relief on his juror bias claim, *see Sampson*, 820 F. Supp. 2d at 156, 157, 160, and other courts of

---

[9] *See, e.g., Maples v. Thomas*, 132 S. Ct. 912, 919 (2012); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1394-95, 1406 (2011); *Rompilla v. Beard*, 545 U.S. 374, 378 (2005); *Roper v. Simmons*, 543 U.S. 551, 557 (2005); *Florida v. Nixon*, 543 U.S. 175, 178, 191 (2004); *Atkins v. Virginia*, 536 U.S. 304, 307-08 (2002); *Simmons v. South Carolina*, 512 U.S. 154, 156, 162 (1994); *Morgan v. Illinois*, 504 U.S. 719, 726 (1992); *Thompson v. Oklahoma*, 487 U.S. 815, 820 (1988); *Buchanan v. Kentucky*, 483 U.S. 402, 419 (1987); *Sumner v. Shuman*, 483 U.S. 66, 85 n.13 (1987); *California v. Brown*, 479 U.S. 538, 539 (1987); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986); *Lockhart v. McCree*, 476 U.S. 162, 182 (1986); *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981); *Bullington v. Missouri*, 451 U.S. 430, 445 (1981).

appeals, too, have consistently referred to the penalty phase under the FDPA as a "trial" or "penalty phase trial."[10]

The consistent usage of the term "trial" to describe the penalty phase of a federal capital case reflects the understanding that such a proceeding constitutes a "trial" as that term is commonly understood. *Cf. Wall*, 131 S. Ct. at 1284-85 (holding that the Court's prior usage of the term "collateral" supported the understanding that the term "collateral review" in 28 U.S.C. §2244(d)(2) means a form of review that is not part of the direct appeal process); *see also* BLACK'S LAW DICTIONARY 1169 (9th ed. 2009) (hereafter "BLACK'S") (defining "penalty phase" as "[t]he part of a criminal trial in which the fact-finder determines the punishment for a defendant who has been found guilty.").

The conclusion that the district court's order is best understood as an order granting a "new trial" under §2255 also is underscored by the fact, when §2255 was enacted in 1948, and when *Andrews* was decided in 1963, the penalty phase of a federal capital case differed fundamentally from sentencing proceedings in non-capital cases. Prior to 1986, courts exercised "wide discretion" under the system of

---

[10] *See, e.g., United States v. Ebron*, 683 F.3d 105, 147 (5th Cir. 2012); *United States v. Montgomery*, 635 F.3d 1074, 1091-92 (8th Cir. 2011), *cert. denied*, 132 S. Ct. 1731 (2012); *United States v. Lighty*, 616 F.3d 321, 342 (4th Cir. 2010), *cert. denied,* 131 S. Ct. 846 (2010), 132 S. Ct. 451 (2011); *United States v. Whitten*, 610 F.3d 168, 176 (2d Cir. 2010); *United States v. Lujan,* 603 F.3d 850, 856-60 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 1718 (2011).

"indeterminate" sentencing then in place, determining within statutory limits "whether the offender should be incarcerated and for how long, whether he should be fined and how much, and whether some lesser restraint, such as probation, should be imposed instead of imprisonment or fine." *Mistretta v. United States*, 488 U.S. 361, 363 (1989). By contrast, the determination whether a defendant should be sentenced to death in a federal capital case was made by a jury. *See, e.g., United States v. Jackson*, 390 U.S. 570, 573-78 (1968) (holding that former Federal Kidnaping Act did not give the trial judge discretion to set aside a jury recommendation of death, and that jury that determines whether defendant should be put to death is the same jury that passes on guilt or innocence under that Act). Hence, at the time of §2255's enactment in 1948, and also when *Andrews* was decided in 1963, the "resentence" provision of §2255 did not encompass a penalty phase retrial before a jury.

The conclusion that the district court's order is best understood as an order granting a "new trial" under §2255 also is not defeated by the fact that the FDPA refers to the penalty phase as a "separate sentencing hearing" convened by "the judge who presided at the trial." 18 U.S.C. §3593(b). There is no indication that in using these terms in §3593(b), Congress intended to demarcate the "trial" as only occurring during the guilt phase of a federal capital case, let alone that it intended to convey that an order granting a new penalty phase constitutes an order granting resentencing

-45-

rather than an order granting a "new trial" for purposes of §2255.  Rather, in the context of the FDPA, the term "sentencing hearing" is treated as being essentially synonymous with the term "penalty phase."  *See, e.g., Jones*, 527 U.S. at 406 (Ginsburg, J., dissenting) (stating that the FDPA "prescribes penalty-phase procedures" by providing for "a separate sentencing hearing"); *United States v. Williams*, 610 F.3d 271, 289, 290 (5th Cir. 2010) (referring to the "penalty-phase sentencing hearing"); *Mitchell*, 502 F.3d at 1008 ("[T]he process of determining a capital defendant's sentence [under the FDPA] occurs during the sentencing or penalty phase."); *United States v. Purkey,* 428 F.3d 738, 749 (8th Cir. 2005) ("Under the FDPA, once the jury finds the defendant guilty of one of the offenses listed in 18 U.S.C. §3591, the trial proceeds to a separate phase – the sentencing or penalty phase."); *United States v. Fell*, 360 F.3d 135, 140 (2d Cir. 2004) ("During this separate hearing, referred to as the sentencing or penalty phase, the jury first considers whether the government has sustained its burden of proving the existence of one or more statutorily defined aggravating factors beyond a reasonable doubt.").

> **b.**  **The district court's order is final because the §2255 proceeding has been completed.**

That the penalty phase of a capital case is a "trial" is further underscored by the fact that the §2255 court cannot "resentence" Sampson, as the lower court was able to do in *Andrews*, but must convene a jury trial under the FDPA.  Section 2255

-46-

provides, in pertinent part, that the "the court shall * * * determine the issues and make findings of fact and conclusions of law with respect thereto," and further provides that, "[i]f the court finds" that the prisoner is entitled to relief, "the court shall" enter appropriate relief, including ordering a "new trial" or "resentenc[ing]" the prisoner. 28 U.S.C. §2255(b). The statute, by its plain terms, thus contemplates that it is the *court* that serves as the finder of fact in a §2255 proceeding, that it is the *court* that makes any conclusions of law, and that it is the *court* that determines whether the petitioner is entitled to relief and what form of relief should be granted. A district court can "resentence" a prisoner in a non-capital case consistent with these statutory requirements.

Under the FDPA, by contrast, the determination of whether a defendant should be sentence to death is "presumptively decided by the jury," *Acosta-Martinez*, 252 F.3d at 17 (citing 18 U.S.C. §3593(b)), and it would be a newly-constituted jury in the case of a new penalty phase trial. *See* 18 U.S.C. §3593(b)(2)(D). The district court order granting Sampson a new penalty phase trial thus completes the §2255 proceeding because the court cannot "resentence" Sampson by empaneling a jury under the FDPA; indeed, the court would be acting *ultra vires* under §2255 were it to do so. In other words, the finality rule of *Andrews* does not bar the government's

-47-

appeal because Sampson has had a final adjudication of his claims "in these §2255 proceedings."

### c.     *Stitt* and *Hammer* were wrongly decided.

Two courts of appeals have concluded that an order granting a new penalty phase in a federal capital case is not final and immediately appealable under *Andrews*. *See Hammer*, 564 F.3d at 632-36; *Stitt*, 459 F.3d at 484-86; *see also id.* at 486-89 (Williams, J., concurring).  Those decisions, with respect, are not persuasive and were wrongly decided.

The Third Circuit concluded that *Andrews* was controlling because "[a] capital sentencing is still a sentencing: it determines what punishment an already-convicted defendant should receive," *Hammer*, 564 F.3d at 634.  And the Fourth Circuit likewise concluded that, whenever a new federal capital penalty phase trial is ordered, "*Andrews* mandates that there is no final judgment 'until the prisoners [are] resentenced." *Stitt*, 459 F.3d at 485 (quoting *Andrews*, 373 U.S. at 340).  But *Andrews* was not a capital case, and the Supreme Court therefore had no occasion to consider whether the penalty phase of a capital case is best understood as an order granting a "new trial" or an order to "resentence" the prisoner under §2255.  This consequently is not a case in which *Andrews* has "direct application," as the Fourth Circuit

-48-

erroneously believed.[11]  *See, e.g., United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1201-02 (D.C. Cir. 2005) (where there is "no Supreme Court case having direct application, it is our duty to construe the statute.").

The courts of appeals in *Hammer* and *Stitt* also failed to appreciate the import of the Court's reasoning in *Andrews*.  The Court's conclusion that the orders granting resentencing were interlocutory was not based simply on the fact that the prisoners in those cases had yet to be resentenced, it was based on the fact that the resentencings had not yet occurred "in these §2255 proceedings."  373 U.S. at 340.  This distinction is critical because, as shown above, a district court cannot "resentence" a capital defendant under the FDPA, but rather must convene a new jury which hears evidence and determines, if a unanimous conclusion is reached, whether a death sentence is warranted.

The Third Circuit thus missed the mark in reasoning that although §2255 "does not specifically contemplate the process of capital resentencing," that did not change matters because "[t]he statute does not have to address specifically every feature of sentencing procedure in order to apply in the capital context" and that, "had Congress

---

[11] The Supreme Court has stated that where one of its decisions has "direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [courts] should follow the line of cases which directly controls, leaving to the Court the prerogative of overturning its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (internal quotation omitted).

-49-

wanted a different rule to apply in capital cases, it could have said so." 564 F.3d at 634-35. This reasoning fails to recognize that Congress did expressly provide in enacting §2255 that "the court" shall determine the issues and make findings of fact and conclusions of law, that if "the court" finds that the prisoner is entitled to relief, "the court" shall vacate and set the judgment aside and determine the appropriate relief. A court cannot act consistent with these statutory requirements by empaneling a new jury under the FDPA. Here, the district court determined that the appropriate relief is a new penalty phase trial under the FDPA, and that order is best understood as an order granting a "new trial" under §2255.

*    *    *

In sum, the penalty phase of a capital case conducted under the FDPA constitutes a "trial" rather than a "sentencing" as those terms are commonly understood, and the district court's order granting Sampson a new penalty phase trial therefore is best understood as an order granting a "new trial" under §2255, appealable as a final order under 28 U.S.C. §1291 and 28 U.S.C. §2253(a).

**B.    If the District Court's Order is Deemed Interlocutory and Not Immediately Appealable, this Court Has Jurisdiction Under 28 U.S.C. §1292(b).**

If this Court concludes that the district court's order is not final and immediately appealable, this Court should accept the government's petition for permission to take an interlocutory appeal under 28 U.S.C. §1292(b). That statute provides, in pertinent part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

28 U.S.C. §1292(b). The district court in this case certified the following questions for interlocutory appeal: (1) whether *McDonough* requires proof of actual bias or implied bias to obtain relief; and, if not, (2) whether the court correctly stated the *McDonough* test in its *Memorandum and Order on Jury Claim*. [G.Add.102].

This Court should exercise its discretion, assuming it concludes that the government cannot take an appeal under 28 U.S.C. §1291 and 28 U.S.C. §2253(a), to accept that certification. That determination turns on two questions: (1) is a collateral

attack on a prisoner's conviction or sentence under §2255 a "civil action" within the meaning of §1292(b); and (2) if so, are the requirements of the statute satisfied. The answer to both questions is "yes."

### 1. A §2255 proceeding is a "civil action" for purposes of §1292(b).

The Supreme Court has recently noted that "there has been some confusion over whether §2255 proceedings are civil or criminal in nature." *Wall*, 131 S. Ct. at 1289 n.7. This Court, however, has stated that §2255 proceedings are generally treated as civil actions. *Trenkler v. United States*, 536 F.3d 85, 94 (1st Cir. 2008). And even if *Trenkler* is not dispositive of the issue, a §2255 proceeding is civil in nature for purposes of appeal, and therefore constitutes a "civil action" within the meaning of §1292(b).

### a. Under *Trenkler*, a §2255 proceeding is a "civil action."

This Court's decision in *Trenkler* supports the conclusion that a §2255 action constitutes a "civil action" for purposes of §1292(b). The threshold question in that case was whether jurisdiction existed to consider the government's appeal from the grant of a writ of error coram nobis. 536 F.3d at 94-95. In answering that question in the affirmative, this Court rejected the petitioner's claim that coram nobis was criminal in nature, and therefore subject to the traditional limitation on government

-52-

appeals, based on a "snippet" from a footnote in *United States v. Morgan*, 346 U.S. 502, 505 n.4 (1954), which characterized coram nobis as a "step in the criminal case and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a separate civil proceeding." This Court held that this footnote from *Morgan* "cannot bear the heavy weight that the petitioner piles upon it," pointing, in part, to the fact that the very next line of the footnote stated that coram nobis is of the same general character as proceedings under §2255 and that "[s]ection 2255 proceedings, like classic petitions for habeas corpus, are generally treated as civil in nature." 536 F.3d at 94 (citing *Heflin v. United States*, 358 U.S. 415, 418 n.7 (1959), and *Rogers v. United States*, 180 F.3d 349, 352 n.3 (1st Cir. 1999)).[12] This Court's decision in *Trenkler* is consistent with *Andrews*, in which the Supreme Court stated that an action under §2255 is "a separate proceeding, independent of the original criminal case." 373 U.S. at 338.

This Court, to be sure, has stated on other occasions that "[a]lthough a section 2255 motion may possess several characteristics of a separate civil proceeding, procedurally it is 'a further step in the movant's criminal case.'" *United States v.*

---

[12] This Court also stated that it would follow Judge Friendly's lead in declining to read the footnote in *Morgan* as extending beyond the narrow question that the Court was endeavoring to answer in that case – whether coram nobis could be deployed to correct errors in criminal cases notwithstanding the promulgation of Fed. R. Civ. P. 60(b), which abolished coram nobis in "suits of a civil nature." *Id.* (citing *United States v. Keogh*, 391 F.2d 138, 140 (2d Cir. 1968) (Friendly, J.).

*Gordon*, 634 F.2d 638, 639 (1st Cir. 1980) (quoting Advisory Committee Note to Rule 1 of the Rules Governing Section 2255 Proceedings); *see also United States v. Quin*, 836 F.2d 654, 655 n.2 (1st Cir. 1988); *Nogueira v. United States*, 683 F.2d 576, 580 (1st Cir. 1982). But those statements were not integral to the Court's decisions in those cases and therefore were mere dicta, while this Court's statement in *Trenkler* that §2255 proceedings "are generally treated as civil in nature" was part of the Court's rationale for its holding. This Court's decision in *Trenkler*, therefore, supports the conclusion that a §2255 proceeding is a "civil action" for purposes of §1292(b).

### b. A §2255 proceeding is a "civil action" for appellate purposes.

In any event, even if this Court were to conclude that this question is not entirely free from doubt notwithstanding *Trenkler*, §2255 proceedings should be considered civil for appellate purposes. A §2255 proceeding may be best described as a "hybrid" remedy with characteristics of both civil and criminal actions, and a §2255 proceeding thus "may properly be categorized as one or the other depending on the context and the reason for making the inquiry." *United States v. Means*, 133 F.3d 444, 448 (6th Cir. 1998); *see also Hadden*, 475 F.3d at 664 (describing §2255 as a "hybrid" remedy). Multiple aspects of a §2255 proceeding support the conclusion that it should be treated as a civil action for purposes of appeal.

-54-

To begin with, §2255 expressly provides that "[a]n appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus," 28 U.S.C. §2255(d), and that language should control the characterization of a §2255 proceeding when an appeal is taken.  Habeas corpus proceedings indisputably "are characterized as civil in nature," *Mayle v. Felix*, 545 U.S. 644, 654 n.4 (2005), and the Supreme Court therefore has held that "[a]ppeals from orders denying motions under Section 2255 are governed by the civil rules applicable to appeals from final judgment in habeas corpus actions."  *United States v. Hayman*, 342 U.S. 205, 209 n.4 (1952) (citing *Mercado v. United States*, 183 F.2d 486 (1st Cir. 1950)).  Rule 11(b) of the Rules Governing Section 2255 Proceedings also provides that Rule 4(a) of the Federal Rules of Appellate Procedure – which sets forth the time for appeal in civil cases – also "governs the time to appeal an order entered under these rules."  *See, e.g., Lopez-Nieves v. United States*, 917 F.2d 645, 647 (1st Cir. 1990).  For these reasons, this Court should join those courts of appeals which have concluded that "appeals in §2255 proceedings are treated as civil in nature."  *Butcher v. United States*, 368 F.3d 1290, 1293 n.1 (11th Cir. 2004); *see also Lawuary v. United States*, 669 F.3d 864, 866 (7th Cir. 2012) (noting that "§2255 proceedings are treated as civil matters for some purposes, such as the time for appeal"); *United States v. Fiorelli*, 337 F.3d 282, 286 (3d Cir. 2003) ("Thus, while a

-55-

§2255 motion is deemed a further step in the movant's criminal case, it is also considered a civil remedy for purposes of appellate jurisdiction.").

This Court's reasoning in *Trenkler* also supports this conclusion. In answering the question whether coram nobis should be treated as civil or criminal for purposes of appeal, this Court explained coram nobis proceedings are "best seen as hybrids – quasi-civil and quasi-criminal," and that, "[o]n this view, the denomination of the nature of a given petition calls for a functional analysis rather than for doctrinal rigidity." 536 F.3d at 94. In then applying that functional analysis, this Court saw "no reason to apply the more restrictive rules governing criminal appeals to the government's appeal in a coram nobis proceeding (even though that proceeding is ancillary to a criminal case)," pointing to the fact that the double jeopardy concerns that underlie the traditional restrictions on the government's right to appeal "are far less weighty when dealing with collateral challenges to criminal convictions." *Id.* at 94-95. This Court therefore concluded that "coram nobis proceedings are appealable as civil matters." *Id.* That reasoning applies with equal force to §2255, as, like coram nobis, a §2255 action is a collateral proceeding, *see Wall*, 131 S. Ct. at 1289.

Nor do any of the arguments which Sampson advanced in opposition to the government's motion for permission to take an interlocutory appeal have merit. In opposing the government's petition, Sampson argued that §2255 is criminal in nature,

-56-

relying principally on the advisory committee note to the Rules Governing Section 2255 Proceedings, which states that "a motion under §2255 is a further step in the movant's criminal case and not a separate civil action."  Advisory Committee Note to Rule 1 of the Rules Governing Section 2255 Proceedings.  But this characterization of a §2255 action has been subject to much criticism; a leading commentator has noted, for example, that the advisory committee note "is based on a single paragraph from the legislative history of the 1948 statute and without any reference to the cases that have reached a contrary conclusion." 3 C. Wright & S. Welling, *Federal Practice and Procedure* §622 (4th ed. 2011) (cited in *Wall*, 131 S. Ct. at 1289 n.7).  Indeed, the advisory note does not take into account *Andrews*, in which the Supreme Court stated that an action under §2255 is "a separate proceeding, independent of the original criminal case," 373 U.S. at 338, nor *Heflin*, in which four Justices stated that a §2255 action is "an independent civil suit," 358 U.S. at 418 n.7.[13]

Moreover, the Rules Governing Section 2255 Proceedings do not themselves characterize a §2255 proceeding as being exclusively criminal in nature, and that is significant because while the notes "are entitled to weight in interpreting federal rules

---

[13] A majority of the Court concluded that the case had not properly been brought as a §2255 motion at all and therefore did not reach the question. *See id.; see also id*. at 422 (Stewart, J., joined by four other Justices, concurring).  The statement in the footnote reflected only the view of "those of us who deem that §2255 is available," *i.e.*, only four Justices.  *Id.* at 418 n.7.

of practice and procedure," *Scott-Harris v. City of Fall River*, 134 F.3d 427, 433 (1st Cir. 1997), it nonetheless is axiomatic that "the Advisory Committee note is not the law; the rule is." *United States v. Carey*, 120 F.3d 509, 512 (4th Cir. 1997); *see also Tome v. United States*, 513 U.S. 150, 168 (1995) (Scalia, J., concurring in part and concurring in the judgment) ("The Notes are, to be sure, submitted to us and to the Members of Congress as the thoughts of the body initiating the recommendations, but there is no certainty that either we or they read those thoughts, nor is there any procedure by which we formally endorse them or disclaim them. That being so, the Notes cannot, by some power inherent in the draftsmen, change the meaning that the Rules would otherwise bear.") (internal citation omitted). The advisory committee note, consequently, should not be construed as establishing that §2255 proceedings are exclusively criminal in nature. Rather, for the reasons set forth above, a §2255 proceeding is best understood as being civil in nature for purposes of appeal.

### c.    There is precedent for the grant of an interlocutory appeal in a §2255 action.

Two additional points bear mention. First, other courts of appeals have accepted interlocutory appeals under §1292(b) in §2255 actions without any suggestion that such relief is inappropriate. *See United States v. Pelullo*, 399 F.3d 197, 202 (3d Cir. 2005); *United States v. Barron*, 127 F.3d 890, 892 (9th Cir. 1997), *rev'd on other grounds on rehearing en banc*, 172 F.3d 1153 (9th Cir. 1999) (en

banc). Those cases did not involve, to be sure, the precise situation presented here – whether an interlocutory appeal under §2255 is appropriate where a district court has granted a petitioner a new penalty phase trial in a capital case. But there is nothing in the text of §1292(b) that suggests that a district court decision ordering a new capital penalty phase trial in a capital case is somehow immune from certification under §1292(b) where the statutory conditions are satisfied.

Second, in opposing the government's petition for permission to take an interlocutory appeal, Sampson argued that the government's request is an impermissible effort to "circumvent" the Supreme Court's decision in *Andrews* and the policy against piecemeal appeals. That contention lacks merit. The very purpose of §1292(b) is to *allow* interlocutory appeals of non-final orders so long as the statutory conditions are satisfied, and the Supreme Court has made clear that an interlocutory appeal under §1292(b) is an available remedy even where the Court itself has held that a particular order is non-final and therefore not immediately appealable under §1291. *See, e.g., Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 607 (2009); *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 378 (1981); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 n.27 (1978). Moreover, certification of an interlocutory appeal under §1292(b) is an *exception* to the general rule against piecemeal appeals. *See, e.g., Behrens v. Pelletier*, 516 U.S. 299, 323

-59-

(1996) ("This Court has frequently observed that the availability of §1292(b) review counsels against expanding other judicial exceptions to the rule against piecemeal appeals."); *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996) ("Section 1292(b)'s legislative history reveals that although that law was designed as a means to make an interlocutory appeal available, it is a rare exception to the final judgment rule that generally prohibits piecemeal appeals."). Certification of an interlocutory appeal in these circumstances thus is an available, appropriate remedy, so long as the statutory conditions are satisfied. They are, as the government now shows.

### 2.    The certification requirements are satisfied.

The certification requirements of §1292(b) are easily satisfied in this case, as the district court correctly determined.

### a.    "Controlling Question of Law."

The district court's decision that the *McDonough* test can be satisfied by a showing of "inferable bias," even where actual bias or implied bias are not proven, presents a "controlling question of law." The term "controlling" under the statute "means serious to the conduct of the litigation, either practically or legally * * *. And on the practical level, saving of time of the district court and of expense to the litigants was deemed by the sponsors to be a highly relevant factor." *Bank of New York v.*

*Hoyt*, 108 F.R.D. 184, 189 (D.R.I. 1985) (Selya, J.) (internal quotation omitted); *see also Arizona v. Ideal Basic Indus. (In re Cement Antitrust Litigation)*, 673 F.2d 1020, 1026 (9th Cir. 1982) ("[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of the litigation in the district court.").

That standard is easily satisfied here. If the government's appeal were to prove meritorious, the necessary consequence of that ruling would be that Sampson's death sentence would be reinstated, and a second penalty phase trial would not need to be conducted. That unquestionably would materially affect the course of the litigation and result in an enormous saving of time and resources by the district court and the parties, and would spare needless additional suffering for the families of the victims. Indeed, the penalty phase trial that resulted in Sampson's death sentence lasted for six weeks, and a second penalty phase trial could be expected to last equally as long and would be, as the district court characterized it, "another long, expensive, and exhausting sentencing hearing." [G.Add.97-98]. The proposed interlocutory appeal, therefore, presents a controlling question of law under §1292(b).

### b.    "Substantial Grounds for Difference of Opinion."

The question whether the *McDonough* test can be satisfied upon a showing of "inferable bias," even where actual or implied bias are not proven, also satisfies the

"substantial grounds" requirement. As shown below, the district court erred in concluding that the *McDonough* test can be satisfied by a showing of "inferable bias" and does not require a showing of actual or implied bias. That conclusion is inconsistent with *McDonough* itself, decisions by this Court and other courts of appeals, and fails to recognize the difference between the breadth of a district court's discretion during the voir dire process and the showing that must be made to sustain a juror bias claim on appeal or on collateral review. At an irreducible minimum, however, this case presents a question of first impression to the extent that neither the Supreme Court nor this Court has expressly considered the question whether the *McDonough* test can be satisfied by a showing of "inferable bias." This case therefore satisfies the "substantial ground" standard because it "presents one or more difficult and pivotal questions of law not settled by controlling authority." *McGillicuddy v. Clements*, 746 F.2d 76, 76 n.1 (1st Cir. 1984) (citing *In re Heddendorf*, 263 F.2d 887, 888-89 (1st Cir. 1959)); *see also Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010) ("Courts traditionally will find that a substantial ground for difference of opinion exists where * * * novel and difficult questions of first impression are presented.") (internal quotation omitted).

The district court recognized this principle in granting the government's motion to certify an interlocutory appeal, stating that although it continued to believe that it

had correctly interpreted *McDonough*, the "substantial grounds" factor was nonetheless satisfied:

> In essence, the court believes that in reaching its conclusions, the court harmonized the three opinions in *McDonough*, well-reasoned decisions from several Courts of Appeals, and language in several First Circuit cases whose analysis was less extensive. However, in recognition of the lack of binding First Circuit authority concerning the meaning of *McDonough* and the confusion that is manifest in some decisions in other circuits, the court finds that there is a "substantial ground for difference of opinion" regarding its conclusion that *McDonough* is satisfied without proof of actual or implied bias if the trial judge would have had the discretion to excuse for cause a juror who answered a material question dishonestly, and would in fact have excused her.

[G.Add.96-97]. This Court should reach the same conclusion.

### c.    "Materially advance the ultimate termination of the litigation."

Finally, resolution of the question whether the *McDonough* test can be satisfied by a showing of "inferable bias," even where actual or implied bias are not proven, would materially advance the ultimate termination of the litigation. If this Court were to accept certification and agree that the district court erred in its application of the *McDonough* test, Sampson's death sentence would be reinstated. Conversely, and as the district court also noted, if the court's decision granting a new penalty phase trial is affirmed, the remaining claims raised by Sampson in his §2255 motion concerning

the conduct of the penalty phase trial would be moot. [G.Add.97]. An interlocutory appeal therefore would materially advance the ultimate termination of the litigation.

It is true, of course, that Sampson has raised claims in his §2255 motion that have yet to be resolved by the district court. But the statute only requires that an interlocutory appeal "materially advance the ultimate termination of the litigation," not that it necessarily terminate the litigation altogether. The potential avoidance of a new penalty phase trial would not only save an enormous amount of time and resources for the district court, the parties, and the public that would otherwise have to be expended, but it would also spare the families of the victims the considerable toll that would result from having to go through a potentially unnecessary penalty phase trial. None of the remaining claims that would have to be litigated regarding the conduct of the penalty phase trial, even if an evidentiary hearing were required, would come close to approaching the amount of time and resources that would go into conducting a new penalty phase trial. An interlocutory appeal therefore would materially advance the ultimate termination of the litigation.

### C.    If §2255 is deemed to be criminal in nature, this Court alternatively has jurisdiction under 18 U.S.C. §3731.

As set forth above, the government believes that a §2255 proceeding is a "civil action" for purposes of appeal.  However, as the district court noted in granting the government's motion to certify an interlocutory appeal, if Sampson is correct that §2255 proceedings are exclusively criminal rather than civil in nature, that necessarily raises the question whether the government could take an interlocutory appeal under 18 U.S.C. §3731.  [G.Add.89-90 & n.3].  That statute provides, in relevant part:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, or any part thereof, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.
>
> *    *    *
>
> The provisions of this section shall be liberally construed to effectuate its purposes.

18 U.S.C. §3731.

As the district court noted in granting the government's motion to certify an interlocutory appeal, the Supreme Court in *Andrews* stated that "[a]n action under 28 U.S.C. §2255 is a separate proceeding, independent of the original criminal case," and the Criminal Appeals Act therefore "has no applicability to such a proceeding."  373

U.S. at 338. But under Sampson's theory, the district court noted, this reasoning may have been "eroded" by the advisory committee note to the amended §2255 Rules. [G.Add.90 n.3]. In addition, the district court noted, "*Andrews* relied on a 'long-established rule against piecemeal appeals,' but §3731 was amended after *Andrews* to increase the government's opportunity to obtain review of certain non-final orders, and the statute expressly states that its provisions 'shall be liberally construed to effectuate its purposes.'" [G.Add.90 n.3 (quoting, respectively, *Andrews,* 373 U.S. at 340, and 18 U.S.C. §3731)].

If this Court concludes, notwithstanding the government's arguments to the contrary, that a §2255 proceeding is criminal rather than civil in nature, it follows that an interlocutory appeal under §3731 should be available. The penalty phase under the FDPA is best understood as a "trial" for the reasons set forth above, and that conclusion applies with even more force to §3731, which by its terms states that its provisions "shall be liberally construed to effectuate its purposes." The Sixth Circuit therefore has held that an order granting a new penalty phase under the FDPA pursuant to Fed. R. Crim. P. 33 is immediately appealable under §3731 as an interlocutory order granting a "new trial":

> If the district court's order were deemed unreviewable until after a final judgment of sentence were issued on Count Eight, a death-qualified jury would have to be empaneled to determine again whether a sentence of death is justified.

-66-

> This determination would be made, based on consideration
> of any aggravating factors established beyond a reasonable
> doubt and any mitigating factors established by a
> preponderance of the information, in a proceeding having
> the hallmarks of a trial on guilt or innocence. Considering
> the nature of federal capital sentencing proceedings, the
> notion urged by defendant Lawrence that the new
> sentencing hearing ordered by the district court is not a new
> trial on any part of Count Eight rings hollow.

*United States v. Lawrence*, 555 F.3d 254, 260 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 1879 (2010).  If Sampson is correct that §2255 is exclusively criminal in nature, or is simply a further step in his criminal case, this Court should reach the very same conclusion.

At the end of the day, Sampson cannot have it both ways.  If §2255 is best understood as a "civil action," whether as a general matter or for purposes of appeal, then an interlocutory appeal under §1292(b) is available, assuming, that is, that the court's order is not a final, immediately appealable order under §1291.  If, however, a §2255 proceeding is best understood as being criminal in nature, or a further step in his criminal case, then an interlocutory appeal under §3731 should be available.

#### D.    This Court Can Exercise its Advisory Mandamus Authority.

Finally, if this Court determines that the court's grant of a new penalty phase trial is not appealable, it can, and should, exercise its advisory mandamus authority.

"[A]dvisory mandamus is available in rare cases; the usual requisites are that the issue be an unsettled one of substantial public importance, that it be likely to recur, and that deferral of review would potentially impair the opportunity for effective review or relief later on." *United States v. Pleau*, 680 F.3d 1, 4 (1st Cir. 2012) (en banc), *petitions for certiorari filed* (Aug. 21, 2012) (Nos. 12-223, 12A107), (Nos. 12-230, 12A108).    "The aim of advisory mandamus * * * is to settle substantial questions of law in circumstances that would assist other jurists, parties, [and] lawyers." *Green*, 407 F.3d at 439 (internal quotation omitted).    Thus, under the rubric of advisory mandamus, this Court "may entertain a petition that presents a systemically important issue as to which this court has not yet spoken." *In re Sony BMG Music Entertainment*, 564 F.3d 1, 4 (1st Cir. 2009) (internal quotation omitted).

In *Green*, for example, this Court exercised its advisory mandamus authority to review a district court's pretrial order in a capital case calling for the empanelment of two separate juries:  one jury to determine guilt, and a second, totally different jury in composition, to determine whether to impose the death penalty.  *Id*. at 439-40. Application of the advisory mandamus was appropriate, this Court explained, because

"[t]he district court's interpretation of section 3593(b) is unprecedented, and it hardly needs explaining why proper death penalty procedure is of great importance to the administration of justice." *Id*. at 439.  This Court also noted that the question was likely to evade review but would almost certainly recur, and that the case therefore was "an appropriate candidate for the exercise of our advisory mandamus authority."

This case, like *Green*, presents a hornbook example of a case in which advisory mandamus is appropriate.  First, as set forth in greater detail below, the district court's conclusion that the *McDonough* test can be satisfied upon a showing of "inferable bias," even where actual or implied bias are not proven, is inconsistent with *McDonough*, decisions by this Court and other courts of appeals, and fails to recognize the fundamental difference between the breadth of a court's discretion during the voir dire process and the standard that must be applied when a defendant seeks to set aside a conviction based on juror bias, whether raised on appeal, in a Rule 33 motion for a new trial, or on collateral review.  But even if this Court were to find this question to be an open one, the district court's ruling is unprecedented, as no other court of which the government is aware has sustained a claim of juror bias based solely upon a showing of "inferable bias," and in the absence of a showing of either actual or implied bias.  The government notes that after the district court's decision in this case, a district court in the Second Circuit sustained a juror bias claim, in part,

on a finding of "inferable bias" on the part of the juror, but that court also found that both actual bias and implied bias had been shown. *See United States v. Daugerdas*, — F. Supp. 2d —, 2012 WL 2149238, at **22-28 (S.D.N.Y. June 4, 2012).

Second, it is not unreasonable to believe that the question will likely recur. Juror bias claims are frequently raised, and the district court's decision has the potential of greatly expanding the universe of juror bias claims, particularly in this circuit; so long as juror dishonesty is shown, a party no longer will have to show "demonstrated bias" or actual partiality on the part of the juror, but only a "risk of partiality," a far less demanding showing.

Third, if the Court finds there is no mechanism for appeal until after a new penalty phase trial is conducted, there is a risk that that order will evade review unless the Court exercises mandamus authority. If Sampson were to be sentenced to death following a new penalty phase trial and that sentence were upheld on appeal, the government's appeal of the instant order would be moot. If, on the other hand, Sampson were to be sentenced to life imprisonment after a new penalty phase trial, Sampson will no doubt argue that the Double Jeopardy Clause bars any future proceeding that would result in the imposition of the death penalty. Judge Williams dismissed this concern in her concurring opinion in *Stitt*, asserting that no double jeopardy claim would likely succeed because consideration of the first appeal would

-70-

not result in future factual findings against the government, and instead would merely result in the court of appeals ordering the original death sentence to be reinstated. 459 F.3d at 489 n.3 (Williams, J., concurring). It is doubtful, however, that Sampson would concede the point, and the uncertainty regarding this question at least raises the specter that this issue could evade meaningful review.

Fourth, a new penalty phase trial would be lengthy and costly for the parties; as noted above, the original penalty phase trial lasted for six weeks after 17 days of voir dire, and it can be expected that a new penalty phase trial would last equally as long. The families of the victims also have withstood the proceedings in this case for more than ten years, and a new penalty phase trial will only compound the pain and suffering that they have already endured. Immediate resolution of the purely legal question whether the district court properly interpreted the *McDonough* test thus has the potential to avoid what the district court properly characterized as "another long, expensive, and exhausting sentencing hearing." [G.Add.97-98].

For all these reasons, if this Court determines that the district court's order granting a new penalty phase trial is not appealable, this is an appropriate case for the exercise of this Court's advisory mandamus authority.

**II.   THE DISTRICT COURT ERRED IN CONCLUDING THAT SAMPSON'S SIXTH AMENDMENT RIGHT TO AN IMPARTIAL JURY WAS VIOLATED AND IN GRANTING SAMPSON'S AMENDED §2255 MOTION BASED ON A JUROR'S SO-CALLED "INFERABLE BIAS."**

The district court concluded that Sampson's Sixth Amendment right to an impartial jury was violated because Juror C knowingly gave false answers to questions during the voir dire process and, if fully informed before empanelment, the court would have had the discretion to excuse Juror C for cause. The court expressly found that actual and implied bias were not proven, but nonetheless reasoned that the *McDonough* test can be satisfied merely upon a showing of "inferable bias," or a "risk of partiality" on the part of the juror. Because the district court erred in so concluding, the court's order granting Sampson a new penalty phase trial should be reversed and his death sentence reinstated.

### A.   Preliminary §2255 Issues and Standard of Review

"[P]ost-conviction relief on collateral review is an extraordinary remedy," *Singleton v. United States*, 26 F3d 233, 236 (1st Cir. 1994), and is limited to those rare occasions where a petitioner can establish a "fundamental defect which inherently results in a complete miscarriage of justice," "an omission inconsistent with the rudimentary demands of fair procedure," or, as Sampson claims here, a constitutional error. *Hill v. United States*, 368 U.S. 424, 428 (1962); *United States v. Addonizio*, 442

U.S. 178, 185 (1975).[14] The petitioner bears the burden of establishing his entitlement to relief. *David v. United States*, 134 F.3d 470, 474 (1988). Moreover, "errors warranting a reversal on direct appeal will not necessarily support a collateral attack." *Knight v. United States*, 37 F.3d 769, 773 (1st Cir. 1994); *see also United States v. George*, 676 F.3d 249, 258 (1st Cir. 2012) ("[T]he further a case progresses through the remedial steps available to a criminal defendant, the stiffer the requirements for vacating a final judgment. Thus, direct review is more defendant-friendly than post-judgment review * * *.").

The district court addressed Sampson's *McDonough* claim as if Sampson, like the defendants in *Torres*, had raised it in a Rule 33 motion for new trial. Sampson's *McDonough* claim, however, was brought pursuant to §2255 and certain rules, borne out of important prudential considerations, apply in this context. One set of rules precludes the application of most new procedural rules to the collateral context. That is, a prisoner's §2255 rights are limited by the nonretroactivity principle set out in *Teague v. Lane*, 489 U.S. 288, 310 (1989). "Pursuant to that principle, a prisoner is generally not entitled to collateral relief if granting that relief would require the court to apply a 'new rule' of constitutional procedure. * * * A rule of constitutional procedure is considered 'new' if it 'was not *dictated* by precedent existing at the time

---

[14] Relief is also available when the district court was without jurisdiction or the sentence exceeded the statutory maximum – both inapplicable here.

the defendant's conviction became final.'" *Ferrara v. United States*, 456 F.3d 278, 288 (1st Cir. 2006) (emphasis in original) (quoting *Teague*, 489 US at 301). In this case, and as shown in greater detail below, the district court's application of an out-of-circuit decision regarding the breath of a court's discretion to excuse a venireperson to a prisoner's claim that the jury should have been excused was not dictated by existing precedent, and *Teague*'s non-retroactivity principle should apply.[15]

---

[15] Another limitation on collateral relief has to do with a litigant's failure to raise a claim in his criminal case. Sampson did not raise a juror bias claim during his penalty phase trial or on direct appeal, nor did he raise it in a timely Rule 33 motion. The claim is technically defaulted, which should require the application of the "cause and prejudice" doctrine. *See, e.g., United States v. Frady*, 456 U.S. 152, 167 (1982). While Sampson presumably would argue that he had no obligation to search for information about jurors (although that is precisely what he did, years after the judgment became final), *cf. Williams v. Taylor*, 529 U.S. at 443 (cause shown where juror and prosecutor failed to disclose information), the cause and prejudice doctrine requires proof of both cause and "actual prejudice." *Bucci v. United States*, 662 F.3d 18, 29 (1st Cir. 2011), *petition for certiorari filed* (May 31, 2012) (No. 11A946, 12-5015). To establish "actual prejudice," a prisoner must show "not merely that the errors at * * * trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. It is a standard more demanding than that for plain error. *Ramirez-Burgos v. United States*, 313 F.3d 23, 32 n.12 (1st Cir. 2002). The government raised the cause and prejudice doctrine generally in moving to dismiss Sampson's amended §2255 motion, [D.1057], but did not pursue it after the motion to summarily dismiss the juror claim was denied. Though this Court may overlook the government's failure to raise procedural default in the district court, *see Oakes v. United States*, 400 F.3d 92, 96 (1st Cir. 2005), the government does not raise the doctrine here, given that it is in part a fact-based claim and there are no cases analyzing "actual prejudice" in this context. Because any opinion in this case may signal the availability of *McDonough* claims in the collateral context, we hope the Court's opinion does not suggest through its silence that the cause and prejudice doctrine does not apply.

Although it argued that application of "inferable bias" was inconsistent with governing authority and would be unprecedented, [JSA 1096-1101], the government did not challenge the application of that standard based on *Teague*. This Court is free to overlook the forfeiture, however, in the interests of justice. *See Curtis v. Duval*, 124 F.3d 1, 5 (1st Cir. 1997); *cf. Oakes*, 400 F.3d at 96 (given the importance of judicial economy and finality, courts may overlook the government's failure to raise procedural default, even though it is an affirmative defense).

Putting aside *Teague*, the Court's review is plenary. This Court reviews a district court's legal determinations in ruling on a §2255 motion de novo and its findings of fact for clear error. *See, e.g., Moreno-Espada v. United States,* 666 F.3d 60, 64 (1st Cir. 2012); *Parsley v. United States*, 604 F.3d 667, 671 (1st Cir. 2010). Because the government here is only challenging the district court's legal conclusions in this appeal, this Court's review is plenary.

**B.     The *McDonough* Test Requires a Showing of "Demonstrated Bias," and Cannot Be Satisfied by a <u>Showing of "Inferable Bias."</u>**

The Sixth Amendment guarantees that in all criminal prosecutions, "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. The protections of the Due Process Clause of the Fifth Amendment also have "long

demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. at 727. The voir dire process serves to protect that right because it "provides a means of discovering actual or implied bias and a firmer basis upon which the parties may exercise their peremptory challenges intelligently." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143-44 (1994).

In this case, the district court found that Sampson did *not* carry his burden of proving either actual or implied bias, but nonetheless determined that he was entitled to a new penalty phase trial because, in its view, the *McDonough* test can be satisfied upon a showing of "inferable bias." That unprecedented conclusion finds no support in existing authority. The district court's order granting Sampson a new penalty phase trial therefore should be reversed and his death sentence reinstated.

### 1. Legal Principles

#### a. Actual and Implied Bias

"Traditionally courts have distinguished between two types of challenges for cause: those based on actual bias and those based on implied bias." *United States v. Mitchell*, 690 F.3d 137, 142 (3d Cir. 2012); *see also United States v. Wood*, 299 U.S. 123, 133 (1936) ("The bias of a prospective juror may be actual or implied; that is, it

-76-

may be bias in fact or bias conclusively presumed as matter of law."). Actual bias is "bias in fact," *Wood*, 299 F.3d at 133, and "is typically found when a prospective juror states that he can not be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view." *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) (en banc); *see also United States v. Chandler*, 996 F.2d 1073, 1102 (11th Cir. 1993) (actual bias can be demonstrated "either by an express admission of bias or facts demonstrating such a close connection to the present case that bias must be presumed."). The determination of whether a juror is actually biased is a question of fact, *see, e.g., United States v. Allen*, 605 F.3d 461, 466 (7th Cir. 2010), *cert. denied,* 131 S. Ct. 1475 (2011); *Fields*, 503 F.3d at 767, and it frequently (and the Supreme Court has said, appropriately) turns upon the testimony of the juror in question. *See Smith v. Phillips*, 455 U.S. 207, 217 n.7 (1982).

Implied bias, by contrast, is "bias conclusively presumed as matter of law," *Wood*, 299 U.S. at 133, and is limited to "exceptional" or "extreme" circumstances, *Amirault v. Fair*, 986 F.2d 1404, 1406 (1st Cir. 1992) (per curiam). As Justice O'Connor has noted, some examples of the "extreme situations that would justify a finding of implied bias" include "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in

-77-

the trial, or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Smith*, 455 U.S. at 222 (O'Connor, J., concurring).

### b. *McDonough*

In *McDonough*, a products liability action, jurors were asked on voir dire whether they or any family members had ever suffered a severe injury. 464 U.S. at 550. One member of the panel, who ultimately became the jury foreperson, did not respond, even though his son had once suffered a broken leg from the explosion of a truck tire. *Id.* at 550-51. The jury found for the defendant company following a three-week trial. *Id.* at 551. After information about the juror was discovered, the plaintiff sought but was denied a new trial. *Id.* The Tenth Circuit reversed and ordered a new trial, finding that the withholding of the information prejudiced the plaintiff's right to exercise peremptory challenges. *Id.* at 551-52. The Supreme Court reversed, holding that the juror's good-faith response to the question (he did not consider his son's broken leg to be the type of injury asked about) was insufficient to warrant a new trial. *Id.* at 553-56.

In reaching this conclusion, the Court noted that "[o]ne touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it,'" and that "[v]oir dire examination serves to protect that right

by exposing possible biases, both known and unknown, on the part of potential jurors." *Id*. at 554 (quoting *Smith,* 455 U.S. at 217). The Court expressly distinguished, however, between the kinds of bias that would serve as a basis for a challenge for cause and those that might support a peremptory challenge: "Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause," the Court explained, while "hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges." *Id.* In either case, "[t]he necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." *Id.*

The Court also emphasized, however, that litigants are entitled to a fair trial "but not a perfect one, for there are no perfect trials," and that courts had "come a long way from the time when all trial error was presumed prejudicial and reviewing courts were considered citadels of technicality." *Id.* at 553 (internal quotations omitted). The Tenth Circuit's ruling "must be assessed against this backdrop," the Court stated, and the juror's failure to identify his son's injury during voir dire did not warrant a new trial because he apparently believed that his son's broken leg was not the kind of injury inquired of during voir dire. *Id.* at 554-55. Indeed, the Court noted, another juror had identified a relatively minor incident in response to the question and a third juror did not respond to the question when initially posed, and it was only subsequent

-79-

questioning that brought out the fact that her husband had been injured in a machinery

accident. *Id.* at 555.

In these circumstances, the Court held, "[w]hatever the merits of the Court of

Appeals' standard in a world which would redo and reconstruct what had gone before

upon any evidence of abstract imperfection," that standard was inconsistent with

modern practice. *Id.* at 555. "A trial represents an important investment of private

and social resources," the Court explained, "and it ill serves the important end of

finality to wipe the slate clean simply to recreate the peremptory challenge process

because counsel lacked an item of information which objectively he should have

obtained from a juror on voir dire examination." *Id.* at 554. Rather, the Court

concluded, a new trial is warranted only where a juror fails to answer honestly a

material question on voir dire and there is a showing of bias on the part of the juror:

> We hold that to obtain a new trial in such a situation, a
> party must first demonstrate that a juror failed to answer
> honestly a material question on voir dire, and then further
> show that a correct response would have provided a valid
> basis for a challenge for cause. The motives for concealing
> information may vary, *but only those reasons that affect a
> juror's impartiality can truly be said to affect the fairness
> of a trial.*

*Id.* at 556 (emphasis added).

Justice Blackmun, who was joined by Justices Stevens and O'Connor, joined

in the Court's opinion but wrote separately to note his understanding that the Court's

-80-

holding did not "foreclose the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury," regardless of whether the juror's answer was honest or dishonest. *Id.* at 556 (Blackmun, J., concurring). Justice Brennan, who was joined by Justice Marshall, concurred only in the judgment, explaining that the "proper focus when ruling on a motion for new trial in this situation should be on the bias of the juror and the resulting prejudice to the litigant," an inquiry in which the juror's dishonesty (if any) is but one factor. *Id.* at 558-59 (Brennan, J., concurring in the judgment).

Although *McDonough* was a civil case, this Court has applied that decision in considering a claim of juror bias raised in a motion for a new trial in a criminal case, *see Amirault*, 968 F.2d at 1405-06 & n.2, as have other courts of appeals. *See, e.g., Williams v. Price*, 283 F.3d 223, 229-30 (3d Cir. 2003); *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002); *United States v. Patterson*, 215 F.3d 776, 782 (7th Cir. 2000); *United States v. Boney*, 977 F.2d 624, 634 n.7 (D.C. Cir. 1992).

### c.    The theory of "inferable bias"

In *Torres*, the Second Circuit recognized a third category of bias that would support a challenge for cause during the voir dire process, "inferable" or "inferred bias." The defendants in that case, who had engaged in structuring a cash transaction, argued, *inter alia*, that they were entitled to a new trial pursuant to Rule 33 because

-81-

the district court had erroneously excused four potential jurors for cause during the voir dire process. 128 F.3d at 41-42. The Second Circuit concluded that three of the jurors were properly dismissed for actual bias, and that the district court acted within its discretion in dismissing the fourth juror for "inferable bias," who had admitted to having some involvement in a structuring transaction in the past. *Id.* at 42-45.

In reaching this conclusion, the Second Circuit explained that "there exists a few circumstances that involve no showing of actual bias, and that fall outside of the implied bias category, where a court may, nevertheless, properly decide to excuse a juror." *Id.* at 46-47. The court described that category, which it referred to as "inferable bias" or "inferred bias," as follows:

> Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make a mandatory presumption of bias. There is no *actual* bias because there is no finding of partiality based upon either the juror's own admission or the judge's evaluation of the juror's demeanor and credibility following voir dire questioning as to bias. And there is no *implied* bias because the disclosed fact does not establish the kind of relationship between the juror and the parties or issues in the case that mandates the juror's excusal for cause.

128 F.3d at 47 (emphasis in original). The court stated that it did not need to "consider the precise scope of a trial judge's discretion to infer bias," but noted that

-82-

"cases in which a juror has engaged in activities that closely approximate those of the defendant on trial are particularly apt." *Id.*

In then applying the category of "inferable bias," the Second Circuit found that given the similarity of the juror's structuring activity to charges in the case, the district court acted within its discretion in excusing the juror. *Id.* at 47-48. The court emphasized, however, that "[w]e do not hold today that, even in such circumstances, the district court would have erred had it kept Juror No. 7 on the jury," and the court's holding therefore was limited to the question whether the court "acted within its discretion in excusing her from the jury." *Id.* at 48. In other words, the Second Circuit did not hold in *Torres* that a showing of "inferable bias" would be sufficient to overturn a conviction based on a claim of juror bias, whether on appeal or on collateral review.

Indeed, subsequent to *Torres*, the Second Circuit has questioned whether the doctrine of "inferable bias" applies when a juror bias claim is raised on appeal. In *United States v. Greer*, 285 F.3d 158 (2d Cir. 2002), the Second Circuit affirmed a district court's determination that no actual bias had been proven in support of a juror bias claim, and further stated that "[i]t is unclear whether our affirmance of the District Court's findings regarding actual bias ends our inquiry, or whether a post-trial allegation of jury partiality may alternatively be proven by implied or inferred bias."

*Id.* at 172 (citing *Smith*, 455 U.S. at 215). The court stated that it "need not answer that question," however, as neither implied nor "inferable" bias had been shown in the case. *Id.*

### 2. *McDonough* requires a showing of actual or implied bias, and cannot be satisfied by a showing of "inferable bias."

The district court's determination that Sampson's Sixth Amendment right to an impartial jury was violated is dependent on its conclusion that the *McDonough* test can be satisfied by a showing of "inferable bias," as the court expressly found that neither actual bias nor implied bias had been proven. 820 F. Supp. 2d at 188-92. The district court believed that the *McDonough* test does not require a showing of actual or implied bias; in its view, *McDonough* only requires a litigant to prove juror dishonesty and that a correct response would have provided a valid basis for a challenge for cause. *Id.* at 175. "By its terms," the district court reasoned, "the *McDonough* test does not require proof of actual or implied bias," as "a valid basis to excuse a juror for cause includes not only actual or implied bias, but also inferable bias." *Id.*

The district court also reasoned that because five Justices stated in their concurring opinions in *McDonough* that a claim of juror bias based on actual or implied bias survives even where juror dishonesty is not shown, the only way to

-84-

harmonize the three opinions in that case is to conclude that actual or implied bias is not a necessary component of the *McDonough* test:

> If the *McDonough* test required a showing of actual or implied bias in addition to a showing of dishonesty, the test Justice Rehnquist stated for the majority would be superfluous. Any party who proved the bias prong of the *McDonough* test would necessarily be entitled to relief under the actual or implied bias tests, without regard to whether the party succeeded in proving dishonesty. The only way to interpret the Opinion of the Court in *McDonough* to have any meaning, therefore, is to recognize three distinct but overlapping tests and permit relief under *McDonough* without requiring a showing of actual or implied bias.

*Id.* at 176.

Finally, the district court indicated that its reading of *McDonough* was consistent with this Court's decisions in *Amirault* and *Dall v. Coffin*, 970 F.2d 964 (1st Cir. 1992), emphasizing in particular that in *Dall*, this Court "found that the *McDonough* test was not satisfied because it had not been shown that 'correct responses to the voir dire questions would have required *or resulted in* the disqualification of [the juror] for cause." 820 F. Supp. 2d at 176 (quoting *Dall*, 970 F.2d at 970) (emphasis in original). The court reasoned that the inclusion of the words "or resulted" indicated that proof of actual or implied bias is not a requirement for the *McDonough* test because "disqualification of a juror for cause is *required* in cases of actual or implied bias," while "[a] juror may also be excused for cause as *a result* of

-85-

the trial judge's discretion in cases involving inferable bias." *Id.* at 176-77 (emphasis in original) (citing *Torres*, 128 F.3d at 47).

None of these rationales has merit. To the contrary, as shown below, the district court's belief that the *McDonough* test can be satisfied by a showing of "inferable bias" is inconsistent with *McDonough*; it is at odds with decisions by this Court and other courts of appeals, which hold that a claim of juror bias can succeed only upon a showing of actual or implied bias; and it fails to appreciate the fundamental difference between a court's discretion during the voir dire process and post-judgment review.

### a.    The district court misinterpreted the test in *McDonough*.

The district court's conclusion that the *McDonough* test can be satisfied by a showing of "inferable bias" in inconsistent with *McDonough* itself. The district court placed significance on the fact that the Court did not use the terms actual or implied bias in setting out the test for juror bias, but only stated that such a claim will succeed if it is shown that a juror is dishonest and that a correct response would have provided a valid basis for a challenge for cause. But the Court left no doubt what it meant by a valid challenge for cause, having earlier explained that "[d]emonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause," while "hints of bias not sufficient to warrant challenge for cause may assist parties in

-86-

exercising their peremptory challenges." 464 U.S. at 554. "Demonstrated bias" thus means *proven* bias – whether bias in fact or bias conclusively presumed as a matter of law – and it is only *proven* bias that the Court stated "can truly be said to affect the fairness of a trial." *Id.* at 556. That the Court meant actual or implied bias is further confirmed by the fact that the only accepted challenges for cause at the time that *McDonough* was decided – other than for statutory ineligibility, *see* 28 U.S.C. §1865(b) – were for actual or implied bias. *See, e.g., Wood*, 299 U.S. at 133 (stating that "[t]he bias of a prospective juror may be actual or implied"); *Government of Virgin Islands v. Felix*, 569 F.2d 1274, 1277 n.5 (3d Cir. 1978) ("Challenges for cause are subject to approval by the court and must be based on a finding of actual or implied bias."). Indeed, the theory of "inferable bias" was first identified as a distinct basis for a challenge for cause only in 1997 by the Second Circuit in *Torres*, more than a decade after *McDonough* was decided in 1984, and that decision was limited to the question whether a district court has discretion to excuse a juror for "inferable bias" during the voir dire process; it did not involve a request for a new trial based on a claim of juror bias.

Moreover, "inferable bias" is not demonstrated or proven bias. It is "a *risk of partiality* sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make a mandatory presumption of

bias," *Torres*, 128 F.3d at 47, and a "risk of partiality," by definition, does not amount to demonstrated or proven bias.[16] "Inferable bias" instead is much more akin to the "hints of bias" that the Court in *McDonough* said can aid a party in the exercise of peremptory challenges, but which would not warrant the granting of a new trial even if a juror withheld information during voir dire that prejudiced the party's right to exercise those peremptory challenges. Indeed, the Court rejected the Tenth Circuit's judgment that a new trial was warranted because the withholding of the information by the juror prejudiced the plaintiff's right to exercise peremptory challenges, holding that "it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination." *Id.* at 555. The denial of the opportunity to uncover "hints of bias," in other words, did not warrant the granting of a new trial, and the denial of the opportunity to uncover a "risk of partiality" likewise does not warrant the granting of a new trial.

The district court also erred in believing that its reading of *McDonough* was compelled because, "[i]f the *McDonough* test required a showing of actual or implied bias in addition to a showing of dishonesty, the test Justice Rehnquist stated for the

---

[16] The term "risk" is defined as "the possibility of loss, injury, disadvantage, or destruction." WEBSTER'S at 1961; *see also* BLACK'S at 1353 (defining "risk" as "[t]he uncertainty of a result, happening, or loss; the chance of injury, damage or loss; esp., the existence and extent of the possibility of harm.").

majority would be superfluous." 820 F. Supp. 2d at 176.[17] The disagreement amongst

the Justices in *McDonough* was whether a showing of juror dishonesty was necessary

to sustain a claim of juror bias; it was not whether some form of bias that did not rise

to the level of actual or implied bias could support such a claim. Justice Rehnquist's

opinion for the Court said that dishonesty *and* juror partiality has to be shown, but a

majority of five concurring Justices said that even where dishonesty is not proven, a

party could still establish a jury bias claim by demonstrating actual or implied bias.[18]

Justice Rehnquist's opinion thus set out the narrower, more restrictive test amongst

the Justices, requiring a showing of dishonesty *and* juror partiality, yet in attempting

to give that opinion "meaning," the district court transformed it into a far more

expansive opinion, allowing for a more generous standard for proving juror bias

---

[17] At an earlier point in the litigation, the government also stated erroneously that actual or implied bias stood apart from the *McDonough* test. It later corrected course. [D.1192, 1202; JSA1067-1101].

[18] *See* 464 U.S. at 556 (Blackmun, J, concurring) ("I also agree that, in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial. I therefore join the Court's opinion, but I write separately to state that I understand the Court's holding not to foreclose the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury."); *id*. at 558-59 (Brennan, J, concurring in the judgment) (stating that the bias of a juror can be actual or implied, and that "[w]hether the juror answered a particular question on voir dire honestly or dishonestly, or whether an inaccurate answer was inadvertent or intentional, are simply factors to be considered in this latter determination of actual bias.").

claims than even the concurring opinions would allow. That construction does not give "meaning" to Justice Rehnquist's opinion; it radically expands it.

It is true that the practical effect of the concurring opinions in *McDonough* is to allow juror bias claims to proceed even where juror dishonesty is not shown, which blunts some of the emphasis on juror dishonesty in Justice Rehnquist's opinion. But the Court was fragmented on this issue, and tension of this nature is inherent whenever the Court issues a divided opinion. *See, e.g., United States v. Henry*, 472 F.3d 910, 918 (D.C. Cir. 2007) (Kavanaugh, J., concurring) (noting that the remedial opinion in *United States v. Booker*, 543 U.S. 220 (2005), was "[i]n some tension with the *Booker* constitutional opinion"). The Justices in *McDonough* simply disagreed as to whether juror dishonesty must be shown to sustain a claim of juror bias, and the district court's apparent attempt to harmonize the opinions transformed Justice Rehnquist's opinion into something it was not.

Indeed, in purporting to give "meaning" to the first prong of the *McDonough* test, the district court rendered the second prong of that test all but meaningless. A juror's dishonesty during voir dire is a relevant, but not dispositive, factor in determining whether the juror was *actually biased* against a litigant. *See, e.g., McDonough*, 464 U.S. at 556 (Blackmun, J., concurring); *id.* at 558 (Brennan, J., concurring in the judgment); *United States v. Stewart*, 433 F.3d 273, 305-06 (2d Cir.

-90-

2006).  If the second prong of the *McDonough* test can be satisfied merely by a showing of "inferable bias" (*i.e.,* a "risk of partiality"), however, a finding of juror dishonesty could very well prove dispositive of the *McDonough* inquiry, as many courts no doubt will find at least a "risk of partiality" to be inherent whenever there is juror dishonesty.  In attempting to give "meaning" to the first prong of the *McDonough* then, the district court's interpretation of that test rendered the second prong essentially superfluous.

The conclusion that the *McDonough* test requires a showing of actual or implied bias, and cannot be satisfied by a showing of "inferable bias," finds further support in the Court's earlier decision in *Smith v. Phillips*, which the Court in *McDonough* cited with approval.  In that case, a juror submitted an application to the prosecutor's office during trial for a position as a major felony investigator, which the prosecutors did not disclose to defense counsel until after the trial.  455 U.S. at 212.  The state trial judge determined after a hearing that the juror was not biased against the defense notwithstanding his desire to work at the prosecutor's office.  *Id.* at 213-14.  The district court granted relief on federal habeas review, concluding that bias should be imputed to the juror in those circumstances, and the Second Circuit affirmed (albeit on a somewhat different ground).  *Id.* at 214.

-91-

The Supreme Court reversed and, in doing so, expressly rejected the contention that a court could not ascertain the impartiality of a juror by relying solely upon the testimony of the juror in question, but rather had to impute bias in the circumstances of the case. *Id.* at 215. The Court stated that it had "long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias," and further stated that it had rejected claims of implied bias in several prior cases. *Id.* at 215-16. The Court noted, for example, that in *Dennis v. United States*, 339 U.S. 162 (1950), it had stated that "'[a] holding of implied bias to disqualify jurors because of their relationship with the Government is no longer permissible. * * * Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury.'" *Smith,* 455 U.S. at 216 (quoting *Dennis*, 339 U.S. at 171-72). In then considering whether actual bias was shown, the Court concluded that the hearing conducted by the state trial judge was sufficient to ensure that the juror was impartial, and there was no basis to the claim that the testimony of the juror in question at such a hearing should be deemed inherently suspect. *Id.* at 217-18 & n.7. Justice O'Connor wrote separately to express her view that "the opinion does not foreclose the use of 'implied bias' in appropriate circumstances." *Id.* at 221 (O'Connor, J., concurring).

Of relevance here, the decision in *Smith* has led some courts to question whether the doctrine of implied bias remains viable. *See, e.g., Mitchell*, 690 F.3d at 144 ("In the wake of *Smith*, some Courts of Appeals questioned whether the majority opinion quietly discarded the doctrine of implied bias.") (citing cases); *Greer*, 285 F.3d at 172 ("It is unclear whether our affirmance of the District Court's findings regarding actual bias ends our inquiry, or whether a post-trial allegation of jury partiality may alternatively be proven by implied or inferred bias.") (citing *Smith*, 455 U.S. at 215). The majority view is that *Smith* did not abrogate the doctrine of implied bias altogether, particularly when considered with the concurrences in *McDonough*, *see Mitchell*, 690 F.3d at 144-45 (citing cases and agreeing with the majority view), and this Court is in accord with the majority view, holding that the concurring opinions in *McDonough* allow for an inquiry into actual or implied bias even where juror dishonesty is not present. *See Amirault*, 968 F.2d at 1405-06 & n.2.

But the fact that this question has even been raised – and that Justice O'Connor saw it necessary to write separately in *Smith* to note her view that the doctrine of implied bias remains viable – underscores the conclusion that the *McDonough* test cannot be satisfied by a showing of "inferable bias." *Smith*, like *McDonough*, was authored by Justice Rehnquist, and Justice Rehnquist's opinion in *McDonough* was joined in full by Chief Justice Burger and Justices White and Powell, who also were

in the majority in *Smith.* Hence, in light of *Smith*, Justice Rehnquist's opinion in *McDonough* could be read as requiring a showing of juror dishonesty and *actual bias* to sustain a juror bias claim; implied bias would not suffice. It cannot plausibly be read, however, to allow for a showing of bias that did not even rise to the level of implied bias, such as the theretofore unheard of theory of "inferable bias." *Smith* is yet further evidence that the district court's reading of *McDonough* is unsupportable.

### b.   *Amirault* and *Dall* do not support the district court's interpretation of *McDonough*.

The district court stated that this Court's decisions in *Amirault* and *Dall* support the conclusion that the *McDonough* test does not require a showing of actual or implied bias. To the contrary, this Court's decisions support the exact opposite conclusion. In *Dall*, this Court set out the test for a juror bias claim as follows:

> A party seeking a new trial because of non-disclosure by a juror during voir dire must do more than raise a speculative allegation that the juror's possible bias may have influenced the outcome of the trial. Rather, "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." Further, we have held that a party seeking a new trial based on nondisclosure by a juror must "demonstrate actual prejudice or bias." This "burden of proof must be sustained not as a matter of speculation, but as a demonstrable reality."

-94-

970 F.2d at 969 (quoting, respectively, *McDonough*, 464 U.S. at 556; *United States v. Aponte-Suarez*, 905 F.2d 483, 492 (1st Cir. 1990); *United States v. Rivera-Sola*, 713 F.2d 866, 874 (1st Cir. 1983); and *United States v. Vargas*, 606 F.2d 341, 344 (1st Cir. 1979)). Similarly, in *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387 (1st Cir. 2002), this Court rejected a claim of juror bias based, in part, on the fact that the party advancing the claim "only speculates as to whether the juror actually is biased, for it has not 'demonstrate[d] actual prejudice or bias,' but only has alleged 'possible bias.'" *Id.* at 408 (quoting *Dall*, 970 F.2d at 969).

Most recently, in *DeBurgo v. St. Amand*, 587 F.3d 61 (1st Cir. 2009), this Court again indicated that to succeed on a claim of juror bias under *McDonough*, a petitioner must demonstrate proven bias on the part of the juror:

> Because the Sixth Amendment guarantees a criminal defendant the right to an impartial jury, "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." The defendant must meet two showings in order to obtain a new trial: "[A] party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." Importantly, the defendant has "the burden of showing that the juror was not impartial and must do so by a preponderance of the evidence."

*Id.* at 71-72 (quoting, respectively, *Smith*, 455 U.S. at 215; *McDonough*, 464 U.S. at 556, and *Commonwealth v. Amirault*, 399 Mass. 617, 626 506 N.E.2d 129 (1987)).

-95-

Each of these decisions support the conclusion that the *McDonough* test cannot be satisfied by a showing of "inferable bias" or a "risk of partiality" on the part of the juror, but rather requires a showing of "actual bias or prejudice" which must be shown "not as a matter of speculation, but as a demonstrable reality." *Dall*, 970 F.2d at 969.

This Court is not alone in reaching this conclusion. The D.C. Circuit has held that to obtain relief under *McDonough*, a party must show actual bias on the part of a juror.[19] Other courts of appeals have either held that a party must show actual bias or implied bias to obtain relief under the second prong of *McDonough*,[20] or have

---

[19] *See United States v. North*, 910 F.2d 843, 904 (D.C. Cir. 1990) ("Read along with the concurrences of five Justices, *McDonough* suggests that an aggrieved party must show that the juror's correct response at voir dire would have demonstrated actual bias."). The Supreme Judicial Court of Massachusetts shares this view. *See Amirault*, 399 Mass. at 625, 506 N.E.2d 129 ("Our reading of *Philips* and *McDonough* compels the conclusion that when a defendant raises a substantial claim of juror misconduct subsequent to the verdict, the due process requirement is satisfied by a hearing conducted by the trial judge in which the defendant has the opportunity to show that a juror was actually biased because the juror dishonestly answered a material question on voir dire and that prejudice resulted from the dishonesty.").

[20] *See Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005) ("Regarding *McDonough*'s second prong, a juror is subject to a valid challenge for cause based on actual bias and, in certain limited circumstances, implied bias."); *United States v. Doke*, 171 F.3d 240, 246-47 (5th Cir. 1999) (stating that "[t]o obtain a new trial for juror bias, this circuit requires a party to meet the test of the plurality opinion in [*McDonough*]. * * * Without more, these jurors' failures to disclose the information asserted by appellants does not raise a material question concerning actual or implied bias that would necessitate a removal for cause."); *United States v. Perkins*, 748 F.2d 1519, 1532 (11th Cir.1984) ("We now turn to the second prong of the *McDonough* test: whether a correct response would have provided a valid basis for a challenge for cause. A party who seeks a new trial because of non-disclosure by a juror during voir

implicitly so held by stating that a challenge for cause can only be based on a showing of actual or implied bias.[21]

By contrast, not a single court of appeals has held that a claim of juror bias can succeed under *McDonough* based on a showing of "inferable bias," nor has any other court for that matter. The Second Circuit, as noted above, has stated that it is unclear whether the determination that a juror is not actually biased ends the juror bias inquiry altogether, and the court in that case did not decide whether a claim of juror bias could be sustained based on a showing of "inferable bias." *See Greer*, 285 F.3d at 172. And while the Fourth Circuit has allowed that "inferable bias" "might be available" as a third category of challenges for cause, *see Jones*, 311 F.3d at (citing *Torres*, 128 F.3d at 43), that court has never upheld a claim of juror bias on that basis, instead analyzing such claims only for actual or implied bias. *See, e.g., United States v. Blackwell*, 436 F. App'x 192, 195-96 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 1093, 132 S. Ct. 1097 (2012); *Conaway v. Polk*, 453 F.3d 567, 585-88 (4th Cir. 2006).

---

dire must show actual bias. Actual bias may be shown in two ways: by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.") (internal quotation and citation omitted).

[21] *See Mitchell*, 690 F.3d at 142 (actual bias and implied bias are traditionally the "two types of challenges for cause"); *Fields*, 503 F.3d at 773 ("Fields had a remedy at that point – a challenge for cause, which lies for implied as well as actual bias * * *.").

Nor do *Amirault* or *Dall* suggest otherwise.  In *Amirault*, this Court held that a new trial was not required in a case involving the rape of a child because a juror who had been raped blocked the incident from memory.  968 F.2d at 1405.  This Court rejected the petitioner's claim of juror bias under *McDonough* because the petitioner failed to prove that the juror was dishonest, and further noted that although the concurring opinions in *McDonough* "require a further determination on the question of juror bias even where a juror is found to have been honest," no showing of actual or implied bias had been made.  *Id.* at 1405-06 & n.2.  *Amirault* does not support the district court's conclusion that the *McDonough* test can be satisfied without a showing of actual or implied bias, as this Court had no occasion to consider that question, having determined that the first prong of the test (juror dishonesty) had not been shown.  This Court did, to be sure, consider whether actual or implied bias was otherwise shown in accordance with the views of the concurring opinions in *McDonough*, but that says nothing about whether the *McDonough* test itself requires such a showing.

The district court also pointed to language in *Dall* that the plaintiffs in that case had not shown that correct responses to the voir dire questions "would have required or resulted in the disqualification" of the juror in question, emphasizing that the inclusion of the words "or resulted in" suggested that "inferable bias" was significant

-98-

because "disqualification of a juror for cause is *required* in cases of actual or implied bias," while "[a] juror may also be excused for cause as *a result* of the trial judge's discretion in cases involving inferable bias." 820 F. Supp. 2d at 176-77 (emphasis in original) (citing *Torres*, 128 F.3d at 47). But this passing reference in *Dall* cannot possibly bear the weight that the district court placed on it.

To begin with, if this Court had intended to break new ground and adopt the theory of "inferable bias," or hold that such a showing was sufficient to satisfy the *McDonough* test where juror dishonesty is shown, it surely would have engaged in a panoptic discussion of the issue and expressly declared that such a theory of bias exists. The Second Circuit in *Torres*, for example, devoted much of the court's opinion to a discussion of "inferable bias," and stated that it was "explicitly" recognizing the category of "inferable bias." 128 F.3d at 43, 46-48. The district court in this case also devoted a considerable portion of its lengthy Memorandum and Order on Jury Claim to a discussion of "inferable bias" and to a consideration of whether the *McDonough* test requires a showing of actual or implied bias, or could be satisfied by a showing of "inferable bias." 820 F. Supp. 2d at 165-67, 170-81 & nn.6, 8-18. Yet, under the district court's reading of *Dall*, this Court accomplished all of this simply by appending the words "or resulted in" to the word "required," without any accompanying discussion, and without explicitly stating what the court was doing.

-99-

What is more, this Court has long emphasized that "[a] court of appeals should always be reluctant to create a circuit split without a compelling reason," *Alternative System Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 31 (1st Cir. 2004), and when it has done so, this Court has been careful to explain its disagreement with a sister circuit.[22] If the inclusion of the words "or resulted in" in *Dall* were somehow meant to suggest that a showing of actual or implied bias is not necessary under *McDonough*, however, this Court would have created a split with, at a minimum, the D.C. Circuit in *North*, *see* 910 F.2d at 904 (actual bias must be shown under *McDonough*), and the Eleventh Circuit in *Perkins*, *see* 748 F.2d at 1532 (actual or implied bias must be shown under *McDonough*), with nary a discussion of those cases nor an explanation as to why this Court was going in a different direction. The emphasis which the district court places on the words "or resulted in" in *Dall* therefore is unwarranted.

This Court also stated in *Dall* that "actual prejudice or bias" must be shown to sustain a claim of juror bias under *McDonough*, 970 F.2d at 969, further undercutting the district court's belief that that decision supports its view that a showing of actual or implied bias is not necessary to sustain a juror bias claim under *McDonough*. The district court stated that this language in *Dall* is limited to "non-disclosure cases" and

---

[22] *See, e.g., United States v. Nascimento*, 491 F.3d 25, 38-40 (1st Cir. 2007); *In re: Bank of New England Corp.*, 364 F.3d 355, 365-66 (1st Cir. 2004); *Rossiter v. Potter*, 357 F.3d 26, 32 & n.5 (1st Cir. 2004).

"does not refer to cases where jurors provide inaccurate answers, to which *McDonough* applies." 820 F. Supp. 2d at 177 n.12. That is plainly wrong. This Court stated in *Dall* that "[a] party seeking a new trial because of non-disclosure by a juror during voir dire" must do more than raise a speculative allegation about the juror's possible bias, but "[r]ather" must satisfy the *McDonough* test and, "[f]urther," must "demonstrate actual prejudice or bias." 970 F.2d at 969. Moreover, it is clear that this Court intended this test to cover *all* claims of juror bias, as the plaintiff in that case had asserted that the juror in question had given "false answers to the voir dire questions concerning bias," *id.*, an "inaccurate answer" case under the district court's formulation. 820 F. Supp. 2d at 169. This Court's use of the term "non-disclosure" in *Dall* thus encompasses *all* claims of juror bias, including both so-called "non-disclosure" and "incorrect answer" cases, and the district court's assertion that the "actual prejudice or bias" language does not refer to "inaccurate answer" cases thus is bootless.

> **c.    The "inferable bias" theory articulated in *Torres* does not apply when a defendant seeks to set aside a conviction based on juror bias.**

In concluding that the *McDonough* test could be satisfied by a showing of "inferable bias," the district court also failed to appreciate the difference between the breadth of a court's discretion during the voir dire process, and the showing that must

-101-

be made when a defendant seeks to set aside a conviction based on juror bias. The Second Circuit's decision in *Torres* involved the former, rather than the latter, situation, and although that court held that a district court has discretion to excuse a venireperson for "inferable bias," it also expressly stated that it was *not* deciding when a venireperson *must* be (or, in hindsight, should have been) excused. 128 F.3d at 48. The Second Circuit also has questioned whether "inferable bias" could even support a juror bias claim where actual bias has not been shown. *See Greer*, 285 F.3d at 172.

The calculus is different when a defendant seeks to set aside a conviction based on juror bias. As *McDonough* makes clear, a court considering a claim that a juror should have been excused in such situations looks to whether the jury, in fact, was impartial, not whether a different jury might have been seated if all the information that should have been disclosed during voir dire had come to light. As the Court explained, even where a party "lacked an item of information which objectively he should have obtained from a juror on voir dire examination," which might have uncovered "hints of bias" that would have assisted the parties in exercising their peremptory challenges, a new trial to "recreate the peremptory challenge process" is not warranted. 464 U.S. at 554-56. Rather, the party advancing the claim must show "demonstrated bias" on the part of the juror such that the juror would have been

-102-

excused for cause, as "only those reasons that affect a juror's partiality can truly be said to affect the fairness of a trial." *Id.* at 556.

The decision in *McDonough* thus reflects the fundamental difference between the consideration of challenges for cause during the voir dire process and during post-judgment review. As the Court has elsewhere recognized, the "reality of the jury selection process" is that "[c]hallenges for cause and rulings upon them * * * are fast paced, made on the spot and under pressure. Counsel as well as the court, in that setting, must be prepared to decide, often between shades of gray, by the minute." *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) (internal quotation omitted). A district court, in other words, is given wide latitude to dismiss a juror for cause during the voir dire process, and the breadth of that latitude is greater than when a defendant seeks to set aside a conviction based on juror bias. *See, e.g., Fields*, 503 F.3d 811 n.17 (Berzon, J., dissenting) ("I accept the majority's implicit suggestion that implied bias operates to exclude a broader category of individuals when raised as a for-cause challenge during voir dire than when raised for the first time on appeal."). This is the interest that the Second Circuit validated by adopting the theory of "inferable bias" in *Torres*, as it allows a court discretion to dismiss a venireperson during the voir dire process when there are doubts about his or her impartiality, but it is an interest different from the determination of whether a juror, in fact, was

-103-

impartial.  *See, e.g., Torres*, 128 F.3d at 47 (although holding that the district court could excuse a juror for cause based on "inferable bias," also stating that "[t]here is no actual bias because there is no finding of partiality.").

"Inferable bias" thus operates in much the same fashion as did the claim that the plaintiff's right to exercise peremptory challenges had been prejudiced in *McDonough*, asking not whether the juror, in fact, was impartial, but whether the court, in its discretion, would have excused her for cause during the voir dire process had it been aware of the information which she should have disclosed.  *See, e.g.,* 820 F. Supp. 2d at 195 ("[I]f the court had been properly informed by honest answers in C's questionnaire and during individual voir dire, it would have exercised its discretion to excuse her for cause.").  That form of inquiry is just the type of "recreation" of the voir dire process that the Court disavowed in *McDonough* as the basis for the granting of a new trial.  The district court erred in applying "inferable bias" to Sampson's case.

In sum, the district court expressly found in this case that Sampson failed to carry his burden of demonstrating actual bias or implied bias on the part of Juror C, *id.* at 188-92, and those findings should have led the court to reject the Sixth Amendment claim that Sampson has raised.  The court erred as a matter of law in failing to do so.

### C.    A Claim of Juror Bias Based Only on a Showing of "Inferable Bias" Should be *Teague*-Barred.

Even if this Court concludes that "inferable bias" may be a basis to set aside a conviction, that rule should not apply in this collateral context. As noted above, under *Teague*, a prisoner is generally not entitled to collateral relief if granting that relief would require the court to apply a "new rule" of constitutional procedure, meaning a rule that "was not *dictated* by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301 (emphasis in original). As argued above, neither the Supreme Court nor this Court has even recognized "inferable bias" as a distinct category of challenges for cause, let alone held that such a showing would be sufficient to satisfy the second prong of the *McDonough* test. Moreover, no other court of which the government is aware has granted relief on a juror bias claim under *McDonough* solely on a showing of "inferable bias," where neither actual nor implied bias was proven. Thus, the district court's conclusion that a juror bias claim under *McDonough* does not require a showing of actual or implied bias, but may lie where only "inferable bias" is shown, was not dictated by existing precedent and constitutes a new rule.

The rule, moreover, is a procedural, not substantive, one. A substantive rule is one that "prohibit[s] criminal punishment for certain types of primary conduct" or "forbid[s] the imposition of certain categories of punishment for a particular class of

-105-

defendants." *Sepulveda v. United States*, 330 F.3d 55, 59-60 (1st Cir. 2003). The district court's application of *Torres* regarding the breadth of a district court's discretion to excuse a venireperson to a prisoner's claim that the jury should have been excused for bias does neither of these things, and therefore is not a substantive rule. Nor does the rule fall within one of the exceptions to the *Teague* rule. It is not a "watershed rule of criminal procedure" implicating fundamental fairness by mandating procedures central to the accurate determination of innocence or guilt, nor does it place certain kinds of "conduct beyond the power of the criminal law-making authority to prosecute." *Teague*, 489 U.S. at 311. In short, the court's application of "inferable bias" to this §2255 case runs afoul of *Teague.*

This Court should overlook the government's failure to bring the *Teague* bar to the district court's attention. "Ordering a new trial is a drastic remedy that exacts substantial costs on the administration of justice and taxpayers." *Conley v. United States*, 415 F.3d 183, 193-94 (1st Cir. 2005). Here, given the lack of demonstrable bias, this is not a case "where serious doubts about the reliability of a trial" exist. *Id.* at 194. Consequently, application of *Teague* is in the interests of justice.

**D.    In Any Event, Constitutional Error Does Not Alone Justify §2255 Relief.**

Finally, putting aside *Teague*, the district court's application of an "inferable bias" standard to this case did not justify §2255 relief. Although Sampson claims a

-106-

constitutional error, §2255 only requires that a court grant relief where there has been "such a denial or infringement of a constitutional righ[t] * * * as to render the judgment vulnerable to collateral attack." 28 U.S.C. §2255(b). While Juror C's inaccurate statements are regrettable, a finding of "inferable bias" does not rise to this level. This is so because, in the absence of a structural error (and there is none here), constitutional error does not entitle a §2255 petitioner relief in the absence of prejudice – and this is true even when the claim raised on collateral review is deemed to have been preserved. *See Brecht v. Abrahamson*, 507 U.S. 617, 637 (1993); *see infra* footnote 15. There, must be, rather, a "'substantial and injurious effect or influence on the jury's verdict.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750,776 (1946))*; see also Singleton*, 26 F.3d at 237. There is no evidence of this sort in this case; indeed, the district court found that neither actual nor implied bias had been proven. Simply put, the district court's findings – that there was, at best, a "risk of partiality" – establishes that the error was harmless and insufficient to warrant relief. Morever, granting a new trial based on "inferable bias" is at odds with the limited purpose of §2255: to provide relief where there has been a grievous wrong. *See, e.g., Singleton*, 26 F.3d at 237, n.9; *Ellis v. United States*, 313 F.3d 636, 644 (1st Cir. 2002) ("The impetus for the standard articulated in *Brecht* is that the bar should be held fairly high on post-conviction review. Such proceedings are meant to afford

-107-

relief only to those who have been grievously wronged, not to those who show merely a possibility – even a reasonable possibility – of harm.").

\* \* \*

In sum, Sampson's trial, while perhaps imperfect, was a fair one. *See McDonough*, 464 U.S. at 553 (stating that litigants are entitled to a fair trial but not a perfect one, "for there are no perfect trials"). The district court, after conducting three evidentiary hearings and having the opportunity to judge Juror C's credibility and demeanor, found that Sampson had failed to demonstrate actual or implied bias. Based on those findings, the court should have denied Sampson's juror bias claim.

## CONCLUSION

For these reasons, the government respectfully requests that the Court deny Sampson's motion to dismiss, reverse the district court's order granting Sampson a new penalty phase trial, and remand the case to the district court with instructions to reinstate Sampson's death sentence.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    /s/ *Mark T. Quinlivan*
       MARK T. QUINLIVAN
       Assistant U.S. Attorney

-108-

# CERTIFICATE OF COMPLIANCE WITH
## Rule 32(a)

### Certificate of Compliance with Type-Volume Limitation
### Typeface Requirements, and Type Style Requirements

1.    This brief complies with the Court's Order of September 12, 2012, allowing the government to file a principal brief not to exceed 28,000 words, because this brief contains **27,569** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) (*i.e.*, the corporate disclosure statement, table of contents, table of citations, addendum, and certificates of counsel).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Word Perfect X5.

/s/ *Mark T. Quinlivan*
MARK T. QUINLIVAN
Dated:  September 27, 2012

## <u>CERTIFICATE OF SERVICE</u>

I, Mark T. Quinlivan, AUSA, certify that on September 27, 2012, I electronically served a copy of the Government's Opening Brief and Petition by electronic service on the following registered participants of the CM/ECF system, and served copies of the Joint Appendix and Joint Sealed Appendix by overnight delivery or hand-delivery, as designated:

William E. McDaniels
Jennifer G. Wicht
Thomas Windom
Williams & Connolly, LLP
725 Twelfth Street, N.W
Washington, D.C 20005
(overnight delivery)

Susan Katherine Marcus
3 Fort Mason
San Francisco, CA 94123
(overnight delivery)

J. Martin Richey
Elizabeth L. Prevett
Office of the Federal Defender
51 Sleeper Street, Fifth Floor
Boston, MA 02210
(hand delivery)

I further hereby certify that, pursuant to Fed. R. App. P. 21(a)(1), I served a copy of the Government's Opening Brief and Petition on the district court by hand delivery at the following address:

Hon. Mark L. Wolf
Chief Judge
United States District Court for the District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

*/s/ Mark T. Quinlivan*
MARK T. QUINLIVAN

-110-

**Nos. 12-1643, 12-8019**

════════════════════════════════

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

────────────────────

**GARY LEE SAMPSON,**
**PETITIONER-APPELLEE**

**v.**

**UNITED STATES OF AMERICA,**
**RESPONDENT-APPELLANT**

────────────────────

## ADDENDUM TABLE OF CONTENTS

────────────────────

1.    18 U.S.C. §§3591-3594 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.1

2.    18 U.S.C. §3731 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.7

3.    28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.9

4.    28 U.S.C. §1292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.11

5.    28 U.S.C. §2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.13

6.    28 U.S.C. §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G.Add.15

7.    *United States v. Sampson*,
           820 F. Supp. 2d 151 (D. Mass. 2011) . . . . . . . . . . . . . . . . . G.Add.17

8.    *United States v. Sampson*,
           *Memorandum and Order* (D. Mass. May 10, 2012) . . . . . . . G.Add.69

(c) TREATMENT OF MULTIPLE SENTENCE AS AN AGGREGATE.—Multiple terms of imprisonment ordered to run consecutively or concurrently shall be treated for administrative purposes as a single, aggregate term of imprisonment.

(Added Pub. L. 98–473, title II, §212(a)(2), Oct. 12, 1984, 98 Stat. 2000.)

### EFFECTIVE DATE

Section effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of this section, see section 235(a)(1) of Pub. L. 98–473, set out as a note under section 3551 of this title.

### §3585. Calculation of a term of imprisonment

(a) COMMENCEMENT OF SENTENCE.—A sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served.

(b) CREDIT FOR PRIOR CUSTODY.—A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—

(1) as a result of the offense for which the sentence was imposed; or

(2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

that has not been credited against another sentence.

(Added Pub. L. 98–473, title II, §212(a)(2), Oct. 12, 1984, 98 Stat. 2001.)

### EFFECTIVE DATE

Section effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of this section, see section 235(a)(1) of Pub. L. 98–473, set out as a note under section 3551 of this title.

### §3586. Implementation of a sentence of imprisonment

The implementation of a sentence of imprisonment is governed by the provisions of subchapter C of chapter 229 and, if the sentence includes a term of supervised release, by the provisions of subchapter A of chapter 229.

(Added Pub. L. 98–473, title II, §212(a)(2), Oct. 12, 1984, 98 Stat. 2001.)

### EFFECTIVE DATE

Section effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of this section, see section 235(a)(1) of Pub. L. 98–473, set out as a note under section 3551 of this title.

### CHAPTER 228—DEATH SENTENCE

Sec.
3591.    Sentence of death.
3592.    Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified.
3593.    Special hearing to determine whether a sentence of death is justified.
3594.    Imposition of a sentence of death.
3595.    Review of a sentence of death.
3596.    Implementation of a sentence of death.
3597.    Use of State facilities.
3598.    Special provisions for Indian country.
3599.    Counsel for financially unable defendants.

### PRIOR PROVISIONS

A prior chapter 228 (§§3591 to 3599) relating to imposition, payment, and collection of fines was added by Pub. L. 98–473, title II, §238(a), Oct. 12, 1984, 98 Stat. 2034, effective pursuant to section 235(a)(1) of Pub. L. 98–473 the first day of the first calendar month beginning twenty-four months after Oct. 12, 1984. Pub. L. 98–596, §12(a)(1), Oct. 30, 1984, 98 Stat. 3139, repealed chapter 228 applicable pursuant to section 12(b) of Pub. L. 98–596 on and after the date of enactment of Pub. L. 98–473 (Oct. 12, 1984). Section 238(i) of Pub. L. 98–473 which repealed section 238 of Pub. L. 98–473 on the same date established by section 235(a)(1) of Pub. L. 98–473 was repealed by section 12(a)(9) of Pub. L. 98–596.

### AMENDMENTS

2006—Pub. L. 109–177, title II, §222(b), Mar. 9, 2006, 120 Stat. 232, which directed amendment of the "table of sections of the bill" by adding item 3599 after item 3598, was executed by adding item 3599 to the table of sections for this chapter to reflect the probable intent of Congress.

### §3591. Sentence of death

(a) A defendant who has been found guilty of—

(1) an offense described in section 794 or section 2381; or

(2) any other offense for which a sentence of death is provided, if the defendant, as determined beyond a reasonable doubt at the hearing under section 3593—

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;

(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act,

shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified, except that no person may be sentenced to death who was less than 18 years of age at the time of the offense.

(b) A defendant who has been found guilty of—

(1) an offense referred to in section 408(c)(1) of the Controlled Substances Act (21 U.S.C. 848(c)(1)), committed as part of a continuing criminal enterprise offense under the conditions described in subsection (b) of that section which involved not less than twice the quantity of controlled substance described in subsection (b)(2)(A) or twice the gross receipts described in subsection (b)(2)(B); or

**G.Add.1**

(2) an offense referred to in section 408(c)(1) of the Controlled Substances Act (21 U.S.C. 848(c)(1)), committed as part of a continuing criminal enterprise offense under that section, where the defendant is a principal administrator, organizer, or leader of such an enterprise, and the defendant, in order to obstruct the investigation or prosecution of the enterprise or an offense involved in the enterprise, attempts to kill or knowingly directs, advises, authorizes, or assists another to attempt to kill any public officer, juror, witness, or members of the family or household of such a person,

shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified, except that no person may be sentenced to death who was less than 18 years of age at the time of the offense.

(Added Pub. L. 103–322, title VI, § 60002(a), Sept. 13, 1994, 108 Stat. 1959.)

### SHORT TITLE

Section 60001 of title VI of Pub. L. 103–322 provided that: "This title [enacting this chapter and sections 36, 37, 1118 to 1121, 2245, 2280, 2281, and 2332a of this title, amending sections 34, 241, 242, 245, 247, 794, 844, 924, 930, 1091, 1111, 1114, 1116, 1117, 1201, 1203, 1503, 1512, 1513, 1716, 1958, 1959, 1992, 2113, 2119, 2251, 2332, 2340A, 3005, and 3432 of this title and section 1324 of Title 8, Aliens and Nationality, renumbering former section 2245 of this title as 2246, repealing section 46503 of Title 49, Transportation, and enacting provisions set out as notes under this section and sections 36, 37, and 2280 of this title] may be cited as the 'Federal Death Penalty Act of 1994'."

### APPLICABILITY TO UNIFORM CODE OF MILITARY JUSTICE

Section 60004 of title VI of Pub. L. 103–322 provided that: "Chapter 228 of title 18, United States Code, as added by this title, shall not apply to prosecutions under the Uniform Code of Military Justice (10 U.S.C. 801)."

### § 3592. Mitigating and aggravating factors to be considered in determining whether a sentence of death is justified

(a) MITIGATING FACTORS.—In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:

(1) IMPAIRED CAPACITY.—The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

(2) DURESS.—The defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

(3) MINOR PARTICIPATION.—The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

(4) EQUALLY CULPABLE DEFENDANTS.—Another defendant or defendants, equally cul-pable in the crime, will not be punished by death.

(5) NO PRIOR CRIMINAL RECORD.—The defendant did not have a significant prior history of other criminal conduct.

(6) DISTURBANCE.—The defendant committed the offense under severe mental or emotional disturbance.

(7) VICTIM'S CONSENT.—The victim consented to the criminal conduct that resulted in the victim's death.

(8) OTHER FACTORS.—Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

(b) AGGRAVATING FACTORS FOR ESPIONAGE AND TREASON.—In determining whether a sentence of death is justified for an offense described in section 3591(a)(1), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

(1) PRIOR ESPIONAGE OR TREASON OFFENSE.—The defendant has previously been convicted of another offense involving espionage or treason for which a sentence of either life imprisonment or death was authorized by law.

(2) GRAVE RISK TO NATIONAL SECURITY.—In the commission of the offense the defendant knowingly created a grave risk of substantial danger to the national security.

(3) GRAVE RISK OF DEATH.—In the commission of the offense the defendant knowingly created a grave risk of death to another person.

The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

(c) AGGRAVATING FACTORS FOR HOMICIDE.—In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

(1) DEATH DURING COMMISSION OF ANOTHER CRIME.—The death, or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of, an offense under section 32 (destruction of aircraft or aircraft facilities), section 33 (destruction of motor vehicles or motor vehicle facilities), section 37 (violence at international airports), section 351 (violence against Members of Congress, Cabinet officers, or Supreme Court Justices), an offense under section 751 (prisoners in custody of institution or officer), section 794 (gathering or delivering defense information to aid foreign government), section 844(d) (transportation of explosives in interstate commerce for certain purposes), section 844(f) (destruction of Government property by explosives), section 1118 (prisoners serving life term), section 1201 (kidnapping), section 844(i) (destruction of property affecting interstate commerce by explosives), section 1116 (killing or attempted killing of diplomats), section

1203 (hostage taking), section 1992[1] (wrecking trains), section 2245 (offenses resulting in death), section 2280 (maritime violence), section 2281 (maritime platform violence), section 2332 (terrorist acts abroad against United States nationals), section 2332a (use of weapons of mass destruction), or section 2381 (treason) of this title, or section 46502 of title 49, United States Code (aircraft piracy).

(2) PREVIOUS CONVICTION OF VIOLENT FELONY INVOLVING FIREARM.—For any offense, other than an offense for which a sentence of death is sought on the basis of section 924(c), the defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person.

(3) PREVIOUS CONVICTION OF OFFENSE FOR WHICH A SENTENCE OF DEATH OR LIFE IMPRISONMENT WAS AUTHORIZED.—The defendant has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was authorized by statute.

(4) PREVIOUS CONVICTION OF OTHER SERIOUS OFFENSES.—The defendant has previously been convicted of 2 or more Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person.

(5) GRAVE RISK OF DEATH TO ADDITIONAL PERSONS.—The defendant, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense.

(6) HEINOUS, CRUEL, OR DEPRAVED MANNER OF COMMITTING OFFENSE.—The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim.

(7) PROCUREMENT OF OFFENSE BY PAYMENT.—The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

(8) PECUNIARY GAIN.—The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

(9) SUBSTANTIAL PLANNING AND PREMEDITATION.—The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

(10) CONVICTION FOR TWO FELONY DRUG OFFENSES.—The defendant has previously been convicted of 2 or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.

(11) VULNERABILITY OF VICTIM.—The victim was particularly vulnerable due to old age, youth, or infirmity.

_____
[1] See References in Text note below.

(12) CONVICTION FOR SERIOUS FEDERAL DRUG OFFENSES.—The defendant had previously been convicted of violating title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more years may be imposed or had previously been convicted of engaging in a continuing criminal enterprise.

(13) CONTINUING CRIMINAL ENTERPRISE INVOLVING DRUG SALES TO MINORS.—The defendant committed the offense in the course of engaging in a continuing criminal enterprise in violation of section 408(c) of the Controlled Substances Act (21 U.S.C. 848(c)), and that violation involved the distribution of drugs to persons under the age of 21 in violation of section 418 of that Act (21 U.S.C. 859).

(14) HIGH PUBLIC OFFICIALS.—The defendant committed the offense against—

(A) the President of the United States, the President-elect, the Vice President, the Vice President-elect, the Vice President-designate, or, if there is no Vice President, the officer next in order of succession to the office of the President of the United States, or any person who is acting as President under the Constitution and laws of the United States;

(B) a chief of state, head of government, or the political equivalent, of a foreign nation;

(C) a foreign official listed in section 1116(b)(3)(A), if the official is in the United States on official business; or

(D) a Federal public servant who is a judge, a law enforcement officer, or an employee of a United States penal or correctional institution—

(i) while he or she is engaged in the performance of his or her official duties;

(ii) because of the performance of his or her official duties; or

(iii) because of his or her status as a public servant.

For purposes of this subparagraph, a "law enforcement officer" is a public servant authorized by law or by a Government agency or Congress to conduct or engage in the prevention, investigation, or prosecution or adjudication of an offense, and includes those engaged in corrections, parole, or probation functions.

(15) PRIOR CONVICTION OF SEXUAL ASSAULT OR CHILD MOLESTATION.—In the case of an offense under chapter 109A (sexual abuse) or chapter 110 (sexual abuse of children), the defendant has previously been convicted of a crime of sexual assault or crime of child molestation.

(16) MULTIPLE KILLINGS OR ATTEMPTED KILLINGS.—The defendant intentionally killed or attempted to kill more than one person in a single criminal episode.

The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

(d) AGGRAVATING FACTORS FOR DRUG OFFENSE DEATH PENALTY.—In determining whether a sentence of death is justified for an offense described in section 3591(b), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

(1) PREVIOUS CONVICTION OF OFFENSE FOR WHICH A SENTENCE OF DEATH OR LIFE IMPRISONMENT WAS AUTHORIZED.—The defendant has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment or death was authorized by statute.

(2) PREVIOUS CONVICTION OF OTHER SERIOUS OFFENSES.—The defendant has previously been convicted of two or more Federal or State offenses, each punishable by a term of imprisonment of more than one year, committed on different occasions, involving the importation, manufacture, or distribution of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) or the infliction of, or attempted infliction of, serious bodily injury or death upon another person.

(3) PREVIOUS SERIOUS DRUG FELONY CONVICTION.—The defendant has previously been convicted of another Federal or State offense involving the manufacture, distribution, importation, or possession of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) for which a sentence of five or more years of imprisonment was authorized by statute.

(4) USE OF FIREARM.—In committing the offense, or in furtherance of a continuing criminal enterprise of which the offense was a part, the defendant used a firearm or knowingly directed, advised, authorized, or assisted another to use a firearm to threaten, intimidate, assault, or injure a person.

(5) DISTRIBUTION TO PERSONS UNDER 21.—The offense, or a continuing criminal enterprise of which the offense was a part, involved conduct proscribed by section 418 of the Controlled Substances Act (21 U.S.C. 859) which was committed directly by the defendant.

(6) DISTRIBUTION NEAR SCHOOLS.—The offense, or a continuing criminal enterprise of which the offense was a part, involved conduct proscribed by section 419 of the Controlled Substances Act (21 U.S.C. 860) which was committed directly by the defendant.

(7) USING MINORS IN TRAFFICKING.—The offense, or a continuing criminal enterprise of which the offense was a part, involved conduct proscribed by section 420 of the Controlled Substances Act (21 U.S.C. 861) which was committed directly by the defendant.

(8) LETHAL ADULTERANT.—The offense involved the importation, manufacture, or distribution of a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), mixed with a potentially lethal adulterant, and the defendant was aware of the presence of the adulterant.

The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

(Added and amended Pub. L. 103–322, title VI, § 60002(a), title XXXIII, § 330021(1), Sept. 13, 1994, 108 Stat. 1960, 2150; Pub. L. 104–132, title VII, § 728, Apr. 24, 1996, 110 Stat. 1302; Pub. L. 104–294, title VI, §§ 601(b)(7), 604(b)(35), Oct. 11, 1996, 110 Stat. 3499, 3508; Pub. L. 107–273, div. B, title IV, § 4002(e)(2), Nov. 2, 2002, 116 Stat. 1810; Pub. L.

109–248, title II, § 206(a)(4), July 27, 2006, 120 Stat. 614.)

REFERENCES IN TEXT

Section 1992 of this title, referred to in subsec. (c)(1), was repealed and a new section 1992 enacted by Pub. L. 109–177, title I, § 110(a), Mar. 9, 2006, 120 Stat. 205, and, as so enacted, section 1992 no longer relates only to the crime of wrecking trains.

The Comprehensive Drug Abuse Prevention and Control Act of 1970, referred to in subsec. (c)(12), is Pub. L. 91–513, Oct. 27, 1970, 84 Stat. 1236, as amended. Title II of the Act, known as the Controlled Substances Act, is classified principally to subchapter I (§ 801 et seq.) of chapter 13 of Title 21, Food and Drugs. Title III of the Act, known as the Controlled Substances Import and Export Act, is classified principally to subchapter II (§ 951 et seq.) of chapter 13 of Title 21. For complete classification of this Act to the Code, see Short Title note set out under sections 801 and 951 of Title 21 and Tables.

AMENDMENTS

2006—Subsec. (c)(1). Pub. L. 109–248 inserted "section 2245 (offenses resulting in death)," after "section 1992 (wrecking trains),".

2002—Subsec. (c)(1). Pub. L. 107–273 substituted "section 37" for "section 36".

1996—Subsec. (c)(1). Pub. L. 104–294, § 601(b)(7), substituted "section 2332a (use of weapons of mass destruction)" for "section 2339 (use of weapons of mass destruction)".

Subsec. (c)(12). Pub. L. 104–294, § 604(b)(35), substituted "Comprehensive Drug Abuse Prevention and Control Act of 1970" for "Controlled Substances Act".

Subsec. (c)(16). Pub. L. 104–132 added par. (16).

1994—Subsec. (c)(1). Pub. L. 103–322, § 330021(1), substituted "kidnapping" for "kidnaping".

EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by section 604(b)(35) of Pub. L. 104–294 effective Sept. 13, 1994, see section 604(d) of Pub. L. 104–294, set out as a note under section 13 of this title.

### § 3593. Special hearing to determine whether a sentence of death is justified

(a) NOTICE BY THE GOVERNMENT.—If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice—

(1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and

(2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information. The court may permit the

attorney for the government to amend the notice upon a showing of good cause.

(b) HEARING BEFORE A COURT OR JURY.—If the attorney for the government has filed a notice as required under subsection (a) and the defendant is found guilty of or pleads guilty to an offense described in section 3591, the judge who presided at the trial or before whom the guilty plea was entered, or another judge if that judge is unavailable, shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted—

(1) before the jury that determined the defendant's guilt;

(2) before a jury impaneled for the purpose of the hearing if—

(A) the defendant was convicted upon a plea of guilty;

(B) the defendant was convicted after a trial before the court sitting without a jury;

(C) the jury that determined the defendant's guilt was discharged for good cause; or

(D) after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary; or

(3) before the court alone, upon the motion of the defendant and with the approval of the attorney for the government.

A jury impaneled pursuant to paragraph (2) shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate, with the approval of the court, that it shall consist of a lesser number.

(c) PROOF OF MITIGATING AND AGGRAVATING FACTORS.—Notwithstanding rule 32 of the Federal Rules of Criminal Procedure, when a defendant is found guilty or pleads guilty to an offense under section 3591, no presentence report shall be prepared. At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. For the purposes of the preceding sentence, the fact that a victim, as defined in section 3510, attended or observed the trial shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury. The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death. The government

shall open the argument. The defendant shall be permitted to reply. The government shall then be permitted to reply in rebuttal. The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information.

(d) RETURN OF SPECIAL FINDINGS.—The jury, or if there is no jury, the court, shall consider all the information received during the hearing. It shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found to exist. A finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established. A finding with respect to any aggravating factor must be unanimous. If no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death authorized by law.

(e) RETURN OF A FINDING CONCERNING A SENTENCE OF DEATH.—If, in the case of—

(1) an offense described in section 3591(a)(1), an aggravating factor required to be considered under section 3592(b) is found to exist;

(2) an offense described in section 3591(a)(2), an aggravating factor required to be considered under section 3592(c) is found to exist; or

(3) an offense described in section 3591(b), an aggravating factor required to be considered under section 3592(d) is found to exist,

the jury, or if there is no jury, the court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.

(f) SPECIAL PRECAUTION TO ENSURE AGAINST DISCRIMINATION.—In a hearing held before a jury, the court, prior to the return of a finding under subsection (e), shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be. The jury, upon return of a finding under subsection (e), shall also return to the court a certificate, signed by each juror, that consideration of the race, color, religious be-

G.Add.5

liefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be.

(Added Pub. L. 103–322, title VI, § 60002(a), Sept. 13, 1994, 108 Stat. 1964; amended Pub. L. 105–6, § 2(c), Mar. 19, 1997, 111 Stat. 12; Pub. L. 107–273, div. B, title IV, § 4002(e)(8), Nov. 2, 2002, 116 Stat. 1810.)

#### REFERENCES IN TEXT

The Federal Rules of Criminal Procedure, referred to in subsec. (c), are set out in the Appendix to this title.

#### AMENDMENTS

2002—Subsec. (c). Pub. L. 107–273 substituted "rule 32" for "rule 32(c)" in first sentence.

1997—Subsec. (c). Pub. L. 105–6 inserted "For the purposes of the preceding sentence, the fact that a victim, as defined in section 3510, attended or observed the trial shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury."

#### EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105–6 applicable to cases pending on Mar. 19, 1997, see section 2(d) of Pub. L. 105–6, set out as an Effective Date note under section 3510 of this title.

### § 3594. Imposition of a sentence of death

Upon a recommendation under section 3593(e) that the defendant should be sentenced to death or life imprisonment without possibility of release, the court shall sentence the defendant accordingly. Otherwise, the court shall impose any lesser sentence that is authorized by law. Notwithstanding any other law, if the maximum term of imprisonment for the offense is life imprisonment, the court may impose a sentence of life imprisonment without possibility of release.

(Added Pub. L. 103–322, title VI, § 60002(a), Sept. 13, 1994, 108 Stat. 1966.)

### § 3595. Review of a sentence of death

(a) APPEAL.—In a case in which a sentence of death is imposed, the sentence shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time specified for the filing of a notice of appeal. An appeal under this section may be consolidated with an appeal of the judgment of conviction and shall have priority over all other cases.

(b) REVIEW.—The court of appeals shall review the entire record in the case, including—

(1) the evidence submitted during the trial;

(2) the information submitted during the sentencing hearing;

(3) the procedures employed in the sentencing hearing; and

(4) the special findings returned under section 3593(d).

(c) DECISION AND DISPOSITION.—

(1) The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592.

(2) Whenever the court of appeals finds that—

(A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

(C) the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure,

the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death. The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless.

(3) The court of appeals shall state in writing the reasons for its disposition of an appeal of a sentence of death under this section.

(Added Pub. L. 103–322, title VI, § 60002(a), Sept. 13, 1994, 108 Stat. 1967.)

### § 3596. Implementation of a sentence of death

(a) IN GENERAL.—A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

(b) PREGNANT WOMAN.—A sentence of death shall not be carried out upon a woman while she is pregnant.

(c) MENTAL CAPACITY.—A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.

(Added Pub. L. 103–322, title VI, § 60002(a), Sept. 13, 1994, 108 Stat. 1967.)

### § 3597. Use of State facilities

(a) IN GENERAL.—A United States marshal charged with supervising the implementation of

**G.Add.6**

Sec.
3732.    Taking of appeal; notice; time—Rule.
3733.    Assignment of errors—Rule.
3734.    Bill of exceptions abolished—Rule.
3735.    Bail on appeal or certiorari—Rule.
3736.    Certiorari—Rule.
3737.    Record—Rule.
3738.    Docketing appeal and record—Rule.
3739.    Supervision—Rule.
3740.    Argument—Rule.
3741.    Harmless error and plain error—Rule.
3742.    Review of a sentence.

### AMENDMENTS

1984—Pub. L. 98–473, title II, §213(b), Oct. 12, 1984, 98 Stat. 2013, added item 3742.

## §3731. Appeal by United States

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, or any part thereof, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

An appeal by the United States shall lie to a court of appeals from a decision or order, entered by a district court of the United States, granting the release of a person charged with or convicted of an offense, or denying a motion for revocation of, or modification of the conditions of, a decision or order granting release.

The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.

The provisions of this section shall be liberally construed to effectuate its purposes.

(June 25, 1948, ch. 645, 62 Stat. 844; May 24, 1949, ch. 139, §58, 63 Stat. 97; Pub. L. 90–351, title VIII, §1301, June 19, 1968, 82 Stat. 237; Pub. L. 91–644, title III, §14(a), Jan. 2, 1971, 84 Stat. 1890; Pub. L. 98–473, title II, §§205, 1206, Oct. 12, 1984, 98 Stat. 1986, 2153; Pub. L. 99–646, §32, Nov. 10, 1986, 100 Stat. 3598; Pub. L. 103–322, title XXXIII, §330008(4), Sept. 13, 1994, 108 Stat. 2142; Pub. L. 107–273, div. B, title III, §3004, Nov. 2, 2002, 116 Stat. 1805.)

### HISTORICAL AND REVISION NOTES

#### 1948 ACT

Based on title 18, U.S.C., 1940 ed., §682 (Mar. 2, 1907, ch. 2564, 34 Stat. 1246; Mar. 3, 1911, ch. 231, §291, 36 Stat. 1167; Jan. 31, 1928, ch. 14, §1, 45 Stat. 54; May 9, 1942, ch. 295, §1, 56 Stat. 271).

The word "dismissing" was substituted for "sustaining a motion to dismiss" in two places for conciseness and clarity, there being no difference in effect of a decision of dismissal whether made on motion or by the court sua sponte.

Minor changes were made to conform to Rule 12 of the Federal Rules of Criminal Procedure. The final sentence authorizing promulgation of rules is omitted as redundant.

#### 1949 ACT

This section [section 58] corrects a typographical error in the second paragraph of section 3731 of title 18, U.S.C., and conforms the language of the fifth, tenth, and eleventh paragraphs of such section 3731 with the changed nomenclature of title 28, U.S.C., Judiciary and Judicial Procedure. See sections 41, 43, and 451 of the latter title.

### AMENDMENTS

2002—First par. Pub. L. 107–273 inserted ", or any part thereof" after "as to any one or more counts".

1994—Second par. Pub. L. 103–322 substituted "order of a district court" for "order of a district courts".

1986—Fifth par. Pub. L. 99–646 struck out fifth par. which read as follows: "Pending the prosecution and determination of the appeal in the foregoing instances, the defendant shall be released in accordance with chapter 207 of this title."

1984—First par. Pub. L. 98–473, §1206, inserted "or granting a new trial after verdict or judgment," after "indictment or information".

Third par. Pub. L. 98–473, §205, inserted third par. relating to appeals from a decision or order, entered by a district court of the United States, granting the release of a person charged with or convicted of an offense, or denying a motion for revocation of, or modification of the conditions of, a decision or order granting release.

1971—First par. Pub. L. 91–644, §14(a)(1), enacted provision for appeal to a court of appeals from decision, judgment, or order of district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where double jeopardy prohibits further prosecution.

Second par. Pub. L. 91–644, §14(a)(1), enacted provision for appeal to a court of appeals from decision or order of district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

Such first and second pars. superseded former first eight pars. Pars. one through four had provided for appeal from district courts to Supreme Court from decision or judgment setting aside, or dismissing any indictment or information, or any count thereof and from decision arresting judgment of conviction for insufficiency of indictment or information, where such decision or judgment was based upon invalidity or construction of the statute upon which the indictment or information was founded and for an appeal from decision or judgment sustaining a motion in bar, where defendant had not been put in jeopardy. Pars. five through eight provided for appeal from district courts to a court of appeals where there were no provisions for direct appeal to Supreme Court from decision or judgment setting aside, or dismissing any indictment or information, or any count thereof and from decision arresting a judgment of conviction, and from an order, granting a motion for return of seized property or a motion to suppress evidence, made before trial of a person charged with violation of a Federal law, if the United States attorney certified to the judge who granted the motion that the appeal was not taken for purpose of delay and that the evidence was a substantial proof of the charge pending against the defendant.

Third par. Pub. L. 91–644, §14(a)(2), authorized within third par., formerly ninth, an appeal within thirty days after order has been rendered.

Fourth par. Pub. L. 91–644, §14(a), in revising the provisions, had the effect of designating former tenth par. as *fourth par.*

Fifth par. Pub. L. 91–644, §14(a)(3), substituted as a fifth par. provision for liberal construction of this section for prior eleventh par. provision respecting remand of case by Supreme Court to court of appeals that should have been taken to such court and treatment of the court's jurisdiction to hear and determine the case as if the appeal were so taken in the first instance and for prior twelfth par. provision respecting certification of case to Supreme Court that should have been taken directly to such Court and treatment of the Court's jurisdiction to hear and determine the case as if the appeal were taken directly to such Court.

1968—Pub. L. 90–351 inserted eighth par. providing for an appeal by the United States from decisions sustaining motions to suppress evidence and substituted in tenth par. "defendant shall be released in accordance with chapter 207 of this title" for "defendant shall be admitted to bail on his own recognizance", respectively.

1949—Act May 24, 1949, substituted "invalidity" for "validity" after "upon the" in second par., and conformed language of fifth, tenth, and eleventh pars. to the changed nomenclature of the courts.

#### SAVINGS PROVISION

Section 14(b) of Pub. L. 91–644 provided that: "The amendments made by this section [amending this section] shall not apply with respect to any criminal case begun in any district court before the effective date of this section [Jan. 2, 1971]."

### § 3732. Taking of appeal; notice; time—(Rule)

#### SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Taking appeal; notice, contents, signing; time, Rule 37(a).

(June 25, 1948, ch. 645, 62 Stat. 845.)

#### REFERENCES IN TEXT

Rule 37 of the Federal Rules of Criminal Procedure was abrogated Dec. 4, 1967, eff. July 1, 1968, and is covered by Rule 3, Federal Rules of Appellate Procedure, set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

### § 3733. Assignment of errors—(Rule)

#### SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Assignments of error on appeal abolished, Rule 37(a)(1).

Necessity of specific objection in order to assign error in instructions, Rule 30.

(June 25, 1948, ch. 645, 62 Stat. 845.)

#### REFERENCES IN TEXT

Rule 37 of the Federal Rules of Criminal Procedure was abrogated Dec. 4, 1947, eff. July 1, 1968, and is covered by Rule 3, Federal Rules of Appellate Procedure, set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

### § 3734. Bill of exceptions abolished—(Rule)

#### SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Exceptions abolished, Rule 51.
Bill of exceptions not required, Rule 37(a)(1).

(June 25, 1948, ch. 645, 62 Stat. 845.)

#### REFERENCES IN TEXT

Rule 37 of the Federal Rules of Criminal Procedure was abrogated Dec. 4, 1967, eff. July 1, 1968, and is covered by Rule 3, Federal Rules of Appellate Procedure, set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

### § 3735. Bail on appeal or certiorari—(Rule)

#### SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Bail on appeal or certiorari; application, Rules 38(c) and 46(a)(2).

(June 25, 1948, ch. 645, 62 Stat. 845.)

#### REFERENCES IN TEXT

Rule 38(c) of the Federal Rules of Criminal Procedure was abrogated Dec. 4, 1967, eff. July 1, 1968, and is covered by rule 9, Federal Rules of Appellate Procedure, set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

Rule 46 was amended as part of the Bail Reform Act in 1966 and in 1972, and some provisions originally contained in Rule 46 are covered by this chapter, see Notes of Advisory Committee on Rules and Amendment notes under Rule 46, this Appendix.

### § 3736. Certiorari—(Rule)

#### SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Petition to Supreme Court, time, Rule 37(b).

(June 25, 1948, ch. 645, 62 Stat. 845.)

#### REFERENCES IN TEXT

Rule 37 of the Federal Rules of Criminal Procedure was abrogated Dec. 4, 1967, eff. July 1, 1968. Provisions of such former rule for certiorari are covered by rule 19 et seq. of the Rules of the United States Supreme Court.

### § 3737. Record—(Rule)

#### SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Preparation, form; typewritten record, Rule 39(b).
Exceptions abolished, Rule 51.
Bill of exceptions unnecessary, Rule 37(a)(1).

(June 25, 1948, ch. 645, 62 Stat. 846.)

#### REFERENCES IN TEXT

Rules 37 and 39 of the Federal Rules of Criminal Procedure were abrogated Dec. 4, 1967, eff. July 1, 1968, and are covered by Rule 10, Federal Rules of Appellate Procedure, set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

### § 3738. Docketing appeal and record—(Rule)

#### SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Filing record on appeal and docketing proceeding; time, Rule 39(c).

(June 25, 1948, ch. 645, 62 Stat. 846.)

#### REFERENCES IN TEXT

Rule 39 of the Federal Rules of Criminal Procedure was abrogated Dec. 4, 1967, eff. July 1, 1968, and is covered by Rules 10 to 12, Federal Rules of Appellate Procedure, set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

### § 3739. Supervision—(Rule)

#### SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Control and supervision in appellate court, Rule 39(a).

(June 25, 1948, ch. 645, 62 Stat. 846.)

#### REFERENCES IN TEXT

Rule 39 of the Federal Rules of Criminal Procedure was abrogated Dec. 4, 1967, eff. July 1, 1968, and is covered by Rule 27, Federal Rules of Appellate Procedure, set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

### § 3740. Argument—(Rule)

#### SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Setting appeal for argument; preference to criminal appeals, Rule 39(d).

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–352 effective ninety days after June 27, 1988, except that such amendment not to apply to cases pending in Supreme Court on such effective date or affect right to review or manner of reviewing judgment or decree of court which was entered before such effective date, see section 7 of Pub. L. 100–352, set out as a note under section 1254 of this title.

EFFECTIVE DATE OF 1970 AMENDMENT

Section 199(a) of title I of Pub. L. 91–358 provided that: "The effective date of this title (and the amendments made by this title) [enacting sections 1363, 1451, and 2113 of this title and amending this section, sections 292 and 1869 of this title, section 5102 of Title 5, Government Organization and Employees, and section 260a of Title 42, The Public Health and Welfare] shall be the first day of the seventh calendar month which begins after the date of the enactment of this Act [July 29, 1970]."

### § 1258. Supreme Court of Puerto Rico; certiorari

Final judgments or decrees rendered by the Supreme Court of the Commonwealth of Puerto Rico may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of the Commonwealth of Puerto Rico is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

(Added Pub. L. 87–189, §1, Aug. 30, 1961, 75 Stat. 417; amended Pub. L. 100–352, §4, June 27, 1988, 102 Stat. 662.)

AMENDMENTS

1988—Pub. L. 100–352 struck out "appeal;" before "certiorari" in section catchline and amended text generally. Prior to amendment, text read as follows: "Final judgments or decrees rendered by the Supreme Court of the Commonwealth of Puerto Rico may be reviewed by the Supreme Court as follows:

"(1) By appeal, where is drawn in question the validity of a treaty or statute of the United States and the decision is against its validity.

"(2) By appeal, where is drawn in question the validity of a statute of the Commonwealth of Puerto Rico on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favor of its validity.

"(3) By writ of certiorari, where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of the Commonwealth of Puerto Rico is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution, treaties, or statutes of, or commission held or authority exercised under, the United States."

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–352 effective ninety days after June 27, 1988, except that such amendment not to apply to cases pending in Supreme Court on such effective date or affect right to review or manner of reviewing judgment or decree of court which was entered before such effective date, see section 7 of Pub. L. 100–352, set out as a note under section 1254 of this title.

### § 1259. Court of Appeals for the Armed Forces; certiorari

Decisions of the United States Court of Appeals for the Armed Forces may be reviewed by the Supreme Court by writ of certiorari in the following cases:

(1) Cases reviewed by the Court of Appeals for the Armed Forces under section 867(a)(1) of title 10.

(2) Cases certified to the Court of Appeals for the Armed Forces by the Judge Advocate General under section 867(a)(2) of title 10.

(3) Cases in which the Court of Appeals for the Armed Forces granted a petition for review under section 867(a)(3) of title 10.

(4) Cases, other than those described in paragraphs (1), (2), and (3) of this subsection, in which the Court of Appeals for the Armed Forces granted relief.

(Added Pub. L. 98–209, §10(a)(1), Dec. 6, 1983, 97 Stat. 1405; amended Pub. L. 101–189, div. A, title XIII, §1304(b)(3), Nov. 29, 1989, 103 Stat. 1577; Pub. L. 103–337, div. A, title IX, §924(d)(1)(C), (2)(A), Oct. 5, 1994, 108 Stat. 2832.)

AMENDMENTS

1994—Pub. L. 103–337 substituted "Court of Appeals for the Armed Forces" for "Court of Military Appeals" in section catchline and wherever appearing in text.

1989—Pub. L. 101–189 substituted "section 867(a)(1)" for "section 867(b)(1)" in par. (1), "section 867(a)(2)" for "section 867(b)(2)" in par. (2), and "section 867(a)(3)" for "section 867(b)(3)" in par. (3).

EFFECTIVE DATE

Section effective on the first day of the eighth calendar month beginning after Dec. 6, 1983, see section 12(a)(1) of Pub. L. 98–209, set out as an Effective Date of 1983 Amendment note under section 801 of Title 10, Armed Forces.

## CHAPTER 83—COURTS OF APPEALS

| Sec. | |
|---|---|
| 1291. | Final decisions of district courts. |
| 1292. | Interlocutory decisions. |
| [1293. | Repealed.] |
| 1294. | Circuits in which decisions reviewable. |
| 1295. | Jurisdiction of the United States Court of Appeals for the Federal Circuit. |
| 1296. | Review of certain agency actions. |

AMENDMENTS

1996—Pub. L. 104–331, §3(a)(2), Oct. 26, 1996, 110 Stat. 4069, added item 1296.

1984—Pub. L. 98–620, title IV, §402(29)(C), Nov. 8, 1984, 98 Stat. 3359, struck out item 1296 "Precedence of cases in the United States Court of Appeals for the Federal Circuit".

1982—Pub. L. 97–164, title I, §127(b), Apr. 2, 1982, 96 Stat. 39, added items 1295 and 1296.

1978—Pub. L. 95–598, title II, §236(b), Nov. 6, 1978, 92 Stat. 2667, directed the addition of item 1293, "Bankruptcy appeals", which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

1961—Pub. L. 87–189, §4, Aug. 30, 1961, 75 Stat. 417, struck out item 1293 "Final decisions of Puerto Rico and Hawaii Supreme Courts".

### § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit)

**G.Add.9**

shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, § 48, 65 Stat. 726; Pub. L. 85–508, § 12(e), July 7, 1958, 72 Stat. 348; Pub. L. 97–164, title I, § 124, Apr. 2, 1982, 96 Stat. 36.)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§ 225(a), 933(a)(1), and section 1356 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, § 128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, § 9, 37 Stat. 566; Jan. 28, 1915, ch. 22, § 2, 38 Stat. 804; Feb. 7, 1925, ch. 150, 43 Stat. 813; Sept. 21, 1922, ch. 370, § 3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, § 1, 43 Stat. 936; Jan. 31, 1928, ch. 14, § 1, 45 Stat. 54; May 17, 1932, ch. 190, 47 Stat. 158; Feb. 16, 1933, ch. 91, § 3, 47 Stat. 817; May 31, 1935, ch. 160, 49 Stat. 313; June 20, 1938, ch. 526, 52 Stat. 779; Aug. 2, 1946, ch. 753, § 412(a)(1), 60 Stat. 844).

This section rephrases and simplifies paragraphs "First", "Second", and "Third" of section 225(a) of title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.

The district courts for the districts of Hawaii and Puerto Rico are embraced in the term "district courts of the United States." (See definitive section 451 of this title.)

Paragraph "Fourth" of section 225(a) of title 28, U.S.C., 1940 ed., is incorporated in section 1293 of this title.

Words "Fifth. In the United States Court for China, in all cases" in said section 225(a) were omitted. (See reviser's note under section 411 of this title.)

Venue provisions of section 1356 of title 48, U.S.C., 1940 ed., are incorporated in section 1295 of this title.

Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1295 of this title.

In addition to the jurisdiction conferred by this chapter, the courts of appeals also have appellate jurisdiction in proceedings under Title 11, Bankruptcy, and jurisdiction to review:

(1) Orders of the Secretary of the Treasury denying an application for, suspending, revoking, or annulling a basic permit under chapter 8 of title 27;

(2) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(3) Orders of the Secretary of the Army under sections 504, 505 and 516 of title 33, U.S.C., 1940 ed., Navigation and Navigable Waters;

(4) Orders of the Civil Aeronautics Board under chapter 9 of title 49, except orders as to foreign air carriers which are subject to the President's approval;

(5) Orders under chapter 1 of title 7, refusing to designate boards of trade as contract markets or suspending or revoking such designations, or excluding persons from trading in contract markets;

(6) Orders of the Federal Power Commission under chapter 12 of title 16;

(7) Orders of the Federal Security Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;

(8) Orders of the Federal Power Commission under chapter 15B of title 15;

(9) Final orders of the National Labor Relations Board;

(10) Cease and desist orders under section 193 of title 7;

(11) Orders of the Securities and Exchange Commission;

(12) Orders to cease and desist from violating section 1599 of title 7;

(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;

(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties.

The courts of appeals also have jurisdiction to enforce:

(1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(2) Final orders of the National Labor Relations Board;

(3) Orders to cease and desist from violating section 1599 of title 7.

The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.

Changes were made in phraseology.

### AMENDMENTS

1982—Pub. L. 97–164, § 124, inserted "(other than the United States Court of Appeals for the Federal Circuit)" after "The court of appeals" and inserted provision that the jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

1958—Pub. L. 85–508 struck out provisions which gave courts of appeals jurisdiction of appeals from District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.

1951—Act Oct. 31, 1951, inserted reference to District Court of Guam.

### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

### EFFECTIVE DATE OF 1958 AMENDMENT

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c.16 as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

### TERMINATION OF UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE CANAL ZONE

For termination of the United States District Court for the District of the Canal Zone at end of the "transition period", being the 30-month period beginning Oct.

1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 2101 and 2201 to 2203 of Pub. L. 96–70, title II, Sept. 27, 1979, 93 Stat. 493, formerly classified to sections 3831 and 3841 to 3843, respectively, of Title 22, Foreign Relations and Intercourse.

## § 1292. Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

(1) of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

(2) of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

(d)(1) When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(2) When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(3) Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

(4)(A) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

(B) When a motion to transfer an action to the Court of Federal Claims is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Court of Federal Claims pursuant to the motion shall be carried out.

(e) The Supreme Court may prescribe rules, in accordance with section 2072 of this title, to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for under subsection (a), (b), (c), or (d).

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, § 49, 65 Stat. 726; Pub. L. 85–508, § 12(e), July 7, 1958, 72 Stat. 348; Pub. L. 85–919, Sept. 2, 1958, 72 Stat. 1770; Pub. L. 97–164, § 125, Apr. 2, 1982, 96 Stat. 36; Pub. L. 98–620, title IV, § 412, Nov. 8, 1984, 98 Stat. 3362; Pub. L. 100–702, title V, § 501, Nov. 19, 1988, 102 Stat. 4652; Pub. L. 102–572, title I, § 101, title IX, §§ 902(b), 906(c), Oct. 29, 1992, 106 Stat. 4506, 4516, 4518.)

ant to a judgment of a court of the United States, the respondent shall promptly file with the court certified copies of the indictment, plea of petitioner and the judgment, or such of them as may be material to the questions raised, if the petitioner fails to attach them to his petition, and same shall be attached to the return to the writ, or to the answer to the order to show cause.

(June 25, 1948, ch. 646, 62 Stat. 966.)

HISTORICAL AND REVISION NOTES

Derived from H.R. 4232, Seventy-ninth Congress, first session. It conforms to the prevailing practice in habeas corpus proceedings.

### § 2250. Indigent petitioner entitled to documents without cost

If on any application for a writ of habeas corpus an order has been made permitting the petitioner to prosecute the application in forma pauperis, the clerk of any court of the United States shall furnish to the petitioner without cost certified copies of such documents or parts of the record on file in his office as may be required by order of the judge before whom the application is pending.

(June 25, 1948, ch. 646, 62 Stat. 966.)

HISTORICAL AND REVISION NOTES

Derived from H.R. 4232, Seventy-ninth Congress, first session. It conforms to the prevailing practice.

### § 2251. Stay of State court proceedings

(a) IN GENERAL.—

(1) PENDING MATTERS.—A justice or judge of the United States before whom a habeas corpus proceeding is pending, may, before final judgment or after final judgment of discharge, or pending appeal, stay any proceeding against the person detained in any State court or by or under the authority of any State for any matter involved in the habeas corpus proceeding.

(2) MATTER NOT PENDING.—For purposes of this section, a habeas corpus proceeding is not pending until the application is filed.

(3) APPLICATION FOR APPOINTMENT OF COUNSEL.—If a State prisoner sentenced to death applies for appointment of counsel pursuant to section 3599(a)(2) of title 18 in a court that would have jurisdiction to entertain a habeas corpus application regarding that sentence, that court may stay execution of the sentence of death, but such stay shall terminate not later than 90 days after counsel is appointed or the application for appointment of counsel is withdrawn or denied.

(b) NO FURTHER PROCEEDINGS.—After the granting of such a stay, any such proceeding in any State court or by or under the authority of any State shall be void. If no stay is granted, any such proceeding shall be as valid as if no habeas corpus proceedings or appeal were pending.

(June 25, 1948, ch. 646, 62 Stat. 966; Pub. L. 109–177, title V, § 507(f), Mar. 9, 2006, 120 Stat. 251.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 465 (R.S. § 766; Mar. 3, 1893, ch. 226, 27 Stat. 751; Feb. 13, 1925, ch. 229, § 8(c), 43 Stat. 940; June 19, 1934, ch. 673, 48 Stat. 1177).

Provisions relating to proceedings pending in 1934 were deleted as obsolete.

A provision requiring an appeal to be taken within 3 months was omitted as covered by sections 2101 and 2107 of this title.

Changes were made in phraseology.

AMENDMENTS

2006—Pub. L. 109–177 designated first par. of existing provisions as subsec. (a)(1) and inserted headings, added pars. (2) and (3), and designated second par. of existing provisions as subsec. (b) and inserted heading.

EFFECTIVE DATE OF 2006 AMENDMENT

Pub. L. 109–177, title V, § 507(d), Mar. 9, 2006, 120 Stat. 251, provided that:

''(1) IN GENERAL.—This section [enacting section 2265 of this title, amending this section and sections 2261 and 2266 of this title, and repealing former section 2265 of this title] and the amendments made by this section shall apply to cases pending on or after the date of enactment of this Act [Mar. 9, 2006].

''(2) TIME LIMITS.—In a case pending on the date of enactment of this Act, if the amendments made by this section establish a time limit for taking certain action, the period of which began on the date of an event that occurred prior to the date of enactment of this Act, the period of such time limit shall instead begin on the date of enactment of this Act.''

### § 2252. Notice

Prior to the hearing of a habeas corpus proceeding in behalf of a person in custody of State officers or by virtue of State laws notice shall be served on the attorney general or other appropriate officer of such State as the justice or judge at the time of issuing the writ shall direct.

(June 25, 1948, ch. 646, 62 Stat. 967.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 462 (R.S. § 762).

Section 462 of title 28, U.S.C., 1940 ed., was limited to alien prisoners described in section 453 of title 28, U.S.C., 1940 ed. The revised section extends to all cases of all prisoners under State custody or authority, leaving it to the justice or judge to prescribe the notice to State officers, to specify the officer served, and to satisfy himself that such notice has been given.

Provision for making due proof of such service was omitted as unnecessary. The sheriff's or marshal's return is sufficient.

Changes were made in phraseology.

### § 2253. Appeal

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

**G.Add.13**

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

(June 25, 1948, ch. 646, 62 Stat. 967; May 24, 1949, ch. 139, § 113, 63 Stat. 105; Oct. 31, 1951, ch. 655, § 52, 65 Stat. 727; Pub. L. 104–132, title I, § 102, Apr. 24, 1996, 110 Stat. 1217.)

HISTORICAL AND REVISION NOTES
1948 ACT

Based on title 28, U.S.C., 1940 ed., §§ 463(a) and 466 (Mar. 10, 1908, ch. 76, 36 [35] Stat. 40; Feb. 13, 1925, ch. 229, §§ 6, 13, 43 Stat. 940, 942; June 29, 1938, ch. 806, 52 Stat. 1232).

This section consolidates paragraph (a) of section 463, and section 466 of title 28, U.S.C., 1940 ed.

The last two sentences of section 463(a) of title 28, U.S.C., 1940 ed., were omitted. They were repeated in section 452 of title 28, U.S.C., 1940 ed. (See reviser's note under section 2241 of this title.)

Changes were made in phraseology.

1949 ACT

This section corrects a typographical error in the second paragraph of section 2253 of title 28.

AMENDMENTS

1996—Pub. L. 104–132 reenacted section catchline without change and amended text generally. Prior to amendment, text read as follows:

''In a habeas corpus proceeding before a circuit or district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit where the proceeding is had.

''There shall be no right of appeal from such an order in a proceeding to test the validity of a warrant to remove, to another district or place for commitment or trial, a person charged with a criminal offense against the United States, or to test the validity of his detention pending removal proceedings.

''An appeal may not be taken to the court of appeals from the final order in a habeas corpus proceeding where the detention complained of arises out of process issued by a State court, unless the justice or judge who rendered the order or a circuit justice or judge issues a certificate of probable cause.''

1951—Act Oct. 31, 1951, substituted ''to remove, to another district or place for commitment or trial, a person charged with a criminal offense against the United States, or to test the validity of his'' for ''of removal issued pursuant to section 3042 of Title 18 or the'' in second par.

1949—Act May 24, 1949, substituted ''3042'' for ''3041'' in second par.

### § 2254. State custody; remedies in Federal courts

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(f) If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such deter-

### IN FORMA PAUPERIS DECLARATION

[Insert appropriate court]

|  |  |
|---|---|
| (Petitioner) | DECLARATION IN SUPPORT OF REQUEST |
| v. | TO PROCEED *IN FORMA* |
| (Respondent(s)) | *PAUPERIS* |

I, _____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed? Yes ☐ No ☐
   a. If the answer is "yes," state the amount of your salary or wages per month, and give the name and address of your employer.

   _____

   b. If the answer is "no," state the date of last employment and the amount of the salary and wages per month which you received.

   _____

2. Have you received within the past twelve months any money from any of the following sources?
   a. Business, profession or form of self-employment? Yes ☐ No ☐
   b. Rent payments, interest or dividends? Yes ☐ No ☐
   c. Pensions, annuities or life insurance payments? Yes ☐ No ☐
   d. Gifts or inheritances? Yes ☐ No ☐
   e. Any other sources? Yes ☐ No ☐
   If the answer to any of the above is "yes," describe each source of money and state the amount received from each during the past twelve months.

   _____

3. Do you own cash, or do you have money in a checking or savings account?
   Yes ☐ No ☐ (Include any funds in prison accounts.)
   If the answer is "yes," state the total value of the items owned.

   _____

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?
   Yes ☐ No ☐
   If the answer is "yes," describe the property and state its approximate value.

   _____

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

   _____

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on _____.
                    (date)

_____
Signature of Petitioner

#### Certificate

I hereby certify that the petitioner herein has the sum of $_____ on account to his credit at the _____ institution where he is confined. I further certify that petitioner likewise has the following securities to his credit according to the records of said _____ institution:

_____

_____

_____

_____

_____
Authorized Officer of Institution

(As amended Apr. 28, 1982, eff. Aug. 1, 1982; Apr. 26, 2004, eff. Dec. 1, 2004.)

MODEL FORM FOR USE IN 28 U.S.C. § 2254 CASES INVOLVING A RULE 9 ISSUE

Form No. 9

[Abrogated Apr. 30, 2007, eff. Dec. 1, 2007.]

*Changes Made After Publication and Comments—Forms Accompanying Rules Governing § 2254 and § 2255 Proceedings.* Responding to a number of comments from the public, the Committee deleted from both sets of official forms the list of possible grounds of relief. The Committee made additional minor style corrections to the forms.

### § 2255. Federal custody; remedies on motion attacking sentence

(a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

(b) Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

(c) A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

(d) An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

(e) An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by

**G.Add.15**

motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

(f) A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

(g) Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

(h) A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—

(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

(June 25, 1948, ch. 646, 62 Stat. 967; May 24, 1949, ch. 139, § 114, 63 Stat. 105; Pub. L. 104–132, title I, § 105, Apr. 24, 1996, 110 Stat. 1220; Pub. L. 110–177, title V, § 511, Jan. 7, 2008, 121 Stat. 2545.)

### HISTORICAL AND REVISION NOTES

#### 1948 ACT

This section restates, clarifies and simplifies the procedure in the nature of the ancient writ of error coram nobis. It provides an expeditious remedy for correcting erroneous sentences without resort to habeas corpus. It has the approval of the Judicial Conference of the United States. Its principal provisions are incorporated in H.R. 4233, Seventy-ninth Congress.

#### 1949 ACT

This amendment conforms language of section 2255 of title 28, U.S.C., with that of section 1651 of such title and makes it clear that the section is applicable in the district courts in the Territories and possessions.

### REFERENCES IN TEXT

Section 408 of the Controlled Substances Act, referred to in subsec. (g), is classified to section 848 of Title 21, Food and Drugs.

### AMENDMENTS

2008—Pub. L. 110–177 designated first through eighth undesignated pars. as subsecs. (a) to (h), respectively.

1996—Pub. L. 104–132 inserted at end three new undesignated paragraphs beginning "A 1-year period of limitation", "Except as provided in section 408 of the Controlled Substances Act", and "A second or successive motion must be certified" and struck out second and fifth undesignated pars. providing, respectively, that "A motion for such relief may be made at any time." and "The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner."

1949—Act May 24, 1949, substituted "court established by Act of Congress" for "court of the United States" in first par.

### APPROVAL AND EFFECTIVE DATE OF RULES GOVERNING SECTION 2254 CASES AND SECTION 2255 PROCEEDINGS FOR UNITED STATES DISTRICT COURTS

For approval and effective date of rules governing petitions under section 2254 and motions under section 2255 of this title filed on or after Feb. 1, 1977, see section 1 of Pub. L. 94–426, set out as a note under section 2074 of this title.

### POSTPONEMENT OF EFFECTIVE DATE OF PROPOSED RULES AND FORMS GOVERNING PROCEEDINGS UNDER SECTIONS 2254 AND 2255 OF THIS TITLE

Rules and forms governing proceedings under sections 2254 and 2255 of this title proposed by Supreme Court order of Apr. 26, 1976, effective 30 days after adjournment sine die of 94th Congress, or until and to the extent approved by Act of Congress, whichever is earlier, see section 2 of Pub. L. 94–349, set out as a note under section 2074 of this title.

## RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS

*(Effective Feb. 1, 1977, as amended to Jan. 7, 2011)*

Rule
1.      Scope.
2.      The Motion.
3.      Filing the Motion; Inmate Filing.
4.      Preliminary Review.
5.      The Answer and the Reply.
6.      Discovery.
7.      Expanding the Record.
8.      Evidentiary Hearing.
9.      Second or Successive Motions.
10.     Powers of a Magistrate Judge.
11.     Certificate of Appealability; Time to Appeal.
12.     Applicability of the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure.

### APPENDIX OF FORMS

Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody.

### EFFECTIVE DATE OF RULES; EFFECTIVE DATE OF 1975 AMENDMENT

Rules, and the amendments thereto by Pub. L. 94–426, Sept. 28, 1976, 90 Stat. 1334, effective with respect to petitions under section 2254 of this title and motions under section 2255 of this title filed on or after Feb. 1, 1977, see section 1 of Pub. L. 94–426, set out as a note under section 2074 of this title.

### Rule 1. Scope

These rules govern a motion filed in a United States district court under 28 U.S.C. § 2255 by:

(a) a person in custody under a judgment of that court who seeks a determination that:

(1) the judgment violates the Constitution or laws of the United States;

**G.Add.16**

**UNITED STATES of America,**

**v.**

**Gary Lee SAMPSON.**

**Cr. No. 01–10384–MLW.**

United States District Court,
D. Massachusetts.

Oct. 20, 2011.

**Background:** Following affirmance, 486 F.3d 13, of death sentence imposed after defendant pleaded guilty to two counts of carjacking resulting in death, he moved to vacate, set aside, or correct sentence.

**Holdings:** The District Court, Wolf, J., held that:

(1) juror provided inaccurate answers to voir dire questions;

(2) questions were material;

(3) juror's inaccurate responses were dishonest;

(4) juror's reasons for lying adversely affected her impartiality; and

(5) court, if fully informed about juror's inaccurate responses, would have exercised its discretion to excuse her for cause.

Motion granted in part.

**1. Jury ⟜97(1)**

To qualify as an impartial juror an individual must not have views or personal experiences that will prevent or substantially impair his or her ability to decide a matter based solely on the evidence.

**2. Jury ⟜33(2.10)**

In the conventional criminal case in which the jury is asked only whether guilt has been proven beyond a reasonable doubt, the bias or prejudice of even a single juror would violate a defendant's

Sixth Amendment right to a fair trial. U.S.C.A. Const.Amend. 6.

**3. Jury ⟜33(2.10)**

Sixth Amendment guarantees a defendant on trial for his life the right to an impartial jury. U.S.C.A. Const.Amend. 6.

**4. Jury ⟜108**

**Sentencing and Punishment ⟜1789(9)**

Under the Federal Death Penalty Act, if even one juror who is not impartial is empaneled and the death sentence is imposed, the government is disentitled to execute the sentence. 18 U.S.C.A. §§ 3593, 3594.

**5. Jury ⟜108**

**Sentencing and Punishment ⟜1789(9)**

Under the Federal Death Penalty Act, in a case in which the death penalty is imposed, a defendant is deprived of the right to an impartial jury and entitled to a new trial when a juror who is not impartial participates in deciding a case, regardless of whether or not the verdict would have been different. 18 U.S.C.A. §§ 3593, 3594.

**6. Jury ⟜33(2.10)**

An impartial jury, to which every defendant is entitled under the Sixth Amendment, is one in which every juror is capable and willing to decide the case solely on the evidence before him. U.S.C.A. Const. Amend. 6.

**7. Jury ⟜97(1)**

A juror is not impartial if his experiences, opinions, predispositions, biases, prejudices, interests, or relationships would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.

**152**        820 FEDERAL SUPPLEMENT, 2d SERIES

**8. Jury ⚮97(1)**

To establish actual bias after a trial, a party must prove that a juror was not capable and willing to decide the case solely on the evidence before him.

**9. Jury ⚮97(1)**

A juror is found by the judge to be partial, as would establish actual bias, either because the juror admits partiality or the judge finds actual partiality based upon the juror's voir dire answers.

**10. Jury ⚮133**

Whether a juror is actually biased is a question of fact determined by the trial judge.

**11. Jury ⚮97(1)**

A juror who is found to be actually biased must be excused for cause.

**12. Criminal Law ⚮923(2)**

A moving party is entitled to a new trial if a judge failed to excuse an actually biased juror based on information available at time of trial or if it is later discovered that a juror who was actually biased participated in rendering a verdict.

**13. Jury ⚮97(1)**

Implied bias, which is sometimes called presumed bias, is determined as a matter of law and attributed to a prospective juror regardless of actual partiality.

**14. Jury ⚮97(1)**

Where a juror is impliedly biased, disqualification of the juror is mandatory.

**15. Criminal Law ⚮923(2)**

After trial, a conclusion that a juror who participated in rendering a verdict was impliedly biased entitles the moving party to a new trial.

**16. Jury ⚮97(1)**

Bias is implied in extreme situations where the relationship between a prospec-

tive juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.

**17. Jury ⚮97(1)**

In some circumstances, bias is implied when there are similarities between the personal experiences of the juror and the issues being litigated.

**18. Jury ⚮131(18)**

Bias may be implied where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury.

**19. Jury ⚮131(18)**

Dishonest answers to voir dire questions are a factor that can contribute to a finding of implied bias on the part of a juror.

**20. Jury ⚮97(1)**

Inferable or inferred bias exists when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias.

**21. Jury ⚮131(6)**

Voir dire protects the right to an impartial jury by exposing possible biases, both known and unknown, on the part of potential jurors.

**22. Jury ⚮85**

There is no precise formula to guide judges in juror-qualification matters; rather, a trial judge must exercise judgment and discretion in deciding whether a juror should be excused for cause.

**23. Jury ⚮97(1)**

A court's assessment of a juror's demeanor in discussing areas of potential bias plays an important part in a judge's

**G.Add.18**

determination of whether a juror is impartial or should be excused for cause.

**24. Jury ☞97(1)**

With regard to decisions being made during the jury selection process, an impartial jury is so fundamental to the Sixth Amendment right to a fair trial, that doubts regarding bias must be resolved against the juror. U.S.C.A. Const.Amend. 6.

**25. Jury ☞97(1)**

In cases in which a judge's questions on voir dire do not elicit relevant information about a juror's bias, a party claiming his right to an impartial jury has been violated can obtain a new trial only by proving actual or implied bias.

**26. Jury ☞131(18)**

Where a juror has provided an incorrect answer to a question on voir dire that should have revealed information relevant to a determination of juror bias, a party claiming he was denied an impartial jury may obtain relief by showing actual bias or implied bias, or by satisfying the test articulated in *McDonough.*

**27. Criminal Law ☞1162**

Harmless error principles require a court to exercise judgment instead of ordering automatic reversal for error, and to ignore errors that do not affect the essential fairness of the trial.

**28. Criminal Law ☞923(2)**

A party seeking new trial on basis of juror partiality under *McDonough* must prove by a preponderance of evidence that: (1) a juror gave an inaccurate answer to a question that was asked on voir dire, (2) the question was material, (3) the inaccurate response was dishonest, meaning knowingly and intentionally false, rather than the result of a good faith misunderstanding or mistake, (4) the reasons for

the knowingly and intentionally false response relate to the juror's ability to decide the particular case based solely on the evidence and, therefore, call into question the juror's ability to be impartial, and (5) a correct response would have provided a valid basis for a challenge for cause and would have required or resulted in the excusal of the juror for cause based on actual bias, implied bias, or inferable bias.

**29. Jury ☞131(18)**

Generally, a matter is "material" for voir dire purposes if it has a natural tendency to influence, or be capable of influencing, the judge who must decide whether to excuse a juror for cause.

> See publication Words and Phrases for other judicial constructions and definitions.

**30. Jury ☞131(18)**

An innocent, unintentional erroneous answer by a prospective juror on voir dire does not itself raise a question of whether the individual is able to decide a case based solely on the evidence, even if the information that should have been provided may do so; such a mistake does not suggest that the failure to disclose information that was solicited may have denied a party his right to an impartial jury.

**31. Jury ☞131(18)**

Under the *McDonough* test, because the motives for concealing information on voir dire may vary, only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

**32. Criminal Law ☞923(2)**

Under the *McDonough* test for new trial relief, even an intentionally dishonest answer by a prospective juror on voir dire is not fatal, so long as the falsehood does not bespeak a lack of impartiality.

**33. Criminal Law ⟜923(2)**

Under the *McDonough* test for new trial relief, a party can prove that he was deprived of his right to an impartial jury without proving that a juror was actually or impliedly biased.

**34. Criminal Law ⟜923(2)**

Defendant bears burden of proving by a preponderance of the evidence facts that justify granting a new trial for actual bias, implied bias, or under *McDonough*.

**35. Criminal Law ⟜1491**

Evidence was insufficient, in post-conviction proceeding challenging defendant's death sentence, to determine whether juror who intentionally gave inaccurate answers to important questions during voir dire, due to personal embarrassment, was actually biased, as would entitle defendant to a new trial; District Court was precluded from questioning the juror about matters that occurred during jury deliberations, and when questioned about whether her personal experiences affected her ability to be fair and impartial in deciding whether defendant should be executed, she displayed a repeated lack of candor and inability to discuss certain matters unemotionally and coherently. Fed.Rules Evid. Rule 606(b), 28 U.S.C.A.

**36. Criminal Law ⟜1491**

Despite juror's repeated dishonesty at voir dire, evidence was insufficient, in post-conviction proceeding challenging defendant's death sentence, to find that juror was impliedly biased because of any direct personal relationship to the parties or specific events in the case, as would entitle defendant to a new trial; juror had no direct relationship to the parties or events in the case, the occurrences in her own life which might have affected her ability to decide the case based solely on the evidence occurred before rather than during

trial, and she did not lie in order to secure a seat on the jury.

**37. Jury ⟜131(18)**

Juror provided inaccurate answers, in death penalty case, to many voir dire questions which should have elicited the information that her daughter was addicted to cocaine, had been convicted of related crimes, and had served time in prison, and that her former husband abused drugs and had threatened to shoot her, causing her to fear him and obtain an abuse prevention order against him, satisfying first prong of *McDonough* test for determining whether defendant was deprived of an impartial jury.

**38. Jury ⟜131(18)**

Voir dire questions to which juror provided inaccurate answers, in death penalty case, were material, satisfying second prong of *McDonough* test for determining whether defendant was deprived of an impartial jury; each of the questions that the juror answered inaccurately by withholding elicited information had the potential to influence the decision on whether she was willing and able to decide the case based solely on the evidence and, therefore, could and would be an impartial juror.

**39. Jury ⟜131(18)**

Each of juror's inaccurate responses to voir dire questions that should have elicited relevant information about her daughter's drug addiction and imprisonment and her former husband's drug abuse and threats against her, was dishonest, meaning knowingly and intentionally false, rather than the result of a good faith misunderstanding or mistake, satisfying third prong of *McDonough* test for determining whether defendant was deprived of an impartial jury in trial to determine whether a death sentence was warranted.

**40. Jury ⟸131(8)**

Juror's reasons for lying, in her responses to voir dire questions that should have elicited relevant information about her ability to decide whether to impose the death penalty on defendant based solely on the evidence, reflected her deep emotional distress about events similar to those presented at trial and were thus reasons that adversely affected her impartiality, satisfying fourth prong of *McDonough* test for determining whether defendant was deprived of an impartial jury; juror lied because of her shame and embarrassment about her daughter's drug addiction and imprisonment and her former husband's drug abuse and threats against her, feelings which were so intense that she could not discuss those matters candidly, unemotionally or, often, coherently.

**41. Jury ⟸131(18)**

District court, if fully informed, before juror's empanelment, regarding the painful personal experiences which caused her to give dishonest responses to voir dire questions that should have elicited relevant information about her ability to decide whether to impose the death penalty on defendant based solely on the evidence, would have had discretion to excuse the juror for cause, and would have done so, satisfying fifth prong of *McDonough* test for determining whether defendant was deprived of an impartial jury; there was a substantial risk that juror's extreme emotional distress would significantly impair her impartiality, and juror's dishonestly would have caused the court concern that she would not follow instructions on other issues.

**42. Criminal Law ⟸923(2)**

Juror's inaccurate answers, to voir dire questions that should have elicited relevant information about her ability to decide whether to impose the death penal-

ty on defendant based solely on the evidence, did not demonstrate such implied bias as would support granting a new trial on basis of a deprivation of an impartial jury; juror's responses were not intentionally false, she impressed the court as honest and thoughtful, and the matters she failed to disclose were not comparable to matters at issue in the case.

**43. Criminal Law ⟸923(2)**

Juror's inaccurate answers, to voir dire questions regarding whether he had ever been charged with a crime and his past experiences with police and the criminal justice system, did not demonstrate such implied bias as would support granting a new trial on basis of a deprivation of an impartial jury; juror's inaccurate responses were not intentionally false, he was not shown to have been actually biased, and the matters he failed to disclose were not comparable to matters involved in the case.

**44. Criminal Law ⟸923(1)**

In context of a juror's inaccurate responses to questions on voir dire, mere injury to the ability to exercise peremptory challenges properly is not a ground on which a new trial may be granted.

**45. Criminal Law ⟸923(2)**

Alleged injury to defendant's ability to exercise peremptory challenges intelligently, in trial to determine whether imposition of the death penalty was warranted, based on inaccurate responses given by three jurors on voir dire, did not warrant new trial.

---

George W. Vien, Donnelly, Conroy & Gelhaar, LLP, John A. Wortmann, Jr., Mark T. Quinlivan, Zachary R. Hafer,

United States Attorney's Office, Boston, MA, for Plaintiff.

William E. McDaniels, Williams & Connolly, LLP, Jennifer G. Wicht, Thomas P. Windom, Williams & Connolly LLP, Washington, DC, Elizabeth L. Prevett, J. Martin Richey, Federal Public Defender Office, Boston, MA, for Defendant.

### ORDER

WOLF, District Judge.

The attached version of the October 20, 2011 Memorandum and Order on Jury Claim is being filed for the public record. In order to strike the appropriate balance between personal privacy interests, *see In re Globe Newspaper Company*, 920 F.2d 88, 95 (1st Cir.1990), and transparency concerning the reasons for judicial decisions, it replaces the names of jurors and third-parties with initials, and includes minor redactions concerning particularly sensitive information regarding third-parties. An unredacted form of the Memorandum and Order on Jury Claim that includes the names of the jurors and third-parties is being filed under seal and provided to the parties.

### MEMORANDUM AND ORDER ON JURY CLAIM

#### I.  SUMMARY

On July 24, 2001, Gary Lee Sampson murdered Philip McCloskey and attempted to steal his car.  On July 27, 2001, Sampson murdered Jonathan Rizzo and stole his car.  Then, on July 30, 2001, in New Hampshire, Sampson murdered Robert Whitney and later took his car as well.  On July 31, 2001, William Gregory picked up Sampson who was hitchhiking in Vermont. Gregory escaped Sampson's attack on him. Soon after, Sampson called 911 and surrendered to the Vermont State Police.

Sampson quickly confessed to the murders of McCloskey, Rizzo, and Whitney.

In October, 2001, Sampson was charged in this federal court with two counts of carjacking resulting in the deaths of McCloskey and Rizzo, respectively.  As permitted but not required by the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 *et seq.*, the government decided to seek the death penalty.

Sampson pled guilty to the charges against him.  Pursuant to the legal requirements established by the Supreme Court and codified in the Federal Death Penalty Act, a trial was nevertheless required to permit a jury to determine whether Sampson should be executed.

[1]  Under the Sixth Amendment, every defendant in a criminal case has a constitutional right to be tried by an impartial jury.  U.S. Const. Amend. VI. An impartial jury is a "touchstone of a fair trial" and has been defined as a "jury capable and willing to decide the case solely on the evidence before it."  *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (internal quotation omitted). Therefore, to qualify as an impartial juror an individual must not have views or personal experiences that will prevent or substantially impair his or her ability to decide a matter based solely on the evidence.

In the conventional criminal case in which the jury is asked to decide unanimously only whether guilt has been proven beyond a reasonable doubt, the existence of even a single partial person on the jury requires a new trial.  In a Federal Death Penalty Act case it is particularly important that each and every juror be able to decide the case based solely on the evidence and, therefore, be impartial.  The Supreme Court has held that: "the penalty of death is qualitatively different from a sentence of imprisonment, however

long.... Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). To implement this principle, the Federal Death Penalty Act provides that if even one juror does not find the death penalty to be justified the defendant may not be executed. *See* 18 U.S.C. §§ 3593, 3594; *Jones v. United States*, 527 U.S. 373, 380–81, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). Therefore, each juror has the power to decide that a defendant will live rather than die. Each juror must be able to make that decision based solely on the evidence, uninfluenced by personal experiences that he or she may have had. The Supreme Court has held that if even one member of a jury that has sentenced a defendant to death was not impartial, that sentence must be vacated. *See Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

At trial, the court and the parties made an extensive effort to assure that each and every juror in this case would be able to decide whether Sampson should be sentenced to death based solely on the evidence. Hundreds of potential jurors were required to answer in writing, under oath, seventy-seven questions designed to elicit information concerning any possible bias or prejudice that the potential juror recognized and was willing to reveal, and also to elicit information concerning life experiences that might subconsciously injure an individual's ability to decide Sampson's case based solely on the evidence. Many potential jurors were excused based on their written responses alone. Many other jurors were questioned individually, again under oath, to determine whether they could decide whether Sampson should live or die based solely on the evidence and

were, therefore, eligible to serve as jurors in his case. The jury selection process lasted seventeen days.

The court recognized that the written and oral questioning would involve matters a potential juror might regard as private and sensitive. Therefore, the potential jurors were told that, upon request, the questioning and their responses on such sensitive subjects would not be made part of the public record. They were also repeatedly told, however, that it was essential that they answer every question honestly and accurately.

During weeks of individual questioning, potential jurors were excused for cause for a range of conventional reasons. Some were excused because of pretrial exposure to information about the case or because of the existence of attitudes they acknowledged that raised serious questions about their ability to be impartial. Other potential jurors were excused for cause because they had emotional life experiences that were comparable to matters that would be presented in Sampson's case and created a serious risk that they would not be able to decide whether the death penalty should be imposed based solely on the evidence. In addition, potential jurors were excused when it was discovered that they had responded to written or oral questions dishonestly.

Eventually, twelve deliberating jurors, including C, and six alternates were empaneled. During the trial, two jurors were excused when it was discovered they had answered voir dire questions dishonestly.

At trial, the jurors heard evidence of, among other things: the manner in which Sampson murdered McCloskey, Rizzo, and Whitney, and the fear his victims undoubtedly experienced; Sampson's threats to shoot female bank tellers in the course of robberies; Sampson's substance abuse and

the fact that one of his marriages ended because of it; Sampson's experiences in prison; and Sampson's parents' refusal to speak to his attorneys. Ultimately, the jury unanimously decided that Sampson should be executed for the murders of McCloskey and Rizzo.

The court subsequently denied motions to question jurors about their verdict and for a new trial. In January, 2004, it sentenced Sampson to be executed. The Court of Appeals for the First Circuit affirmed the death sentence. The Supreme Court declined to review the case.

As required by the Federal Death Penalty Act, this court then appointed new counsel for post-conviction proceedings. In May, 2009, Sampson filed a motion for a new trial pursuant to 28 U.S.C. § 2255 ("the § 2255 Motion"), alleging that his constitutional rights had been violated. Among other things, Sampson alleged that he had been deprived of his right to have his sentence decided by an impartial jury. This contention was based on evidence developed by Sampson's new counsel that three jurors, including C, had answered voir dire questions inaccurately. Sampson also argued that their inaccurate answers deprived him of his right to exercise his peremptory challenges on a properly informed basis.

Because material facts were in dispute, in November, 2010, the court conducted a hearing in which the three jurors were required to testify concerning their inaccurate responses to voir dire questions. The court finds that two of these jurors made unintentional errors in responding to voir dire questions and that Sampson is not entitled to a new trial because of those errors.

However, as explained in detail in this Memorandum, the court also finds that C intentionally and repeatedly answered a series of questions dishonestly in an effort to avoid disclosing or discussing painful experiences she had endured concerning her daughter J and her former husband P. Her dishonesty began when she filled out her questionnaire in September, 2003, continued when she returned for individual voir dire in October, 2003, and was repeated when she was required to testify in these § 2255 proceedings.

More specifically, C intentionally lied during the jury selection process in response to questions that should have elicited the facts that: in 2000 her husband P had a rifle or shotgun and threatened to shoot her; C had feared that P would kill her; as a result, C obtained an Abuse Prevention Order against P; P was later arrested in her presence and prosecuted for violating that Order; C's marriage to P ended because of his substance abuse; J also had a drug problem; and J's drug abuse resulted in her serving time in prison, where C visited her. As information concerning these experiences involving J and P emerged slowly in the course of three hearings in these § 2255 proceedings, C repeatedly characterized each of those experiences as "horrible" and a "nightmare." She often cried when required to think about these matters. She was frequently unable to discuss them candidly or coherently.

In *McDonough*, the Supreme Court described the circumstances in which inaccurate responses to voir dire questions would deny a party his right to an impartial jury and, therefore, require a new trial. *See* 464 U.S. at 556, 104 S.Ct. 845. It stated:

> We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may

vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.*

Accordingly, for the reasons explained in detail in § III of this Memorandum, to obtain relief under *McDonough*, Sampson was required to prove by a preponderance of the evidence that: (1) C was asked a question during voir dire that should have elicited particular information; (2) the question was material; (3) C's response was dishonest, meaning deliberately false, rather than the result of a good faith misunderstanding or mistake; (4) her motive for answering dishonestly relates to her ability to decide the case solely on the evidence and, therefore, calls her impartiality into question; and (5) the concealed information, when considered along with the motive for concealment, the manner of its discovery, and C's demeanor when required to discuss J and P, would have required or resulted in her excusal for cause for either actual bias, implied bias, or what the Second Circuit characterizes as "inferable bias."

The court finds that Sampson has satisfied his burden of proving every element of the *McDonough* test. C did not falsely answer any question as part of a conscious effort to become a juror and punish Sampson for the abuse inflicted on her by P. However, it has been proven that during the jury selection process C dishonestly answered all material questions that should have revealed important events concerning J and P because C was deeply ashamed, and became distraught when required to think about them. She repeatedly lied because the events concerning J and P were too painful for her to disclose or discuss. C's decision to lie rather than reveal these events demonstrates the tremendous emotional impact that they had

on C at the time of the voir dire and calls her impartiality into question.

The matters about which C repeatedly lied under oath were comparable to matters presented by the evidence in Sampson's case. C dishonestly did not disclose prior to the empanelment that, among other things, she had been threatened with being shot and killed, had ended a marriage due to her husband's substance abuse, and felt deeply ashamed of her daughter's criminal activity, drug abuse, and incarceration. If these matters had been revealed, the court would have found that there was a high risk that after being exposed to the evidence at trial C's decision on whether Sampson should be executed would be influenced by her own life experiences and, therefore, a high risk that she would be substantially impaired in her ability to decide whether Sampson should be executed based solely on the evidence. Like other potential jurors, C would have been excused for cause solely for that reason. The decision to excuse her for cause would have been reinforced by her demonstrated dishonesty, which was alone a reason that other potential jurors were excused for cause.

As the requirements of *McDonough* have been satisfied, the court is compelled to vacate Sampson's death sentence and grant him a new trial to determine his sentence. In essence, despite dedicated efforts by the parties and the court to assure that the trial would be fair and the verdict final, it has now been proven that perjury by a juror resulted in a violation of Sampson's constitutional right to have the issue of whether he should live or die decided by twelve women and men who were each capable of deciding that most consequential question impartially.

As the court said in sentencing Sampson in 2004, his crimes were "despicable." *United States v. Sampson*, 300 F.Supp.2d

275, 276 (D.Mass.2004). Sampson "destroyed the lives of Philip McCloskey, Jonathan Rizzo, and Robert Whitney. [He] deeply and irreparably damaged each of their families. If anyone deserves the death penalty, [Sampson] do[es]." *Id.* at 278.

However, in sentencing Sampson to die, the court also reasoned that "there is a difference between a murder and an execution. That difference is the fair process by which a jury of citizens from this community [ ] decided that [Sampson's] death is justified." *Id.* at 277. It has now been proven that Sampson did not receive the fair process that the Constitution guarantees every man no matter how despicable his conduct. Therefore, Sampson must be given a new trial to determine his sentence.[1]

## II. PROCEDURAL HISTORY

On October 24, 2001, a federal grand jury charged Sampson with two counts of carjacking resulting in death in violation of 18 U.S.C. § 2119(3). The charges arose out of the killings of McCloskey and Rizzo by Sampson in Massachusetts in July, 2001. *See United States v. Sampson,* 335 F.Supp.2d 166, 174–75 (D.Mass.2004). Sampson also killed Whitney in New Hampshire and carjacked Gregory in Vermont in July, 2001. While not charged in this case, those crimes were considered nonstatutory aggravating factors for sentencing purposes. Although Sampson subsequently pled guilty to both counts, his sentence was determined in a jury trial conducted pursuant to 18 U.S.C. § 3593.

To select a jury, the court first required prospective jurors to respond to a written questionnaire. The prospective jurors not immediately excused for cause based on their responses to the questionnaire were subject to individual voir dire by the court and the parties. After additional prospective jurors were excused for cause as a result of individual voir dire, the parties exercised peremptory challenges with respect to the remainder. The court empaneled a jury of twelve deliberating jurors and six alternates. Among the twelve deliberating jurors were C,[2] D,[3] and G.

Following trial, the jury decided that the death penalty should be imposed for each of Sampson's offenses. The court sentenced Sampson to death on both counts on January 29, 2004. *See Sampson,* 300 F.Supp.2d at 276. The First Circuit affirmed the death sentences in May, 2007. *See United States v. Sampson,* 486 F.3d 13, 52 (1st Cir.), *reh'g and reh'g en banc denied,* 497 F.3d 55 (1st Cir.2007). Sampson unsuccessfully sought review by the United States Supreme Court, which denied his petition for a writ of certiorari on May 12, 2008. *See Sampson v. United States,* 553 U.S. 1035, 128 S.Ct. 2424, 171 L.Ed.2d 234 (2008).

On June 25, 2008, the court appointed new counsel for postconviction proceedings as required by 18 U.S.C. § 3599. *See* June 25, 2008 Order at 8. The court subsequently denied without prejudice Sampson's request for discovery prior to the filing of the instant § 2255 Motion. *See* May 6, 2009 Order at 2. On May 11, 2009, Sampson filed his § 2255 Motion. The government filed a Request for Summary

---

**1.** Sampson is not entitled to a new trial because C′s dishonesty at voir dire deprived him of information necessary to exercise his peremptory challenges on a properly informed basis. Such a claim was rejected by the Supreme Court in *McDonough,* 464 U.S. at 556, 104 S.Ct. 845.

**2.** [Redacted].

**3.** [Redacted].

Dismissal of the entire § 2255 Motion and requested discovery, which the court denied without prejudice pending the outcome of the Request for Summary Dismissal. *See* March 1, 2010 Order at 4–5. On March 29, 2010, Sampson filed an Amended § 2255 Motion. The government did not object and again requested summary dismissal. *See* Gov't's Response to Pet'r's Mem. of Law Regarding Fed. R.Civ.P. 15 (Docket No. 1044).

Claim IV of the Amended § 2255 Motion alleges that C, D, and G provided inaccurate answers to voir dire questions, beginning with inaccurate answers to questions on their respective questionnaires. Sampson claims that he is entitled to relief: (1) under *McDonough, supra;* (2) because these three jurors were actually or impliedly biased; and (3) because Sampson was prevented from intelligently exercising his peremptory challenges.

For the reasons stated in a session closed to the public on August 31, 2010, the court denied summary dismissal of this claim and held three closed evidentiary hearings.[4] At the first evidentiary hearing, held on November 18, 2010, all three of the implicated jurors testified. At the second evidentiary hearing, held on March 18, 2011, C was recalled to clarify her previous testimony and to testify on certain additional matters. Following the second evidentiary hearing, the court closed the evidentiary record for this claim and ordered the parties to submit proposed findings of fact and conclusions of law. *See* March 19, 2011 Order. However, after Sampson identified in his proposed findings of fact certain potentially material inconsistencies between C's testimony and her statements to the media, the court recalled C to testify further on August 8, 2011, regarding those inconsisten-

cies. Following this third evidentiary hearing, neither Sampson nor the government requested that the court receive additional evidence, and the parties agreed that further briefing was unnecessary.

## III. THE APPLICABLE STANDARDS

### A. *Right to an Impartial Jury*

[2] The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury. . . ." U.S. Const. Amend. VI. "One touchstone of a fair trial is an impartial trier of fact-'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough,* 464 U.S. at 554, 104 S.Ct. 845 (quoting *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). In the conventional criminal case in which the jury is asked only whether guilt has been proven beyond a reasonable doubt, "[t]he bias or prejudice of even a single juror would violate [a defendant's] right to a fair trial." *Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir.1998) (en banc); *see also United States v. Gonzalez,* 214 F.3d 1109, 1114 (9th Cir.2000).

[3] Consistent with these generally applicable principles, it has long been "well settled that the Sixth . . . Amendment[ ] guarantee[s] a defendant on trial for his life the right to an impartial jury." *Ross v. Oklahoma,* 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). In a Federal Death Penalty Act case it is particularly important that each and every juror be impartial. As indicated earlier, the Supreme Court has held that:

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment

---

**4.** Much of the record regarding this claim has now been made part of the public record in

redacted form. *See* April 15, 2011 Order at 5–8.

than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson,* 428 U.S. at 305, 96 S.Ct. 2978. To implement this principle, the Federal Death Penalty Act provides that if even one juror does not find the death penalty to be justified the defendant may not be executed, and the court must impose a lesser sentence. *See* 18 U.S.C. §§ 3593, 3594; *Jones,* 527 U.S. at 380–81, 119 S.Ct. 2090; *see also Sampson,* 335 F.Supp.2d at 240–41 & n. 43. In essence, a single juror has the power to decide whether the defendant will live rather than die.

**[4, 5]** It is essential that every juror be willing and able to make that decision based solely on the evidence. "If even one juror [who is not impartial] is empaneled" and the death sentence is imposed, "the [government] is disentitled to execute the sentence." *Morgan,* 504 U.S. at 729, 112 S.Ct. 2222; *see also United States v. Martinez–Salazar,* 528 U.S. 304, 316–17, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). Therefore, a defendant is deprived of the right to an impartial jury and entitled to a new trial when a juror who is not impartial participates in deciding a case, regardless of whether or not the verdict would have been different. *See Dyer,* 151 F.3d at 973 n. 2 ("The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice."); *United States v. Carpa,* 271 F.3d 962, 967 (11th Cir.2001) ("If a court determines there was actual bias, the juror's inclusion in the petit jury is never harmless error.").

### B. *Meaning of Impartiality*

**[6, 7]** An impartial jury, to which every defendant is entitled, is one in which every juror is " 'capable and willing to decide the case solely on the evidence before [him].' " *McDonough,* 464 U.S. at 554, 104 S.Ct. 845 (quoting *Smith,* 455 U.S. at 217, 102 S.Ct. 940); *see also United States v. Villar,* 586 F.3d 76, 84 (1st Cir.2009). Jurors are regularly instructed that one of their duties is to decide the case based solely on the evidence. *See United States v. Thomas,* 116 F.3d 606, 616–17 n. 10 (2d Cir. 1997). However, a juror is not impartial if his experiences, opinions, predispositions, biases, prejudices, interests, or relationships "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *See Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); *see also Cravens v. Smith,* 610 F.3d 1019, 1031 (8th Cir.2010) (juror properly excused for cause after expressing "gut feeling" that he would disfavor insurance company); *United States v. Torres,* 128 F.3d 38, 47–48 (2d Cir.1997) (juror properly excused for cause who had structured financial transactions, in case involving evidence of structuring of cash deposits); *Hunley v. Godinez,* 975 F.2d 316, 319 (7th Cir.1992) (per curiam)(jurors in case charging burglary and murder should have been excused after they became victims of burglary during trial).

When a judge makes decisions about whether to dismiss a juror for cause during voir dire, or when a litigant argues after trial that he was denied his right to an impartial jury because of a juror's bias, several types of bias are recognized and relevant: actual bias, implied bias, and inferable bias.

### 1. *Actual Bias*

**[8]** "Actual bias is 'bias in fact.' " *Torres,* 128 F.3d at 43 (quoting *United States*

*v. Wood,* 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936)); *see also United States v. Greer,* 285 F.3d 158, 171 (2d Cir.2002). To establish actual bias after a trial, a party must prove that a juror was not "capable and willing to decide the case solely on the evidence before [him]." *McDonough,* 464 U.S. at 554, 104 S.Ct. 845; *see also Rogers v. McMullen,* 673 F.2d 1185, 1190 (11th Cir.1982).

**[9, 10]**  With regard to actual bias, "[a] juror is found by the judge to be partial either because the juror admits partiality . . . or the judge finds actual partiality based upon the juror's voir dire answers." *Torres,* 128 F.3d at 43; *see also Hughes v. United States,* 258 F.3d 453, 456 (6th Cir. 2001).  Whether a juror is actually biased is a question of fact determined by the trial judge.  *See Dyer,* 151 F.3d at 973 (citing *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)); *Torres,* 128 F.3d at 43 (citing *Wood,* 299 U.S. at 133, 57 S.Ct. 177); *Dall v. Coffin,* 970 F.2d 964, 970–71 (1st Cir. 1992)(Wolf, D.J., sitting by designation); *Amirault v. Fair,* 968 F.2d 1404, 1405–06 (1st Cir.1992).

**[11, 12]**  A juror who is found to be actually biased must be excused for cause. *See United States v. Rhodes,* 177 F.3d 963, 965 (11th Cir.1999); *Morgan,* 504 U.S. at 729, 112 S.Ct. 2222.  Therefore, a moving party is entitled to a new trial if a judge failed to excuse an actually biased juror based on information available at the time of trial or if it is later discovered that a juror who was actually biased participated in rendering a verdict.  *See Dyer,* 151 F.3d at 972 n. 2; *see also McDonough,* 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring)(recognizing actual bias as a basis for relief).  However, absent an admission by the juror, actual bias is difficult to prove, in part because the juror may have an interest in concealing it and in part

because the juror may not even be consciously aware of it.  *See Smith,* 455 U.S. at 221–22, 102 S.Ct. 940 (O'Connor, J., concurring).  This difficulty is magnified when the issue is addressed many years after trial.  *See Dyer,* 151 F.3d at 981.

### 2.  *Implied Bias*

The difficulty of determining actual bias has led courts to imply bias when "certain circumstances create too great a risk of affecting a juror's decisionmaking process, even if the juror is not, consciously, fully aware of the impact."  *Fields v. Brown,* 503 F.3d 755, 806 (9th Cir.2007)(Berzon, J., dissenting).  As explained by the Supreme Court:

> Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one (on account of his relations with one of the parties) who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence.  The law therefore most wisely says that, with regard to some of the relations which may exist between the juror and one of the parties, bias is implied, and evidence of its actual existence need not be given.

*Crawford v. United States,* 212 U.S. 183, 196, 29 S.Ct. 260, 53 L.Ed. 465 (1909); *see McDonough,* 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring)(recognizing implied bias as a basis for relief); *Smith,* 455 U.S. at 221–22, 102 S.Ct. 940 (O'Connor, J., concurring) (same); *Amirault,* 968 F.2d at 1406 (same); *see also Conaway v. Polk,* 453 F.3d 567, 587 n. 22 (4th Cir.2006) (collecting cases demonstrating continuing viability of the principle).

**[13–15]**  Implied bias, which is sometimes called "presumed bias," is deter-

mined as a matter of law and "attributed to a prospective juror regardless of actual partiality." *Torres,* 128 F.3d at 45 (citing *Wood,* 299 U.S. at 133, 57 S.Ct. 177); *see United States v. Tucker,* 243 F.3d 499, 509 (8th Cir.2001) (implied bias determined "without regard to [the juror's] subjective state of mind"). Where a juror is impliedly biased, disqualification of the juror is mandatory. *See Rhodes,* 177 F.3d at 965. Therefore, after trial, a conclusion that a juror who participated in rendering a verdict was impliedly biased entitles the moving party to a new trial. *See, e.g., Hunley,* 975 F.2d at 319–20.

[16]  Bias is implied in " 'extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.' " *Sanders v. Norris,* 529 F.3d 787, 792 (8th Cir.2008)(quoting *Person v. Miller,* 854 F.2d 656, 664 (4th Cir.1988)); *see also Fields,* 503 F.3d at 770. "Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Smith,* 455 U.S. at 222, 102 S.Ct. 940 (O'Connor, J., concurring); *see also United States v. Brazelton,* 557 F.3d 750, 753–54 (7th Cir.2009)(stating that courts must imply bias if the juror is related to one of the principals in the case, regardless of whether the juror is objective in fact); *cf. Treesh v. Bagley,* 612 F.3d 424, 437–38 (6th Cir. 2010) (holding that bias should not be implied where a juror had taken a course taught by the prosecutor).

[17]  In some circumstances, bias is also implied "when there are similarities between the personal experiences of the juror and the issues being litigated." *Skaggs v. Otis Elevator Co.,* 164 F.3d 511, 517 (10th Cir.1998). In criminal trials, for example, bias has been implied when the juror was himself, at the time of trial, involved in events that shared significant similarities with the alleged criminal conduct at issue in the case. *See Hunley,* 975 F.2d at 319–20 (holding, in a case charging murder in the course of a burglary, that bias should be implied where two jurors were the victims of similar burglaries during deliberations); *Burton v. Johnson,* 948 F.2d 1150, 1159 (10th Cir.1991)(holding, in murder case in which the defendant presented a defense based on having suffered domestic violence at the hands of the victim, that a juror living in similarly abusive circumstances at the time of trial, and who gave dishonest answers regarding that subject at voir dire, was impliedly biased); *United States v. Eubanks,* 591 F.2d 513, 517 (9th Cir.1979) (per curiam) (implying bias where, in a trial for participation in a heroin distribution conspiracy, a juror failed to disclose at voir dire that he had two sons who were serving long prison sentences for heroin-related crimes); *cf. Fields,* 503 F.3d at 774–75 (holding, in a case involving allegations of robbery, rape and murder, in which the juror answered questions honestly at voir dire, that bias should not be implied where a juror's wife had been beaten, raped and robbed two years prior to voir dire); *United States v. Powell,* 226 F.3d 1181, 1186, 1189 (10th Cir.2000)(holding, in case involving charge of kidnaping for sexual gratification, that bias should not be implied where a juror honestly disclosed at voir dire that she had a daughter who had been raped ten years earlier); *Torres,* 128 F.3d at 46 (holding, in case involving structuring of financial transactions, that bias should not be implied where juror honestly disclosed in response to voir dire question that the juror

herself structured transactions "some years before");[5] *Amirault,* 968 F.2d at 1406 (holding, in a case charging rape of a child, that bias should not be implied where the juror had repressed a memory of being raped as a child forty years earlier and had, therefore, answered voir dire questions honestly).

[18]   In addition, bias may be implied "where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury." *Fields,* 503 F.3d at 770 (citing *Dyer,* 151 F.3d at 982); *see also Green v. White,* 232 F.3d 671, 677–78 (9th Cir.2000) (holding that a juror was impliedly biased where he "lied twice to get a seat on the jury," provided misleading, contradictory, and false responses when questioned about those lies, and engaged in behavior that brought his impartiality into question).  As the Ninth Circuit explained in *Dyer,* where implied bias was found because a juror repeatedly lied to get on the jury, "[a] juror . . . who lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process." *Dyer,* 151 F.3d at 983; *see also Green,* 232 F.3d at 676 (holding that a juror's "pattern of lies, inappropriate behavior, and attempts to cover up his behavior introduced 'destructive uncertainties' into the fact-finding process, and, under *Dyer,* we must presume bias under these circumstances").

[19]   Even when prospective jurors are dishonest for reasons other than a desire to secure a seat on the jury, dishonest answers to voir dire questions indicate that a juror is unwilling or unable "to apply the law as instructed by the court to the evidence presented by the parties" and,

therefore, are indicative of a lack of impartiality because a fundamental instruction in every federal case is that a juror must render a verdict "solely on the evidence presented at trial." *Thomas,* 116 F.3d at 617 & n. 10 (citing the Federal Judicial Center's *Benchbook for U.S. District Court Judges* ).   Therefore, dishonest answers are a factor that can contribute to a finding of implied bias. *See Skaggs,* 164 F.3d at 517.

### 3.   *Inferable Bias*

In *Torres,* the defendants argued that a judge had improperly dismissed a juror who was not shown to have an actual or implied bias, and that the judge's improper dismissal caused the government to gain an additional peremptory challenge. *See Torres,* 128 F.3d at 42.   The defendants were charged with conspiring to violate federal money laundering laws and, at voir dire, the trial judge excused for cause a potential juror who recognized that she herself had at one point engaged in structuring cash transactions. *Id.* at 41–42. Writing for the Second Circuit, Judge Guido Calabresi rejected the defendants' claim, finding that "there exist a few circumstances that involve no showing of actual bias, and that fall outside of the implied bias category, where a court may, nevertheless, properly decide to excuse a juror.   We call this third category 'inferable bias.' " *Id.* at 46–47.

[20]   "Inferable" or "inferred" bias exists " 'when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias.' " *Greer,* 285 F.3d at 171 (quoting *Torres,* 128 F.3d at

---

**5.**  As discussed below*, however, in *Torres* it was held that the juror was properly excused for what the Second Circuit refers to as *"in-*

ferable" or "inferred" bias. *See* 128 F.3d at 47.

47). As the Second Circuit wrote with regard to excusing a juror for inferred bias:

> There is no *actual* bias because there is no finding of partiality based upon either the juror's own admission or the judge's evaluation of the juror's demeanor and credibility following voir dire questioning as to bias. And there is no *implied* bias because the disclosed fact does not establish the kind of relationship between the juror and the parties or issues in the case that mandates the juror's excusal for cause.
>
> Nonetheless, inferable bias is closely linked to both of these traditional categories. Just as the trial court's finding of actual bias must derive from voir dire questioning, so the court is allowed to dismiss a juror on the ground of inferable bias only after having received responses from the juror that permit an inference that the juror in question would not be able to decide the matter objectively. In other words, the judge's determination must be grounded in facts developed at voir dire. And this is so even though the juror need not be asked the specific question of whether he or she could decide the case impartially. Moreover, once facts are elicited that permit a finding of inferable bias, then, just as in the situation of implied bias, the juror's statements as to his or her ability to be impartial become irrelevant.[6]

*Torres,* 128 F.3d at 47; *see also Greer,* 285 F.3d at 171; *United States v. Quinones,* 511 F.3d 289, 301 (2d Cir.2007).

Although declining to define the "precise scope of a trial judge's discretion to infer bias," Judge Calabresi further explained:

> *It is enough for the present to note that cases in which a juror has engaged in activities that closely approximate those of the defendant on trial are particularly apt. The exercise of the trial judge's discretion to grant challenges for cause on the basis of inferred bias is especially appropriate in such situations.* "Because [in such cases] the bias of a juror will rarely be admitted by the juror himself, 'partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it,' [partiality] necessarily must be inferred from surrounding facts and circumstances." *McDonough Power Equip.,* 464 U.S. at 558, 104 S.Ct. at 851 (Brennan, J., concurring) (citation omitted).

*Torres,* 128 F.3d at 47 (emphasis added). Therefore, the category of inferable bias, one courts have long "implicitly assumed to exist," *id.* at 43, permits a court in its discretion to dismiss a juror because of an inference that the juror will not be able to decide the case solely on the evidence, even though the juror has not been found to be actually biased and does not satisfy the requirements of implied bias.

Such discretion on the part of trial judges deciding matters of juror bias both during trial and after it has also been recognized by the First Circuit. *See United States v. Rowe,* 144 F.3d 15, 20 (1st Cir.1998) ("[W]e will not intervene unless the trial court's denial of a cause-based challenge to a juror constitutes a 'clear

---

**6.** In *Torres,* the Second Circuit further explained in a footnote:

Nonetheless, a judge may—particularly when considering whether some marginal types of disclosed facts are enough to show inferable bias-ask about a juror's impartiali-

ty and might be persuaded by the force of the juror's assurance (even though another judge would have discretion to take the disclosed fact and make a finding of inferred bias without further inquiry).

128 F.3d at 47 n. 12.

abuse.' " (quoting *United States v. McNeill,* 728 F.2d 5, 10 (1st Cir.1984))); *see also United States v. Rodriguez–Ortiz,* 455 F.3d 18, 23 (1st Cir.2006); *Crowley v. L.L. Bean, Inc.,* 303 F.3d 387, 393–94 (1st Cir.2002); *United States v. Lowe,* 145 F.3d 45, 49 (1st Cir.1998); *United States v. Gonzalez–Soberal,* 109 F.3d 64, 69–70 (1st Cir.1997). Although the First Circuit has not expressly recognized inferable bias, its deferential review of trial courts' decisions about juror bias is consistent with the Second Circuit's conclusion that a category of bias must exist for which removal of a juror for cause is permissible, but not mandatory. *See Torres,* 128 F.3d at 46–47.

### C.  *The Role of Voir Dire*

**[21]** Voir dire examination is intended to assure that every juror is both willing and able to be impartial. *See McDonough,* 464 U.S. at 554, 104 S.Ct. 845. Voir dire protects the right to an impartial jury "by exposing possible biases, both known and unknown, on the part of potential jurors." *Id.; see also Wainwright,* 469 U.S. at 423, 105 S.Ct. 844 ("the quest is for jurors who will conscientiously apply the law and find the facts"); *Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981)("Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.").

It can be challenging, however, to determine whether a juror is capable of being impartial in a particular case. *See Smith,* 455 U.S. at 221–22, 102 S.Ct. 940 (O'Connor, J., concurring); *Crawford,* 212 U.S. at 196, 29 S.Ct. 260; *Fields,* 503 F.3d at 806 (Berzon, J., dissenting). As explained earlier, similarities between the pre-trial experiences of the juror and matters being litigated raise concerns about whether the juror can decide the case solely on the evidence, uninfluenced by his extrajudicial experiences. *See Skaggs,* 164 F.3d at 517; *Lowe,* 145 F.3d at 48–49; *Gonzales v. Thomas,* 99 F.3d 978, 987 (10th Cir.1996). These concerns arise because some cases involving circumstances similar to a juror's own experiences create "the 'potential for substantial emotional involvement' " adversely affecting impartiality. *Eubanks,* 591 F.2d at 517 (quoting *United States v. Allsup,* 566 F.2d 68, 71–72 (9th Cir.1977)).

**[22, 23]** "There is no precise formula to guide judges in juror-qualification matters." *Sampson,* 486 F.3d at 41. Rather, a trial judge must exercise judgment and discretion in deciding whether a juror should be excused for cause. *See Lowe,* 145 F.3d at 49; *Gonzalez–Soberal,* 109 F.3d at 69–70. A court's assessment of a juror's demeanor in discussing those areas of potential bias plays "an important part" in a judge's determination of whether a juror is impartial or should be excused for cause. *See Ristaino v. Ross,* 424 U.S. 589, 594–95, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). For example, in a case involving alleged interstate transportation for illegal sexual activity, the First Circuit held that the trial judge properly excused for cause several jurors who had experience with sexual abuse, even though they asserted that they could be impartial, because "the judge did not believe [them] after assessing their demeanor." *Lowe,* 145 F.3d at 49. The court also found, however, that the trial judge properly declined to excuse for cause two other jurors who had experience with sexual abuse, relying on their demeanor and noting with regard to one of them, " '[u]nlike the . . . two other women who were just in front of me who appeared so visibly upset, she didn't. She seemed to be able to put it aside, she said she'd be fair and impartial.' " *Id.* (quoting trial court); *see also United States v. Ploof,* 464

F.2d 116, 118 (2d Cir.1972) ("[T]he judge was in the best position to evaluate the juror's demeanor and to determine, by the juror's answers to the judge's questions, whether he could fairly and impartially hear the case and return a verdict based solely on the evidence presented in court.").

Deciding whether to excuse a juror for cause necessarily requires a prediction, in part because even a well-intentioned juror at voir dire does not then know much in advance about the nature of the evidence at trial. A judge must decide whether a juror who claims to be impartial at voir dire, and who the judge may not find to be actually or impliedly biased at that time, will in fact become impaired during the course of the trial because exposure to the evidence will dredge up in the juror's mind memories of disturbing events and associated emotional responses. *See Lowe,* 145 F.3d at 49. The need to make such a prediction is one of the reasons that " '[t]here are few aspects of a jury trial where [the First Circuit] would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause.' " *Id.* (quoting *Gonzalez–Soberal,* 109 F.3d at 69–70).

**[24]** At the same time, with regard to decisions being made during the jury selection process, "an impartial jury is so fundamental to the Sixth Amendment right to a fair trial, [that] '[d]oubts regarding bias must be resolved against the juror.' " *United States v. Mitchell,* 568 F.3d 1147, 1154 (9th Cir.2009) (Thomas, J., dissenting)(quoting *Gonzalez,* 214 F.3d at 1114). Therefore, "in spite of [the] deferential standard of review" applied to trial judges' rulings on challenges for cause, Judge Calabresi again writing for the Second Circuit found that a district court had abused its discretion and committed reversible error in denying a challenge for

cause of a juror whose answers to voir dire questions revealed actual bias. *See United States v. Nelson,* 277 F.3d 164, 202 (2d Cir.2002). At voir dire, the juror in that case repeatedly expressed doubt about his ability to remain impartial, and expressed personal interest in events affecting the Jewish community and in the specific crime at issue in the case. *See id.* at 201–02; *see also United States v. Nell,* 526 F.2d 1223, 1230 (5th Cir.1976) (reversal warranted where trial judge failed to explore potential bias of juror who belonged to rival union and knew defendant in case charging embezzlement of union funds).

### D. *Post–Trial Relief Based Upon Evidence of Partiality*

Where a judge's questions on voir dire do not elicit relevant information about a juror's bias, a juror may be empaneled whose ability to decide a question solely on the evidence is later placed into question. There are generally two reasons why voir dire might not have revealed relevant information. First, in what are sometimes referred to as "non-disclosure cases," jurors are not asked any questions during voir dire that should have elicited the information. *See, e.g., Crowley,* 303 F.3d at 407 (describing "nondisclosure" standard); *Dall,* 970 F.2d at 969–70 (referencing a nondisclosure standard and stating that "jurors cannot be faulted for failing to disclose information for which they were never asked"); *United States v. Aponte–Suarez,* 905 F.2d 483, 492 (1st Cir.1990)("Jurors cannot be faulted for failing to disclose . . . since they were never asked during the course of voir dire to make such a disclosure."). Second, in what are sometimes referred to as "inaccurate answer cases," jurors do not provide relevant information because they give inaccurate or incomplete answers to the questions that should have elicited it. *See,*

*e.g., McDonough,* 464 U.S. at 555, 104 S.Ct. 845 (characterizing the case as one involving "a juror's mistaken, though honest response to a question"); *Crowley,* 303 F.3d at 407 (describing "inaccurate answer[ ]" standard); *Amirault,* 968 F.2d at 1405 (analyzing claim of juror bias based on juror's failure to mention she had brought rape charges forty years prior when asked during voir dire about previous involvement in criminal or civil cases).[7]

### 1. *Non–Disclosure Cases*

[25] In non-disclosure cases, a party claiming his right to an impartial jury has been violated can obtain a new trial only by proving actual or implied bias. *See Crowley,* 303 F.3d at 407–08; *Dall,* 970 F.2d at 969–70; *Aponte–Suarez,* 905 F.2d at 492. Because non-disclosure cases do not involve juror dishonesty or fault on the part of the juror, *see id.,* they do not raise the substantial concerns that exist in cases where jurors are deliberately dishonest on voir dire. *See Dyer,* 151 F.3d at 982–83 (juror's repeated lies during voir dire cast doubt on process and supported finding of implied bias requiring new trial). Therefore, a litigant claiming the denial of the right to an impartial jury in a non-disclosure case must prove that a juror was actually biased or that the facts are such that bias is to be implied. *See Aponte–Suarez,* 905 F.2d at 492. Such a litigant cannot prevail under the additional test provided by *McDonough,* which grants relief in cases involving dishonest answers provided by jurors who would have been dismissed for cause if relevant information had been received in response to questions asked during voir dire.

### 2. *Inaccurate Answer Cases*

[26] Where a juror has provided an incorrect answer to a question that should

have revealed information relevant to a determination of juror bias, a party claiming he was denied an impartial jury may obtain relief by showing actual bias or implied bias, or by satisfying the test articulated in *McDonough.* As explained below, the *McDonough* test provides a separate means of relief, and does not require a showing of actual or implied bias. *See* 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring); *Amirault,* 968 F.2d at 1405–06 & n. 2; *Dall,* 970 F.2d at 970.

### a. *Traditional Means of Obtaining Post–Trial Relief*

Prior to *McDonough,* the traditional means of obtaining post-trial relief based on a juror's inaccurate answers during voir dire were the same as those for obtaining such relief as a result of a juror's non-disclosure of information about which the juror was not asked during voir dire. *See Skaggs,* 164 F.3d at 516 ("Before the *McDonough* test was adopted by the Supreme Court, litigants alleging juror [partiality] had the opportunity to prove actual or implied bias on the part of a juror after a verdict was entered."). The "normal avenue of relief available to a party . . . asserting that he did not have the benefit of an impartial jury" was the demonstration that a juror was actually biased, or, that circumstances were such that bias had to be implied. *See McDonough,* 464 U.S. at 556–57, 104 S.Ct. 845 (Blackmun, J., concurring); *see also Smith,* 455 U.S. at 215, 102 S.Ct. 940 (remedy for allegations of juror partiality is opportunity to prove actual bias); *id.* at 221–22, 102 S.Ct. 940 (O'Connor, J., concurring)(asserting that implied bias remained viable form of relief in juror bias claims); *United States v. Fulks,* 454 F.3d 410, 432 (4th Cir.2006);

---

**7.** Some First Circuit cases conflate the standards for nondisclosure and inaccurate answer cases. *See, e.g., DeBurgo v. St. Amand,* 587 F.3d 61, 71–72 (1st Cir.2009).

*Fields,* 503 F.3d at 768 & n. 6. These two forms of relief correspond with the "tradi-tional[ ]" means of challenging a juror for cause, based on actual or implied bias. *See Torres* 128 F.3d at 43; *Wood,* 299 U.S. at 133, 57 S.Ct. 177.

    b.  *Relief Pursuant to McDonough*

*McDonough* was a product liability case involving a child who was injured in a lawnmower accident. *See* 464 U.S. at 549, 104 S.Ct. 845. The court of appeals or-dered a new trial because one juror who had a son who had been hurt by the explo-sion of a truck tire did not respond to a voir dire question asking whether any pro-spective jurors or their immediate family members had ever sustained severe injury in an accident. *Id.* at 549–50, 104 S.Ct. 845. The juror's failure to respond affir-matively was assumed to have been the result of an honest interpretation of the question by the juror. *Id.* at 555, 104 S.Ct. 845.

The Supreme Court rejected the view that a mistaken, but honest response to a voir dire question was by itself grounds for a new trial. *Id.* Instead the Court defined the key inquiry as whether "the juror's failure to disclose denied respondents their right to an impartial jury." *Id.* at 549, 104 S.Ct. 845; *see also id.* at 556, 104 S.Ct. 845 (Blackmun, J., concurring)("I agree with the Court that the proper inquiry in this case is whether the defendant had the benefit of an impartial trier of fact.").

[27]  This framing of the relevant ques-tion was based on harmless error princi-ples, which require a court to exercise judgment instead of ordering "automatic reversal for 'error,'" and to "ignore errors that do not affect the essential fairness of the trial." *Id.* at 553, 104 S.Ct. 845 (citing *Kotteakos v. United States,* 328 U.S. 750, 759–60, 66 S.Ct. 1239, 90 L.Ed. 1557

(1946)). The Supreme Court reasoned that " '[a litigant] is entitled to a fair trial but not a perfect one,' " and that "the important end of finality" would be ill served if the court were to "invalidate the result of a three week trial" in order to recreate the voir dire process because of a mistaken, but honest response to a ques-tion. *Id.* at 553, 555, 104 S.Ct. 845 (quot-ing *Brown v. United States,* 411 U.S. 223, 231–32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973)).

Applying these principles, the Court in *McDonough* then described circumstances in which inaccurate responses to voir dire questions would deny a party his right to an impartial jury and, therefore, affect the essential fairness of the trial, stating:

> We hold that to obtain a new trial in such a situation, a party must first dem-onstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a cor-rect response would have provided a valid basis for a challenge for cause. The motive for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial.

*Id.* at 556, 104 S.Ct. 845.

[28]  As explained below, this test re-quires a party seeking relief under *Mc-Donough* to prove by a preponderance of evidence admissible under the Federal Rules of Evidence [8] that: (1) A juror gave an inaccurate answer to a question that was asked on voir dire; (2) the question was material; (3) the inaccurate response was dishonest, meaning knowingly and in-tentionally false, rather than the result of a good faith misunderstanding or mistake; (4) the reasons for the knowingly and in-tentionally false response relate to the ju-ror's ability to decide the particular case

---

**8.**  *See DeBurgo,* 587 F.3d at 71; *Crowley,* 303    F.3d at 408; Fed.R.Evid. 1101(b).

based solely on the evidence and, therefore, call into question the juror's ability to be impartial; and (5) a correct response would have provided a valid basis for a challenge for cause and would have required or resulted in the excusal of the juror for cause based on actual bias, implied bias, or inferable bias. *See id.; Dall,* 970 F.2d at 970. A defendant who proves these five elements has demonstrated a deprivation of the right to an impartial jury—meaning a jury composed only of individuals willing and able to decide the case solely on the evidence—even absent proof of actual or implied bias. *See McDonough,* 464 U.S. at 556, 104 S.Ct. 845. If the juror would have been excused for cause and the other elements of the *McDonough* test are met, the defendant is entitled to a new trial without regard to whether the participation of the juror affected the outcome of the case. *See Jackson v. Alabama State Tenure Comm'n,* 405 F.3d 1276, 1288–89 (11th Cir.2005)(affirming district court's ruling that defendant was entitled to relief under *McDonough* because a juror dishonestly failed to disclose convictions making her statutorily ineligible to serve, where district court "did not consider the effect that said juror might have had on the outcome of the jury's deliberations or any possible bias she might have had"); *see also McDonough,* 464 U.S. at 556, 104 S.Ct. 845; *Dyer,* 151 F.3d at 973 n. 2.

As explained below, the *McDonough* test provides an additional means for a defendant to demonstrate that he was denied a right to an impartial jury, distinct from the "normal avenue of relief" available through a claim of actual or implied bias. *See Fitzgerald v. Greene,* 150 F.3d 357, 363 (4th Cir.1998) (quoting *McDonough,* 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring)); *Amirault,* 968 F.2d at 1405–06 & n. 2. In providing this additional form of relief, the *McDonough*

test recognizes that inaccurate answers cast doubt on the efficacy of the voir dire process and the integrity of the trial in a way in which simple non-disclosure of unsolicited information does not. *See* 464 U.S. at 554, 104 S.Ct. 845. The test further recognizes the unique connection between willfully dishonest answers and the likely partiality of a potential juror, *see id.* at 556, 104 S.Ct. 845 (Blackmun, J., concurring), and the principle that convictions should not be overturned unless an error is one that affects the fundamental fairness of the trial by denying the defendant the right to an impartial jury, *see id.* at 553–54, 104 S.Ct. 845.

i.  Inaccurate Answer to Question Asked at Voir Dire (Prong One)

The first prong of the *McDonough* test requires that a question soliciting the relevant information have been asked of the juror during voir dire, provoking an inaccurate answer. *See* 464 U.S. at 556, 104 S.Ct. 845. This prong recognizes that the *McDonough* test applies only to cases involving inaccurate answers to voir dire questions, and not to cases involving nondisclosure of unsolicited information. *See Dall,* 970 F.2d at 969–70. When a juror fails to answer accurately a question that is asked, doubts are raised about the juror's motives for the inaccurate answer which are not present when a juror is not asked a question that should elicit relevant information. *See id.* at 970; *Aponte–Suarez,* 905 F.2d at 492. Accordingly, the additional form of relief available in claims of jury bias through *McDonough* applies only where a relevant question was asked at voir dire and the juror's answer was inaccurate. *See* 464 U.S. at 556, 104 S.Ct. 845; *Skaggs,* 164 F.3d at 515; *Crowley,* 303 F.3d at 407–08.

ii.  Material Question (Prong Two)

**[29]**  In addition, the juror must have provided an inaccurate answer to a ques-

tion that was material. *See McDonough,* 464 U.S. at 556, 104 S.Ct. 845. Generally, a matter is material if it has a natural tendency to influence, or be capable of influencing, the judge who must decide whether to excuse a juror for cause. *See Neder v. United States,* 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)(giving general definition of materiality). This requirement is connected to the other requirements of the test, including that the juror's motive for lying at voir dire relate to juror's ability to the decide the case based solely on the evidence, and that the information eventually learned by the court, if known, would have provided a valid basis to excuse the juror for cause.

### iii.   Dishonest Answer (Prong Three)

The *McDonough* test requires a defendant to demonstrate that a juror "failed to answer honestly," that is, that his inaccurate response was dishonest rather than merely mistaken or a result of misunderstanding. *See McDonough,* 464 U.S. at 556, 104 S.Ct. 845; *see also United States v. Perkins,* 748 F.2d 1519, 1531 (11th Cir. 1984)(court must determine whether juror "was aware of the fact that his answers were false"). The Court in *McDonough* characterized the issue presented as being whether "the result of a three-week trial" should be invalidated "because of a juror's mistaken, though honest response to a question." 464 U.S. at 555, 104 S.Ct. 845. The Court then stated the test to be applied when an inaccurate response is at issue and held that it is not met unless it is proven that the inaccurate response was dishonest rather than merely mistaken. *Id.* at 555–56, 104 S.Ct. 845; *see also De-Burgo,* 587 F.3d at 71–72 (no relief under *McDonough* where inadequate showing of

dishonesty); *Crowley,* 303 F.3d at 408 (same); *Davila Cortes v. Ramos Barroso,* 27 F.3d 554, at *2 (1st Cir.1994) (per curiam) (unpublished table decision) (same); *Dall,* 970 F.2d at 970 (same); *Amirault,* 968 F.2d at 1405 (same).

[30]   *McDonough* reflects the understanding that the implications of an innocent error and a dishonest answer are different. An innocent, unintentional error does not itself raise a question of whether an individual is able to decide a case based solely on the evidence, although the information that should have been provided may do so.[9]   *See* 464 U.S. at 555–56, 104 S.Ct. 845. Such a mistake does not suggest that the failure to disclose information that was solicited may have denied a party his right to an impartial jury. *See id.* at 549, 555–56, 104 S.Ct. 845. *McDonough* recognizes the reality that "in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." *Id.* at 556, 104 S.Ct. 845 (Blackmun, J., concurring); *see also United States v. Boney,* 977 F.2d 624, 634 (D.C.Cir.1992) ("[L]ying or failing to disclose relevant information during voir dire itself raises substantial questions about the juror's possible bias."); *Burton,* 948 F.2d at 1159 ("This dishonesty, of itself, is evidence of bias."); *United States v. Colombo,* 869 F.2d 149, 152 (2d Cir.1989) ("[H]er willingness to lie about it exhibited an interest strongly suggesting partiality."); *United States v. Stewart,* 433 F.3d 273, 304 (2d Cir.2006) ("[C]ertain false statements that 'might be harmless in isolation' may present a 'much more sinister picture' when viewed as a whole." (quoting *Green,* 232 F.3d at 678 n. 10)).

---

**9.**   An unintentional, erroneous response may, however, communicate something about a juror's ability to understand and follow instruc-

tions of law, and therefore may be relevant to his fitness to serve.

The requirement that a defendant show that an answer was dishonest also recognizes the way in which dishonest answers call into question the integrity of the trial. As the court observed in *McDonough*, "[t]he necessity of truthful answers by prospective jurors if [voir dire] is to serve its purpose is obvious." 464 U.S. at 554, 104 S.Ct. 845. "Honesty is the heart of the jury-selection process in an adversarial system; indeed, 'voir dire' means 'to speak the truth.'" *Fields*, 503 F.3d at 772. As explained by Justice Benjamin Cardozo in a related context:

> If the answers to the [voir dire] questions are willfully evasive or knowingly untrue, the [prospective juror], when accepted, is a juror in name only. His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham.

*Clark v. United States*, 289 U.S. 1, 11, 53 S.Ct. 465, 77 L.Ed. 993 (1933).

### iv.  Motive for Dishonest Answer (Prong Four)

**[31, 32]**   Even an intentionally false response to a material question is not the end of the *McDonough* inquiry because "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556, 104 S.Ct. 845. The implications of this statement were not explained by the Supreme Court in *McDonough*. However, as discussed below, a "reason[ ] that affect[s] a juror's impartiality" is not necessarily a motive that proves actual or implied bias. *See id.* Rather, Judge John Noonan expressed the test correctly when he wrote for the Ninth Circuit that, "[u]nder *McDonough*, a new trial is warranted only if the district court finds that the juror's voir dire responses were dishonest, rather than merely mistaken, *and that her reasons for making*

*the dishonest response call her impartiality into question.*" *Pope v. Man–Data, Inc.*, 209 F.3d 1161, 1164 (9th Cir.2000) (citing *McDonough*, 464 U.S. at 556, 104 S.Ct. 845) (emphasis added). Therefore, under *McDonough*, "even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality." *Dyer*, 151 F.3d at 973. Similarly, in *Boney*, the District of Columbia Circuit wrote that, "[b]ecause the record provides no evidence that the motivation for the lie was unrelated to bias in this case," an evidentiary hearing was required. *See* 977 F.2d at 634; *see also U.S. v. Tucker*, 137 F.3d 1016, 1028 (1998) ("If [the defendant] can prove that [the juror] deceived the court at voir dire, he will also have to prove that she did so because of partiality, *rather than for some reason that is irrelevant to the fairness of the trial.*" (emphasis added)).

In other words, the *McDonough* test is not met when the motive for dishonesty is irrelevant to a juror's ability to decide the case impartially. *See United States v. Langford*, 990 F.2d 65, 69–70 (2d Cir.1993)(motion for new trial properly denied where juror in controlled substances case did not reveal, due to embarrassment, that she had been convicted of prostitution fifteen years earlier). Rather, as articulated by *McDonough*, the party seeking relief must show a motive that calls the juror's impartiality into question. 464 U.S. at 556, 104 S.Ct. 845.

### v.  Correct Answer Would Have Provided Valid Basis for Challenge For Cause (Prong Five)

Finally, in order to justify a new trial under *McDonough*, a party must prove that an accurate answer would have provided a valid basis for a challenge for cause. *See* 464 U.S. at 556, 104 S.Ct. 845. The First Circuit has stated that for the

**174**     **820 FEDERAL SUPPLEMENT, 2d SERIES**

purpose of *McDonough* analysis, a party seeking a new trial must prove that " 'correct' responses to the voir dire questions would have *required or resulted* in the disqualification of [the juror] for cause." *Dall,* 970 F.2d at 970 (emphasis added); *see also Greer,* 285 F.3d at 171. As described further below, this court understands *McDonough* and *Dall* to refer both to cases in which the court would have been *required* to excuse a juror because of actual or implied bias, and to cases where the court would have had discretion, and would have exercised that discretion, to excuse a juror because of inferable bias. *See Rhodes,* 177 F.3d at 965 (mandatory excusal for cause in cases of actual and implied bias); *Torres,* 128 F.3d at 47 (describing discretion to excuse juror on basis of inferable bias). The court must " 'determine if it would have granted the hypothetical challenge' " to the juror for cause. *Stewart,* 433 F.3d at 304 (quoting *Greer,* 285 F.3d at 171). The focus is on what the court would have done if it had, prior to empanelment of the juror, all of the information obtained after trial.[10] *See Stewart,* 433 F.3d at 304. As recognized by the parties,[11] a court may consider not only what it would have done in light of a juror's "correct response" to the questions asked at voir dire, *see McDonough,* 464 U.S. at 556, 104 S.Ct. 845, but also how it would have been affected by knowledge of any deliberate action that the juror took to conceal information sought to be elicited in the jury selection process and the circumstances under which the information was eventually disclosed, as a juror's dishonesty itself raises questions about partiality and about the juror's willingness to follow instructions. *See Boney* 977 F.2d at 634; *Burton,* 948 F.2d at 1159.

vi. *McDonough* Does Not Require Proof of Actual or Implied Bias

The last two prongs of the *McDonough* test require a party seeking a new trial to show that a juror's "motives for concealing information" were those that "affect a juror's impartiality," and that the concealed information, when considered along with the motive for concealment and the circumstances of eventual disclosure, "would have provided a valid basis for a challenge for cause." 464 U.S. at 556, 104 S.Ct. 845. As explained earlier, this inquiry requires the court to determine, among other things, whether the information obtained after trial "would have required or resulted in the disqualification of [the juror] for cause." *Dall,* 970 F.2d at 970.

**[33]** The government asserts that *McDonough,* and other cases, should be interpreted to require a showing of actual or implied bias to establish the necessary "valid basis for a challenge for cause." *See McDonough,* 464 U.S. at 556, 104 S.Ct. 845. This contention is not correct. Under the *McDonough* test, a party can prove that he was deprived of his right to an impartial jury without proving that a juror was actually or impliedly biased. *See id.; Dall,* 970 F.2d at 970; *Amirault,* 968 F.2d at 1405–06 & n. 2. In other words, the Court in *McDonough* identified certain factors which, if proven, are sufficiently indicative of a juror's inability to decide a case based solely on the evidence

---

**10.** Events potentially affecting a juror's impartiality occurring after jury empanelment is complete are not relevant for *McDonough* purposes because a juror could not have dishonestly failed to provide such information during voir dire. For example, if the only basis of the claim is the fact that a juror was subjected to extrajudicial influences during the course of the trial, a party may attain relief by proving actual or implied bias, but is not eligible for relief under *McDonough.*

**11.** *See* Gov't's Resp. to Order of Nov. 19, 2010 at 28; Sampson's Resp. to Sealed Order of Nov. 19, 2010 at 18.

to demonstrate that a party was deprived of his right to an impartial jury, whether or not that juror can be shown to have been actually or impliedly biased. *See* 464 U.S. at 556, 104 S.Ct. 845.

This construction of *McDonough* is consistent with the Supreme Court's own statements in that case. After rejecting the proposition that a mistaken, but honest response to a voir dire question would alone be sufficient to require a new trial, the Court stated a test that allowed a litigant to prove a deprivation of his right to a fair trial in cases where a juror provided dishonest answers at voir dire and "a correct response would have provided a valid basis for a challenge for cause." *McDonough,* 464 U.S. at 556, 104 S.Ct. 845. By its own terms, the *McDonough* test does not require proof of actual or implied bias. *Id.* As explained earlier, a valid basis to excuse a juror for cause includes not only actual or implied bias, but also inferable bias. *See Greer,* 285 F.3d at 171–72; *Torres,* 128 F.3d at 43; *see also Wainwright,* 469 U.S. at 424, 105 S.Ct. 844 (juror excusable for cause if his views or experiences would prevent or substantially impair the performance of his duties as a juror in accordance with his oath); *Jones v. Cooper,* 311 F.3d 306, 312 (4th Cir.2002) (noting, in analyzing a *McDonough* claim, that inferred bias might justify a challenge for cause). A valid basis to excuse a juror for cause has been recognized to encompass the highly discretionary determination of a trial court that a juror should be excused for cause because there is reason to doubt that he will be able to decide the case solely on the evidence. *See Rowe,* 144 F.3d at 20; *Rodriguez–Ortiz,* 455 F.3d at 23; *see also Wainwright,* 469 U.S. at 425–26, 105 S.Ct. 844 (recognizing answers to voir dire questions frequently do not lead to definite conclusions about juror bias, and determinations by trial judge must be given deference); *Frazier v. Unit-*

*ed States,* 335 U.S. 497, 511, 69 S.Ct. 201, 93 L.Ed. 187 (1948) ("in each case a broad discretion and duty reside in the court to see that the jury as finally selected is subject to no solid basis of objection on the score of impartiality"). The plain language of *McDonough* does not require actual or implied bias. Rather, it is broad enough to include that range of cases in which a judge would have had discretion to excuse a juror for cause and, as stated in *Dall,* would have exercised his discretion to do so. *See Dall,* 970 F.2d at 970.

This interpretation of *McDonough* is consistent with the manifest understanding of the majority of the Justices in that case. The seven-member majority in *McDonough* did not expressly state whether its new test was intended to replace actual and implied bias as bases for relief or provide an additional means of proving a claim of juror bias. However, Justices Blackmun, Stevens and O'Connor joined the majority opinion and also concurred separately to clarify that juror partiality could still be proven by showing actual or implied bias, stating that:

> [We] understand the Court's holding not to foreclose the normal avenue for relief available to a party who is asserting that he did not have the benefit of an impartial jury. Thus, regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.

*McDonough,* 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring).

In addition, Justice Brennan, who concurred only in the judgment, wrote for himself and Justice Marshall that:

In my view, the proper focus when ruling on a motion for new trial in this situation should be on the bias of the juror and resulting prejudice to the litigant.... "[T]he bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law."

*Id.* at 557–58, 104 S.Ct. 845 (Brennan, J., concurring in the judgment) (quoting *Wood*, 299 U.S. at 133, 57 S.Ct. 177).

These concurrences indicate that the ability to obtain relief based on actual or implied bias survives *McDonough*. *See Amirault*, 968 F.2d at 1405–06 & n. 2. If the *McDonough* test replaced the actual or implied biased inquiries, a litigant who could not satisfy the other elements of *McDonough* would be deprived of the ability to obtain a new trial even in the face of clear evidence of actual bias, a result that has been rejected by the First Circuit, and would leave no remedy to litigants who could show that they were deprived of their constitutional right to an impartial jury. *See* 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring); *Amirault*, 968 F.2d at 1405–06 & n. 2.

If the *McDonough* test required a showing of actual or implied bias in addition to a showing of dishonesty, the test Justice Rehnquist stated for the majority would be superfluous. Any party who proved the bias prong of the *McDonough* test would necessarily be entitled to relief under the actual or implied bias tests, without regard to whether the party succeeded in proving dishonesty. The only way to interpret the Opinion of the Court in *McDonough* to have any meaning, therefore, is to recognize three distinct but overlapping tests and permit relief under *McDonough* without requiring a showing of actual or implied bias.

The First Circuit recognized these three tests in *Amirault*. *See* 968 F.2d at 1405–

06 & n. 2. In *Amirault*, the First Circuit cited both concurrences for the proposition that *McDonough's* "majority vote ... require[s] a further determination on the question of juror bias even where a juror is found to have been honest," and noted that relief could still be obtained by proving actual or implied bias. *Id.* Thus, the First Circuit held that where relief under *McDonough* is unavailable, a court must still consider whether a juror has been shown to have been actually or impliedly biased. *Id.* Applying these principles, the court in *Amirault* sustained the state trial court's finding that the juror in question was not actually biased, found the petitioner to be ineligible for relief under *McDonough* because the juror was not shown to have been dishonest, and, in addition, found that "bias should not be implied" because there was not a sufficient connection between the unrecalled rape of the juror forty years before and the facts of the case. *Id.* at 1405–06.

The corollary to the court's conclusion in *Amirault* that implied and actual bias are separate tests from the *McDonough* test is that actual and implied bias are not requirements for relief pursuant to *McDonough*. If the *McDonough* test required actual or implied bias, the application of the *McDonough* test in *Amirault* would have been superfluous in light of the First Circuit's conclusion that neither actual nor implied bias were shown. *See id.* at 1405–06.

The First Circuit made this point somewhat more explicitly in *Dall*, where it found that the *McDonough* test was not satisfied because it had not been shown that "correct responses to the voir dire questions would have required *or resulted in* the disqualification of [the juror] for cause." 970 F.2d at 970. As discussed earlier, disqualification of a juror for cause is *required* in cases of actual or implied

bias. *See Rhodes,* 177 F.3d at 965. A juror may also be excused for cause as a *result* of an exercise of the trial judge's discretion in cases involving inferable bias. *See Torres,* 128 F.3d at 47. Thus, the First Circuit's decisions in *Dall* and *Amirault* indicate that proof of actual or implied bias is not a requirement of the *McDonough* test.

Nevertheless, this court's statement of the *McDonough* test has been developed without the benefit of extensive discussion by the First Circuit. The lack of extensive discussion is, in part, the result of the fact that the First Circuit has never decided a case in which the party seeking a new trial proved that a juror had been dishonest at voir dire and it has not, therefore, been required to analyze the remaining prongs of the *McDonough* test. For example, in *Amirault,* relief under *McDonough* was denied because the juror was not dishonest, and there was no occasion to discuss whether a further showing of actual bias or implied bias was necessary to satisfy the *McDonough* test. *See* 968 F.2d at 1405–06; *see also DeBurgo,* 587 F.3d at 72 (inadequate showing of dishonesty); *Crowley,* 303 F.3d at 408 (same); *Davila Cortes,* 27 F.3d at *2 (same); *Dall,* 970 F.2d at 970

(same). However, the First Circuit has never held that the *McDonough* test requires a showing of actual or implied bias.[12] Instead, in *Amirault,* the case whose analysis is most explicit and most faithful to *McDonough* itself, the First Circuit stated that actual or implied bias provide a separate means of relief from that provided under the *McDonough* test. *See* 968 F.2d at 1405–06 & n. 2.

As the Sixth Circuit has noted, the case law reflects some confusion concerning the meaning of *McDonough.* *See Zerka v. Green,* 49 F.3d 1181, 1185 (6th Cir.1995). However, the decisions of several circuits support the conclusion that *McDonough* establishes the existence of three distinct tests: the *McDonough* test announced in the Opinion of the Court, and the actual and implied bias tests, which remain as alternate bases of relief. In *Skaggs,* the Tenth Circuit upheld the district court's conclusion that a plaintiff in a product liability case was not entitled to a new trial under *McDonough* on the basis of a juror's intentionally dishonest failure to respond affirmatively to a question inquiring whether any juror had been involved in a lawsuit. *See* 164 F.3d at 515–16. Although it was later revealed that the juror

---

**12.** The government cites *DeBurgo* and *Dall* for the proposition that the First Circuit requires actual bias in order to obtain relief under *McDonough.* *See* Gov't's Reply to Pet'r's Proposed Findings of Fact and Rulings of Law on Juror Misconduct Claims at 3, 8. However, those decisions do not support that contention.

*DeBurgo* articulates the *McDonough* test and then states that "the defendant has 'the burden of showing that the juror was not impartial and must do so by a preponderance of the evidence.'" 587 F.3d at 71 (quoting *Commonwealth v. Amirault,* 399 Mass. 617, 626, 506 N.E.2d 129 (1987)). Although the government does not make this argument, the court notes that the Supreme Judicial Court's decision in *Amirault,* which was cited in *DeBurgo,* suggests relief is only available when

the moving party proves actual bias. *See* 399 Mass. at 625, 506 N.E.2d 129. However, *DeBurgo* did not cite the Supreme Judicial Court decision for this proposition. *See* 587 F.3d at 71. *DeBurgo* cited the state court's decision in *Amirault* only for the proposition that a defendant must prove a juror was not impartial. *See id.* As explained in this Memorandum, satisfying the *McDonough* test is one way in which a party may prove a juror was not impartial.

In *Dall,* the First Circuit stated that "a party seeking a new trial *based on nondisclosure* by a juror must 'demonstrate actual prejudice or bias.'" 970 F.2d at 969 (quoting *Aponte–Suarez,* 905 F.2d at 492)(emphasis added). This statement, however, does not refer to cases where jurors provide inaccurate answers, to which *McDonough* applies.

had been involved in at least nine lawsuits, the district court found that the juror would not have been excused for cause on this basis. *Id.* Still, the court found it necessary to consider whether the plaintiff was entitled to relief on the basis of actual or implied bias. *Id.* at 516. The court explained that "*McDonough* merely provides a party who alleges juror dishonesty during voir dire with an additional vehicle to obtain a new trial by demonstrating juror bias. The advent of the test did not eliminate a litigant's broader historic right to prove actual or implied juror bias." *Id.* at 516. Similarly, in *Gonzales,* the Tenth Circuit wrote:

> Cases such as this one-based on allegations of dishonest voir dire answers-fall within a larger category that comprises all cases of alleged juror partiality, whatever the source of partiality. Though a petitioner in the position of Mr. Gonzales has available the *McDonough* analysis, he is not "foreclose[d] [from] the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury."

99 F.3d at 985 (quoting *McDonough,* 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring)); *see also Burton,* 948 F.2d at 1159 (juror impliedly biased, and, additionally, relief was appropriate under *McDonough* because juror was dishonest and correct answer to voir dire questions would

have resulted in juror's dismissal for cause).

The Fourth Circuit has also indicated that actual or implied bias are not necessarily requirements of relief under *McDonough* and that "[t]he *McDonough* test is not the exclusive test for determining whether a new trial is warranted: a showing that a juror was actually biased, regardless of whether the juror was truthful or deceitful, can also entitle a defendant to a new trial." *Jones,* 311 F.3d at 311–13 (inquiring, for purposes of relief under *McDonough,* whether a juror would have been excused on the basis of actual, implied or inferable bias, and separately inquiring whether relief was warranted on the basis of actual or implied bias); *see also Fulks,* 454 F.3d at 432 (holding that, where *McDonough* was not satisfied because the district court found that it would not have exercised its discretion to excuse the juror for cause, a party seeking a new trial must show actual or implied bias); *Fitzgerald,* 150 F.3d at 362–63 ("[f]ailure to satisfy the requirements of *McDonough* does not end the court's inquiry") (citing *McDonough,* 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring)).[13]

In *Greer,* the Second Circuit explained that, in deciding a claim under *McDonough,* a court must determine whether a correct answer at voir dire would have provided a valid basis for a challenge for

---

**13.** As the government notes, a subsequent, unpublished case of the Fourth Circuit holds (citing *Fulks* ) that, even where the district court would actually have excused a juror for cause "in an abundance of caution," a *McDonough* claim necessarily fails without a showing that the district court would have abused its discretion in denying a challenge for cause because the juror was actually or impliedly biased. *See United States v. Blackwell,* 436 Fed.Appx. 192, 195–96, 2011 WL 2558845, at *3 (4th Cir.2011)(per curiam). The court finds *Blackwell* to be inconsistent

with *Fulks,* and, in any event, unpersuasive. Moreover, *Blackwell* is an unpublished decision that is not binding precedent even in the Fourth Circuit.

The Fourth Circuit's analysis of the motive prong in *Conaway* arguably requires a motive for dishonesty that proves actual bias or implied bias, although the Fourth Circuit did not articulate the concept in precisely those terms. *See* 453 F.3d at 585 & n. 20, 588–89. If this is an accurate reading of *Conaway,* this court respectfully disagrees with its reasoning.

cause, and whether the court "would have granted" such a challenge. *See* 285 F.3d at 171. In finding that no grounds for a successful challenge for cause were present in that case, the court explained that "[c]hallenges for cause are generally based on actual bias, implied bias, or inferable bias." *Id.* (citing *Torres*, 128 F.3d at 43).[14]

Other cases cited by the government do not persuade the court that *McDonough* requires proof of actual or implied bias. In *Johnson v. Luoma*, the Sixth Circuit stated in applying the *McDonough* test that "a juror is subject to a valid challenge for cause based on actual bias and, in certain limited circumstances, implied bias." *See* 425 F.3d 318, 326 (6th Cir. 2005). However, the court in *Johnson* cited only the Second Circuit's decision in *Torres* for this definition of a valid basis for a challenge for cause and explicitly noted that the court in *Torres* also permitted a challenge for cause based on inferred bias. *See* 425 F.3d at 326 (citing *Torres*,

128 F.3d at 43, 49).[15] In other cases the Sixth Circuit has recognized that "the *McDonough* test is not the exclusive test for determining whether a new trial is warranted on the basis of juror bias." *Dennis v. Mitchell*, 354 F.3d 511, 520 n. 4 (6th Cir.2003); *see also Zerka*, 49 F.3d at 1186 n. 7 ("*McDonough* does not entirely foreclose a party from seeking a new trial on the basis of a prospective juror's honest, though mistaken, response." (citing, among others, *Amirault*, 968 F.2d at 1405–06; *McDonough*, 464 U.S. at 556–57, 104 S.Ct. 845 (Blackmun, J., concurring))).

The Eleventh Circuit has also stated that relief under *McDonough* "requires a showing of actual bias." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1473 (11th Cir.1992) (citing *Perkins*, 748 F.2d at 1532). However, that circuit employs the term "actual bias" in a different manner than other courts.[16] The requirements for relief under *McDonough* in the Eleventh Circuit are, therefore, un-

**14.** Although questioning whether "affirmance of the District Court's findings regarding actual bias ends our inquiry, or whether a post-trial allegation of jury partiality may alternatively be proven by implied or inferred bias," the Second Circuit in *Greer* found none of these bases for an excusal for cause was proven. *See* 285 F.3d at 171–72.

**15.** In addition, the statements in *Johnson* regarding bias are dicta, in that the court had already concluded that the petitioner was not entitled to relief because the juror at issue "honestly answered all questions posed during voir dire." *See* 425 F.3d at 325.

**16.** The Eleventh Circuit provides that "[a]ctual bias may be shown in two ways: 'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.'" *See Perkins*, 748 F.2d at 1532 (quoting *Nell*, 526 F.2d at 1229). However, in *Nell*, the court explicitly concluded that the term "presumed bias" is not the same thing as implied bias, but rather describes "situa-

tions in which the circumstances point so sharply to bias in a particular juror that even his own denials must be discounted in ruling on a challenge for cause." *Nell*, 526 F.2d at 1229 n. 8. *Nell* involved a juror who knew who the defendant was, and belonged to a union that had been in a dispute with the defendant's union. *Id.* at 1228. Although the juror had not admitted bias, and insufficient information had been elicited from that juror to permit a presumption of bias, the court observed that "doubts about the existence of actual bias should be resolved against permitting the juror to serve," and concluded that the juror should have been excused for cause. *Id.* at 1230. These cases suggest that relief under *McDonough* could be obtained in the Eleventh Circuit based on facts which are insufficient to prove actual bias, and do not involve the sort of relationships associated with the concept of implied bias, but raise enough question about a juror's actual bias as to warrant dismissal of that juror for cause. *See BankAtlantic*, 955 F.2d at 1473; *Perkins*, 748 F.2d at 1532; *Nell*, 526 F.2d at 1229–30 & n. 8.

clear.[17]   Even assuming that the Eleventh Circuit's test requires actual or implied bias, its analysis is inconsistent with *Mc-Donough*, which requires only a "valid basis for a challenge for cause," *see* 464 U.S. at 556, 104 S.Ct. 845, and with the First Circuit. *See Dall,* 970 F.2d at 970; *Amirault,* 968 at 1405–06 & n. 2.[18]

The remaining case on which the government relies, *North*, states that "a 'valid basis for a challenge for cause,' absent a showing of actual bias, is insufficient" to obtain relief under *McDonough. See United States v. North,* 910 F.2d 843, 904 (D.C.Cir.1990) (quoting *McDonough,* 464 U.S. at 556, 104 S.Ct. 845). In so stating, the D.C. Circuit adds a requirement to *McDonough* that is unsupported by the Supreme Court's language in that case. *See McDonough,* 464 U.S. at 556, 104 S.Ct. 845. The D.C. Circuit relied on the concurrences of Justices Blackmun and Brennan for the proposition that "an aggrieved party must show that the juror's correct response at voir dire would have demonstrated actual bias." *See North,* 910 F.2d at 904. However, this conclusion is not supported by Justice Blackmun's concurrence and is contrary to the First Circuit's interpretation of it. *See Amirault,* 968 F.2d at 1405–06 & n. 2 (citing Justice Blackmun's concurrence and stating that "a further determination on the question of

juror bias" is required after a party has failed to satisfy the *McDonough* test). It is, of course, necessary that this court follow the law as it has been described by the First Circuit. The court can do so comfortably because the First Circuit's recognition in *Amirault* that there are three tests for determining whether a juror was impartial—actual bias, implied bias, and *McDonough*—is consistent with the language and reasoning of the Supreme Court in that case.

### E.  *Conclusion*

For the foregoing reasons, to vacate a sentence of death and obtain a new trial on the question of punishment based on a juror's inaccurate answer to a question asked on voir dire, Sampson must show actual or implied bias, or satisfy the *Mc-Donough* test. Under that test, Sampson must prove by a preponderance of the evidence that: (1) the juror provided an inaccurate answer to a question asked at voir dire that should have elicited particular information; (2) the question was material; (3) the juror response was dishonest; (4) the motive for answering dishonestly relates to the juror's ability to decide the case based solely on the evidence and calls the juror's impartiality into question; and (5) the concealed information, when consid-

---

**17.** In a later case, the Eleventh Circuit found that, where a juror had dishonestly failed to disclose a felony conviction which would have disqualified that juror from serving on the jury, *McDonough* was satisfied because "an honest answer from this juror would have provided a basis to challenge her for cause." *Jackson,* 405 F.3d at 1288. The court in that case upheld the district court's grant of a new trial even though the lower court had not considered whether the juror had any bias. *Id.*

**18.** The government also cites *Gonzalez,* 214 F.3d 1109, and *United States v. Doke,* 171 F.3d 240 (5th Cir.1999), as cases requiring actual or implied bias for a showing of a valid

basis for a challenge for cause under *McDonough*. However, *Gonzalez* was a direct appeal of a district court's denial of a challenge for cause and did not address *McDonough. See* 214 F.3d at 1111–12. *Doke* addresses *McDonough* and notes that actual or implied bias would necessitate a removal for cause, but the analysis is brief and does not state that *only* actual or implied bias can justify excusing a juror for cause. *See* 171 F.3d at 246–47. The court does not, therefore, find these cases to be persuasive authority for the proposition that a finding of actual or implied bias is necessary to justify relief under *Mc-Donough*.

ered with the motive for concealment and circumstances of eventual disclosure, including the juror's demeanor in answering the question, would have required or resulted in the juror's dismissal for cause based on actual bias, implied bias, or inferable bias.

## IV.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  *Juror C*

As indicated earlier, Sampson bears the burden of proving facts justifying a new trial by a preponderance of the evidence that is admissible under the Federal Rules of Evidence.  *See DeBurgo,* 587 F.3d at 71; *Crowley,* 303 F.3d at 408; Fed.R.Evid. 1101(b).  Sampson asserts that he is entitled to a new trial because C's inaccurate answers at voir dire caused him to be deprived of the right to an impartial jury guaranteed by the Sixth Amendment. This contention is correct.

#### 1.  *Voir Dire and Testimony at 52255 Proceedings*

C testified three times in these § 2255 proceedings.  The opportunity to observe and evaluate her demeanor was important to the court in several ways.  First, it was important in deciding her credibility.  The court's perception of C's demeanor was also important in assessing whether she would have been able to decide whether Sampson should be executed based solely on the evidence or, instead, was likely to have been substantially impaired in her ability to do so by her disturbing personal experiences and enduring emotional reaction to them.  As described below, the court finds that: C intentionally gave false answers to many important questions in her questionnaire, during individual voir dire, and in these § 2255 proceedings; she did so in an effort to hide painful experiences which were, in some respects, comparable to matters involved in Sampson's

case; if, before empanelment, the court had the information it now possesses, she would have been excused for cause because of the high risk that she would not be able to decide whether Sampson should live or die based solely on the evidence; and the decision to excuse her for cause would have been reinforced by her repeated perjury.

As explained earlier, in this case Sampson was charged with two carjackings resulting in death.  Prior to trial, the parties and the court knew that the jury would be exposed to disturbing evidence of those murders and of a third murder in New Hampshire.  It was also known that the trial would include evidence that Sampson had threatened to shoot female bank tellers in North Carolina in the course of a series of robberies, and that he had made threats during a third carjacking as well. In addition, it was known to Sampson's counsel, at least, that the jury would hear evidence of Sampson's history of drug abuse and the toll it took on one of his marriages.  It was also foreseen that there would be testimony about Sampson's experiences in prison.  Moreover, it was expected that the jury would learn that Sampson's parents and other family members had abandoned him after he was charged with being a murderer.

Prior to trial, the court worked with counsel for the parties to develop a detailed questionnaire that was intended to elicit all of the information necessary to determine whether a juror was eligible to serve in Sampson's particular capital case. The seventy-seven questions were designed to develop information concerning any bias a juror realized that he or she had and was willing to reveal.  The questions were also designed to obtain information concerning life experiences that were relevant to determining whether a juror would be able to decide the issues present-

ed based solely on the evidence, unimpaired by the influence of anything that he or she may have experienced personally.

The jury selection process began with jurors appearing in court to complete the questionnaire. Each juror was sworn and instructed orally by the court. The jurors were told that while there were no right or wrong answers, it was essential that each question be answered truthfully. To emphasize this, the jurors were informed that any intentionally false statement could subject them to a prosecution for perjury. The jurors were also instructed to take whatever time was necessary to answer the questions thoughtfully.

The court was aware that some of the questions on the questionnaire were designed to elicit information that jurors might regard as private and sensitive. Therefore, the jurors were told that they could request that certain of their answers be kept permanently out of the public record or, alternatively, that they could respond to a question by writing "private." The jurors were informed that if they were called back for individual voir dire, upon request sensitive or private information would be discussed in a session closed to the public.

These points were reiterated in the questionnaire itself. The introduction to the questionnaire instructed each juror that "[i]t is very important that you answer the questions as completely and accurately as you can." Ex. 64 at 1. The questionnaire also explained that "[y]ou have taken an oath promising to give truthful answers, and any intentionally false statement could subject you to prosecution for perjury." *Id.* The written instructions also stated that with regard to a sensitive subject a juror could either request that her answer be kept out of the public record or, alternatively, simply write the word "private," which would re-

sult in oral questioning on that matter if the juror was recalled for individual voir dire. *Id.* at 1–2.

C was in a group that received the court's oral instructions and completed their questionnaires on September 18, 2003. She was then 51 years old. She had graduated from high school and had worked for many years in customer service for a telecommunications company. C understood the oral and written instructions she received, including the requirement that she provide honest, accurate, and complete answers to each question unless she marked a question "private." She took the time necessary to complete the questionnaire. She then signed it, certifying "under the pains and penalties of perjury, that the answers which I have given in this questionnaire are true and complete to the best of my knowledge and belief." *Id.* at 30.

As described below, this certification was known by C to be false. As C then knew, she had deliberately falsely answered a series of questions because it was too emotionally painful for her to disclose or discuss certain personal experiences that she regarded as "horrible." *See* Mar. 18, 2011 Tr. at 70; Nov. 18, 2010 Tr. at 66, 133, 143.

While many other jurors were excused for cause based on their written responses to the questionnaire, C was not. Rather, she and some other jurors appeared for individual voir dire on October 2, 2003. She was asked to read the transcript of the court's earlier oral instructions. In addition, she was told again that, upon request, the public would be excluded from the discussion of sensitive, personal subjects. C was also reminded that she remained under oath. Prior to being questioned orally, C confirmed that she had read the transcript of the court's oral instructions

and that she understood that she remained under oath.

When asked whether she wanted to correct her responses to any of the questions in the questionnaire, C asked to clarify only her response to Question 24, which addressed her ability to consider mental illness as a mitigating factor. However, in her questionnaire, C had answered "no" to, among other inquiries, questions that asked: whether she or anyone close to her had been charged with committing a crime (Question 63); whether she knew anyone who had ever been in prison (Question 64); whether she, or anyone: close to her, had ever been a victim of a crime or a witness to a crime (Question 59); whether she, or anyone close to her, had ever been questioned as part of a criminal investigation (Question 61); whether she or anyone close to her had an experience with the police in which she or that other person was treated fairly (Question 65); whether she or anyone else close to her had ever been employed, in any way, in law enforcement (Question 68); and whether she or anyone close to her ever had a drug problem (Question 32). As C knew both when she answered the questionnaire on September 18, 2003, and when she appeared for individual voir dire on October 2, 2003, her "no" response to each of those questions was false.

As of September, 2003, C had endured a difficult personal life that included events she subsequently described in these § 2255 proceedings as "horrible" experiences that she "had to move on" from and "ha[d] to forget." *See* Mar. 18, 2011 Tr. at 40–41, 81, 86–87. These experiences mainly involved her daughter J and her second husband P. These experiences were so deeply disturbing to C that she frequently cried when testifying about them in these § 2255 proceedings. Both during voir dire in 2003 and in the course of these § 2255

proceedings, C deliberately and systematically gave false answers to questions intended to elicit information concerning these experiences because it was too painful for her to disclose or discuss them.

C married [redacted] in 1971, and divorced him in about 1978. C and had [redacted] two children, J and a son. J married [redacted] [redacted] and moved from the small town of Merrimac, Massachusetts, where C lived, to Florida in about 1993.

In about 1995, J got a job performing administrative duties with the Sanibel, Florida Police Department, where she received promotions and commendations. C was very proud of J's success in the Police Department.

However, by September, 2003, when she appeared as a potential juror in Sampson's case, C was no longer proud of J because she knew the following. In 1997, J was arrested and charged with stealing property from the Police Department, and then arrested and charged again for stealing and using a coworker's credit card. J was placed on probation for these offenses. Then, in 1998, J was sentenced to six months in prison for violating the terms of her probation by using cocaine and absconding from supervision. C believed that J had been treated fairly by law enforcement in all of these matters. In connection with them, C learned that J was addicted to cocaine. She visited J in prison and was distraught by her daughter's appearance. In 2003, C had a relationship with J, for example, bringing J's children to see her annually.

C was deeply ashamed of J's criminal conduct. In these § 2255 proceedings C tearfully characterized J's conviction and incarceration as "a nightmare" and said they had caused "a horrible, horrible time in [her] life." Mar. 18, 2011 Tr. at 40, 73. Indeed, she tried hard but unsuccessfully

to forget about J's drug addiction and incarceration because thinking of them was "killing [her]." *Id.* at 87. In September, 2003, C remembered J's convictions and incarceration, but she "could not admit that [ ] would happen in [her] family." *Id.* at 73. These feelings were still evident in 2011.

C married her second husband, P, in 1979, and divorced him in 2002. P worked for the United States Postal Service. The couple had three sons.

During their marriage, P regularly abused alcohol and marijuana. C urged him to get treatment for his drug problem. P's substance abuse ultimately contributed greatly to C's decision to divorce him. As she testified in these § 2255 proceedings: "He liked to drink. He liked his vodka. And he liked smoking his pot. And I had had it." Nov. 18, 2010 Tr. at 143–44.

In about 1985, [redacted]. When C later learned about it, she felt confused, ashamed, and embarrassed. *See* Mar. 18, 2011 Tr. at 66. As the crying C described it in her testimony in these § 2255 proceedings, "[i]t was horrible," *id.*, "like the end of my life," Nov. 18, 2010 Tr. at 162.

In addition, P often threatened to harm his wife by physically chasing her, punching walls, and causing C to believe he would punch her too if he could catch her. These incidents frightened C, who would frequently go to her mother's home to avoid her husband.

On May 29, 2000, P's threats to his wife escalated. After refusing C's repeated requests for a divorce, P angrily confronted her at a bar. Later that day, C found in her home a suicide note her husband had written. Soon after, P came to their house with a shotgun or rifle. He told C that "he was going to shoot [her] and then himself." *Id.* at 141. As C wrote in her affidavit to obtain an Abuse Prevention

Order, she was genuinely "afraid he was going to shoot [her]." Ex. 66. Two of her sons took the weapon away from P. C took it and the suicide note to the Merrimac Chief of Police, who she knew, and discussed the incident with him. As she later tearfully testified in the course of these § 2255 proceedings, this incident too was "horrible" for her. Nov. 18, 2010 Tr. at 143.

On May 31, 2000, C requested and received an Abuse Prevention Order that required that P stay at least fifty yards away from her. Ex. 66. At the top, the document stated that "VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE punishable by imprisonment or fine or both." *Id.* C read the Order. In both 2000 and in September, 2003, when she filled out her questionnaire, she knew that a violation of the Order was a criminal offense.

P violated the Order on June 20, 2000, and was arrested in C's presence for doing so. On that day, P returned to C's home, chased her into a bedroom, and would not let her leave. Once again, C was afraid he was going to hurt her. However, after one of her sons intervened, C was able to call 911. When police officers arrived, they observed that C was "visibly shaken and crying." Ex. 67. She was, however, able to report that her husband had violated the Abuse Prevention Order. A police officer questioned her at her home about the incident. As he was doing so, P returned and was arrested. C then went to the police station and gave a further statement.

Although C unconvincingly claimed in her testimony in these § 2255 proceedings not to know it, P was prosecuted for violating the Abuse Prevention Order and put on probation. When C went to court to have that Order extended, her husband became very angry and unruly, and court

security officers had to remove him from the courtroom.

While the Abuse Prevention Order was in effect, P stalked C at least three times. When she complained to the police, they told her they could not do anything because her husband was remaining more than fifty yards away from her. C believed that the Merrimac police had treated her fairly, just as she believed that J had been treated fairly by authorities in Florida.

Between the time of C's divorce in 2002 and voir dire in September, 2003, she maintained regular contact with P. They talked about their children and were supportive of each other when their youngest son was hospitalized for ten days. Thus, as of September, 2003, P remained a person who was close to C.

Nevertheless, C regards the events that lead to her divorce from P as "horrible" and "a nightmare." Mar. 18, 2011 Tr. at 81; Nov. 18, 2010 Tr. at 133. Although she never forgot those events, including during the voir dire process, she found those events emotionally too difficult to disclose or discuss.

As indicated earlier, during voir dire C consistently and intentionally answered questions falsely in order to avoid disclosing J's drug addiction, convictions, and incarceration. She also consistently gave dishonest answers to questions which should have revealed, among other things, that P had threatened to kill her about three years earlier.

For example, with regard to J, in response to Question 47 which asked for information concerning any children, C disclosed only her two sons who were then living with her in her home. In these § 2255 proceedings, C testified that she thought the question only sought to identify children who were living at home,[19] noting that in response to Question 48 she disclosed that she then had a son in the Marines. This claim of confusion might have been convincing if C had not intentionally refused to mention J in her dishonest responses to many other questions. For example, C did not disclose J in response to Question 63(a), which asked "[h]ave you or anyone close to you ever been charged with committing a crime," or to Question 64, which asked "[d]o you or anyone close to you know anyone who is, or has been, in prison." Similarly, C answered "no" when asked whether anyone close to her ever had a drug problem (Question 32); whether anyone close to her ever had an experience with the police or the criminal justice system in which the person was treated fairly (Question 65); and whether anyone close to her had worked in law enforcement in any way (Question 68). As discussed below, when C's inaccurate answers concerning J were discovered in the course of these § 2255 proceedings, she gave a series of excuses for them that are not credible. As she admitted concerning her failure during voir dire to disclose that J had been in prison, C's inaccurate answers to questions that should have elicited information about J were each deliberately untrue.[20]

---

**19.** Question 47 stated: "If you have a spouse or live in companion, and/or any children or grandchildren, please provide the following information for them." The form contained columns with space under each for "Relationship," "Age," "Gender," "Education," and "Employment." Ex. 64 at 21–22.

**20.** With regard to Question 64, which asked whether C knew anyone who had been in prison, C had the following colloquy with the court:

THIS COURT: What you just said is you knew—what's your explanation for why you answered that, "No," is it you forgot your daughter was in prison or you knew she

C also deliberately failed to provide honest answers concerning questions that should have revealed that P had threatened to kill her, among other things that were material to whether she was capable of being an impartial juror in this case. Indeed, as with J, P is not mentioned in her responses to the questionnaire. For example, C intentionally did not disclose that: P, who was close to her, had a drug problem (Question 32); she had been a victim of a crime—an assault by P—that two of her sons had witnessed (Question 59); she had been questioned as part of the criminal investigation of the violation of the Abuse Restraining Order (Question 61); P was charged with the crime of violating that Order (Question 63); and C felt she had been dealt with fairly by the Merrimac police (Question 65). If C had

disclosed that her former husband had been charged with a crime, she would have been required to provide details concerning it (Question 63(b)-(e)).[21] These details would have prompted questions during the individual voir dire that would have revealed that P had threatened to shoot C, and that she remained very emotional about that experience.

C's dishonest answers were not discovered before she was empaneled and became one of the deliberating jurors who unanimously decided that Sampson should be executed. However, Sampson's counsel in these § 2255 proceedings discovered that in 2000 C had obtained an Abuse Prevention Order against P, and successfully argued that she should be questioned about it and related matters.

was in prison but you didn't want to admit it or is it something else?
THE WITNESS: I didn't want to admit it.
THIS COURT: But you knew it?
THE WITNESS: Oh, yeah.
(Pause.)
THE COURT: *So with regard to [Question 64], you gave me, and everybody else, an answer that you knew was not true, right ?*
THE WITNESS: *Yes.*
Mar. 18, 2011 Tr. at 90 (emphasis added).

**21.** The court finds that C answered the following material questions dishonestly: Question 32 (dishonestly failed to disclose that both J and P had drug problems); Question 34 (dishonestly failed to disclose that P worked for the United States Postal Service); Question 47 (dishonestly failed to disclose the existence of three of her five children, including J); Question 54 (dishonestly failed to disclose that she was raised as and remained an Episcopalian because she did not think it was appropriate for the court to inquire about religious matters); Question 59 (dishonestly failed to disclose that she was the victim of P's repeated assaults, that two of her sons were witnesses to two of these assaults, and that, [redacted] ); Question 61 (dishonestly failed to disclose that she gave a statement to the police when she turned in the rifle or shotgun and suicide note, and that she and

her sons were questioned by police with respect to P's violation of the restraining order); Question 63 (dishonestly failed to disclose that P had been charged with violating the restraining order, and that J had been charged with theft, fraudulent use of a credit card, and parole violations); Question 64 (dishonestly failed to disclose that she knew J, who had been in prison); Question 65 (dishonestly failed to disclose that she believed she was treated fairly by the Merrimac police following P's assaults, and that she believed that J was treated fairly by the Sanibel police in connection with her prosecution and parole violations in Florida); Question 68 (dishonestly failed to disclose that J worked for the Sanibel Police Department).

The questions regarding religion and employment by the federal government were material. C's dishonest responses to those questions were relevant to assessing her credibility and her reasons for answering other questions inaccurately. However, the court does not consider these two dishonest responses to be important to the overall legal analysis of Sampson's claims because, in contrast to C's many other dishonest answers, the information concealed would probably not alone have produced a valid basis for a challenge for cause if discovered during voir dire. *See Mc-Donough,* 464 U.S. at 556, 104 S.Ct. 845.

C appeared for questioning on November 18, 2010. She reviewed her answers to her questionnaire and the transcript of her individual voir dire. After again being sworn to tell the truth, and given the opportunity to correct any previous response that was inaccurate or incomplete, C did not correct any of her dishonest answers concerning P or J. Instead, her dishonesty concerning P was disclosed through questioning. When asked why she had withheld information relating to P, she responded that: "When I was filling out this questionnaire, my personal life— that was my personal life.... I didn't think my personal life had anything to do with me being a juror." Nov. 18, 2010 Tr. at 149. At the November 18, 2010, hearing, C resisted answering questions about the details of her personal life, stating, "I don't want to go into all of these [things]." *Id.* at 148. C was visibly distraught while talking about matters involving P. When asked, "In September and October of 2003, when you filled out the questionnaire and then came back and had questions asked, did you know all these horrible things had happened to you?," C responded, "I did know those things happened to me . . . yes." *Id.* at 156. C explained that she had deliberately refused to provide information concerning P because she just did not want to talk about him. *Id.* at 157. It was too painful.

At the November 18, 2010, hearing the parties and the court learned for the first time that C had five children, including J. Sampson's counsel conducted additional investigation and persuaded the court to recall C in order to question her about J.

C appeared again on March 18, 2011. After again being placed under oath and asked whether there was anything in her prior testimony that she wanted to correct, C said that she recalled after she left the courthouse on November 18, 2010 that her daughter J had been arrested "like 20 years ago." Mar. 18, 2011 Tr. at 40. She claimed that she wanted to call the court to report this, but did not have the telephone number. This contention was dishonest. The court's letter and subpoena for her November 18, 2010 appearance provided C a telephone number she could have called. In addition, a call could have been made to the court's Deputy Clerk at a number available on the District Court's website. The court finds that C mentioned J at the outset of the March 18, 2011 hearing only because she had correctly inferred that she had been recalled because J's criminal history had been discovered.

In any event, C quickly characterized her experience with J's crimes as a "humiliating" "nightmare." *Id.* at 40, 41. Her tears, and many inconsistent and incredible explanations [22] for her continued failure to provide accurate information demonstrated that J was, and remains for C a very painful subject. As C did candidly testify: "I am not proud of [J] . . . I just . . . can't admit it would happen in my family." *Id.* at 73; *see also id.* at 72 ("It's not something I like to admit, even on paper.").

At the March 18, 2011 hearing, C testified that she did not speak to any of her fellow jurors after the trial was over. *Id.* at 70. She also stated that she had not had any contact with the families of the victims in the case. *Id.* These statements too proved to be dishonest.

---

**22.** Among the untruthful explanations C gave for her failure to discuss J before March 18, 2011 were: that she filled out the questionnaire in a hurry, Mar. 18, 2011 Tr. at 74; she "block[ed] that one part of my life out," *id.;* and she "knew" but she "was not thinking," *id.* at 71–72.

After March 18, 2011, Sampson's counsel found newspaper articles that reported that C had come to court to observe Sampson's sentencing. *See* Ex. 25. One article quoted C as saying that she had returned to the sentencing because she "needed to meet the [victims'] families." *Id.* When recalled to testify again on August: 8, 2011, C admitted that she had returned for the sentencing, spoke to another juror who had also come, and spoke to and hugged the parents of one of Sampson's victims, Jonathan Rizzo. C also disclosed that after the verdict was returned she had received letters from the McCloskey and Rizzo families.[23]

#### 2. *C's Inaccurate Answers Denied Sampson His Right to an Impartial Jury*

[34] As explained earlier, to prove that he is entitled to a new trial because he was denied his constitutional right to a jury that is "capable and willing to decide the case solely on the evidence before it," *McDonough*, 464 U.S. at 554, 104 S.Ct. 845, Sampson bears the burden of proving by a preponderance of the evidence facts that

justify granting a new trial for actual bias, implied bias, or under *McDonough*. *See Amirault*, 968 F.2d at 1405–06 & n. 2; *Dall*, 970 F.2d at 970. As explained below, while actual or implied bias have not been proven, Sampson has established that he is entitled to a new sentencing trial under *McDonough*.

#### a. *Actual Bias*

The court finds that the foregoing facts are not sufficient to prove whether or not C was actually biased. Sampson is, therefore, not entitled to relief based on actual bias.

As described earlier, actual bias is an issue of fact. *See Amirault*, 968 F.2d at 1405–06; *Fields*, 503 F.3d at 767; *Dyer*, 151 F.3d at 973; *Torres*, 128 F.3d at 43. When the issue arises during the jury empanelment process, actual bias has been defined as "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Fields*, 503 F.3d at 767 (quoting *Gonzalez*,

---

**23.** In making these findings of fact, the court is not suggesting that it was improper for C to attend the sentencing of Sampson or to have contact with the families of his victims after the verdict. However, before the January, 2003 media reports were discovered, in arguing that Sampson had not proven that C lacked impartiality, the government wrote that:

> Nor has C's conduct since the trial cast any doubt about her lack of impartiality during it. Since the verdict was returned more than seven years ago, C has eschewed any involvement with this case; she has made no known statements to the press or sought to capitalize on her experience as a juror, and she testified that she [had] not stayed in touch with her fellow jurors, nor has she had any contact with victims' families. While these facts do not preclude a finding of partiality, they do provide some relevant backdrop against which her recent testimony can be assessed.

Proposed Findings of Fact and Rulings of Law of the United States (Docket No. 1184) at 53. The court's findings concerning C's conduct after the jury returned its verdict in December, 2003, are relevant to the government's argument concerning her alleged actual bias. They are also relevant generally to her credibility. However, as these events occurred after the verdict and, therefore, could not have been the subject of dishonest answers to voir dire questions, these facts have not been considered by the court as a possible basis for relief under *McDonough*. *See McDonough*, 464 U.S. at 556, 104 S.Ct. 845 (to obtain *McDonough* relief "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire"); *Stewart*, 433 F.3d at 304 (in applying *McDonough* analysis, court must " 'determine if it would have granted the hypothetical challenge' " to a juror for cause (quoting *Greer*, 285 F.3d at 171)).

214 F.3d at 1112 and *Torres,* 128 F.3d at 43)(internal quotation marks omitted).

When it is alleged after trial that a juror who participated in deciding the case was actually biased, courts often focus on whether the juror proved to be willing and able to decide the case based solely on the evidence. For example, in *Fields* the defendant was charged with committing robbery, rape, and murder. *See* 503 F.3d at 761. In response to voir dire questions a juror disclosed that his wife had been assaulted and robbed two years earlier. *Id.* at 764. After trial, it was discovered that the juror's wife had been raped in the course of those crimes. *Id.* at 764–65. The trial court found that the juror "did not intend to mislead the trial court, or hide the facts of the attack on his wife, by using the word 'assault' instead of 'rape.'" *Id.* at 767.[24] Further, the trial court believed the juror's testimony that "he never confused the events that occurred to his wife with the facts presented in the Field's case, he did not urge other jurors to follow any course of action because of his wife's experience, and he was one of the jurors who initially defended Fields in deliberations." *Id.* at 764–65. The Ninth Circuit affirmed the trial court. It stated:

> We are satisfied that there was no manifest error in the district court's finding that [the juror] was not actually biased. He put aside what happened to his wife and did not confuse those events with what he had to decide about Fields. He truthfully represented that he was impartial.

*Id.* at 767.

In the instant case, it is not possible for the court to determine whether or not C

was willing and able to decide whether the death penalty was justified based solely on the evidence, unimpaired by her painful personal experiences. As the government argued, Federal Rule of Evidence 606(b) provides that: "a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions ... or concerning the juror's mental processes." The First Circuit has recognized a limited exception to this principle where it is alleged that a juror was biased because of the defendant's race or ethnicity. *See Villar,* 586 F.3d at 87–88. However, this exception is not applicable in the instant case. Therefore, the court informed the parties of its tentative view that Rule 606(b) operates to exclude evidence of matters or statements occurring during the course of jury deliberations, even if offered to show dishonesty at voir dire rather than to prove a juror's thought process in deciding whether the death penalty was justified. *See* Mar. 18, 2011 Tr. at 8–9; *United States v. Benally,* 546 F.3d 1230, 1235–36 (10th Cir.2008) (citing *Williams v. Price,* 343 F.3d 223, 235 (3rd Cir.2003) (Alito, J.)); *but see Hard v. Burlington Northern Railroad,* 812 F.2d 482, 485 (9th Cir.1987) (citing *Maldonado v. Missouri Pacific Railway Co.,* 798 F.2d 764, 770 (5th Cir.1986)). Sampson did not generally press this issue and, following the court's comments, C was not questioned specifically about matters that occurred during jury deliberations.[25]

C did claim that her painful personal experiences did not affect her ability to be fair and impartial in deciding whether

---

**24.** Because the juror was not dishonest, the defendant was not entitled to a new trial under *McDonough,* which as explained earlier requires a dishonest answer to a voir dire question. *See Fields,* 503 F.3d at 767.

**25.** This case is, therefore, distinguishable from *Fields,* where the court considered evidence about the juror's thought process and statements during deliberations. *See Fields,* 503 F.3d at 764–66.

**190**        **820 FEDERAL SUPPLEMENT, 2d SERIES**

Sampson should be executed. *See* Nov. 18, 2010 Tr. at 136–37, 166–67. The court is not persuaded that this contention is correct. C credibly testified that she would be very disturbed if her conduct caused the jury's verdict to be vacated; as she put it, "[i]t would kill [her]." Aug. 8, 2011 Tr. at 39.[26] This concern provided a motive for her to lie about whether her painful personal experiences impacted her performance as a juror. As described earlier, C began providing dishonest answers to relevant questions when she filled out her questionnaire and she continued to respond dishonestly during individual voir dire and in her testimony in these § 2255 proceedings. She may well have done so with regard to whether she was able to compartmentalize her own experiences and decide the issues presented based solely on the evidence.

In any event, it is often difficult to determine many years after the fact whether a juror was actually biased. *See Dyer,* 151 F.3d at 981 ("Whether [the juror] was actually biased . . . is difficult to figure out eighteen years later."). It is particularly difficult to now assess C's state of mind in 2003 because she was so distraught during her testimony. C herself may not now truly know whether she performed her jury service impartially. Her repeated lack of candor and her inability to discuss certain matters unemotionally and coherently cause the court to be concerned that C was not actually able to decide the relevant issues based solely on the evidence.

**[35]** However, there is insufficient evidence for the court to find whether or not C was actually biased. Accordingly, Sampson has not satisfied his burden of proving that he is entitled to a new trial because of actual bias.

### b. *Implied Bias*

Whether Sampson is entitled to a new trial because C should be found to have been impliedly biased is a close question. As explained earlier:

> Implied or presumed bias is "bias conclusively presumed as a matter of law." *Wood,* 299 U.S. at 133, 57 S.Ct. at 179. It is attributed to a prospective juror regardless of actual partiality. In contrast to the inquiry for actual bias, which focuses on whether the record at voir dire supports a finding that the juror was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced. *See* [*U.S. v.*] *Haynes,* 398 F.2d [980] at 984 [ (2d Cir. 1968) ]. And in determining whether a prospective juror is impliedly biased, "his statements upon voir dire [about his ability to be impartial] are totally irrelevant." *Id.*

*Torres,* 128 F.3d at 45 (footnote omitted); *see also Fields,* 503 F.3d at 770; *Sanders,* 529 F.3d at 792–93.

This case does not involve "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Smith,* 455 U.S. at 222, 102 S.Ct. 940 (O'Connor, J., concurring). Therefore, C is not impliedly biased because of any direct personal relationship to the parties or specific events in the case.

---

**26.** More specifically, in response to a question asking how C would feel if as a result of her performance as a juror a new trial was required, she responded:

> It would kill me. It would kill me to see those families go through that again because of me. It's just not right. It would kill me. (Cries.)

Aug. 8, 2011 Tr. at 39.

Nor is the relationship between C's personal experiences and the issues being litigated in Sampson's case as immediate as those in some criminal cases in which implied bias has been found. For example, in *Hunley* the defendant was being tried for murder committed in the course of a burglary and two jurors were victims of similar burglaries during deliberations. *See* 975 F.2d at 320. There, implied bias was found because "[t]he burglary placed the jurors in the shoes of the victim just before she was murdered." *Id.* at 319.[27] Similarly, in *Eubanks* implied bias was found to be proven when the defendant was charged with conspiring to distribute drugs and the juror had dishonestly failed to disclose that he had two sons serving long sentences for crimes relating to their efforts to buy heroin. *See* 591 F.2d at 517.[28] In addition, in *Burton*, a juror dishonestly failed to disclose that she was afraid of being abused by her husband while she was serving in a case in which the defendant claimed that she suffered from "battered woman's syndrome" that had contributed to her belief that she had to kill her husband to protect herself. *See* 948 F.2d at 1154. In view of the juror's dishonest answers at voir dire, the Tenth Circuit found that a new trial was required both because implied bias had been proven and because the *McDonough* test was satisfied. *Id.* at 1158–59. In the instant case, the temporal relationship between the relevant events in C's life, which occurred before the trial, and those testified to at trial is more remote than in the foregoing cases in which implied bias was found.

In addition, this case is not one in which implied bias may be found because "repeated lies in voir dire imply that the juror concealed material facts *in order to secure a spot on the particular jury.*" *See Fields*, 503 F.3d at 770 (citing *Dyer*, 151 F.3d at 982)(emphasis added); *see also Green*, 232 F.3d at 677–78 (holding that a juror was impliedly biased where he "lied twice to get a seat on the jury," provided misleading, contradictory, and false responses when questioned about those lies, and engaged in behavior that brought his impartiality into question). C did not lie during the jury selection process because of a conscious desire to become a juror and punish Sampson for the fear and abuse she had suffered. Rather, she lied to avoid having to disclose or discuss her painful personal experiences.

However, C did repeatedly provide dishonest answers at voir dire, a factor that weighs in favor of a finding of implied bias. *See Skaggs*, 164 F.3d at 517. This case is, therefore, distinguishable from those in which jurors discussed their experiences honestly, and implied bias was not found. *See, e.g., Fields*, 503 F.3d at 774–75 (holding, in a case involving allegations of robbery, rape and murder, where the juror answered questions honestly at voir dire, that bias should not be implied because juror's wife had been raped and robbed two years prior to voir dire); *Powell*, 226 F.3d at 1186, 1189 (holding, in a case involving a charge of kidnaping for sexual gratification, that bias should not be implied where a juror honestly disclosed in voir dire that she had a daughter who had been raped ten years earlier); *Torres*, 128 F.3d at 46 (holding, in a case involving

---

**27.** Because these events occurred after voir dire, they could not have been the subject of dishonest answers and, therefore, *McDonough* did not provide a basis for analysis or relief.

**28.** *Eubanks* was decided in 1979, five years before *McDonough*. If it had been decided after 1984, the defendant would evidently also have been entitled to relief under *McDonough*.

structuring of financial transactions, that bias should not be implied where the juror disclosed during voir dire that she had herself structured transactions "some years before," but finding that inferable bias justified her excusal for cause); *Amirault*, 968 F.2d at 1406 (holding, in a case charging rape of child, that bias should not be implied where the juror had repressed a memory of being raped as a child forty years earlier and had, therefore, answered voir dire questions honestly).

[36]  Although C's repeated dishonesty at voir dire contributes to raising a close question about whether she should be found to have been impliedly biased, the court does not find that implied bias has been proven because C did not have a direct relationship to the parties or events in the case, the occurrences in her own life which may have affected her ability to decide the case based solely on the evidence occurred before rather than during the trial, and she did not lie in order to secure a seat on the jury.

### c. *Sampson is Entitled to Relief Under McDonough*

Although the court does not find actual or implied bias proven, this case is a paradigm for granting relief under *McDonough*. As explained earlier, *McDonough* is a third, alternative means of obtaining a new trial, which does not require proof of actual or implied bias. *See McDonough*, 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring); *Amirault*, 968 F.2d at 1405 n. 2. Once again, *McDonough* is rooted in the recognition that "the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." *McDonough*, 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring). Because dishonest answers to material questions create destructive uncertainty concerning whether a juror is

willing and able to decide issues based solely on the evidence, *McDonough* creates a special test when dishonest answers have been given to material questions. *Id.* (majority opinion).

For the reasons explained previously, to achieve relief under *McDonough*, a party must prove by a preponderance of the evidence that: (1) a juror gave an inaccurate answer to a question that was asked on voir dire; (2) the question was material; (3) the inaccurate response was dishonest, meaning knowingly and intentionally false rather than the result of a good faith misunderstanding or mistake; (4) the reason for the knowingly and intentionally false response relates to the juror's ability to decide the particular case based solely on the evidence and, therefore, calls into question the juror's ability to be impartial; and (5) a correct response would have provided a valid basis for a challenge for cause and would have resulted in disqualification of the juror based on actual bias, implied bias, or inferred bias. The court finds that Sampson has satisfied each of the requirements of this test.

First, C provided inaccurate answers to questions asked at voir dire. Thus, the instant case is not a "non-disclosure" case in which the information now at issue was not required to be disclosed by any question and, therefore, relief would be available only if actual or implied bias are proven. *See id.* (Blackmun, J., concurring); *Crowley*, 303 F.3d at 407–08; *Dall*, 970 F.2d at 969–70; *Aponte–Suarez*, 905 F.2d at 492. Rather, in this case the questionnaire included many questions which, if answered accurately, would have elicited most of the information concerning C's painful experiences with J and P, which would in turn have led to the discovery of any remaining, undisclosed facts.

[37]  More specifically, C answered inaccurately all of the questions that should

have elicited the information that J was addicted to cocaine, convicted of related crimes, and served time in prison. She also inaccurately answered every question that should have elicited the information that P abused drugs and had threatened to shoot C about three years earlier, that C feared that P would kill her and obtained an Abuse Prevention Order against him, that P's drug abuse had contributed to their divorce, and that these subjects were too painful for C to discuss. Because C provided inaccurate answers to many voir dire questions, the *McDonough* test applies in this case and its first prong is satisfied. *See, e.g., Amirault,* 968 F.2d at 1405–06 (applying *McDonough* where the voir dire questioning should have elicited the relevant information).

[38] With regard to the second prong of the *McDonough* test, each of the questions that C answered inaccurately by withholding elicited information concerning J and P had the potential to influence the decision on whether she was willing and able to decide the case based solely on the evidence and, therefore, could and would be an impartial juror. Thus, those questions were material. *See Neder,* 527 U.S. at 16, 119 S.Ct. 1827; *United States v. Lecco,* 634 F.Supp.2d 633, 660 (S.D.W.Va. 2009) (vacating a death sentence under *McDonough* based in part on a finding that questions about prior investigation of juror by law enforcement were material).

[39] In addition, each of C's inaccurate responses to questions that should have elicited relevant information about J and P was dishonest, meaning knowingly and intentionally false, rather than the result of a good faith misunderstanding or mistake. *See Jackson,* 405 F.3d at 1288–89 (granting a new trial under *McDonough* where trial judge implicitly found that juror's inaccurate answers to material questions were intentional and dishonest); *Burton,* 948

F.2d at 1158 (granting a new trial under *McDonough* after finding that, contrary to the conclusion of the state court, it was "hard to believe that the juror honestly answered the [relevant] voir dire questions").

The fourth prong of the *McDonough* test requires this court to examine the motives for C's dishonesty, and whether these reasons call into question her ability to be impartial. *See McDonough,* 464 U.S. at 556, 104 S.Ct. 845; *Pope,* 209 F.3d at 1164; *Greer,* 285 F.3d at 167; *Dyer,* 151 F.3d at 973; *Tucker,* 137 F.3d at 1028; *Boney,* 977 F.2d at 634. As the Supreme Court noted in *McDonough,* "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can be said to affect the fairness of the trial." 464 U.S. at 556, 104 S.Ct. 845. Accordingly, the court must decide whether the reasons for C's dishonest answers to voir dire questions that should have elicited important information concerning J and P relate to C's willingness or ability to decide Sampson's case based solely on the evidence.

[40] The court has found that C lied because of her shame and embarrassment about what J had done and about her experiences with P. Her shame and embarrassment were so intense that she could not discuss those matters candidly, unemotionally or, often, coherently. Moreover, thinking of J and P damaged, if not destroyed, C's general ability to think clearly and respond rationally, rather than with excessive emotion, about other matters.

The intensely emotional matters that caused C to lie repeatedly under oath in order to avoid disclosing and discussing them relate to matters the jury was required to consider in deciding whether to sentence Sampson to death. Like Samp-

son's victims, C had experienced the fear of being murdered. Like the bank tellers Sampson robbed, she had been threatened with being shot. Like Sampson's former wife, C had a marriage that was destroyed by her husband's substance abuse. And like Sampson's parents, C was deeply ashamed of her child and refused to be associated publicly with her problems. As discussed in the implied bias context, such emotional responses to facts that are similar to evidence that will be presented in a trial present a risk of an emotional involvement that will adversely affect a juror's impartiality. *See Tinsley v. Borg,* 895 F.2d 520, 527 (9th Cir.1990); *Burton,* 948 F.2d at 1159; *Eubanks,* 591 F.2d at 517.

This case is, therefore, unlike *Langford,* discussed below, in which a juror's dishonest failure to reveal during voir dire in a drug case that she had been convicted of prostitution many years before was a result of her embarrassment about that conviction and did not suggest that she would react emotionally to the evidence in the case or would otherwise be unable or unwilling to decide the case solely on the evidence. *See Langford,* 990 F.2d at 67–68. Here, C's reasons for lying during voir dire reflect her deep emotional distress about events similar to those presented in the trial and are, therefore, "reasons that affect [her] impartiality." *McDonough,* 464 U.S. at 556, 104 S.Ct. 845. Prong four of *McDonough* is thus satisfied.

[41] The fifth prong of the *McDonough* test is also satisfied because, if fully informed before empanelment, the court would have had the discretion to excuse C for cause,[29] *see Torres,* 128 F.3d at 46–48, and would have exercised that discretion to excuse C. *See Dall,* 970 F.2d at 969; *Stewart,* 433 F.3d at 304. More specifical-

ly, if the court had been properly informed before empanelment of C's painful personal experiences, it would have excused C for cause primarily because of the substantial risk that those experiences would significantly impair her ability to decide whether the death penalty was justified based solely on the evidence. *See Dall,* 970 F.2d at 970 (applicant for relief must show that " 'correct' responses to the voir dire questions would have required or resulted in the disqualification of [the juror] for cause."). This conclusion would have been based not only on the matters revealed, but also on C's extreme emotional distress when required to think about them. *See Ristaino,* 424 U.S. at 594–95, 96 S.Ct. 1017 (court's perception of juror's demeanor plays "an important part" in determining whether a juror could and would be impartial); *Lowe,* 145 F.3d at 49. This concern would have been reinforced by C's repeated dishonesty. *See, Boney,* 977 F.2d at 634; *Burton,* 948 F.2d at 1159; *Colombo,* 869 F.2d at 152; *Stewart,* 433 F.3d at 304. Such dishonesty during a jury selection process in which the importance of accurate answers was emphasized would also have caused the court substantial concern that C would not follow its instructions on other issues and would, therefore, have provided another reason to have excused her for cause. *See Thomas,* 116 F.3d at 616–17 & n. 10.

During voir dire, the court excused other jurors who had disturbing life experiences that were similar to events at issue in the case and which evoked a highly emotional response. For example, one juror stated that she could be impartial, but disclosed that her late sister had struggled with mental illness and alcoholism. *See* Oct. 2, 2003 Tr. at 242–43. The juror

---

**29.** At the August 8, 2011 hearing the government acknowledged that the court would have

had the legitimate discretion to excuse C for cause. Aug. 8, 2011 Tr. at 69, 78.

indicated that if there was testimony about Sampson suffering from mental illness, she "assume[d] [she] might be able to identify more with it because I've lived with it a little bit." *Id.* at 244. The court observed that the juror was "sincere" in stating that she could be impartial. *Id.* However, the court noted that "the juror's on the verge of weeping when she's talking about her sister" and stated that it was "concerned that if we start hearing about somebody else's family history and claims of mental illness that it's going to have an unduly emotional effect on her and that it could not only be very painful for her, but cause her to be unable to go through the process that a juror has to go through." *Id.* Without stating that the juror was actually biased, with the assent of the parties, the court excused the juror based on the prediction that she would likely encounter problems once she heard the evidence in the case. *See id.* at 244–45. In excusing the juror the court explained to her that:

> All the evidence is going to be hard to hear. That's going to touch nerves with you, as you said, have a stronger impact on you, that will be more upsetting to you because of your sister and her experience than it would be for another juror, and that that could also injure your ability to do everything a juror would need to do.

*Id.* at 245.

Another juror disclosed that she had a sibling who had a serious psychological condition and equivocated when asked if she could be impartial if there was evidence that Sampson was psychologically disturbed. *See* Sept. 30, 2003 Tr. at 131–46. The court found that it would not necessarily excuse a person who expressed such equivocation or who had a family member who was mentally ill. *Id.* at 147. However, this particular juror exhibited such a strong emotional response to dis-

cussion of mental illness that the court concluded that the trial "will become an especially difficult ordeal for her" and was "sufficiently concerned that her experience with her brother will substantially impair her ability to succeed in what [the court thought] would be an effort to follow the law and that she would be in such great risk of having a breakdown of some sort that it could infect the rest of the jury." *Id.* at 147–48. Therefore, although the court did not state that this juror was actually biased, the court concluded that "the most appropriate decision is to excuse her" over the defendant's objection. *Id.* at 148.

Similarly, if the court had been properly informed by honest answers in C's questionnaire and during individual voir dire, it would have exercised its discretion to excuse her for cause. While the jurors just discussed were excused because of their emotional reaction to matters relating to people close to them, C's difficulties arose largely from things that had happened directly to her, such as P's threat to kill her. As indicated earlier, at the time of voir dire, the court would have foreseen that the trial would include: testimony about violent murders; testimony from female bank tellers who Sampson had threatened to shoot; testimony that Sampson abused alcohol, cocaine, and marijuana; testimony that one of Sampson's marriages ended as a result of his drug use; and testimony that Sampson had been incarcerated. If the court had known that C was deeply distressed because: three years earlier she had herself been threatened with being shot and killed; she had ended a marriage due to her husband's substance abuse; and she felt deeply ashamed of her daughter's criminal activity, drug abuse, and incarceration, the court would have found that, after being exposed to the evidence in the case, C was likely to be influenced by her own life experiences and probably be sub-

stantially impaired in her ability to decide the case based solely on the evidence. She would, therefore, have been excused for cause for this significant risk of partiality alone.

In addition, the court also excused jurors solely because it was discovered that they had provided answers that they knew were false on their questionnaire. For example, one juror had disclosed on his questionnaire that his brother had a drug addiction and been treated, but did not reveal his own addiction to oxycontin and treatment for it. *See* Oct. 1, 2003 Tr. at 127–29. The juror explained he had not revealed his own situation because he "just didn't really feel [he] had to...." *Id.* at 128. With the agreement of the parties, he was excused because he had lied. *Id.* at 126–28. Similarly, another juror was excused because, the court explained, "I have, observing his demeanor, the definite impression that he would be unable to apply the law and, indeed, in some respects, was not candid when he filled out the questionnaire." Oct. 15, 2003 Tr. at 67. Moreover, when the court discovered during trial that two sitting jurors had answered portions of the questionnaire dishonestly, it dismissed those jurors as well. *See* Nov. 20, 2003 Tr. (Sealed Lobby Conference) at 3–5; Dec. 12, 2003 Tr. (Sealed Lobby Conference) at 39, 41. Therefore, had the court learned prior to empanelment that C had intentionally lied on her questionnaire and had later failed to correct her responses when given the opportunity to do so, she would have been excused for cause for that reason as well.

In view of the foregoing, prong five of the *McDonough* test, the requirement that C could and would have been excused for cause, is satisfied.

In finding prongs four and five of *McDonough* satisfied, the court concludes that this case is distinguishable from *Langford*, 990 F.2d 65, on which the government relies, and comparable to *Burton*, 948 F.2d 1150, in which the *McDonough* standard was met. *Langford* was a case in which a doctor was charged with dispensing controlled substances illegally. *See* 990 F.2d at 66. In response to a question about whether she had ever been arrested or convicted, a juror intentionally did not disclose that she had, fifteen years earlier, been convicted of prostitution. *Id.* at 67. She did not answer the voir dire question honestly because of "substantial embarrassment." *Id.* However, when her record was discovered, the juror candidly confessed and explained, evidently calmly, her motive for lying. *Id.* Unlike C, the events that the juror dishonestly failed to disclose in *Langford* were very different from the matters presented by the evidence in the case she was called upon to decide. The trial judge found no reason to be concerned that she could not decide the case based solely on the evidence and held that the juror would not have been excusable for cause. *Id.* at 67–68.[30] Therefore, the motion for a new trial was denied. *Id.*

In contrast, in the instant case, C's reasons for lying during voir dire cast doubt on whether she could have decided the case based solely on the evidence and she would, therefore, have been both excusable

---

**30.** The Second Circuit's decision in *Langford*, 990 F.2d 65, preceded its decisions in *Torres*, 128 F.3d at 46–47, and *Greer*, 285 F.3d at 171, which articulated the concept of "inferable bias." If written after them, it appears that the district judge in *Langford* would have recognized that the juror's dishonesty raised a possibility of bias that provided the discretion

to excuse her or not to excuse her for cause. *See Torres*, 128 F.3d at 47. It is evident that the judge would not have exercised such discretion to excuse the juror. Because an honest answer would not have resulted in the juror being excused for cause, the *McDonough* standard would not have been met. *See Dall*, 970 F.2d at 970.

and excused for cause. Thus, this case is analogous to *Burton.* In *Burton* the defendant was charged with murdering her husband. *See Burton,* 948 F.2d at 1151. She claimed that she suffered from "battered woman's syndrome" and that contributed to her belief that she had to kill her husband to protect herself. *Id.* In response to questions intended to elicit information concerning personal experience with abuse, a juror dishonestly failed to mention her own history of being abused by her husband and her fear of him at the time of trial. *Id.* at 1154, 1158. The juror claimed that she did not connect her abusive experiences with the voir dire questions and that she tried not to think about her own situation. *Id.* at 1154. The trial judge did not find this claim to be credible and, therefore, granted a new trial pursuant to *McDonough. Id.* at 1158.

In affirming this decision, and finding implied bias proven as well, the Tenth Circuit wrote:

> Here, the record is clear that [the juror] was dishonest in her response to questions on voir dire—this is true whether or not she simply did not, or could not respond properly because of her own emotional distress. This dishonesty, of itself, is evidence of bias.

> We likewise find that [the juror's] failure to respond on voir dire denied [the defendant] a fair trial under the *McDonough* test, for it is clear that the juror did fail to answer a material question, and that a correct response would have provided a basis for a challenge for cause. Had [the juror] responded honestly, she would have been excused for cause. That is exactly what happened to [other jurors] who revealed their exposures to family and child abuse.

*Id.* at 1159 (citations and footnote omitted). The Tenth Circuit's reasoning regarding *McDonough* is equally applicable to the

instant case. Had C honestly answered the questions that should have elicited the relevant information regarding J and P, the court would have had the discretion to excuse her for cause and would have done so.

In summary, C dishonestly provided inaccurate answers to material voir dire questions which sought to elicit, among other things, information about whether she had experiences which were similar to the evidence that would be presented and whether those experiences would likely impair her ability to decide the case based solely on the evidence. Her motives for lying and her emotional distress about the subjects she refused to disclose raise substantial doubt concerning whether she could and would have decided the case based solely on the evidence. If properly informed, this court would have excused her for cause. Sampson has proven each of the facts required by *McDonough* and, therefore, that he was denied his Sixth Amendment right to an impartial jury. Accordingly, he must be granted a new trial at which twelve truly impartial jurors will have to decide whether he should live or die. *See McDonough,* 464 U.S. at 554, 556, 104 S.Ct. 845; *Morgan,* 504 U.S. at 729, 112 S.Ct. 2222.

### B.   *Juror D*

Sampson also claims that he is entitled to a new trial for sentencing because juror D gave inaccurate responses during jury selection. As discussed earlier, relief is attainable in an inaccurate response case by showing actual or implied bias, or by proving each of the elements of the *McDonough* test. *See Dall,* 970 F.2d at 969–70; *Amirault,* 968 F.2d at 1405–06 & n. 2.

D completed her questionnaire on September 18, 2003, and appeared for individual voir dire on October 17, 2003. Investigation by Sampson's counsel in these

**198**          **820 FEDERAL SUPPLEMENT, 2d SERIES**

§ 2255 proceedings indicated that her responses to some questions were inaccurate. Therefore, the court required her to testify on November 18, 2010. In contrast to C, D was composed, candid, and credible when she testified.

The court finds that D made a number of inaccurate statements in answer to questions at voir dire. However, these statements were the result of a good faith misunderstanding or mistake, rather than of dishonesty.

During the voir dire process, D was living with [redacted], and several of her inaccurate answers to questions on the questionnaire relate to him. First, in response to Question 68, which asked about whether anyone close to her had ever been employed as a private security guard or in law enforcement, she did not report that [redacted] had worked as a police officer at Northeastern University until about 1998. The court finds that D did not withhold this information intentionally. Rather, at the time of voir dire she had forgotten that [redacted] had worked in this capacity.

Similarly, Questions 63 to 66 asked whether D or anyone close to her had been charged with a crime, been in prison, or had a fair or unfair experience with law enforcement. D did not report that [redacted] had been convicted of driving under the influence. However, she did not know in 2003 of [redacted]'s conviction. Therefore, her response was not dishonest.

Question 22 asked whether D or anyone else close to her was a member of any religion that had taken a position concerning the death penalty. In 2003, D was a member of the United Methodist Church, which opposed the death penalty. D, however, did not know that the Church had taken a position on the death penalty. Therefore, her response to Question 22 was also not dishonest.

Finally, Question 48 asked whether any member of D's family had ever served in the military. In 2003, D knew that her father and uncle had served in the Army, and that her uncle had served in combat. She did not report this information because she did not remember it when she was answering the questionnaire or when she returned for individual voir dire. Therefore, D's response to Question 48 was not intentionally false.

[42] In view of these findings, Sampson is not entitled to relief. In general, D impressed the court as an honest, thoughtful juror. She was not proven to be actually biased. Moreover, the matters that she failed to disclose were not comparable to matters at issue in Sampson's case. Because there were not similarities between D's undisclosed personal experiences and the issues involved in Sampson's case, implied bias has not been demonstrated. *See Sanders,* 529 F.3d at 792–93; *Person,* 854 F.2d at 664.

As D did give some inaccurate answers, the *McDonough* test applies. *See McDonough,* 464 U.S. at 556, 104 S.Ct. 845; *De-Burgo,* 587 F.3d at 72; *Crowley,* 303 F.3d at 408; *Dall,* 970 F.2d at 970; *Amirault,* 968 F.2d at 1405. However, because none of D's inaccurate answers were dishonest, they do not provide a basis for granting relief under *McDonough, See McDonough,* 464 U.S. at 556, 104 S.Ct. 845; *Crowley,* 303 F.3d at 408; *Amirault,* 968 F.2d at 1405. Moreover, the information not disclosed does not suggest any impairment of D's ability to decide the case based solely on the evidence. Accordingly, accurate responses would not have required or resulted in her being excused for cause. *See Dall,* 970 F.2d at 970. Therefore, the *McDonough* test is not met for these reasons as well.

In essence, Sampson has failed to prove that D's inaccurate responses demonstrate

actual or implied bias, or meet the requirements of *McDonough.* Therefore, Sampson is not entitled to a new trial based on D's service as a juror.

### C.  *Juror G*

Sampson also argues that he was deprived of his right to an impartial jury because juror G answered some voir dire questions inaccurately. Therefore, G too was required to testify on November 18, 2010. Although at times suffering from a lack of memory, G was a calm and credible witness in 2010.

G completed his questionnaire on September 18, 2003, and returned for individual voir dire on October 17, 2003. The court finds that on July 20, 1990, when G was 18 years old, he lost control of his car and drove it into a fence in East Bridgewater, Massachusetts. On July 22, 1990, an application for a complaint was filed in the Brockton District Court which alleged that G operated his vehicle to endanger the lives or safety of the public in violation of M.G.L. c. 90, § 24. The Brockton District Court summoned G to appear on October 30, 1990, and the case was assigned the docket number [redacted]. G failed to appear and a default warrant issued.

On January 29, 1991, G was stopped by police for a motor vehicle infraction in Brockton, Massachusetts, and was found to be driving with a suspended license in violation of M.G.L. c. 90, § 23. During that stop, police arrested G based on the outstanding warrant for failing to appear. About two hours later, after paying a $25.00 fee, G was released on personal recognizance and was ordered to appear in Brockton District Court the following morning.

The next day, G appeared in Brockton District Court and was arraigned on both the driving to endanger charge, docket number [redacted], and the charge of driv-

ing with a suspended license, which was assigned the separate docket number [redacted]. The default warrant arising out of the driving to endanger charge was removed. The court appointed counsel to represent G in both matters.

On March 26, 1991, G admitted sufficient facts to find him guilty of driving to endanger, and that case, docket number [redacted], was continued without a finding until September 26, 1991. He was ordered to pay $80.00 in costs and assessments, which he paid in April, 1991.

In mid-April, 1991, a default warrant was issued in the case charging G with driving with a suspended license, docket number [redacted]. The warrant was removed on April 23, 1991, at which time G admitted sufficient facts to find him guilty of driving with a suspended license. That case, docket number [redacted], was continued without a finding until September 26, 1991.

On September 26, 1991, the case charging driving to endanger, docket: number [redacted], was dismissed. The case charging driving with a suspended license, docket number [redacted], was not dismissed at that time because G had not paid related costs and fees, and a default warrant was issued in that case. There was no further activity in the case charging driving with a suspended license until 1999, when the case was dismissed by the court for administrative reasons.

On January 2, 1992, G was ticketed for speeding in Arizona, in violation of Arizona Revised Statutes 28–702.01D, a misdemeanor. Shortly thereafter, he appeared in court and paid a fine.

On March 28, 1992, G was issued a citation in Arizona for underage drinking and was ordered to appear in court at a later date. However, he returned to Massachusetts and did not appear as ordered.

The Arizona court issued a warrant for G's arrest.

At some point later in 1992 or in 1993, G moved back to Arizona to attend school. In late 1992 or in 1993, G was a passenger in a car that was stopped for speeding. The police determined that there was an outstanding warrant for G and arrested him. He was transported to the police station in handcuffs, held in a cell for several hours, and then posted bond for his release. About two weeks later, he was required to appear in court in Arizona and to pay a fine equal to his bond, meaning that he did not have to make any additional payments to the court. The court adjudicated G guilty regarding the underage drinking citation on May 18, 1993.

On April 5, 1995, G was charged in Arizona with two motor vehicle violations, entering a highway from a private road or driveway in violation of Arizona Revised Statutes 28–774 and failing to provide proof of financial responsibility in violation of Arizona Revised Statutes 28–1253D. As to both violations, he was found responsible by default on May 2, 1995 and ordered to pay fines totaling $483.00. He paid the fines on May 19, 2005.

G did not disclose any of the foregoing information in his questionnaire or during individual voir dire, despite questions which asked whether he had ever been charged with a crime (Question 68) and whether he had any experience in which the police or criminal justice system had treated him fairly (Question 65) or unfairly (Question 65). At the November 18, 2010, hearing, G was questioned on these matters.

At the time of jury selection in 2003, G remembered some, but not all, of his encounters with the police and courts described above. With respect to events in Massachusetts, he remembered that he was charged with driving to endanger, was arrested in connection with that charge, spent several hours in custody, went to court on at least one occasion, had a court-appointed attorney, and ultimately paid a fine. G believed that the driving to endanger charge was a "traffic violation" and, as such, was not a criminal charge he had to disclose. G did not remember that he had been charged with driving with a suspended license.

With respect to events in Arizona, he remembered that he had been cited for underage drinking, that a warrant was issued for his arrest when he failed to appear, that he was arrested after being a passenger in a car stopped for speeding, that he was transported to the police station in handcuffs and held in a cell for several hours, that he was released on bond, and that he later appeared in court and was ordered to pay a fine. He did not recall being charged for speeding or cited for motor vehicle violations in Arizona. Once again, he did not understand the questionnaire to be asking about traffic violations. In 2003, G felt that during his encounters with police and other parts of the criminal justice system, he had been treated fairly.

[43] The court finds that at the time of jury selection, in 2003, G did not withhold any information because of a desire to serve on the jury in Sampson's case. *Cf. Green,* 232 F.3d at 676–78; *Dyer,* 151 F.3d at 982–83; *see also Clark,* 289 U.S. at 11, 53 S.Ct. 465. G sincerely, but mistakenly, interpreted the questions on the questionnaire soliciting information about "crimes" to be asking about felonies rather than "traffic violations" or a citation for underage drinking. He also thought that the related questions about whether he had been treated fairly or unfairly by the police or criminal justice system referred

only to events arising out of more serious offenses. To the extent that he remembered the events, G did not disclose them because he did not understand the questions. Therefore, his responses were not intentionally false. *See McDonough,* 464 U.S. at 555–56, 104 S.Ct. 845.

G has not been proven to have been actually biased. In addition, the matters he failed to disclose were not comparable to matters involved in Sampson's case. Because there were not similarities between G's undisclosed personal experiences and the issues involved in Sampson's case, implied bias has not been established. *See Sanders,* 529 F.3d at 792–93; *Person,* 854 F.2d at 664. Because G gave inaccurate answers, the *McDonough* test applies. *See McDonough,* 464 U.S. at 556, 104 S.Ct. 845; *DeBurgo,* 587 F.3d at 72; *Crowley,* 303 F.3d at 408. However, because G was not dishonest in responding to any questions, his inaccurate answers do not provide a justification for granting a new trial. *See McDonough,* 464 U.S. at 556, 104 S.Ct. 845; *Crowley,* 303 F.3d at 408; *Amirault,* 968 F.2d at 1405.

As Sampson has failed to meet his burden to prove by a preponderance of the evidence that G was not an impartial juror due to actual bias, implied bias, or under the *McDonough* test, Sampson is not entitled to a new trial based on G's service as a juror.

## V. PEREMPTORY CHALLENGES

[44] Sampson asserts that he is entitled to a new trial because inaccurate responses by C, D, and G deprived him of his right to exercise his peremptory challenges on a properly informed basis. However, in the context of a juror's inaccurate responses to questions on voir dire, mere injury to the ability to exercise peremptory challenges properly is not a ground on which a new trial may be grant-

ed. *See McDonough,* 464 U.S. at 556, 104 S.Ct. 845.

In *McDonough,* the court of appeals had held that a new trial was necessary to remedy the prejudice to plaintiff's right to peremptory challenges due to a juror's failure to give an accurate response during voir dire. *Id.* at 549, 104 S.Ct. 845. The Supreme Court explicitly rejected the contention that a court should "wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination." *Id.* at 555, 104 S.Ct. 845. Accordingly, the Supreme Court has ruled that injury to the ability to exercise peremptory challenges caused by inaccurate responses in voir dire does not constitute a cognizable basis for granting a new trial. *See id.; Jones,* 311 F.3d at 314 n. 3; *Zerka,* 49 F.3d at 1185 ("The Supreme Court in *McDonough* explicitly rejected the argument that a plaintiff who is prevented from intelligently utilizing his peremptory challenges is entitled to a new trial . . . ."); *see also Rivera v. Illinois,* 556 U.S. 148, 129 S.Ct. 1446, 1455, 173 L.Ed.2d 320 (2009)(holding erroneous denial of a peremptory challenge by a state court did not amount to a federal constitutional violation); *Martinez–Salazar,* 528 U.S. at 316, 120 S.Ct. 774 (holding that a conviction should not be reversed where a defendant was permitted the correct number of peremptory challenges, despite the fact that one of the jurors only remained in the venire because the trial court had erroneously denied a motion to excuse the juror for cause).

Sampson's claim concerning peremptory challenges relies on *Colombo,* 869 F.2d at 151. However, in that case, although the Second Circuit noted that incorrect responses in voir dire could result in prejudicial harm to the exercise of peremptory

**202**        **820 FEDERAL SUPPLEMENT, 2d SERIES**

challenges, it ultimately remanded the case for a narrow factual determination relating to the issue of bias. *See Colombo,* 869 F.2d at 152. Sampson also relies on *United States v. Barnes,* 604 F.2d 121, 142 (2d Cir.1979), a case that did recognize a right to the intelligent exercise of peremptory challenges. However, the decision in *Barnes* predates *McDonough,* which in effect overruled it. *See McDonough,* 464 U.S. at 555–56, 104 S.Ct. 845.

[45] Accordingly, this court concludes that denial of the ability to exercise peremptory challenges intelligently due to a juror's erroneous responses during voir dire is not a basis for granting a new trial.

## VI. CONCLUSION AND ORDER

In view of the foregoing findings of fact and conclusions of law concerning C, Sampson has proven Claim IV of his Amended § 2255 Motion. He is, therefore, entitled to a new trial to determine whether the death penalty is justified. However, because it is not clear whether it is necessary to resolve the remaining claims in Sampson's Amended § 2255 Motion, or whether the court must decide whether to issue a Certificate of Appealability regarding Sampson's claims for dismissal, the court is not now entering a final order granting § 2255 relief. Rather, in a separate order, the court is directing the parties to confer and inform the court of their positions concerning how this matter should proceed.

This redacted version of the October 20, 2011 Memorandum and Order on Jury Claim shall be filed for the public record.



UNITED STATES of America

v.

**Gary Lee SAMPSON.**

**Cr. No. 01–10384–MLW.**

United States District Court,
D. Massachusetts.

Oct. 20, 2011.

**Background:** Following affirmance, 486 F.3d 13, of death sentence imposed after defendant pleaded guilty to two counts of carjacking resulting in death, he moved to vacate, set aside, or correct sentence. Government moved for summary dismissal.

**Holdings:** The District Court, Wolf, J., held that:

(1) counsel was not ineffective in failing to advise defendant to plead guilty prior to Supreme Court decision which might have precluded imposition of the death penalty in his case;

(2) counsel was not ineffective in advising defendant to plead guilty to the second superseding indictment without an agreement by the government not to seek the death penalty;

(3) government did not violate its obligation to disclose material exculpatory evidence;

(4) prosecutor did not engage in improper witness coaching;

(5) carjacking statute was a valid exercise of Congress's Commerce Clause power;

(6) evidence was insufficient to determine whether trial counsel were ineffective in failing to conduct an adequate mitigation investigation; and

(7) further development of the facts concerning defendant's mental status was required before court could determine whether trial counsel were objectively

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
        v.                        )      Cr. No. 01-10384-MLW
                                  )
GARY LEE SAMPSON                  )


MEMORANDUM AND ORDER


WOLF, D.J.                                        May 10, 2012

I.    SUMMARY

     In December, 2003, a jury unanimously found that defendant
Gary Sampson should be sentenced to death for the two carjackings
resulting in death to which he had pled guilty.  Under the Federal
Death Penalty Act, if even one juror had found that the death
penalty was not justified, Sampson could not be executed.  After
denying Sampson's motion for a new sentencing hearing, in January,
2004, the court sentenced Sampson to be executed.  The First
Circuit denied Sampson's appeal and the Supreme Court declined to
review his case.

     Sampson subsequently timely exercised his right to seek a new
sentencing hearing in this 28 U.S.C. §2255 proceeding.  He alleged,
among other things, that his constitutional right to an impartial
jury had been violated.  After substantial briefing and three
evidentiary hearings, this court found that Sampson's contention
was correct.  See United States v. Sampson, 820 F. Supp. 2d 151 (D.
Mass. 2011) (Memorandum and Order on Jury Claim).  In essence, the
court concluded that during the jury selection process a juror had

**G.Add.69**

persistently committed perjury concerning important questions relating to her ability to be impartial in deciding whether Sampson should be executed, and if she had answered those questions honestly and accurately, she would have been excused for cause. Therefore, the court found that pursuant to the Supreme Court's decision in <u>McDonough Power Equipment, Inc. v. Greenwood</u>, 464 U.S. 548, 554 (1984), Sampson's death sentence must be vacated and a second hearing to determine his sentence must be conducted.

Sampson asserts that, as the Third and Fourth Circuits have found, an order in a §2255 proceeding requiring a new hearing to determine whether the death penalty is justified is not a final order and, therefore, is not appealable until after that hearing is concluded. See <u>United States v. Hammer</u>, 564 F.3d 628, 632-36 (3rd Cir. 2006); <u>United States v. Stitt</u>, 459 F.3d 483, 484-86 (4th Cir. 2006). The government disagrees and intends to seek immediate review by the First Circuit of the jury claim decision as a final order pursuant to 28 U.S.C. §1291.

The government also asks that this court certify questions concerning its decision for possible immediate review under 28 U.S.C. §1292(b), which authorizes interlocutory appeals of orders in civil cases in limited circumstances. Sampson contends that the instant §2255 proceeding is not a civil case eligible for interlocutory appeal under §1292(b) and, in any event, that the standards for certification under §1292(b) have not been met.

2

**G.Add.70**

As explained in this Memorandum, this court is not required to decide whether this §2255 proceeding is a civil case within the meaning of §1292(b) and has not done so.  However, in the unique circumstances of this case, the court finds that if §1292(b) applies, its requirements are satisfied and that the court should exercise its discretion to allow the First Circuit to consider the full range of issues that the government wishes to present.

Among other things, a second hearing to determine whether Sampson should live or die will be lengthy, expensive, and anguishing for the families of Sampson's victims.  It is, therefore, appropriate to give the First Circuit the opportunity to decide whether the decision that a second sentencing hearing is legally required is now appealable; if it is, whether the First Circuit wishes to exercise its discretion to decide the merits of the government's claims now; and, if it does, whether this court correctly stated the <u>McDonough</u> test in finding that Sampson's death sentence must be vacated and a second sentencing hearing must be conducted.

Accordingly, the two questions defined in §IV of this Memorandum and Order are being certified for possible interlocutory appeal pursuant to 28 U.S.C. §1292(b) and proceedings before this court are being stayed until the First Circuit resolves the government's appeal.

**G.Add.71**

II.   HISTORY OF THE CASE

In October, 2001, Sampson was charged with two counts of carjacking resulting in the deaths of Philip McCloskey and Jonathan Rizzo.  The government exercised its discretion to seek the death penalty.  Sampson pled guilty to the charges against him. Nevertheless, he was entitled to have a jury decide whether he should be sentenced to death.

In 2003, hundreds of potential jurors answered, in writing and under oath, seventy-seven questions designed to elicit information about whether they could be impartial and decide whether Sampson should be executed based solely on the evidence presented in court. About 140 potential jurors not disqualified based on their written responses were individually questioned over fifteen days by the court and the parties for this purpose.  Twelve jurors, including one who has been publicly identified as "C," were empaneled, with six alternates.  Two of the original jurors were excused during trial when it was discovered that they had not answered voir dire questions truthfully.

The jury heard evidence for about six weeks.  It then unanimously found that the death penalty was justified. Accordingly, in January, 2004, the court sentenced Sampson to be executed.  See United States v. Sampson, 300 F. Supp. 2d 278, 284 (D. Mass. 2004); United States v. Sampson, 300 F. Supp. 2d 275 (D. Mass. 2004).

**G.Add.72**

The First Circuit affirmed the death sentence on May 7, 2007. See United States v. Sampson, 486 F.3d 13, 52 (1st Cir.), reh'g and reh'g on banc denied, 497 F.3d 55 (1st Cir. 2007). On May 12, 2008, the Supreme Court denied Sampson's petition for a writ of certiorari. See Sampson v. United States, 553 U.S. 1035 (2008).

On May 11, 2009, Sampson filed a Motion for a New Trial and to Vacate, Set Aside, and Correct Conviction and Death Sentence Made Pursuant to 28 U.S.C. §2255 and/or Rule 33 of the Federal Rules of Criminal Procedure, seeking relief from his conviction and sentence. A First Amended Motion under §2255 and Rule 33 was filed on March 29, 2010 (the "Motion"). The 250-page Motion raised eight distinct claims for relief (referred to here and in the October 20, 2011 Memorandum and Order on Summary Dismissal as Claims III-X), several of which had multiple subclaims. The Motion included claims that Sampson's counsel had been ineffective in their advice to Sampson about his guilty plea, in their investigation of mitigating evidence, and during the sentencing hearing; a claim that the inaccurate answers of three jurors during voir dire deprived Sampson of his constitutional right to an impartial jury; and a claim that Sampson cannot constitutionally be executed because he is severely mentally impaired, as well as several other claims. The government requested summary dismissal of all of Sampson's claims.

The court received hundreds of pages of briefing and held

**G.Add.73**

three days of hearings on the request for summary dismissal in August and September, 2010. In addition, after concluding that Sampson's claim that he was deprived of his right to an impartial jury (Claim IV) could not be summarily dismissed, the court held an evidentiary hearing on November 18, 2010, at which three jurors implicated in Sampson's claim testified about their answers during the jury selection process. One of these jurors, C, testified further at evidentiary hearings held on March 18, 2011, and August 8, 2011.

On October 20, 2011, the court issued the Memorandum and Order on Jury Claim. See Sampson, 820 F. Supp. 2d 151. The court held that Sampson was entitled to a new hearing to determine whether he should be sentenced to death because repeated perjury by C during jury selection deprived the court of important information that would have prompted it to excuse her for cause and, therefore, Sampson had been deprived of his Sixth Amendment right to have the question of whether he would live or die decided by twelve impartial jurors – jurors "'capable and willing to decide the case solely on the evidence before [them].'" Id. at 159, 188 (quoting McDonough, 464 U.S. at 554).

In summarizing some of its extensive factual findings, the court wrote that:

> [A]s explained in detail in this Memorandum, the court
> . . . finds that C intentionally and repeatedly answered
> a series of questions dishonestly in an effort to avoid
> disclosing or discussing painful experiences she had

**G.Add.74**

endured concerning her daughter J and her former husband P. Her dishonesty began when she filled out her questionnaire in September, 2003, continued when she returned for individual voir dire in October, 2003, and was repeated when she was required to testify in these §2255 proceedings.

More specifically, C intentionally lied during the jury selection process in response to questions that should have elicited the facts that: in 2000 her husband P had a rifle or shotgun and threatened to shoot her; C had feared that P would kill her; as a result, C obtained an Abuse Prevention Order against P; P was later arrested in her presence and prosecuted for violating that Order; C's marriage to P ended because of his substance abuse; J also had a drug problem; and J's drug abuse resulted in her serving time in prison, where C visited her. As information concerning these experiences involving J and P emerged slowly in the course of three hearings in these §2255 proceedings, C repeatedly characterized each of those experiences as "horrible" and a "nightmare." She often cried when required to think about these matters. She was frequently unable to discuss them candidly or coherently.

Sampson, 820 F. Supp. 2d at 158.

The court also analyzed the Supreme Court's decision in McDonough and subsequent cases applying that decision. See id. at 170-181. It summarized as follows the holding of McDonough and its understanding of what Sampson had to prove in order to show that C's perjury entitled him to a new trial pursuant to McDonough:

In McDonough, the Supreme Court described the circumstances in which inaccurate responses to voir dire questions would deny a party his right to an impartial jury and, therefore, require a new trial. See 464 U.S. at 556. It stated:

We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a

**G.Add.75**

> valid basis for a challenge for cause. The
> motives for concealing information may vary,
> but only those reasons that affect a juror's
> impartiality can truly be said to affect the
> fairness of a trial.

Id.

> Accordingly . . . to obtain relief under McDonough,
> Sampson was required to prove by a preponderance of the
> evidence that: (1) C was asked a question during voir
> dire that should have elicited particular information;
> (2) the question was material; (3) C's response was
> dishonest, meaning deliberately false, rather than the
> result of a good faith misunderstanding or mistake; (4)
> her motive for answering dishonestly relates to her
> ability to decide the case solely on the evidence and,
> therefore, calls her impartiality into question; and (5)
> the concealed information, when considered along with the
> motive for concealment, the manner of its discovery, and
> C's demeanor when required to discuss J and P, would have
> required or resulted in her excusal for cause for either
> actual bias, implied bias, or what the Second Circuit
> characterizes as "inferable bias."

Sampson, 820 F. Supp. 2d at 158-59.

This formulation of the McDonough test does not require proof

of either of the two types of bias that were recognized before

McDonough – "actual bias," meaning bias in fact, or "implied bias,"

meaning bias which is presumed as a matter of law. See id. at 162-

64, 169-70, 174-75.  Instead, the court concluded that it is

sufficient to obtain relief under McDonough to prove that a juror

intentionally provided a false answer to a material question, the

motive for the juror's dishonesty related to the juror's ability to

be  impartial,  and  discovery  of  the  deliberately  concealed

information  before  trial  would  have  actually  resulted  in  the

juror's excusal for cause based on a third type of bias that the

8

**G.Add.76**

Second Circuit has characterized as "inferable" or "inferred" bias. See id. at 165-66, 180-81 (quoting United States v. Torres, 128 F.3d 38, 46-47 (2d Cir. 1997) and United States v. Greer, 285 F.3d 158, 171 (2d Cir. 2000)).  "'Inferable' or 'inferred' bias exists 'when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias.'"  Sampson, 820 F. Supp. 2d at 165 (quoting Greer, 285 F.3d at 171 (quoting Torres, 128 F.3d at 47)).  This court found that the McDonough test would be met if Sampson proved inferable bias that would have provided the court the discretion to excuse C for cause prior to trial, and that the court would in fact have done so.  See Sampson, 820 F. Supp. 2d at 159, 175 (citing Dall v. Coffin, 970 F.2d 964, 970 (1st Cir. 1992)).

As fully explained in the Memorandum and Order on Jury Claim, the McDonough test recognizes the unique connection between deliberately  dishonest answers and the likely partiality of a potential juror.  Sampson, 820 F. Supp. 2d at 171.  McDonough creates a special test that applies when it is proven that a potential juror has deliberately answered a material question falsely.  "If the McDonough test required a showing of actual or implied bias in addition to a showing of dishonesty, the test Justice Rehnquist stated for the majority would be superfluous."

9

**G.Add.77**

<u>Sampson</u>, 820 F. Supp. 2d at 176.  The court noted that in <u>Amirault v. Fair</u>, 968 F.3d 1404, 1405-06 & n.2 (1st Cir. 1992), the First Circuit held that if relief under <u>McDonough</u> is unavailable, a court must still consider whether a juror has been shown to be actually or impliedly biased.  <u>Sampson</u>, 820 F. Supp. 2d at 176.  In doing so, the First Circuit implicitly recognized that there are three distinct tests for determining whether a party is entitled to a new trial because of juror bias  – actual bias, implied bias, and the <u>McDonough</u> test.  <u>See</u> <u>id.</u>  As the court also explained, its conclusion that actual and implied bias are not required is supported by <u>Dall</u>, 970 F.2d at 970, in which the First Circuit stated that relief under <u>McDonough</u> would be available where correct responses to the voir dire questions would have "required or resulted in" the juror's disqualification for cause.  <u>Id.</u>  This language is significant because while actual and implied bias <u>require</u> a juror's disqualification, inferable bias does not require disqualification, but provides the judge the discretion to excuse a juror for cause.  <u>See</u> <u>id.</u> at 176-77.

The court applied the facts it had found to this understanding of <u>McDonough</u> and summarized its analysis as follows:

> The court finds that Sampson has satisfied his burden of proving every element of the <u>McDonough</u> test. C did not falsely answer any question as part of a conscious effort to become a juror and punish Sampson for the abuse inflicted on her by P. However, it has been proven that during the jury selection process C dishonestly answered all material questions that should have revealed important events concerning J and P because C was deeply

10

**G.Add.78**

ashamed, and became distraught when required to think about them. She repeatedly lied because the events concerning J and P were too painful for her to disclose or discuss. C's decision to lie rather than reveal these events demonstrates the tremendous emotional impact that they had on C at the time of the voir dire and calls her impartiality into question.

The matters about which C repeatedly lied under oath were comparable to matters presented by the evidence in Sampson's case. C dishonestly did not disclose prior to the empanelment that, among other things, she had been threatened with being shot and killed, had ended a marriage due to her husband's substance abuse, and felt deeply ashamed of her daughter's criminal activity, drug abuse, and incarceration. If these matters had been revealed, the court would have found that there was a high risk that after being exposed to the evidence at trial C's decision on whether Sampson should be executed would be influenced by her own life experiences and, therefore, a high risk that she would be substantially impaired in her ability to decide whether Sampson should be executed based solely on the evidence. Like other potential jurors, C would have been excused for cause solely for that reason. The decision to excuse her for cause would have been reinforced by her demonstrated dishonesty, which was alone a reason that other potential jurors were excused for cause.

As the requirements of McDonough have been satisfied, the court is compelled to vacate Sampson's death sentence and grant him a new trial to determine his sentence. In essence, despite dedicated efforts by the parties and the court to assure that the trial would be fair and the verdict final, it has now been proven that perjury by a juror resulted in a violation of Sampson's constitutional right to have the issue of whether he should live or die decided by twelve women and men who were each capable of deciding that most consequential question impartially.

Id. at 159.[1]

_____

[1] The court also found that Sampson was not entitled to a new sentencing hearing because two other jurors inadvertently provided inaccurate answers during the voir dire process. Id. at 198-99, 201. In addition, the court concluded that Sampson was not entitled to a new sentencing proceeding because the

11

**G.Add.79**

In his submissions relating to his jury claim, Sampson asserted that an order requiring a new hearing to determine whether the death penalty is justified would not be appealable until after that hearing was concluded. See Hammer, 564 F.3d at 632-36; Stitt, 459 F.3d at 484-86; see also Andrews v. United States, 373 U.S. 334, 339-40 (1963). The government had not addressed this issue. Therefore, the court deferred entering an order implementing its decision on the jury claim until the parties had an opportunity to confer and brief the issue of whether that decision is immediately appealable. See United States v. Sampson, 820 F. Supp. 2d 249 (D. Mass. 2011) (Memorandum and Procedural Order).

In a separate order also issued on October 20, 2011, the court decided that the government was entitled to summary dismissal of many, but not all, of Sampson's claims that did not relate to the jury. See United States v. Sampson, 820 F. Supp. 2d 202, 213 (D. Mass. 2011) (Memorandum and Order on Summary Dismissal). The court summarized the surviving non-jury claims as follows:

> [Certain] claims cannot be conclusively resolved based on the motion and the record before the court. For example, Sampson alleges that his trial counsel failed to give his medical experts certain medical records that, if considered, would have led to additional investigation and, in turn, would have led to substantial additional evidence of brain abnormality, an important mitigating factor to be considered by the sentencing jury in a capital case (Claim III(C)). See, e.g., Porter v.

---

inaccurate responses by C and the two other jurors deprived him of his right to exercise his peremptory challenges on a properly informed basis. Id. at 201-02.

12

**G.Add.80**

McCollum, 130 S.Ct. 447, 454 (2009) (per curiam). On the present record, the court cannot conclude that Sampson's characterization of these events is inaccurate. Nor can it conclude that Sampson was not prejudiced at trial by the absence of this information. Similarly, the court cannot conclude that Sampson is not entitled to relief based on his claims that his counsel were ineffective because their investigation and presentation of mitigating evidence was inadequate in other respects, because their investigation and impeachment of a government witness was inadequate, because they did not present evidence to the jury that Sampson's demeanor in court was caused by medication, or because they did not raise a question with the court about Sampson's competency (Claims III(B),(D)-(F), (I)-(L) and (N)). Nor can the court conclude that Sampson is not entitled to relief based on the cumulative effect of some or all of these alleged errors (Claim X).

Id. In addition, the court deferred decision on Sampson's claim that he is so severely brain damaged that his execution would be unconstitutional. See id. at 249. Pursuant to the Memorandum and Order on Summary Dismissal, all of the claims which challenged the validity of Sampson's guilty plea are subject to summary dismissal.[2]

It was not clear to the court whether the claims that survived summary dismissal would be moot if a new hearing to determine Sampson's sentence was conducted. Nor was it clear whether the court should decide whether to issue a certificate of appealability

---

[2] In its Memorandum and Order on Summary Dismissal, the court addressed the possibility that Sampson's claim of ineffectiveness of counsel for failure to raise a question of competency could relate to the validity of the plea, not merely the validity of the sentence. Id. at 249. However, the parties have since communicated to the court their shared understanding that this claim challenged only the validity of the sentence, not the plea. See Feb. 1, 2012 Joint Report at 3-4.

13

**G.Add.81**

on any of the dismissed claims before a new sentencing proceeding was conducted, and whether Sampson would request a stay to pursue an appeal concerning any of the dismissed claims. See Sampson, 820 F. Supp. 2d at 250-51 (Memorandum and Procedural Order). The court ordered the parties to confer and address these issues too. See id.

On February 1, 2012, the parties responded in a joint report. The report notified the court of the government's intention to seek review of the court's decision on the jury claim as soon as an order was entered requiring a new sentencing proceeding, and the defendant's position that no appeal could now be taken. More specifically, the government asserted that an order implementing the court's decision on the jury claim and requiring a new sentencing hearing would be final and automatically appealable under 28 U.S.C. §1291, which gives courts of appeals jurisdiction over appeals "from all final decisions of the district courts of the United States." The government stated that it would pursue such an appeal as soon as the court entered an order directing that a new sentencing hearing be conducted. However, acknowledging the decisions holding that an order requiring a resentencing in a §2255 proceeding is interlocutory rather than final, the government also stated its intention to seek certification from this court for an interlocutory appeal under 28 U.S.C. §1292(b), which permits such appeals in civil cases that meet certain standards. Sampson

**G.Add.82**

reported his position that an order granting the defendant a new sentencing hearing would not now be appealable under either §1291 or §1292(b).

Both parties agreed that a stay of proceedings before this court pending resolution of any appeal by the government would be appropriate.  They proposed a briefing schedule relating to the government's request that this court make the findings necessary to authorize an interlocutory appeal under §1292(b).

The parties also reported their agreement that the decision to dismiss summarily certain of Sampson's claims would not now be appealable, and that Sampson's remaining claims challenging the validity of his death sentence would be moot if a new hearing to determine his sentence were conducted.

The court adopted the parties' proposed briefing schedule and stayed the remainder of the case.  The parties have now submitted memoranda addressing the questions: (1) whether an interlocutory appeal of the court's decision on the jury claim is authorized by §1292(b); and (2) if so, whether the requirements for an interlocutory appeal under §1292(b) have been met.

III. ANALYSIS

The parties dispute whether it is permissible to use §1292(b) to obtain interlocutory appeal of an order vacating a death sentence and ordering a new sentencing hearing in a §2255 proceeding.  Arguing that the government cannot now appeal this

15

**G.Add.83**

court's grant of a new sentencing hearing, Sampson relies on Andrews, in which the Supreme Court found that in a §2255 proceeding, a district court's order mandating a new sentencing was "interlocutory not final," and that it was "obvious that there could be no final disposition of the §2255 proceedings until the petitioners were resentenced."  373 U.S. at 339-40.  In Andrews, the Court concluded that the government did not have the right to appeal the order requiring resentencing, and the Court of Appeals lacked jurisdiction to review it, until the resentencing had occurred.  Id. at 337, 339.  Although Andrews was not a capital case and, therefore, did not involve a resentencing before a jury, two circuits have concluded that an appellate court does not have jurisdiction over the government's appeal of a district court's order vacating a death sentence but denying relief as to all claims concerning guilt.  See Hammer, 564 F.3d at 634 (3d Cir.); Stitt, 459 F.3d at 485-86 (4th Cir.).  Applying Andrews, the Third and Fourth Circuits held that a §2255 proceeding is not final until after a new sentencing hearing occurs and, therefore, an order requiring such a hearing is not subject to appeal.  See Hammer, 564 F.3d at 634; Stitt, 459 F.3d at 485-86.  Andrews, Hammer, and Stitt did not, however, address the possibility of interlocutory appeal pursuant to §1292(b).

Although recognizing that the Supreme Court's decision in Andrews has been interpreted by the Third and Fourth Circuits to

16

**G.Add.84**

mean that an order requiring a new sentencing hearing in a capital case is not final or appealable prior to the resentencing, the government intends to appeal this court's decision immediately to the First Circuit on the theory that the decision is final and appealable as of right under §1291.  As requested by the parties, this court will stay the proceedings until that appeal is resolved. Therefore, an appeal to the First Circuit will be taken and there will be an associated delay in the proceedings before this court.

The issue now being decided is whether this court should make the findings necessary to allow the government to present to the First Circuit the additional questions of whether its decision on the jury claim is eligible for interlocutory appeal under §1292(b); if so, whether the requirements of §1292(b) have been met; and, if so, whether the First Circuit should exercise its discretion to decide the merits of the jury claim decision before a new sentencing hearing is conducted.

Section 1292 provides courts of appeals with jurisdiction to review certain interlocutory orders, including orders granting or refusing to grant injunctions, and orders appointing receivers. <u>See</u> 28 U.S.C. §1292(a).  As relevant here, §1292 also provides courts of appeals with the discretion to permit interlocutory appeals in certain other circumstances, with the agreement of the district court.  Specifically, §1292(b) states that:

> When a district judge, in making in a <u>civil action</u> an order not otherwise appealable under this section, shall

**G.Add.85**

be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

(Emphasis added).

By its terms, §1292(b) applies only to civil cases. To obtain certification from the district court, the moving party must show that the matter involves: (1) a "controlling question of law;" (2) "as to which there is substantial ground for difference of opinion;" and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." §1292(b); see Caraballo-Seda v. Municipality Of Hormigueros, 395 F.3d 7, 9 (1st Cir. 2005); see also Bank of New York v. Hoyt, 108 F.R.D. 184, 190 (D.R.I. 1985) (Selya, J.) ("[t]he movant has the obligation of showing that the §1292(b) criteria are met" (citing Fisons Ltd. v. United States, 458 F.2d 1241, 1248 (7th Cir.), cert. denied, 405 U.S. 1041 (1972))). If it makes these findings in a civil case, the district court is permitted, but not required, to authorize an interlocutory appeal. See Swint v. Chambers County Comm'n, 514 U.S. 35, 47 (1995) ("Congress thus chose to confer on district courts first line discretion to allow interlocutory appeals."); Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc., 71 F. Supp. 2d 139, 145-46 (E.D.N.Y. 1999) (Weinstein, J.).

18

**G.Add.86**

Therefore, "[d]istrict courts . . . have independent and 'unreviewable' authority to deny certification even where the three statutory criteria are met." Nat'l Asbestos, 71 F. Supp. 2d at 146 (quoting Executive Software N. Am., Inc. v. U.S. Dist. Court, 24 F.3d 1545, 1550 (9th Cir. 1994)); see also Hoyt, 108 F.R.D. at 190 ("As the legislative history indicates, 'the appeal is discretionary rather than a matter of right. It is discretionary in the first instance with the district judge.'" (quoting S. Rep. 2434, 85th Cong., 2d Sess., 1958, reprinted in 1958 U.S. Code Cong. & Admin. News 5255, 5257)).

If this court makes the necessary findings and certifies its decision on Sampson's jury claim for interlocutory appeal, the First Circuit may have to decide three questions. First, it will have to resolve the dispute as to whether a §2255 proceeding is a "civil action" from which an interlocutory appeal can be taken under §1292(b). See Francisco Sanchez v. Esso Standard Oil Co., 572 F.3d 1, 9 (1st Cir. 2009) (court of appeals has duty to inquire into its own jurisdiction). If the First Circuit finds that §1292(b) applies, it will have to decide independently whether the three §1292(b) criteria are satisfied. See Caraballo-Seda, 395 F.3d at 9 (analyzing §1292(b) requirements and concluding two were not satisfied); In re Heddendorf, 263 F.2d 887, 889 (1st Cir. 1959) (in evaluating whether §1292(b) requirements are satisfied, court of appeals should "weigh the asserted need for the proposed

19

**G.Add.87**

interlocutory appeal with the policy in the ordinary case of discouraging 'piecemeal' appeals"); White v. Nix, 43 F.3d 374, 376-78 (8th Cir. 1994). The issue of whether §1292(b) applies is a pure matter of law and will determine the First Circuit's jurisdiction if the jury claim decision is not appealable under §1291 or some other statutory provision. Whether the requirements of §1292(b) have been met has at times been characterized as jurisdictional as well. See Couch v. Telescope, Inc., 611 F.3d 629, 633 (9th Cir. 2010) ("the requirements of §1292(b) are jurisdictional" (internal quotations omitted)). If §1292(b) applies and its requirements are met, the First Circuit will have "to decide whether, in the exercise of discretion granted . . . by the statute, [it] want[s] to accept jurisdiction." In re Cement Antitrust Litig., 673 F.2d 1020, 1026 (9th Cir. 1982), aff'd, 459 U.S. 1990 (1983).

Therefore, this court is, in effect, a gatekeeper. If it declines to make the findings necessary to permit interlocutory review under §1292(b), the First Circuit will only decide if the jury claim decision can be appealed as a final order under §1291. See Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 92 (1st Cir. 2004). If the court does make the required findings, the First Circuit will have the opportunity to decide the full range of §1292(b) issues presented to this court. For the reasons described below, in the unique circumstances of this case, it is appropriate to

**G.Add.88**

provide the First Circuit that opportunity.

Whether a §2255 proceeding is a "civil action" for the purpose of §1292(b) is a challenging question. The Supreme Court has recently noted that in some contexts "there has been some confusion over whether §2255 proceedings are civil or criminal in nature." Wall v. Kholi, 131 S.Ct. 1278, 1289 n.7 (2011). However, the Court did not clarify that question. See id.

Sampson asserts that the decision on the jury claim is not an order in a "civil action" eligible for a possible interlocutory appeal under §1292(b). He argues that the Advisory Committee Notes to the Rules Governing Section 2255 Proceedings for the United States District Courts (the "Notes") characterize proceedings under §2255 as a "continuation of the criminal case." See Note to Rule 1 ("a motion under §2255 is a further step in the movant's criminal case and not a separate civil action"); Note to Rule 11 ("a §2255 action is a continuation of the criminal case").[3] Sampson observes

---

[3] If Sampson is correct in his contention that §2255 proceedings are criminal rather than civil, a question could be raised regarding whether 18 U.S.C. §3731, concerning appeals by the government in criminal cases, applies to the instant case. Section 3731 permits appeals by the government in criminal cases for orders "granting a new trial after verdict or judgment." In addressing a decision to grant a new sentencing hearing in a capital case, the Sixth Circuit has held that the order would not have been appealable if entered in a §2255 proceeding, but was appealable under §3731 because the order granted a motion brought under Rule 33(b)(2) of the Federal Rules of Criminal Procedure. See United States v. Lawrence, 555 F.3d 254, 258-60 (6th Cir. 2009).

Rule 33(b)(1) requires that "[a]ny motion for a new trial

**G.Add.89**

that there is a strong policy against piecemeal appeals.  See Abney

v. United States, 431 U.S. 651, 656 (1977) ("[S]ince appeals of

right have been authorized by Congress in criminal cases, as in

civil cases, there has been a firm congressional policy against

interlocutory or 'piecemeal' appeals and courts have consistently

given effect to that policy.").  Section 2255(d) states only that

"[a]n appeal may be taken to the court of appeals from the order

entered on the motion as from a final judgment on application for

write of habeas corpus."; see also 28 U.S.C. §2253(a) ("In a habeas

---

grounded on newly discovered evidence must be filed within 3
years after the verdict or finding of guilty."  Sampson pled
guilty in 2003.  The Motion was not filed in this case until
2009.  Therefore, in contrast to Lawrence, it does not appear
that a timely Rule 33 motion has been presented to this court.

Nevertheless, §3731 may deserve some consideration.  This
court recognizes that in Andrews the Supreme Court stated that
the Criminal Appeals Act "has no applicability" to a §2255
proceeding.  373 U.S. at 338.  However, Andrews relied at least
in part on the Court's understanding that "[a]n action under 28
U.S.C. §2255 is a separate proceeding, independent of the
original criminal case."  Id.  This reasoning may have been
eroded by the revision of the §2255 Rules which now provide that
"a motion under §2255 is a further step in the movant's criminal
case and not a separate civil action."  Note to Rule 1.
Furthermore, Andrews relied on a "long-established rule against
piecemeal appeals," 383 U.S. at 340, but §3731 was amended after
Andrews to increase the government's opportunity to obtain review
of certain non-final orders, and it expressly states that its
provisions "shall be liberally construed to effectuate its
purposes."  §3731; see Lawrence, 555 F.3d at 258; see also United
States v. Wilson, 420 U.S. 332, 337 (1975); United States v.
Kane, 646 F.2d 4, 7 (1st Cir. 1981).

The government has not argued that the jury claim decision
is appealable pursuant to §3731, Sampson has not addressed the
question, and this court is not deciding it.  However, the First
Circuit may wish to consider the issue.

22

**G.Add.90**

corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held."). Sampson contends, therefore, that §2255 occupies the field and makes no provision for extraordinary, interlocutory appeals. Sampson asserts that in Hammer and Stitt, the government implicitly recognized this by not contending that §1292(b) was a vehicle for obtaining review. Indeed, it appears that the government has never made such a claim in any §2255 case.

However, there are factors that favor the government's position that decisions in §2255 proceedings are eligible for interlocutory review under §1292(b). Arguably, §2255 proceedings are hybrids, which in some contexts should be considered criminal actions and in other contexts should be considered civil actions. In certain contexts the First Circuit has characterized §2255 proceedings as civil in nature. See Trenkler v. United States, 536 F.3d 85, 94 (1st Cir. 2008) ("Section 2255 proceedings, like classic petitions for habeas corpus, are generally treated as civil in nature."); Rogers v. United States, 180 F.3d 349, 352 n.3 (1st Cir. 1999) ("Motions under §2255 have often been construed as civil actions, much like habeas corpus proceedings."). Sections 2253(a) and 2255(d) directly address how a final order in such a proceeding may be appealed, but do not state that interlocutory appeals are prohibited. The Supreme Court has held that "appeals from orders

23

**G.Add.91**

denying motions under Section 2255 are governed by the civil rules applicable to appeals from final judgment in habeas corpus actions."  United States v. Hayman, 342 U.S. 205, 209 n.4 (1952). Moreover, Rule 11(b) of the Rules Governing §2255 Proceedings provides that Rule 4(a) of the Federal Rules of Appellate Procedure, which establishes the time to appeal in civil cases, "governs the time to appeal an order entered under these rules." In addition, although without discussion of the implications of Andrews or any other analysis, courts have occasionally allowed interlocutory appeals under §1292(b) in §2255 actions.  See United States v. Pelullo, 399 F.3d 197, 202 (3d Cir. 2005); United States v. Barron, 127 F.3d 890, 892 (9th Cir. 1997), rev'd on other grounds on rehearing on banc, 172 F.3d 1153 (9th Cir. 1999) (en banc).

In view of the foregoing, reasonable judges might differ on whether §1292(b) applies to the decision on the jury claim in this case.  While §1292(b) requires that this court state its opinion on certain issues, it does not require that this court decide whether a §2255 proceeding is a "civil action" for the purpose of §1292(b). For the reasons described below, the court concludes that the requirements of §1292(b) are satisfied and it is in the interest of justice to give the First Circuit the opportunity to decide the full range of issues raised by the government.  Therefore, the court is not deciding whether or not §1292(b) applies to its

24

**G.Add.92**

decision on the jury claim, but is making the findings necessary to provide the First Circuit the opportunity to decide that issue, and others if it determines that it has jurisdiction.

In finding that the requirements of §1292(b) have been met, the court understands that interlocutory certification "should be used sparingly and only in exceptional circumstances, and where the proposed immediate appeal presents one or more difficult and pivotal questions of law not settled by controlling authority." Caraballo-Seda, 395 F.3d at 9 (internal quotations omitted); see McGillicuddy v. Clements, 746 F.2d 76, 76 n.1 (1st Cir. 1984). Certification under §1292(b) must be rare because appellate review is generally limited to final decisions precisely in order to "avoid piecemeal litigation, promote judicial efficiency, reduce the cost of litigation, and eliminate the delays caused by interlocutory appeals." Appeal of Licht & Semonoff, 796 F.2d 564, 569 (1st Cir. 1986); see also In re Clark-Franklin-Kingston Press, Inc., C.A. 90-11231-WF, 1993 WL 160580, *2 (D. Mass. 1993) ("appeals of interlocutory orders result in piecemeal litigation, causing delay"). Therefore, "the party seeking interlocutory appeal under §1292(b) bears the heavy burden of persuading the court that exceptional circumstances warrant 'departure from the basic policy of postponing appellate review until after entry of final judgment.'" Clark-Franklin-Kingston, 1993 WL 160580 at *2 (quoting Hoyt, 108 F.R.D. at 190); see also Vimar Seguros Y

25

**G.Add.93**

Reaseguros, S.A. v. M/V Sky Reefer, C.A. 91-13345-WF, 1993 WL

137483, *6 (D. Mass. 1993), aff'd, 29 F.3d 727 (1st Cir. 1994),

aff'd, 515 U.S. 528 (1995).

However, as Professors Wright, Miller, and Cooper have

written:

> [T]he three factors that justify interlocutory appeal
> should be treated as guiding criteria rather than
> jurisdictional requisites. Section 1292(b) is best used
> to inject an element of flexibility into the technical
> rules of appellate jurisdiction established for final
> judgment appeals under §1291 and for interlocutory
> appeals under §1292(a). The three factors should be
> viewed together as the statutory language equivalent of
> a direction to consider the probable gains and losses of
> immediate appeal.

16 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure

§3930 (2d ed. 1996), at 415.[4]  In the instant case, the §1292(b)

factors, viewed together, indicate that it is permissible and

appropriate that this court authorize an interlocutory appeal of

its decision on Sampson's jury claim.

The court's decision on the jury claim involves a "controlling

question of law" within the meaning of §1292(b).  That issue is the

question of whether a litigant seeking to obtain relief under

McDonough is required to prove, among other things, actual or

implied bias.  As explained earlier, this court found that actual

---

[4] This court has regularly employed this understanding in
deciding whether to certify decisions for interlocutory appeal
under §1292(b).  See Clark-Franklin-Kingston, 1993 WL 160580 at
*3; Vimar Seguros, 1993 WL 137483 at *6; United States ex rel.
LaValley v. First Nat. Bank of Boston, C.A. 86-236-WF, 1990 WL
112285, *3-4 (D. Mass. 1990).

26

**G.Add.94**

and implied bias are not required to be proven to obtain relief under McDonough, see Sampson, 820 F. Supp. 2d at 174-75, and that neither was proven with regard to C. Id. at 188, 192. If this court is found to be incorrect in its holding that McDonough provides a third basis for obtaining relief – distinct from actual bias and implied bias – or incorrect in some material respect concerning its statement of the McDonough test, then its decision that a new hearing to determine Sampson's sentence is required will be reversed or remanded. Therefore, a "controlling question of law" is implicated in the proposed interlocutory appeal. See In re Heddendorf, 263 F.2d at 890.

With regard to the second §1292(b) factor, "[t]he level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case." 16 Wright, Miller & Cooper, Federal Practice and Procedure §3930, at 422. In certain circumstances, "certification may be justified at a relatively low threshold of doubt." Id.

This court continues to find that it has correctly interpreted McDonough. As indicated earlier, "if the McDonough test required a showing of actual or implied bias in addition to a showing of dishonesty," as the government contends, "the test Justice Rehnquist stated for the majority would be superfluous." Sampson, 820 F. Supp. 2d at 176. Moreover, this court's interpretation of

27

**G.Add.95**

<u>McDonough</u> is consistent with the First Circuit's most relevant decisions, <u>Amirault</u> and <u>Dall</u>. See <u>Sampson</u>, 820 F. Supp. 2d at 176-77.

However, in <u>McDonough</u> two Justices concurred only in the judgment because they had "difficulty understanding the import of the legal standard adopted by the Court."  464 U.S. at 557 (Brennan, J., concurring).  In addition, "[a]s the Sixth Circuit has noted, the case law reflects some confusion concerning the meaning of <u>McDonough</u>."  <u>Sampson</u>, 820 F. Supp. 2d at 177 (citing <u>Zerka v. Green</u>, 49 F.3d 1181, 1185 (6th Cir. 1995)).  This confusion is manifest in certain cases from other jurisdictions that are inconsistent with this court's interpretation of <u>McDonough</u> and incorrect for the reasons explained in the Memorandum and Order on Jury Claim.  See <u>Sampson</u>, 820 F. Supp. 2d at 179-80 nn.16-18. Moreover, as this court wrote, its:

> statement of the <u>McDonough</u> test has been developed without the benefit of extensive discussion by the First Circuit.  The lack of extensive discussion is, in part, the result of the fact that the First Circuit has never decided a case in which the party seeking a new trial proved that a juror had been dishonest at voir dire and it has not, therefore, been required to analyze the remaining prongs of the <u>McDonough</u> test.

<u>Id.</u> at 177.

In essence, the court believes that in reaching its conclusions, the court harmonized the three opinions in <u>McDonough</u>, well-reasoned decisions from several Courts of Appeals, and language in several First Circuit cases whose analysis was less

**G.Add.96**

extensive. However, in recognition of the lack of binding First Circuit authority concerning the meaning of McDonough and the confusion that is manifest in some decisions in other circuits, the court finds that there is a "substantial ground for difference of opinion" regarding its conclusion that McDonough is satisfied without proof of actual or implied bias if the trial judge would have had the discretion to excuse for cause a juror who answered a material question dishonestly, and would in fact have excused her. See Sampson, 820 F. Supp. 2d at 159.

Finally, "immediate appeal from the [jury claim] order may materially advance the ultimate termination of the litigation." §1292(b). If the court's decision on Sampson's jury claim is reversed on interlocutory appeal, it is possible that a new sentencing hearing will not be necessary. The court will still have to decide the claims not involving the jury that have not been summarily dismissed. Discovery will be necessary and evidentiary hearings may be required. It is not now possible to predict whether any of Sampson's remaining claims will prove to be meritorious. However, it is possible that they will not justify a new sentencing hearing.

If this court's decision on the jury claim is affirmed, the issues concerning Sampson's other claims that were not summarily dismissed will be moot. The government will then have to decide whether it is now possible and appropriate to conduct another long,

29

**G.Add.97**

expensive, and exhausting sentencing hearing. An affirmance may cause the government to conclude that it is in the interests of justice to try to reach an agreement to resolve this matter with Sampson, who previously offered to accept a sentence of life in prison without possibility of parole rather than face possible execution. Such an agreement would expedite the termination of this case. See Clark-Franklin-Kingston, 1993 WL 160580 at *3 ("interlocutory appeals should be granted where resolution of the issues on appeal might lead to settlement"). Therefore, while inherently uncertain, the conclusion of this §2255 proceeding before this court "may" be facilitated by an interlocutory appeal. See §1292(b).

While the court is of the opinion that each of the §1292(b) factors has been adequately established, it still must decide whether to exercise its discretion to allow the First Circuit to consider whether interlocutory appeal of the jury claim decision is legally permissible and, if so, justified. See Swint, 514 U.S. at 47; Nat'l Asbestos, 71 F. Supp. 2d at 145-46; Hoyt, 108 F.R.D. at 190. It is, at this point, particularly appropriate "to consider the probable gains and losses of immediate appeal." 16 Wright, Miller & Cooper, Federal Practice and Procedure §3930, at 416.

The instant case is truly an "exceptional" case. See Caraballo-Seda, 395 F.3d at 9 (internal quotations omitted). It is the only case in the First Circuit in which a person has been

**G.Add.98**

sentenced to be executed under the Federal Death Penalty Act. A resentencing hearing in this case will be far more complicated and consume far more resources than a resentencing in a non-capital case such as <u>Andrews</u>. <u>See Stitt</u>, 459 F.3d at 487 (Williams, J., concurring). It will also be agonizing for the families of the victims. If meritorious, an immediate appeal of the jury claim decision may keep these costs from being incurred.

Interlocutory review of the jury claim decision may also promote confidence in the administration of justice. If there is not an immediate appeal and a second jury finds that Sampson should be sentenced to death, this court's jury claim decision will probably never be reviewed and there will be no appellate determination of whether the second capital sentencing proceeding was necessary. If the jury at a second sentencing hearing finds that Sampson should not be executed, the court's decision on Sampson's jury claim will be final and ripe for appellate review. The First Circuit will then be required to decide whether Sampson should be executed despite a more recent jury determination that the death penalty is not justified. This situation may raise additional, unprecedented appellate issues. In any event, a decision to allow Sampson to be executed despite a more recent finding that the death sentence is not justified would forseeably prompt public confusion and controversy. An interlocutory appeal and determination of the merits of the jury claim decision would

**G.Add.99**

reduce these risks and also assure that the expense and anguish of any second sentencing hearing is, as this court has found, legally required to provide Sampson "the fair process that the Constitution guarantees every man no matter how despicable his conduct." Sampson, 820 F. Supp. 2d at 160.

As described earlier, the instant case will be stayed pending the government's attempt to appeal the decision vacating Sampson's death sentence as a final order under §1291.  Therefore, there will be some piecemeal litigation and delay in any event.  Certification of an interlocutory appeal will only provide the First Circuit the opportunity to consider a fuller range of issues concerning the jury claim decision.   Thus, the delay caused by authorizing an interlocutory appeal in this case is not as significant a factor weighing against certification as delay is in the usual case.   Cf. Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 866-67 (2d Cir. 1996) (certification under §1292(b) was improvidently granted where appeal would delay rather than advance termination of litigation); Nat'l Asbestos, 71 F. Supp. 2d at 167 ("The lengthy delay of trial court proceedings pending the appeal, the probability that an interlocutory appeal will require lengthy appellate consideration on an incomplete record, and the likelihood that continued district court proceedings might moot the issues now sought to be appealed, . . . counsel against interlocutory review at this stage."); Clark-Franklin-Kingston, 1993 WL 160580 at *3 (denying leave to bring

**G.Add.100**

interlocutory appeal of order of Bankruptcy Court where appeal would delay the action's progress towards a trial).

In view of the foregoing, the court concludes that it is permissible and most appropriate to certify for interlocutory review, pursuant to §1292(b), the questions of: (1) whether McDonough requires proof of actual bias or implied bias to obtain relief; and, if not, (2) whether this court correctly stated the McDonough test in its Memorandum and Order on Jury Claim.

As explained earlier, the First Circuit may decide as a matter of law that an interlocutory appeal is not permissible or may conclude that this is not one of the rare cases in which an interlocutory appeal should be granted as an exercise of its discretion. However, it serves the interests of justice for this court to allow the First Circuit to make those decisions.

IV. ORDER

Therefore, for the reasons explained in this Memorandum and in the October 20, 2011 Memorandum and Order on Jury Claim, it is hereby ORDERED that:

1. Claim IV of the Motion (Docket No. 1035) is ALLOWED and Sampson's death sentence is VACATED.

2. The Government's Request for Summary Dismissal of the First Amended 2255 Petition (Docket No. 1055) is DENIED as to Claim IV, the jury claim.

3. Assuming, without finding, that 28 U.S.C. §1292(b) is

**G.Add.101**

applicable, the government's Motion to Certify Interlocutory Appeal Under 28 U.S.C. §1292(b) and for Stay (Docket No. 1235) is ALLOWED as to the questions of: (1) whether McDonough requires proof of actual bias or implied bias to obtain relief; and, if not, (2) whether this court correctly stated the McDonough test in its Memorandum and Order on Jury Claim.

4. A separate Order concerning the claims to be dismissed pursuant to the October 20, 2011 Memorandum and Order on Summary Dismissal shall enter.

5. This case shall continue to be STAYED pending a resolution of the government's appeal by the First Circuit.

  /s/ Mark L. Wolf
UNITED STATES DISTRICT JUDGE

**G.Add.102**