# United States Court of Appeals
## For the First Circuit

————————————

No. 12-1643

GARY LEE SAMPSON,

Petitioner, Appellee,

v.

UNITED STATES OF AMERICA,

Respondent, Appellant.

————————————

No. 12-8019

GARY LEE SAMPSON,

Respondent,

v.

UNITED STATES OF AMERICA,

Petitioner.

————————————

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

————————————

Before

Lynch, Chief Judge,
Selya and Lipez, Circuit Judges.

————————————

Mark T. Quinlivan, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellant.

William E. McDaniels, with whom Jennifer G. Wicht, Cadence Mertz, Williams & Connolly LLP, J. Martin Richey, Elizabeth L. Prevett, Federal Public Defender's Office, and Susan K. Marcus were on brief, for appellee.

———————————

July 25, 2013

———————————

**SELYA, <u>Circuit Judge</u>.** Few accouterments of our criminal justice system are either more fundamental or more precious than the accused's right to an impartial jury. That right is threatened when — as in this case — juror dishonesty occurs during the voir dire process yet is not discovered until well after final judgment has entered on the jury's verdict. But finality is also valuable, and not every instance of juror dishonesty requires setting aside a previously rendered verdict.

In its present posture, this case poses important questions about when and under what circumstances the belated discovery of juror dishonesty during the voir dire process demands vacatur of a jury verdict. The stakes are high — the jury here recommended a death sentence — and the cases that populate this arcane corner of the law are muddled.

The architecture of these appeals is easily described. Gary Lee Sampson, the defendant in the underlying criminal case, is on death row following his conviction on two counts of carjacking (death resulting), a penalty-phase hearing in which the jury voted to recommend capital punishment, and an unsuccessful direct appeal. <u>See</u> <u>United States</u> v. <u>Sampson</u> (<u>Sampson I</u>), 486 F.3d 13 (1st Cir. 2007), <u>cert.</u> <u>denied</u>, 553 U.S. 1035 (2008). In an effort to undo his sentence, the defendant brought a habeas petition, <u>see</u> 28 U.S.C. § 2255, and confronted the district court with a claim that juror dishonesty during the voir dire process antecedent to the

penalty-phase hearing deprived him of an impartial jury.  Following an evidentiary hearing, the district court agreed; it vacated the death sentence and ordered a new penalty-phase hearing.  United States v. Sampson (Sampson IV), No. 01-10384, 2012 WL 1633296, at *15 (D. Mass. May 10, 2012); United States v. Sampson (Sampson II), 820 F. Supp. 2d 151, 202 (D. Mass. 2011).  The government seeks immediate review of this decision.

We first address nuanced questions that cast doubt upon our appellate jurisdiction.  Concluding, as we do, that we can proceed to the merits of the juror dishonesty claim, we adopt the district court's findings of fact, articulate the proper legal framework, array the district court's findings of fact against that framework, and hold that the defendant's sentence must be set aside and a new penalty-phase hearing conducted.

## I.  BACKGROUND

We rehearse here only those facts that are needed to tee up this proceeding.  The reader who hungers for more details should consult the litany of earlier opinions in this case.  See, e.g., Sampson I, 486 F.3d 13; Sampson II, 820 F. Supp. 2d 151; United States v. Sampson (Sampson III), 820 F. Supp. 2d 202 (D. Mass. 2011); see also McCloskey v. Mueller, 446 F.3d 262 (1st Cir. 2006).

In 2001, the defendant engaged in a crime spree that took him up the eastern seaboard.  The spree included a series of bank robberies in North Carolina and a botched attempt to surrender to

the Federal Bureau of Investigation.  See McCloskey, 446 F.3d at 264.  The defendant then perpetrated two Massachusetts carjackings that led to the slaying of the carjacked drivers (Phillip McCloskey and Jonathan Rizzo).  In each instance, the defendant hitched a ride with the victim, forced the victim at knifepoint to drive to a secluded area, and committed murder.

Following these gruesome incidents, the defendant fled to New Hampshire in Rizzo's vehicle, forcibly entered a house, and strangled the caretaker (Robert Whitney).  He then drove Whitney's vehicle to Vermont, abandoned it, and resumed hitchhiking.  Another Good Samaritan, William Gregory, gave him a lift.  To repay his kindness, the defendant attempted to force Gregory at knifepoint to drive to a secluded spot.  This time, however, the intended victim escaped.  The defendant later called 911, surrendered to the authorities, and confessed.

On October 24, 2001, a federal grand jury sitting in the District of Massachusetts charged the defendant with two counts of carjacking, death resulting.[1]  See 18 U.S.C. § 2119(3).  A superseding indictment, deemed necessary to comply with Ring v. Arizona, 536 U.S. 584, 609 (2002), reiterated these charges; and

---

[1] Since neither Whitney's murder nor Gregory's carjacking was charged by the government, these separate crimes were relevant only as aggravating factors for sentencing purposes.  Sampson II, 820 F. Supp. 2d at 160.

the government served a notice of intent to seek the death penalty under the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3593(a).

In due course, the defendant admitted guilt with respect to both counts. The district court empaneled a death-qualified jury to consider the punishment to be imposed. See id. § 3593(b)(2)(A); see also United States v. Green, 407 F.3d 434, 436-37 (1st Cir. 2005) (discussing "death-qualified jury" requirements).

The voir dire lasted seventeen days and involved an extensive effort to ensure that each juror could — and would — decide the defendant's fate solely on the evidence. As a preliminary matter, hundreds of potential jurors were required to answer under oath seventy-seven written questions, carefully designed to elicit information concerning possible bias and life experiences that might have subconsciously affected an individual's ability to consider the defendant's sentence objectively. Many venirepersons were excused based on their written responses. Those who passed muster were interrogated by the court and the parties.

Prospective jurors were repeatedly directed to answer all questions accurately and honestly. All were advised that, upon request, responses concerning sensitive subjects (whether written or oral) would be kept out of the public record.

After individual questioning, the district court excused potential jurors for cause for a wide variety of reasons, including

-6-

pretrial exposure to information about the case, attitudes that raised questions about impartiality, emotional life experiences comparable to matters that would be aired at trial, and responses that lacked candor. Eventually, the court seated a jury of twelve, along with six alternates. During the six-week penalty-phase hearing, the court learned that two jurors had answered voir dire questions inaccurately and replaced them with alternates.

The penalty-phase hearing turned in large measure on the existence vel non of statutory and non-statutory aggravating factors and mitigating factors. See 18 U.S.C. §§ 3592(a), (c), 3593(c). In the end, the jury unanimously recommended that the defendant be sentenced to death on both counts. The district court followed this recommendation and imposed a sentence of death. See id. §§ 3553, 3594; United States v. Sampson, 300 F. Supp. 2d 275, 278 (D. Mass. 2004). The court also denied a flurry of post-trial motions. United States v. Sampson, 332 F. Supp. 2d 325, 341 (D. Mass. 2004).

On direct review, we affirmed the sentence. Sampson I, 486 F.3d at 52. The Supreme Court denied the defendant's ensuing petition for a writ of certiorari. See Sampson v. United States, 553 U.S. 1035 (2008).

On June 25, 2008, the district court appointed new counsel to handle post-conviction proceedings. See 18 U.S.C. § 3599(a)(2). After some procedural skirmishing, the defendant

filed a petition to vacate, set aside, or correct the judgment. See 28 U.S.C. § 2255. Pertinently, the defendant claimed that he was deprived of the right to have his sentence decided by an impartial jury because three jurors, designated for the sake of anonymity as Jurors C, D, and G, had falsely answered material voir dire questions.[2]

The district court prudently convened an evidentiary hearing to determine the scope and severity of the allegedly inaccurate voir dire responses. This hearing was held over three non-consecutive days. The first session concerned all three of the contested jurors; the second and third sessions focused exclusively on Juror C.

After careful consideration, the district court concluded that the inaccuracies contained in Juror D's and Juror G's responses were unintentional errors that did not justify setting aside the results of the penalty-phase hearing. Sampson II, 820 F. Supp. 2d at 197-201. The court reached a different conclusion as to Juror C, finding that she had repeatedly and intentionally provided dishonest responses to important voir dire questions. Id.

---

[2] The defendant's section 2255 petition also includes claims that he was denied effective assistance of counsel; that the government violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963); that the government committed misconduct during the grand jury process; that execution would violate his Eighth Amendment rights due to his severe mental impairment; and that the FDPA and/or the death penalty are unconstitutional. Only the jury dishonesty claim is before us.

at 192-97.  The court stated that truthful answers would have resulted in Juror C's excusal for cause during voir dire because the court would have "inferred bias."  Id. at 165-66, 194-97. Consequently, the court set aside the defendant's sentence,[3] id. at 181-97, and on May 10, 2012, ordered a new penalty-phase hearing, Sampson IV, 2012 WL 1633296, at *15.

At the government's behest, the court subsequently certified the following questions for immediate appeal under 28 U.S.C. § 1292(b): "(1) whether [McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984)] requires proof of actual bias or implied bias to obtain relief; and, if not, (2) whether [the district] court correctly stated the McDonough test."  Sampson IV, 2012 WL 1633296, at *15.

Recognizing that its right to prosecute an immediate appeal of the district court's order was freighted with uncertainty, the government went down three different but complementary roads.  First, it sought to pursue an appeal of the decision as a final order under 28 U.S.C. § 1291 and/or 18 U.S.C. § 3731.  Second, it sought to pursue an interlocutory appeal under the aegis of 28 U.S.C. § 1292(b).  Third, the government argued that, should we find the decision not otherwise immediately

---

[3] In a separate opinion, the court summarily dismissed some of the defendant's other claims.  See Sampson III, 820 F. Supp. 2d at 212-13; see also supra note 2.  These rulings need not concern us because the court has withheld the entry of orders on them. Sampson IV, 2012 WL 1633296, at *15.

appealable, it nonetheless ought to be reviewed through an exercise of advisory mandamus.  See id. § 1651.  We have consolidated all of these initiatives.

Because resolution of the jurisdictional conundrum is logically antecedent to any discussion of the juror dishonesty claim, we start there.

## II.  APPELLATE JURISDICTION

The most conventional assurance of appellate jurisdiction is the existence of a final decision.  See id. § 1291 (vesting courts of appeals with jurisdiction over "appeals from all final decisions of the district courts").  The government asseverates that the district court's decision vacating the defendant's sentence and granting him a new penalty-phase hearing is a final decision and, thus, is immediately appealable.  The government is wrong.

The beacon by which we must steer is the Supreme Court's decision in Andrews v. United States, 373 U.S. 334 (1963).  There, the Court held that an order in a section 2255 proceeding that vacated a previously imposed sentence and required a new sentencing hearing was not a final decision and, thus, not immediately appealable.  Id. at 339-40.  Finality does not attach until the defendant is sentenced anew.  Id.

The government contends that Andrews is not controlling because the decision appealed from here is not an order for

resentencing but, rather, a grant of a new trial which, in a section 2255 case, is immediately appealable. See United States v. Gordon, 156 F.3d 376, 378-79 (2d Cir. 1998) (per curiam); United States v. Allen, 613 F.2d 1248, 1251 (3d Cir. 1980). In support, the government suggests that a penalty-phase hearing in a capital case is more akin to a traditional trial than to a resentencing. It emphasizes that a jury must be empaneled and certain aggravating factors must be proven beyond a reasonable doubt. See 18 U.S.C. § 3593(b)-(c); Ring, 536 U.S. at 602, 609.

To be sure, such similarities do exist, but they are superficial. In any event, the question of whether an order for a new penalty-phase hearing in a capital case should be characterized as a grant of a new trial as opposed to an order for resentencing is not open to us.[4] In Andrews, the Supreme Court stated squarely that "[w]here, as here, what was appropriately asked and appropriately granted was the resentencing of the petitioners, it is obvious that there could be no final disposition of the § 2255 proceedings until the petitioners were resentenced." 373 U.S. at 340. We are bound by this precedent. See Figueroa v. Rivera, 147 F.3d 77, 81 n.3 (1st Cir. 1998).

---

[4] As the government points out, courts sometimes refer to a penalty-phase "trial." But the relevant portion of the FDPA, 18 U.S.C. § 3593(b), describes the penalty-phase proceeding as a "sentencing hearing." We think that Congress's description controls.

Given this holding, it is indisputable that the grant of a new penalty-phase hearing in a capital case is not a final disposition of the proceedings.  "In general, a judgment or decision is final for the purpose of appeal only when it terminates the litigation between the parties on the merits of the case, and leaves nothing to be done but to enforce by execution what has been determined."  Parr v. United States, 351 U.S. 513, 518 (1956) (internal quotation marks omitted).  A decision ordering a new penalty-phase hearing in a capital case does not satisfy this benchmark.  The litigation regarding the defendant's sentence will not terminate until after the conclusion of the penalty-phase hearing and the court sentences him anew.

In a variation on this theme, the government suggests that the order for a new penalty-phase hearing must be final because the last thing that the judge does in an FDPA case is to order a penalty-phase hearing (after all, under most circumstances, the FDPA requires the jury to determine the sentence).  Thus, the government's suggestion goes, an order granting a new penalty-phase hearing is necessarily final.

This suggestion is hopeless.  It may be a jury that determines the sentence, but it is the judge who must empanel the jury, preside over the new penalty-phase hearing, and impose the sentence.  See 18 U.S.C. §§ 3593(d), 3594.  Such a series of steps

-12-

to be taken falls comfortably within the ambit of section 2255. See 28 U.S.C. § 2255(b).

In determining that no final decision has yet been rendered, we do not write on a pristine page. Two other courts of appeals have confirmed the applicability of Andrews to capital penalty-phase hearings and concluded that no final disposition exists until the new hearing is complete and the court imposes a new sentence. See United States v. Hammer, 564 F.3d 628, 632-36 (3d Cir. 2009); United States v. Stitt, 459 F.3d 483, 485-86 (4th Cir. 2006). We agree with these courts.

We likewise reject the government's entreaty that the Criminal Appeals Act (CAA), 18 U.S.C. § 3731, which permits an appeal from an "order . . . granting a new trial" in a criminal case, furnishes a basis for jurisdiction. The Andrews Court specifically held that the CAA "has no applicability" to section 2255 proceedings. 373 U.S. at 338. Andrews is binding on us.

This brings us to the government's assertion that we have jurisdiction under 28 U.S.C. § 1292(b). By its terms, section 1292(b) confers discretionary appellate jurisdiction over certain interlocutory orders not otherwise appealable. But this avenue is available only when an "order involves a controlling question of law as to which there is substantial ground for difference of opinion and [] an immediate appeal from the order may materially advance the ultimate termination of the litigation." Id. The

district court found that these conditions had been satisfied and certified questions to us under section 1292(b). Sampson IV, 2012 WL 1633296, at *11-15. The government, in turn, filed a petition asking that we agree to exercise our section 1292(b) jurisdiction.

There is, however, a threshold question. Congress has expressly restricted the operation of section 1292(b) to "civil action[s]." 28 U.S.C. § 1292(b). Whether a section 2255 proceeding may appropriately be characterized as a civil action for purposes of section 1292(b) is an unsettled question. This uncertainty results from pervasive "confusion over whether § 2255 proceedings are civil or criminal in nature." Wall v. Kholi, 131 S. Ct. 1278, 1289 n.7 (2011); see 3 Charles A. Wright et al., Federal Practice and Procedure § 622 (4th ed. updated Apr. 2013). Several cases indicate that section 2255 proceedings are predominantly civil. See, e.g., Heflin v. United States, 358 U.S. 415, 418 n.7 (1959); Rogers v. United States, 180 F.3d 349, 352 n.3 (1st Cir. 1999). Other cases indicate that section 2255 proceedings are predominantly criminal. See, e.g., United States v. Martin, 226 F.3d 1042, 1047 n.7 (9th Cir. 2000); United States v. Quin, 836 F.2d 654, 655-56 n.2 (1st Cir. 1988).

An advisory committee note suggests that a section 2255 proceeding should be considered "a continuation of the criminal case," rather than a separate civil action. E.g., Rule 3, Rules Governing Section 2255 Proceedings, advisory committee's note.

-14-

Some courts have found this controlling, see, e.g., United States v. Cook, 997 F.2d 1312, 1319 (10th Cir. 1993), and others have not, see, e.g., United States v. Nahodil, 36 F.3d 323, 328-29 (3d Cir. 1994).

To complicate the matter, some courts have abjured an ironclad characterization and have treated section 2255 proceedings as hybrid; that is, as civil for some purposes and criminal for other purposes. See, e.g., United States v. Hadden, 475 F.3d 652, 664-65 (4th Cir. 2007) (collecting cases); United States v. Fiorelli, 337 F.3d 282, 286 (3d Cir. 2003) ("[W]hile a § 2255 motion is deemed a further step in the movant's criminal case, it is also considered a civil remedy for purposes of appellate jurisdiction."); see also Trenkler v. United States, 536 F.3d 85, 94 (1st Cir. 2008) (making similar observation regarding analogous petition for writ of coram nobis).

There is a smattering of direct precedent; courts occasionally have authorized or refused to authorize the use of section 1292(b) in section 2255 cases. Compare, e.g., United States v. Pelullo, 399 F.3d 197, 202 (3d Cir. 2005) (granting interlocutory appeal), with, e.g., Murphy v. Reid, 332 F.3d 82, 83 (2d Cir. 2003) (per curiam) (denying interlocutory appeal). But these courts have done so without elaboration and the decisions are, therefore, generally unhelpful.

Given this lack of uniformity, we think that it is an open and enigmatic question as to whether section 1292(b) can be deployed in a section 2255 case. In the last analysis, we find it unnecessary to answer this vexing question today. Instead, we prefer to take a different route and exercise jurisdiction over the underlying juror dishonesty issue through our advisory mandamus power. See United States v. Horn, 29 F.3d 754, 769-70 (1st Cir. 1994); see also 16 Charles A. Wright et al., Federal Practice and Procedure § 3934.1 (2d ed. updated Apr. 2013) ("Writ review that responds to occasional special needs provides a valuable ad hoc relief valve for the pressures that are imperfectly contained by the statutes permitting appeals from final judgments and interlocutory orders.").

In pursuance of the All Writs Act, 28 U.S.C. § 1651, federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." This provision allows a court of appeals, in certain circumstances, to afford immediate review to otherwise unappealable orders. See, e.g., Horn, 29 F.3d at 769.

The type of writ most appropriate here is advisory mandamus. This writ is reserved for a small class of cases in which the usual general mandamus requirements are not met. See id. It is "strong medicine and, as such, should be dispensed sparingly." In re Sony BMG Music Entm't, 564 F.3d 1, 4 (1st Cir.

-16-

2009).  We typically exercise this power to settle substantial questions of law when doing so would give needed guidance to lawyers, litigants, and lower courts.  See Horn, 29 F.3d at 770. Advisory mandamus is particularly well-suited to the resolution of important questions "which, if not immediately addressed, are likely to recur and to evade effective review."  Green, 407 F.3d at 439.

The case at hand fits snugly within these narrow confines.  To begin, the case presents an unsettled question of systemic significance.  See Horn, 29 F.3d at 769-70.  Vacating a determination made by a jury that has heard evidence for days on end is a serious step.  That is especially true in a capital case: "death is [] different," Gardner v. Florida, 430 U.S. 349, 357 (1977) (plurality opinion), and repastinating previously plowed ground in a capital case exposes the families of his victims and the defendant to renewed emotional strain.  It also entails additional costs.

Additionally, the right at stake in this case deserves great respect.  "All would agree that an impartial jury is an integral component of a fair trial" and must be "jealously safeguard[ed]."  Neron v. Tierney, 841 F.2d 1197, 1200-01 (1st Cir. 1988).

Here, moreover, the framework for determining when a new trial is warranted because of juror dishonesty is not well-defined.

-17-

The leading case on the effect of post-trial discovery of juror dishonesty is the Supreme Court's seminal decision in McDonough. McDonough involved quite different facts and its teachings are open to interpretation.   Further, the district court's reading of McDonough is problematic.

Two other data points are also worthy of note.   First, the issue before us will almost certainly recur.   The specter of juror dishonesty presents a recurring danger in all cases, civil and criminal, capital and non-capital.   A clarification of the applicable legal standard would be a great utility in allowing courts in future cases to cope with this recurrent problem.

Second, forbearance on our part might well result in the juror dishonesty question evading review.   Let us explain.

Were we to squander this opportunity to review the district court's decision, the new penalty-phase hearing ordered by the district court would proceed and a newly empaneled jury would recommend the sentence (life imprisonment or death).   If the new jury votes for a death sentence, the government would have no incentive to appeal — and, indeed, would be foreclosed from doing so.   See United States v. Moran, 393 F.3d 1, 12 (1st Cir. 2004). Nor would the defendant appeal the earlier grant of a new penalty-phase hearing since it occurred at his behest.   See United States v. Angiulo, 897 F.2d 1169, 1216 (1st Cir. 1990) ("[D]efendants

-18-

can[not] properly challenge on appeal a proposal they themselves offered . . . .").

If, however, the newly empaneled jury votes for life imprisonment, the district court's order may still evade review. The defendant, of course, would not appeal.  For its part, the government might be prevented from appealing the earlier decision to vacate the death sentence and order a new penalty-phase hearing. After all, the Double Jeopardy Clause, U.S. Const. amend. V, cl. 2, applies to sentencing hearings in capital cases.  See Sattazahn v. Pennsylvania, 537 U.S. 101, 107-09 (2003).

A jury's disavowal of the death penalty the second time around, based on "findings sufficient to establish legal entitlement to the life sentence," would normally be tantamount to an acquittal for double jeopardy purposes.  Id. at 107-09. Permitting the government to appeal after a second death-eligible jury has disavowed the death sentence would raise serious double jeopardy concerns, and at the least would lead to an incongruous result.  Indeed, the Court has said that "[t]he policies underlying the Double Jeopardy Clause militate against permitting the Government to appeal after a verdict of acquittal." United States v. Wilson, 420 U.S. 332, 352 (1975).

Withal, we note that the Double Jeopardy Clause may not bar a government appeal following a second penalty-phase jury's recommendation of life imprisonment.  As a general rule, no double

-19-

jeopardy problem is presented where an "error could be corrected without subjecting [the defendant] to a second trial before a second trier of fact."   Id. at 345.   The Court has held that "[w]hen a jury returns a verdict of guilty and a trial judge (or an appellate court) sets aside that verdict and enters a judgment of acquittal, the Double Jeopardy Clause does not preclude a prosecution appeal to reinstate the jury verdict of guilty." Smith v. Massachusetts, 543 U.S. 463, 467 (2005).   The Supreme Court has yet to speak directly to this difficult issue.

We need not enter this quagmire: for present purposes, it suffices to say that there is a credible possibility that the district court's decision would evade appellate scrutiny were we to defer review until after a new penalty-phase hearing is completed. If a deferral of review carries with it an appreciable degree of danger that the underlying issue will escape review entirely, that danger argues in favor of exercising advisory mandamus. See United States v. Pleau, 680 F.3d 1, 4 (1st Cir. 2012) (en banc).

To say more about the question of appellate jurisdiction would serve no useful purpose.  For the reasons elucidated above, we deem this case an appropriate one for the exercise of our advisory mandamus authority.  Consequently, we proceed to the merits.

### III.  JUROR DISHONESTY

The government asserts that the district court erred as a matter of law in vacating the defendant's sentence and ordering a new penalty-phase hearing.  In the government's view, the court misinterpreted the Supreme Court's opinion in McDonough, 464 U.S. 548 (1984), and erected an erroneous legal framework for handling post-trial claims of newly discovered juror dishonesty.

Our standard of review is bifurcated.  We review findings of raw fact for clear error.  See United States v. George, 676 F.3d 249, 256 (1st Cir. 2012).  We review the correctness of the district court's legal analysis de novo.  See Prou v. United States, 199 F.3d 37, 42 (1st Cir. 1999).

The government's challenge primarily targets the district court's legal regime.  We agree with the government that the district court misinterpreted McDonough and erected an erroneous framework.  In this instance, however, applying the appropriate framework leads to the same result.

To explain these conclusions, we begin by canvassing the district court's findings of fact.  We turn next to the appropriate legal framework.  Then, we array the facts supportably found against the appropriate framework.  Finally, we deal with two peripheral arguments advanced by the government.

## A. Facts Supportably Found.

The district court's meticulous factfinding brought to light a litany of lies told by Juror C during voir dire. We rehearse the particulars.

The post-trial hearing stretched out over three separate court days. During those occasions, the district judge had ample opportunity to gauge Juror C's credibility and evaluate her impartiality. The court supportably found that Juror C gave false answers not only during voir dire but also during the post-trial hearing itself. These false answers related primarily to two aspects of Juror C's life.

The first area about which Juror C persistently lied involved her ex-husband, P. The second involved her daughter, J.[5]

The district court supportably found, based on evidence adduced during the post-trial proceeding, that P, an employee of the United States Postal Service, regularly abused alcohol and marijuana. P rebuffed Juror C's adjurations to seek treatment and his continued substance abuse contributed to Juror C's decision to obtain a divorce.

During their marriage, Juror C feared physical abuse as P often threatened to harm her. On one occasion, P menaced Juror C with a shotgun. After her sons took the weapon away, Juror C

---

[5] The following summary of the district court's pertinent findings is drawn from the court's exegetic opinion in Sampson II, 820 F. Supp. 2d at 181-88.

reported the incident to the police.  She requested and received an abuse prevention order that required P to stay away from her.  P violated this order, committing a criminal offense, when he approached Juror C at their home, chased her into the bedroom, and would not let her leave.  P was arrested and prosecuted for violating the abuse prevention order.  When Juror C belatedly admitted these events, she characterized them as "horrible" and "a nightmare."

Juror C described her experiences with J, whose very existence she had failed to acknowledge either in her responses to the juror questionnaire or during the voir dire, in much the same way.  As Juror C well knew, J at one time held an administrative job with the Sanibel Police Department in Florida.  J lost this position in 1997, however, when she was placed on probation after admitting to the theft of property.  J violated the terms of her probation and was given a six-month incarcerative sentence.  Juror C vouchsafed her beliefs that J had been treated fairly by the authorities during this ordeal.

J also became a cocaine addict.  Ashamed of J's criminal conduct and drug use, Juror C had tried to forget about these experiences because thinking of them was "killing" her.  She was unwilling to admit that such events could happen in her family.

Although Juror C signed the written voir dire questionnaire under the pains and penalties of perjury, the proof

adduced during the post-trial proceeding, summarized above, made it pellucid that no fewer than ten of her responses were apocryphal. We give the flavor of this mendacity by recounting some of the responses given by Juror C on the questionnaire.

- Question 32 inquired whether Juror C or anyone close to her ever had a drug problem. She answered "no."

- Question 34 inquired whether Juror C or anyone close to her worked for the federal government. She answered "no."

- Question 47 inquired as to how many children Juror C had. She indicated that she had only two sons.

- Question 59 inquired whether Juror C, or anyone close to her had ever been a victim of a crime or a witness to a crime. She answered "no."

- Question 61 inquired whether Juror C or anyone close to her had ever been questioned as part of a criminal investigation. She answered "no."

- Question 63 inquired whether Juror C or anyone close to her had ever been charged with committing a crime. She answered "no."

- Question 64 inquired whether Juror C knew anyone who had ever been in prison. She answered "no."

- Question 65 inquired whether Juror C or anyone close to her ever had an experience with the police in which she (or that other person) was treated fairly.  She answered "no."
- Question 68 inquired whether Juror C or anyone else close to her had ever been employed in law enforcement.  She answered "no."

Each of these answers was false.  Juror C perpetuated these falsehoods during the individual voir dire questioning.

To make a bad situation worse, Juror C continued her charade during the initial session of the post-trial hearing.  When defense counsel attempted to probe her lies about P, she resisted that line of inquiry, professing that she did not "want to go into all of these [things]."

On the second day of the post-trial hearing, the truth about J began to emerge; Juror C admitted, for the first time, that she had a daughter who had been arrested.[6]

During the same post-trial session, Juror C testified that she did not speak to any of her fellow jurors after the trial had concluded.  She also denied any contact with the victims'

---

[6] Juror C testified that she wanted to call the court about this set of lies after the first post-trial session but did not have the telephone number.  The court, noting that its telephone number was on both her subpoena letter and on the court's general website, found this excuse incredible.  Sampson II, 820 F. Supp. 2d at 187.

families.   These statements were untrue — and Juror C admitted as much during the final session of the post-trial hearing.  Although these lies did not occur during voir dire, they are plainly relevant to Juror C's credibility and strongly support the district court's finding of juror dishonesty.

Based on this and other evidence, the district court found that Juror C had intentionally and repeatedly dissembled about P and J because of both the emotional pain involved in discussing these experiences and her desire to avoid the humiliation of sharing them.  Sampson II, 820 F. Supp. 2d at 181, 197.  This finding has overwhelming support in the record.  Juror C herself acknowledged that she had withheld the information about P and J because, when completing the questionnaire, she "didn't think [her] personal life had anything to do with [] being a juror."  Id. at 187.  In all events, her demeanor while testifying evinced her emotional pain and humiliation; she was visibly distraught when discussing P and J, crying and incoherently attempting to excuse her mendacity.  See id. at 184, 185, 190.

### B.  The Legal Framework.

We come next to the underlying legal principles that govern post-trial claims of newly discovered juror dishonesty.  It is constitutional bedrock that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."  U.S. Const. amend VI.  An impartial jury is one

"capable and willing to decide the case solely on the evidence before it."  McDonough, 464 U.S. at 554 (internal quotation marks omitted).  The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life.  See Ross v. Oklahoma, 487 U.S. 81, 85 (1988).

The FDPA enshrines this right.  It requires that the jury be unanimous in concluding that the death penalty is justified.  See 18 U.S.C. § 3593(d).  If even a single biased juror participates in the imposition of the death sentence, the sentence is infirm and cannot be executed.  See Morgan v. Illinois, 504 U.S. 719, 729 (1992).

Voir dire is a singularly important means of safeguarding the right to an impartial jury.  A probing voir dire examination is "[t]he best way to ensure that jurors do not harbor biases for or against the parties."  Correia v. Fitzgerald, 354 F.3d 47, 52 (1st Cir. 2003).  This goal, however, is not easy to achieve: a person who harbors a bias may not appreciate it and, in any event, may be reluctant to admit her lack of objectivity.  See McDonough, 464 U.S. at 554; Crawford v. United States, 212 U.S. 183, 196 (1909).  As the Supreme Court explained over a century ago, "[b]ias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence."  Crawford, 212 U.S. at 196.

-27-

The voir dire process, which is fluid rather than mechanical, is frustrated when a prospective juror is dishonest. Both the juror's dishonesty and her motivation for that dishonesty may cast doubt upon her impartiality. See McDonough, 464 U.S. at 556. "If the answers to [voir dire] questions are willfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only." Clark v. United States, 289 U.S. 1, 11 (1933).

In McDonough, the Supreme Court spoke to the question of when a party is entitled to a new trial after learning that a juror failed to disclose material information during the voir dire. In McDonough, a seated juror in a product liability case, when queried during voir dire whether he or his immediate family members had ever sustained severe injury in an accident, did not disclose that his son had been hurt in a truck tire explosion. 464 U.S. at 549-51. Following a verdict for the defendant and the disclosure of this information, the district court denied a motion for a new trial.[7] The court of appeals reversed. The Supreme Court ruled that the juror's "mistaken, though honest," response did not necessitate a new trial. Id. at 555. Emphasizing that a party "is entitled to a fair trial but not a perfect one," id. at 553

---

[7] The government argues that standards for review of post-conviction claims of juror dishonesty must be more stringent than standards for review of a district court's decision during voir dire to exclude a juror for bias. Because we base our decision on McDonough, we do not discuss this argument.

(internal quotation marks omitted), the Court explained that parties cannot be granted a new trial if the only purpose is "to recreate the peremptory challenge process because counsel lacked . . . information," id. at 555.

The McDonough Court distinguished the case before it from a situation in which a juror was intentionally dishonest during voir dire, and the combination of the undisclosed information and such dishonesty demonstrates bias. To secure a new trial, in the latter situation, a party must show "that a juror failed to answer honestly a material question" at voir dire, and "then further show that a correct response would have provided a valid basis for a challenge for cause." Id. at 556. In this regard, the Court noted that "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." Id.

We think it follows that, under McDonough, a party seeking a new trial based on juror dishonesty during voir dire must satisfy a binary test. See id.; see also Crowley v. L.L. Bean, Inc., 303 F.3d 387, 407 (1st Cir. 2002). The party must show, first, that the juror failed to answer honestly a material voir dire question.[8] See McDonough, 464 U.S. at 556. For this purpose,

---

[8] Of course, a juror, during voir dire, may make honest, but mistaken responses. This category includes situations in which, for example, the juror misunderstands the wording of the question, fails to recall the correct response, or is not asked a question that would necessitate disclosure of the relevant information. We

a voir dire question is material if a response to it "has a natural tendency to influence, or is capable of influencing," the judge's impartiality determination. Neder v. United States, 527 U.S. 1, 16 (1999) (internal quotation marks and alteration omitted).

The second part of the binary test requires a finding that a truthful response to the voir dire question "would have provided a valid basis for a challenge for cause." McDonough, 464 U.S. at 556. Jurors normally are subject to excusal for cause if they are biased or if they fail to satisfy statutory qualifications. 2 Charles Alan Wright et al., Federal Practice and Procedure § 382 (4th ed. updated Apr. 2013). In this instance, only bias is relevant.

What constitutes a valid basis for excusal within the purview of the binary test is the question that lies at the heart of these appeals. The district court took a categorical approach to this question, identifying three such bases: actual bias, implied bias, and inferable bias. Sampson II, 820 F. Supp. 2d at 162-67. We find this categorical delineation unhelpful.

The McDonough Court saw no need to use pigeonholes of this sort. The Court started by defining impartiality as a

---

do not explore here the effect of honest but mistaken voir dire responses. For present purposes, it suffices to say that in the absence of dishonesty, post-trial relief, if available at all, will require a more flagrant showing of juror bias. See Amirault v. Fair, 968 F.2d 1404, 1405 (1st Cir. 1992) (per curiam).

condition that allows a juror to be "capable and willing to decide the case solely on the evidence."  McDonough, 464 U.S. at 554 (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)).  The flip side of impartiality is bias, but the Court warned that "hints of bias [are] not sufficient."  Id.  Instead, only "[d]emonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause."  Id.

This means, of course, that cognizable juror bias is a valid basis for excusal.  But McDonough imposes no requirement that cognizable bias be confined to any particular sub-categories. Everything depends on the particular circumstances.  Seen in this light, we think that attempting to classify biases in sub-categories is likely to do more harm than good.  Consequently, we eschew the district court's formulation and hew to the line plotted by the McDonough court.  Id. at 555-56.

Refraining from a categorical approach makes eminently good sense: after all, bias is not a pedagogical conception but rather a state of mind.  To reveal the existence of this state of mind, "the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."  United States v. Wood, 299 U.S. 123, 145-46 (1936).

When all is said and done, the existence vel non of a valid basis for a challenge for cause is not a matter of labels. Any inquiry into potential bias in the event of juror dishonesty

must be both context specific and fact specific.  The outcome of this inquiry depends on whether a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed).  See McDonough, 464 U.S. at 554.  The party seeking to upset the jury's verdict has the burden of showing the requisite level of bias by a preponderance of the evidence.  See DeBurgo v. St. Amand, 587 F.3d 61, 71 (1st Cir. 2009).

A number of factors may be relevant in determining whether a juror has both the capacity and the will to decide the case solely on the evidence.  This compendium may include (but is not limited to) the juror's interpersonal relationships, see, e.g., United States v. Colombo, 869 F.2d 149, 151-52 (2d Cir. 1989); United States v. Scott, 854 F.2d 697, 698-700 (5th Cir. 1988); the juror's ability to separate her emotions from her duties, see, e.g., Dennis v. Mitchell, 354 F.3d 511, 518-19, 521 (6th Cir. 2003); Burton v. Johnson, 948 F.2d 1150, 1158-59 (10th Cir. 1991); the similarity between the juror's experiences and important facts presented at trial, see, e.g., United States v. Torres, 128 F.3d 38, 47-48 (2d Cir. 1997); Burton, 948 F.2d at 1158-59; the scope and severity of the juror's dishonesty, see, e.g., Dyer v.

Calderon, 151 F.3d 970, 983-84 (9th Cir. 1998) (en banc); Scott, 854 F.2d at 699-700; and the juror's motive for lying, see McDonough, 464 U.S. at 556; Skaggs v. Otis Elevator Co., 164 F.3d 511, 516 (10th Cir. 1998). Although any one of these factors, taken in isolation, may be insufficient to ground a finding of a valid basis for a challenge for cause, their cumulative effect must nonetheless be considered. See United States v. Perkins, 748 F.2d 1519, 1532-33 (11th Cir. 1984).

### C.  Integrating Fact and Law.

It remains for us to evaluate the impact of the facts supportably found in terms of the appropriate legal framework. But there is a rub: the district court misunderstood the applicable legal framework, instead creating a new sub-category that it called "inferable bias" to serve as the cornerstone of its conclusion that Juror C's dishonesty necessitated a new penalty-phase hearing. See Sampson II, 820 F. Supp. 2d at 165-67, 192-96.

The district court's mistaken view of the law, however, does not require us to throw out the baby with the bath water. Where, as here, a trial court, notwithstanding its misapprehension of the law, makes a detailed set of subsidiary findings as to the raw facts, those findings sometimes may be subject to reuse. See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 642 (1st Cir. 1992) (concluding that, in a case in which the trial court supportably found the facts but applied the wrong rule

of law, court of appeals had the authority, in lieu of remand, to array the findings against the correct legal standard); United States v. Mora, 821 F.2d 860, 869 (1st Cir. 1987) (similar). This is such a case.

We turn now to the task of arraying the lower court's factual findings against the correct legal framework. The first part of the binary test focuses on whether Juror C failed to answer honestly one or more material voir dire questions. The district court's factual findings make manifest that this benchmark was satisfied. Juror C understood her duty to be truthful in answering the voir dire questionnaire, yet her certification under the pains and penalties of perjury was knowingly false. As Juror C later admitted, she had been deliberately dishonest when answering the questions that called for information about the exploits of P and J.

The materiality of the questions that Juror C answered dishonestly is nose-on-the-face plain. Each question, individually, was designed to solicit information that potentially could impugn a juror's impartiality; and the questions, collectively, bore heavily on that subject. Questions that go to the heart of juror impartiality are unarguably material to the voir dire process.

This brings us to the second element of the binary test: whether a reasonable judge, armed with the information that the

-34-

dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed).  We conclude that this showing was made.  Our conclusion rests on three cross-braced pillars: (i) Juror C's habitual dissembling; (ii) the intense emotions Juror C exhibited when belatedly relating her life experiences involving P and J; and (iii) the similarities between Juror C's unreported life experiences and the evidence presented during the penalty-phase hearing.  We comment briefly about the way in which these pillars interact to demonstrate a valid basis for excusal for cause.

Although juror dishonesty, by itself, is not sufficient to demonstrate bias, it can be a powerful indicator of bias.  See Colombo, 869 F.2d at 151; Perkins, 748 F.2d at 1532-33.  Here, Juror C lied repeatedly in the voir dire questionnaire and directly to the court.  This parlous pattern of persistent prevarication supports an inference that Juror C's ability to perform her sworn duty as an impartial juror was compromised from the start.

What is more, Juror C's repetitive acts of dishonesty illustrate the powerful emotions she harbored about P and J.  See Burton, 948 F.2d at 1159.  To put this proposition in bold relief, Juror C left no doubt but that she would rather lie to the court

than discuss these painful life experiences.  The record fully supports the district court's observation that, even years after the penalty-phase hearing, her "shame and embarrassment were so intense that she could not discuss those matters candidly, unemotionally or, often, coherently."  Sampson II, 820 F. Supp. 2d at 193.

This display of emotional distress illuminates Juror C's motives for lying.  The McDonough Court made clear that "only those reasons [for lying] that affect a juror's impartiality can truly be said to affect the fairness of a trial."  464 U.S. at 556.  Here, it is far more likely than not that — as the district court found — Juror C's reasons for lying about P and J impaired her ability to decide the case solely on the evidence.  The magnitude of Juror C's emotional distress strongly suggests that it would have been a Sisyphean task for her to separate the evidence presented at the penalty-phase hearing from her intense feelings about her own life experiences.

Juror C's inability to remain detached is especially troubling in this case because of the similarity between her distress-inducing life experiences and the evidence presented during the penalty-phase hearing.  When a juror has life experiences that correspond with evidence presented during the trial, that congruence raises obvious concerns about the juror's possible bias.  See Torres, 128 F.3d at 47-48; Burton, 948 F.2d at

1158-59.   In such a situation, the juror may have enormous difficulty separating her own life experiences from evidence in the case.   For example, it would be natural for a juror who had been the victim of a home invasion to harbor bias against a defendant accused of such a crime.

In the case at hand, the overlap is striking. We offer a few illustrations.

For one thing, the jurors heard evidence that the defendant threatened bank tellers at gunpoint during the string of North Carolina bank robberies and his murder victims at knife point.   For her part, Juror C was frequently threatened by her then-husband once with a shotgun and other times with his fists. The shotgun threat occurred in fairly close temporal proximity to the empanelment of the jury (three years or so).   See Sampson II, 820 F. Supp. 2d at 185.   These parallels raise a serious concern as to whether an ordinary person in Juror C's shoes would be able to disregard her own experiences in evaluating the evidence.

For another thing, the government presented evidence during the penalty-phase hearing that the defendant had substance abuse problems — problems that contributed, inter alia, to the dissolution of his marriage.   For her part, Juror C was forced to deal with the substance abuse of both her husband and her daughter. Indeed, P's substance abuse was a catalyst for the dissolution of Juror C's marriage.   These parallels raise a serious concern as to

whether an ordinary person in Juror C's shoes would be able to disregard her own family's involvement with substance abuse and avoid a bias against the defendant on account of his substance abuse.

Then, too, the jury heard evidence during the penalty-phase hearing anent the defendant's criminal history, including his incarceration for robbery. Analogously, Juror C's daughter committed larceny and was incarcerated as a result. Juror C testified that she was deeply ashamed of her daughter's immurement. These parallels raise a serious concern as to whether an ordinary person in Juror C's shoes would be able to disregard J's troubles with the law and avoid a bias against the defendant on this account.[9] This concern is magnified by the powerful emotions that Juror C displayed about her parallel life experiences.

We conclude that if fully informed of Juror C's willingness to lie repeatedly, her fragile emotional state, her past experiences with P and J, and the similarities between those experiences and the evidence to be presented during the penalty-phase hearing, any reasonable judge would have found that the cumulative effect of those factors demonstrated bias (and, thus, a valid basis for excusal for cause). Indeed, the court below

---

[9] In this regard, Juror C might also have identified with the defendant's parents, whom the penalty-phase evidence depicted as being ashamed of their child (abandoning him and refusing to cooperate with his attorneys). See Sampson II, 820 F. Supp. 2d at 158, 181.

excused a number of prospective jurors for cause on less compelling grounds. Thus, the defendant was deprived of the right to an impartial jury and is entitled to a new penalty-phase hearing.

### D. **Attempts at Avoidance**.

As a last resort, the government tries to catch lightning in a bottle. It argues that even if Juror C's dishonesty constitutes a valid basis for dismissal for cause, the district court had no right to vacate the defendant's sentence and order a new penalty-phase hearing. It advances two theories. We find neither theory persuasive.

To begin, the government asserts that the district court developed a new constitutional rule when it based the grant of a new penalty-phase hearing on "inferable bias." The application of this new rule, the government's thesis runs, transgressed the non-retroactivity principle for criminal cases under collateral review. See Teaque v. Lane, 489 U.S. 288, 310 (1989) (plurality opinion) (holding that a criminal defendant is generally not entitled to collateral relief if granting that relief would require the court to apply a new constitutional rule implicating criminal procedure); Ferrara v. United States, 456 F.3d 278, 288 (1st Cir. 2006) (same).

This proposition is rendered moot by our rejection of the district court's "inferable bias" formulation. The legal framework that we have used does not embody any new constitutional rule of criminal procedure but, rather, merely applies the rule laid down

by the Supreme Court in <u>McDonough</u> to the circumstances of the case at hand.  Such a course of action does not offend the non-retroactivity principle.  After all, a case is deemed to announce a new constitutional rule of criminal procedure only if the result is not driven by precedent that existed at the time of the decision.  See <u>Teague</u>, 489 U.S. at 301 (plurality opinion).  A case does not announce a new constitutional rule of criminal procedure when it is "merely an application of the principle that governed" a prior decision to a different set of facts.  <u>Id.</u> at 307 (plurality opinion; internal quotation marks omitted); <u>accord</u> <u>Chaidez</u> v. <u>United States</u>, 133 S. Ct. 1103, 1107 (2013); <u>O'Dell</u> v. <u>Netherland</u>, 521 U.S. 151, 156 (1997).

If more were needed — and we do not think that it is — the government's assertion of the non-retroactivity principle is untimely.  The government makes this argument for the first time on appeal.  A <u>Teague</u> defense is not jurisdictional, and the government's failure to raise such a defense in a timeous manner constitutes a waiver.  See <u>Ferrara</u>, 456 F.3d at 289.  Because the government failed to interpose this defense below, it is waived.

The government's second attempt at avoidance is no more convincing.  It asserts that because the defendant seeks remediation on collateral review, constitutional error does not entitle him to relief in the absence of actual prejudice.  See <u>Brecht</u> v. <u>Abrahamson</u>, 507 U.S. 619, 637-38 (1993).  Building on

-40-

this foundation, the government insists that there has been no showing of actual prejudice here.

The government is wrong.  There is more than sufficient evidence of prejudice in the record to entitle the defendant to relief,[10] given the extent of Juror C's bias and the capital penalty-phase proceedings in which she participated.  As the Supreme Court said in United States v. Martinez-Salazar, 528 U.S. 304 (2000), where a biased juror sits on a jury that sentenced a defendant to death and the issue was properly preserved, the sentence would have to be overturned, id. at 316 (citing Ross, 487 U.S. at 85); see also Morgan, 504 U.S. at 729 (stating that "[i]f even one [biased] juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence").

## IV.  CONCLUSION

This case is a stark reminder of the consequences of juror dishonesty.  Jurors who do not take their oaths seriously threaten the very integrity of the judicial process.  The costs, whether measured in terms of human suffering or monetary outlays, are staggering.  But the ultimate lesson that this case teaches is that the protections afforded by the Constitution and laws of the

---

[10] In view of the existence of actual prejudice, we need not reach the defendant's contention that the doctrine of structural error applies and obviates any need for a showing of actual prejudice.  See Brecht, 507 U.S. at 629-30.

United States are, in the end, sufficient to protect against even the most insidious threat.

We need go no further.  For the reasons elucidated above, we dismiss the government's two appeals.  Exercising our advisory mandamus power, we conclude — as did the district court — that the death sentence must be vacated and a new penalty-phase hearing undertaken.  Accordingly, we deny the government's request for the issuance of an extraordinary writ.

**So Ordered**.